GIBSON, DUNN & CRUTCHER LLP
GAIL E. LEES, SBN 90363
GLees@gibsondunn.com
S. ASHLIE BERINGER, SBN 263977
ABeringer@gibsondunn.com
JOSHUA A. JESSEN, SBN 222831
JJessen@gibsondunn.com
1881 Page Mill Road
Palo Alto, California  94304
Telephone:  (650) 849-5300
Facsimile:    (650) 849-5333

Attorneys for Defendant
FLURRY, INC.

[Counsel For Additional Mobile Industry
Defendants Listed On Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| In re iPhone Application Litigation | Case No. 11-MD-02250-LHK |
|---|---|
| | **CLASS ACTION** |
| | **MOBILE INDUSTRY DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED, CONSOLIDATED CLASS ACTION COMPLAINT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| | **HEARING**: |
| | Date:      March 29, 2012 |
| | Time:      1:30 p.m. |
| | Place:     Courtroom 4 |
| | Judge:     The Honorable Lucy H. Koh |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT.................................................1

II.   THIS COURT'S ORDER GRANTING THE MOBILE INDUSTRY
      DEFENDANTS' PREVIOUS MOTION TO DISMISS................................................2

III.  FACTUAL BACKGROUND .....................................................................................3

      A.   Representative Plaintiffs And Proposed Class..............................................3

      B.   Mobile Industry Defendants..........................................................................3

      C.   Allegations Against Mobile Industry Defendants..........................................4

           1.   The Mobile "App" Economy ..............................................................4

           2.   Disclosures To Plaintiffs Authorizing Applications ............................5

           3.   Plaintiffs Do Not Allege That Any Mobile Industry Defendant
                Accessed Any Personally Identifying Or Sensitive Information ........6

           4.   Plaintiffs Still Do Not Identify Any Injury Caused By The Mobile
                Industry Defendants' Alleged Collection Of Anonymous Data ........7

      D.   Plaintiffs' Claims Against The Mobile Industry Defendants.........................8

IV.   MOTION TO DISMISS STANDARDS.......................................................................9

      A.   Motion To Dismiss For Lack Of Standing Under Rule 12(b)(1)....................9

      B.   Motion To Dismiss For Failure To State A Claim Under Rule 12(b)(6)........9

V.    ARGUMENT .........................................................................................................9

      A.   Plaintiffs Lack Article III Standing To Pursue Their Claims ........................9

           1.   Plaintiffs Have Failed To Plead Any Injury In Fact ........................10

                a.   Plaintiffs' "Personal Information" Theories Of Harm............11

                b.   Alleged Harm To iOS Devices ................................................12

                c.   Plaintiffs' Assertion Of New Statutory And Constitutional
                     Claims Does Not Satisfy Article III's Injury-In-Fact
                     Requirement ..........................................................................13

           2.   Plaintiffs Have Failed To Plead Any Causal Connection Between
                Any Harm And Each Defendant's Conduct Or Role In That Harm ...16

           3.   Even If Plaintiffs Could Establish Article III Standing, They Do
                Not Satisfy Prudential Standing Requirements...............................16

**TABLE OF CONTENTS** *(continued)*

**Page**

B.    Each Of Plaintiffs' Separate Claims Against The Mobile Industry Defendants Fails To State A Claim.................................................................17

1.    Plaintiffs Fail To State A Claim Under The Computer Fraud And Abuse Act.........................................................................................17

2.    Plaintiffs Fail To State A Claim Under The Stored Communications Act.............................................................................19

3.    Plaintiffs Fail To State A Claim Under The California Constitution, Art. I, Sec. 1 .....................................................................24

4.    Plaintiffs Fail To State A Claim For Trespass To Chattels................................26

5.    Plaintiffs Fail To State A Claim For Conversion.....................................................28

6.    Plaintiffs Fail To State A Claim For Common Counts, Assumpsit Or Restitution.....................................................................................29

VI. CONCLUSION.................................................................................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) ....................................................... 9, 27, 30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................... 9, 30

*Berry v. Webloyalty.com, Inc.*,
  2011 WL 1375665 (S.D. Cal. Apr. 11, 2011) ................................................... 26

*Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*,
  688 F. Supp. 2d 940 (N.D. Cal. 2010) .............................................................. 28

*Bose v. Interclick, Inc.*,
  2011 U.S. Dist. LEXIS 93663 (S.D.N.Y. Aug. 17, 2011) ................................. 18

*Botello v. Morgan Hill Unified Sch. Dist.*,
  2009 WL 3918930 (N.D. Cal. Nov. 18, 2009) .................................................. 25

*Cadle Co. II v. Harvey*,
  83 Cal. App. 4th 927 (2000) ............................................................................. 30

*Cady v. Anthem Blue Cross Life & Health Ins. Co.*,
  583 F. Supp. 2d 1102 (N.D. Cal. 2008) ....................................................... 14, 16

*Cal. Cartage Co., Inc. v. United States*,
  721 F.2d 1199 (9th Cir. 1983) .......................................................................... 16

*Charles O. Bradley Trust v. Zenith Capital LLC*,
  2006 WL 798991 (N.D. Cal. Mar. 24, 2006) .................................................... 25

*Creative Computing v. Getloaded.com LLC*,
  386 F.3d 930 (9th Cir. 2004) ............................................................................ 18

*Crowley v. Cybersource Corp.*,
  166 F. Supp. 2d 1263 (N.D. Cal. 2001) ............................................................ 21

*Del Vecchio v. Amazon.com, Inc.*,
  2011 WL 6325910 (W.D. Wash. Dec. 1, 2011) ................................................ 18

*eBay, Inc. v. Bidder's Edge, Inc.*,
  100 F. Supp. 2d 1058 (N.D. Cal. 2000) ............................................................ 26

*Edwards v. First Am. Corp.*,
  610 F.3d 514 (9th Cir. 2010) ............................................................................ 15

*Egan v. Schmock*,
  93 F. Supp. 2d 1090 (N.D. Cal. 2000) .............................................................. 26

*Elk Grove Unified Sch. Dist. v. Newdow*,
  542 U.S. 1 (2004) .............................................................................................. 16

*Federal Election Commission v. Akins,*
   524 U.S. 11 (1998) ........................................................................... 17

*Fernandez v. Brock,*
   840 F.2d 622 (9th Cir. 1988) ........................................................... 15

*FMC Corp. v. Capital Cities/ABC, Inc.,*
   915 F.2d 300 (7th Cir. 1990) ........................................................... 29

*Folgelstrom v. Lamps Plus, Inc.,*
   195 Cal. App. 4th 986 (2011) .................................................... 26, 29

*Fraley v. Facebook,*
   2011 WL 6303898 (N.D. Cal. Dec. 16, 2011) ................................. 12

*Fredenburg v. City of Fremont,*
   119 Cal. App. 4th 408 (2004) .......................................................... 25

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ......................................................................... 10

*GA Escrow, LLC v. Autonomy Corp. PLC,*
   2008 WL 4848036 (N.D. Cal. Nov. 7, 2008) ................................... 30

*Hilderman v. Enea TekSci, Inc.,*
   551 F. Supp. 2d 1183 (S.D. Cal. 2008) ...................................... 21, 22

*Hill v. Nat'l Collegiate Athletic Ass'n,*
   7 Cal. 4th 1 (1994) ............................................................... 24, 25, 26

*Hull v. Laugharn,*
   3 Cal. App. 2d 310 (1934) ............................................................... 28

*In re Actimmune Mktg. Litig.,*
   2009 WL 37406486 (N.D. Cal. Nov. 6, 2009) ................................. 29

*In re Apple & ATTM Antitrust Litig.,*
   2010 WL 3521965 (N.D. Cal. July 8, 2010) ............................... 19, 27

*In re DoubleClick Privacy Litigation,*
   154 F. Supp. 2d 497 (S.D.N.Y. 2001) ......... 2, 11, 12, 17, 18, 19, 21, 22, 23, 29

*In re Facebook Privacy Litig.,*
   2011 WL 2039995 (N.D. Cal. May 12, 2011) ......................... 13, 23, 28

*In re JetBlue Airways Corp. Privacy Litig.,*
   379 F. Supp. 2d 299 (E.D.N.Y. 2005) .............................................. 11

*In re Stac Elecs. Sec. Litig.,*
   89 F.3d 1399 (9th Cir. 1996) ............................................................. 5

*In re Toys R Us, Inc., Privacy Litig.,*
   2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) .................................. 22

*In Re Zynga Privacy Litig.,*
   No. C-10-04680 JW (N.D. Cal. June 15, 2011) ............................... 18

*Intel Corp. v. Hamidi,*
   30 Cal. 4th 1342 (2003) ............................................................ 26, 27

Gibson, Dunn &
Crutcher LLP

*Jewel v. National Security Agency*,
   2011 WL 6848406 (9th Cir. Dec. 29, 2011) ................................................................. 17

*Johnson v. Weinberger*,
   851 F.2d 233 (9th Cir. 1988) ......................................................................................... 10

*Kearns v. Ford Motor Co.*,
   567 F.3d 1120 (9th Cir. 2009) ....................................................................................... 27

*Kremen v. Cohen*,
   337 F.3d 1024 (9th Cir. 2003) ....................................................................................... 28

*La Court v. Specific Media, Inc.*,
   2011 WL 1661532 (C.D. Cal. Apr. 28, 2011) ............................................. 11, 12, 13, 18, 29

*Lee v. Chase Manhattan Bank*,
   2008 WL 698482 (N.D. Cal. Mar. 14, 2008) ................................................................. 14

*Leonel v. Am. Airlines, Inc.*,
   400 F.3d 702 (9th Cir. 2005) ......................................................................................... 25

*Levine v. Blue Shield of Cal.*,
   189 Cal. App. 4th 1117 (2011) ...................................................................................... 30

*Lewis v. Casey*,
   518 U.S. 343 (1996) ...................................................................................................... 14

*Loder v. City of Glendale*,
   14 Cal. 4th 846 (1997) ................................................................................................... 24

*London v. New Albertson's, Inc.*,
   2008 WL 4492642 (S.D. Cal. Sept. 30, 2008) ............................................................... 25

*Low v. LinkedIn Corp.*,
   2011 WL 5509848 (N.D. Cal. Nov. 11, 2011) ................................................. 11, 12, 29

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................. 9, 10, 16

*LVRC Holdings LLC v. Brekka*,
   581 F.3d 1127 (9th Cir. 2009) ....................................................................................... 19

*Nguon v. Wolf*,
   517 F. Supp. 2d 1177 (C.D. Cal. 2007) ......................................................................... 25

*Pioneer Electronics (USA), Inc. v. Superior Court*,
   40 Cal. 4th 360 (2007) ............................................................................................. 24, 25

*Raines v. Byrd*,
   521 U.S. 811 (1997) ...................................................................................................... 14

*Rene v. G.F. Fishers, Inc.*,
   — F. Supp. 2d —, 2011 WL 4349473 (S.D. Ind. Sept. 16, 2011) ................................... 22

*Ruiz v. Gap, Inc.*,
   540 F. Supp. 2d 1121 (N.D. Cal. 2008) ......................................................................... 28

*Salyer v. Salyer Am. Fresh Foods*,
   2006 WL 709018 (N.D. Cal. Mar. 16, 2006) ................................................................. 20

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

*Scott-Codiga v. Cnty. of Monterey*,
   2011 WL 4434812 (N.D. Cal. Sept. 23, 2011) ................................................ 24

*Shamrock Foods Co. v. Gast*,
   535 F. Supp. 2d 962 (D. Ariz. 2008)........................................................ 19

*Sisseton-Wahpeton Sioux Tribe v. United States*,
   90 F.3d 351 (9th Cir. 1996)................................................................ 30

*State Wide Photocopy, Corp. v. Tokai Financial Services, Inc.*,
   909 F. Supp. 137 (S.D.N.Y. 1995)........................................................ 20

*Summers v. Earth Island Inst.*,
   555 U.S. 488, 129 S. Ct. 1142 (2009) ................................................... 14

*Tethys Bioscience, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*,
   2009 WL 4722679 (N.D. Cal. Dec. 9, 2009) .......................................... 29

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004)............................................................ 21

*United States v. Smith*,
   155 F.3d 1051 (9th Cir. 1998)............................................................ 19

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003)............................................................ 27

*Warth v. Seldin*,
   422 U.S. 490 (1975) ........................................................ 14, 15, 16, 17

*Waste Mgmt. of N. Am., Inc. v. Weinberger*,
   862 F.2d 1393 (9th Cir. 1988)........................................................ 9, 14

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000)............................................................. 9

**Statutes**

18 U.S.C. § 1030(a)(2)................................................................ 19

18 U.S.C. § 1030(a)(5)................................................................ 19

18 U.S.C. § 1030(c)(4)(A)(i)(I)........................................................ 18

18 U.S.C. § 1030(e)(11)............................................................... 18

18 U.S.C. § 1030(e)(8)................................................................ 18

18 U.S.C. § 1030(g) .................................................................. 18

18 U.S.C. § 2510(11)................................................................. 24

18 U.S.C. § 2510(12)................................................................. 21

18 U.S.C. § 2510(15)................................................................. 20

18 U.S.C. § 2510(17)................................................................. 22

18 U.S.C. § 2510(17)(B).............................................................. 22

18 U.S.C. § 2701 ................................................................. 19, 20

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

18 U.S.C. § 2701(a) ............................................................................... 20, 21, 22, 23, 24

18 U.S.C. § 2701(a)(1) ........................................................................................... 23

18 U.S.C. § 2701(c)(2) .............................................................................. 20, 22, 23

18 U.S.C. § 2707(a) ................................................................................................ 24

**Other Authorities**

5 Witkin, Summary of Cal. Law, Torts (2005) ....................................................... 28

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 9

Fed. R. Civ. P. 12(b)(6) ...................................................................................... 9, 17

**Constitutional Provisions**

Cal. Const. art. I, § 1 .................................................................................. 24, 25, 26

U.S. Const. art. III, § 2 .............................................................................................. 9

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

1

2

## NOTICE OF MOTION AND MOTION TO DISMISS
## FIRST AMENDED, CONSOLIDATED CLASS ACTION COMPLAINT

3

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

4

    **PLEASE TAKE NOTICE** that at 1:30 p.m. on March 29, 2012, or as soon thereafter as the matter

5

may be heard by the above-entitled Court, in the courtroom of the Honorable Lucy H. Koh, 280 South

6

1st Street, San Jose, CA 95113, Defendants AdMarvel, Inc., AdMob, Inc., Flurry, Inc., Google Inc., and

7

Medialets, Inc. (the "Mobile Industry Defendants") will and hereby do move for an order dismissing

8

Plaintiffs' First Amended, Consolidated Class Action Complaint (the "AC" or "Amended Complaint")

9

*with prejudice* under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  This Motion

10

is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the

11

Declaration of S. Ashlie Beringer, the Court's files in this action, the arguments of counsel, and any

12

other matter that the Court may properly consider.

13

## ISSUES TO BE DECIDED

14

    1.  Do Plaintiffs have standing under Article III of the United States Constitution?

15

    2.  Does any of Plaintiffs' six claims against the Mobile Industry Defendants state a claim upon

16

which relief can be granted?

17

18

19

20

21

22

23

24

25

26

27

28

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiffs' Amended Complaint is nothing more than a re-packaged version of their failed First Consolidated Complaint ("FCC"), which this Court rejected for lack of Article III standing (among a host of other defects) in its September 20, 2011 Order (the "Order").  The AC adds a few additional details about (i) the iOS Devices Plaintiffs used (one of which was purchased by the lead Plaintiff nine months *after* he filed suit), (ii) a handful of third-party software applications ("apps") that Plaintiffs voluntarily downloaded and authorized (roughly five apps out of 500,000 available in the Apple App Store), and (iii) a few pieces of non-sensitive, non-personally identifying information allegedly transmitted to the Mobile Industry Defendants (such as the device serial number, generic phone properties, or activities relating to the device's use of apps).  But far from bolstering Plaintiffs' standing arguments, these few additional details *definitively establish Plaintiffs' lack of standing.*  Despite having sixty days to prepare an amended complaint—with the help of twenty-eight law firms listed on the AC—Plaintiffs still have not identified a "concrete and particularized" injury to a single person that "resulted from the access or tracking of their personal information."  Order at 6.  Similarly, despite this Court's clear instruction, Plaintiffs still have not "provid[ed] *specific allegations* with respect to the *causal connection* between the exact harm alleged (whatever it is) and *each Defendant's conduct or role in that harm.*"  *Id.* at 9 (emphases added).  Accordingly, the AC should be dismissed for lack of Article III standing—this time with prejudice.

Second, even if Plaintiffs could somehow establish standing, each of the six claims against the Mobile Industry Defendants fails to state a claim upon which relief can be granted.  Simply put, Plaintiffs are attempting to shoehorn widespread commercial protocols into federal statutes (including two criminal statutes) and state laws that plainly do not cover—and were never intended to cover—the type of conduct that Plaintiffs allege here.  Courts consistently have rejected attempts to expand these laws to cover routine Internet and mobile technologies, and this Court should again do the same.

Fundamentally, Plaintiffs' pleading still does not present a "case or controversy" but remains an amorphous policy critique and generalized grievance about the core business model of the mobile application industry as a whole—an industry that provides the economic backbone to a mobile app

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

marketplace accessed by millions of smartphone users every day.  More than ten years ago, the court in *In re DoubleClick Privacy Litigation*, 154 F. Supp. 2d 497 (S.D.N.Y. 2001), rejected a nearly identical challenge to Internet technologies used to collect user information for online advertising, thus ensuring the proliferation of a robust online marketplace of free content and services that (like the mobile app economy) could not exist without such advertising.  The basic practices complained of here simply are not unlawful, and no one has been harmed by them.  Plaintiffs may not use the federal judicial system to pursue their particular notion of how the mobile app industry should operate.  Their AC should be dismissed with prejudice.

## II.   THIS COURT'S ORDER GRANTING THE MOBILE INDUSTRY DEFENDANTS' PREVIOUS MOTION TO DISMISS

The AC is Plaintiffs' second bite at the apple since the consolidation of these cases.  On September 20, 2011, this Court dismissed Plaintiffs' FCC and detailed the significant deficiencies that any amended complaint would have to cure.  Specifically, with respect to Article III standing, the Court held that Plaintiffs had failed to "articulate[] a 'coherent and factually supported theory' of injury," Order at 7, and had "stated general allegations about the Mobile Industry Defendants, the market for apps, and similar abstract concepts (e.g., lost opportunity costs, value-for-value exchanges), but . . .  ha[d] not identified an actual injury to themselves sufficient for Article III standing."  *Id.*  Furthermore, the Court put Plaintiffs "on notice . . . that any amended complaint must provide specific allegations with respect to the causal connection between the exact harm alleged (whatever it is) and each Defendant's conduct or role in that harm."  *Id.* at 9.

As to Plaintiffs' specific claims that are re-alleged in the AC, the Court found, *inter alia*, that Plaintiffs' "allegations under their [Computer Fraud and Abuse Act] claim [were] insufficient" for several reasons, including that Plaintiffs had "failed to sufficiently allege that Defendants accessed a protected computer 'without authorization'" and had failed to plead "economic damages . . . aggregating at least $5,000 in value."  *Id.* at 15-16.  The Court specifically directed Plaintiffs to "cure these deficiencies in any amended complaint."  *Id.* at 17.  With respect to Plaintiffs' trespass to chattels claim, the Court dismissed the claim and held that in any amended pleading Plaintiffs had to connect any alleged trespass "to an identifiable harm or injury."  *Id.* at 19.  As detailed below, Plaintiffs have cured

1   none of these deficiencies, often simply re-pleading the very allegations that this Court already has found

2   insufficient.

### III.    FACTUAL BACKGROUND

#### A.  Representative Plaintiffs And Proposed Class

5   The named Plaintiffs are nine individuals who "downloaded and used numerous free apps from the

6   [Apple] App Store during the Class Period," which they allege resulted in information being transmitted

7   by the apps to third parties that provided services to those apps, including the Mobile Industry

8   Defendants.  AC ¶¶ 35-45.  Critically, none of the Plaintiffs alleges or identifies any harm that he or she

9   experienced due to the alleged "collection" of this information by the Mobile Industry Defendants.

10  Underscoring the sweeping breadth of their case theory, Plaintiffs' claims against the Mobile Industry

11  Defendants are alleged on behalf of a putative "iDevice Class" consisting of *every US resident who has*

12  *downloaded a free app from the App Store*, irrespective of the information (if any) collected or shared by

13  the app.  *Id.* ¶ 203.

#### B.  Mobile Industry Defendants

15  In addition to asserting claims against Apple, Plaintiffs have asserted claims against five companies

16  that provide a wide range of third-party mobile software applications and services to mobile developers:

17  AdMob; AdMarvel; Flurry; Google; and Medialets.  AC ¶¶ 52-68.  Plaintiffs lump these companies

18  together under the misleading term "Tracking Defendants."  *Id.* ¶ 52.  Because that term

19  mischaracterizes these companies' activities, these Defendants are referred to here as the "Mobile

20  Industry Defendants."

21  Plaintiffs allege that the various Mobile Industry Defendants provide different types of services

22  relating to mobile apps, including offering analytics services, "provid[ing] mobile advertising content to

23  mobile devices," and providing "advertisers and publishers the ability to target and personalize

24  advertising."  *Id.* ¶¶ 53-57.  Plaintiffs concede that the types of services some Mobile Industry

25  Defendants provide (*e.g.*, analytics services) differ significantly from those other Mobile Industry

26  Defendants provide (*e.g.*, targeted advertising).  *See id.*  Yet the linchpin of Plaintiffs' complaint against

27  the Mobile Industry Defendants is that they "collect" supposedly "personal information transmitted from

28

1   Plaintiffs' i[OS] Devices" for unspecified "purposes unrelated to the functionality of Plaintiffs' i[OS]

2   Devices or execution of apps on those devices." *Id.* ¶ 52.

### C. Allegations Against Mobile Industry Defendants

4   The central premise of Plaintiffs' AC is unchanged.  The AC takes issue with the core business and

5   technical model of the mobile app marketplace, which consists of more than "10 billion apps"

6   downloaded to date.  *See* FCC ¶ 35.  Plaintiffs complain that apps and the third-party service providers

7   that provide critical support and advertising for those apps can obtain information about Plaintiffs' iOS

8   Devices and activities, as they must to deliver those services.  *See, e.g.*, AC ¶¶ 16-17.

### 1.   The Mobile "App" Economy

10   Mobile devices function as a "mobile platform" on which users may choose to download third-

11   party software applications, or "apps," that allow them to engage in countless different functions from a

12   single, hand-held device.  *See* AC ¶ 88.  As the AC acknowledges, many popular mobile apps—

13   including those used by Plaintiffs—are free, due to third-party advertising that allows the app developer

14   to support the costs of developing and providing free content and services to users.  *See id.* ¶¶ 100-01;

15   *see also* FCC ¶ 39.  Likewise, analytics companies are invaluable in helping app developers understand

16   and organize information about how users are engaging with their apps, so that they can improve their

17   apps and succeed in the mobile app marketplace.  *See* AC ¶¶ 53-57.

18   Just as on the Internet, a mobile user is able to read the *Los Angeles Times* on her iPhone through

19   the "free" *Los Angeles Times* application only because the app displays third-party advertisements that

20   make it economically viable for the publication to provide this content to users.  And, just as on the

21   Internet, developers of mobile apps do not typically provide the third-party advertisements that appear in

22   their content; instead, app and website developers turn to specialized companies—such as the Mobile

23   Industry Defendants—to provide, deliver, and/or measure the performance of the advertisements or to

24   aggregate metrics about how users engage with their apps.  *See* AC ¶¶ 53-57.  These third-party service

25   providers—like the myriad third parties that provide advertising, analytics, widgets, surveys or other

26   content or services to website publishers on the Internet—necessarily obtain access to certain

27   information about users' devices and app-related activities in order to provide their services.  *See, e.g.*,

28   AC ¶¶ 58-63.

### 2. Disclosures To Plaintiffs Authorizing Applications

Although the AC continues to focus on Apple's agreements with *app developers* (AC ¶¶ 95, 98-99), those developer agreements do not inform *users*' expectations or agreements when authorizing applications on their mobile devices—and they are not even public.  AC ¶ 98.

Instead, before a user may use any application, she must first agree to Apple's iTunes Store Terms and Conditions, which is "required to create a user App Store account."  FCC ¶ 36.  Contrary to Plaintiffs' repeated and boilerplate mantra that any access by the Mobile Industry Defendants to their mobile devices was "unauthorized" and "without notice," Apple's Terms and Conditions specifically provide:

> **Third-Party Sites and Services**
> Apple websites, products, applications, and services may contain links to third-party websites, products, and services.  **Our products and services may also use or offer products or services from third parties − for example, a third-party iPhone app. Information collected by third parties, which may include such things as location data or contact details, is governed by their privacy practices.**  We encourage you to learn about the privacy practices of those third parties.[1]

*See* Declaration of S. Ashlie Beringer ("Beringer Decl."), Exh. A (emphasis added).  Thus, Apple's Terms and Conditions—which Plaintiffs cite and on which they rely in the AC—plainly disclose to each and every user who downloads a mobile app onto an Apple device that: (1) third parties that provide products and services may collect information from users' iOS Devices, such as "location data or contact details"; and (2) third-party access to data on users' iOS Devices is *governed by the privacy policies of such third parties*—not Apple's policies.

In addition, as reflected in Apple's terms, before use of an app, a user must authorize the app by downloading it to her device and *agreeing to its terms of service*.[2]  Conspicuously, although Plaintiffs

---

[1]  This Court may consider the contents of Apple's Terms and Conditions and Privacy Policy when ruling on the instant motion.  *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1405 n.4 (9th Cir. 1996); Order at 10.  Additionally, although not necessary to the resolution of this motion, the Court may also consider the contents of the apps that give rise to Plaintiffs' claims, including the terms of service and privacy policies that appear in those apps.  *See id.*

[2]  Plaintiffs initially named several application developers themselves—including The New York Times, Pandora, NPR, and others—as defendants.  Plaintiffs have not included those entities as defendants in the FCC or the AC (although Plaintiffs entered into tolling agreements with them and apparently reserved the right to add them as defendants at a later date).  By removing the app developers as defendants, Plaintiffs presumably hope to avoid drawing the Court's attention to the tens of thousands of privacy policies and agreements implicated by this lawsuit that expressly *authorize* the

[Footnote continued on next page]

now identify a handful of apps they contend transmitted information to third parties, they make no

mention of the terms of service they agreed to when downloading those apps and provide no facts to

support their generic claim that the disclosure of certain information by these apps to the Mobile Industry

Defendants somehow was "unauthorized."  Thus, for example, although Plaintiffs Chiu and Lalo allege

that they used the free Dictionary.com app to look up certain words on their iPhones (AC ¶¶ 17, 58(c)),

they do not (and cannot) allege that the agreement governing their use of that app prohibited disclosure of

their device data and other information to third parties.  They cannot make this allegation because the

Dictionary.com privacy policy (referenced in and part of the app itself) clearly discloses the use of "third-

party companies to serve advertisements" and "[t]hird-party vendors to help us better understand our user

demographics," and confirms that these third parties may "collect information about your interactions

with [Dictionary.com]" and use various "technologies" to recognize the user's device and to provide

these services.  *See* Beringer Decl., Exh. B.  Finally, Plaintiffs do not allege that any of the Mobile

Industry Defendants made *any* representation or promise—much less a false or misleading one—to

Plaintiffs.

### 3. Plaintiffs Do Not Allege That Any Mobile Industry Defendant Accessed Any Personally Identifying Or Sensitive Information

In the AC, Plaintiffs purport to identify a handful of specific apps they agreed to download that, in

turn, allegedly transmitted information about their device and use of the app to certain Mobile Industry

Defendants.  *See* AC ¶¶ 58-63.  Although Plaintiffs now identify certain anonymous data they allege was

transmitted to the Mobile Industry Defendants, they do not point to a single piece of personally

identifying information that was "collected."  *Id*.  Instead, Plaintiffs allege that these apps passed a

device identifier (a serial number unique to a device—not a user—that does not in any way identify the

individuals who may use that device),[3] along with a handful of generic phone properties (*e.g.*, "device

type and model"), anonymous demographic information (*e.g.*, "time zone"), or activities relating to the

---

[Footnote continued from previous page]
activities Plaintiffs complain about here—and that, moreover, give rise to highly individualized facts
that alone would preclude class certification if this matter ever advanced beyond the pleading stage.
[3]  For example, the serial number associated with an iPhone used by counsel for one of the Mobile
Industry Defendants is 5K1033AD3NR.  This variable plainly does not function to identify the specific
individual(s) who use this device.

Gibson, Dunn &
Crutcher LLP

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

use of the app (*e.g.*, whether a Plaintiff "shook his iPhone to activate Urban Spoon's restaurant suggestion function").[4]  *Id*.  For example, the *only* Plaintiff-specific allegation relating to Defendant AdMob is that a single app (the Bible App) transmitted its *own* App Store identifier—not any information related to either the Plaintiff or his device—from Plaintiff Rodimer's device to AdMob.  *See* AC ¶ 61.

Moreover, Plaintiffs do not (and cannot) allege a single instance of any Mobile Industry Defendant disclosing this information to any third party, using this information to "identify" or "de-anonymize" a Plaintiff, or doing anything other than delivering advertisements or furnishing aggregate metrics and reports to the app developers about the use of their apps.

### 4.    Plaintiffs Still Do Not Identify Any Injury Caused By The Mobile Industry Defendants' Alleged Collection Of Anonymous Data

Not surprisingly, then, Plaintiffs still "have not identified a concrete harm from the alleged collection and tracking of their personal information."  Order at 7.  Instead, Plaintiffs continue to allege a series of theoretical, non-specific injuries, without identifying a single, concrete instance of harm any Plaintiff suffered from the collection of his information by a Mobile Industry Defendant.  Thus, while Plaintiffs continue to allege that "the data collected from Plaintiffs" has "an independent, objective market value" and that "Plaintiffs lost and have not been compensated for the value of such data," they fail to explain how this abstract principle actually impacted any Plaintiff.  *See* AC ¶¶ 72(e)-(m), 183-196.  Likewise, although Plaintiffs now make vague claims that "Defendants' conduct" somehow caused "harm to the value and security" of unspecified information and "violated Plaintiffs' . . . right to seclusion in their affairs," the AC does not identify a single example of the security or seclusion of any Plaintiff being compromised at all, much less by any of the Mobile Industry Defendants.  AC ¶ 72(f)-(g).

Finally, as in the FCC, Plaintiffs attempt to allege that the Mobile Industry Defendants' "actions consumed resources" such as "bandwidth resources" and "battery capacity."  AC ¶¶ 197-200.  Yet

---

[4]  Although Plaintiffs Chiu and Lalo allege that certain Mobile Industry Defendants collected the "carrier-assigned user names" from their devices, they conspicuously fail to say what their "carrier-assigned user names" are—or to allege that these "carrier-assigned user names" contained any information that could be used to personally identify them.  *See* AC ¶ 59(a).  Instead, Plaintiffs resort to the misleading use of an example (*e.g.*, "JOHN'S PHONE" (AC ¶ 59(a)) to *suggest* (without alleging) that the "carrier-assigned user name" *might* contain a first name, but without providing any factual support for this notion.

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

1   Plaintiffs still do not allege that any supposed use of device resources was caused by any Mobile

2   Industry Defendant's collection of information, as opposed to the download or use of the app itself—

3   which necessarily would have had access to device identifiers, Plaintiffs' activities on the app and other

4   information allegedly collected.  More fundamentally, Plaintiffs do not point to *any* instance where any

5   particular Plaintiff "lost" resources—and certainly no instance in which any Plaintiff was prevented from

6   using his or her phone in any fashion due to any purported "memory" consumption—or allege that any

7   Plaintiff's device was harmed due to the actions of any Mobile Industry Defendant.[5]

8        Ultimately, the AC continues to rest entirely on the speculative, undifferentiated and alternative

9   theories that the Mobile Industry Defendants somehow "devalued Plaintiffs' information," deprived

10  consumers of "the opportunity to have entered into value-for-value exchanges with other app providers,"

11  "consumed resources to which Plaintiffs had the right of controls and use," and "caused harm to the

12  value and security of Plaintiffs' personal, and personally identifiable, information."  AC ¶¶ 72(g), 188-

13  89, 197.  Once again, the statements are made without differentiating among Plaintiffs or among

14  Defendants, and without pointing to a single, specific fact or supporting detail.  And critically, the AC

15  does not even attempt to "provide specific allegations with respect to the causal connection between the

16  exact harm alleged" in the AC "and each Defendant's conduct or role in that harm," as required by this

17  Court's Order.  Order at 9.

18  **D.  Plaintiffs' Claims Against The Mobile Industry Defendants**

19        Following this Court's Order dismissing their FCC, Plaintiffs amended their pleading and again

20  alleged claims against the Mobile Industry Defendants for violation of the Computer Fraud and Abuse

21  Act (Count Seven) and Trespass (Count Eight)—claims this Court previously held were deficient.  Order

22  at 15-17, 19.  Although the AC does not allege any new theory or factual premise, Plaintiffs also add

23  four new claims against the Mobile Industry Defendants:

24        (1)  Violation of the Stored Communications Act, 18 U.S.C. § 2701 (Count Eleven);

25  _____

26  [5]  Although Plaintiffs purport to cite a single "example" of Defendant Medialets downloading a
    compressed .zip file to certain Plaintiffs' iOS Devices, they do not explain how this supposed .zip file
    relates to their claims or even whether it was used to "collect" information (as opposed to delivering ad
27  content, for example), nor do they cite a single instance where Plaintiffs "paid charges to their carriers,"
    were unable to download apps or use their iOS Device due to storage constraints, lost battery life, or
28  experienced any other *harm* due to this supposed .zip file.

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

(2)  Violation of the California Constitution, Art. I, Sec. 1 (Count Four);

(3)  Conversion (Count Twelve); and

(4)  Common Counts, Assumpsit, and Restitution (Count Thirteen).

## IV.    MOTION TO DISMISS STANDARDS

### A.  Motion To Dismiss For Lack Of Standing Under Rule 12(b)(1)

"A federal court's judicial power extends to cases arising under the laws of the United States." *Waste Mgmt. of N. Am., Inc. v. Weinberger*, 862 F.2d 1393, 1397 (9th Cir. 1988) (citing U.S. Const. art. III, § 2).  "However, it is not enough that a litigant alleges that a violation of federal law has occurred; the litigant must have standing to invoke the federal court's power. . . .  Absent injury, a violation of a statute gives rise merely to a generalized grievance but not to standing." *Id*. at 1397-98 (citations omitted).  A challenge to standing under Article III "pertain[s] to a federal court's subject-matter jurisdiction" and is therefore "properly raised in a motion under Federal Rule of Civil Procedure 12(b)(1)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

### B.  Motion To Dismiss For Failure To State A Claim Under Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted.  To survive a motion to dismiss for failure to state a claim, a complaint must state "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009).  This "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.*, 550 U.S. at 555; *Iqbal*, 129 S. Ct. at 1949.

## V.    ARGUMENT

### A.  Plaintiffs Lack Article III Standing To Pursue Their Claims

As with their FCC, Plaintiffs have failed to plead facts sufficient to establish that any of them suffered a cognizable injury in fact to satisfy "the irreducible constitutional minimum of standing" under Article III.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  To meet the requirements of Article III standing, a plaintiff bears the burden of alleging facts sufficient to establish that "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).  A plaintiff does not satisfy the standing requirement "[w]hen '[s]peculative inferences' are necessary . . . to establish [the] injury." *Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988).  Because Plaintiffs have failed to allege that they have suffered any injury whatsoever (let alone a concrete, non-speculative one), or that any "injury [is] fairly traceable to the challenged action of" any Mobile Industry Defendant, they lack standing to pursue their claims.  *Lujan*, 504 U.S. at 560-61.

### 1.     Plaintiffs Have Failed To Plead Any Injury In Fact

In dismissing Plaintiffs' previous complaint for lack of Article III standing, this Court held that "[d]espite a lengthy Consolidated Complaint, Plaintiffs do not allege *injury in fact to themselves*."  Order at 6.  The Court observed that "Plaintiffs do not identify what i[OS]Devices they used, do not identify which Defendant (if any) accessed or tracked their personal information, do not identify which apps they downloaded that access/track their personal information, ***and do not identify what harm (if any) resulted from the access or tracking of their personal information***."  *Id.* (emphasis added).

In their AC, Plaintiffs have attempted to remedy some of these deficiencies:  they have mentioned (1) a handful of specific iOS Devices (all of which are iPhones),[6] (2) approximately five apps (out of over 500,000 apps available in the App Store) that certain of the named Plaintiffs voluntarily downloaded, and (3) a few types of anonymous data that these apps purportedly passed to certain of the Mobile Industry Defendants.  *See* AC ¶¶ 36-44, 58-65.  But these new details do not bolster Plaintiffs' standing arguments.  Just the opposite:  they confirm that Plaintiffs do *not* have standing to maintain this action, because what the AC has not done and cannot do is "identify what *harm (if any) resulted from the access or tracking of their personal information*."  Order at 6 (emphasis added); *see also id.* at 7 ("Plaintiffs' current allegations suffer from another deficiency.  Plaintiffs have not identified a concrete harm from the alleged collection and tracking of their personal information sufficient to create injury in fact.").  In their new complaint, Plaintiffs have thrown in a mishmash of *theories* of alleged harm (*see,*

---

[6]  Tellingly, the lead Plaintiff in the first-filed suit, Jonathan Lalo, purchased his most recent iOS Device—his third in the past three years—*less than three months ago* (in October 2011), belying any suggestion that Mr. Lalo or his fellow named Plaintiffs are genuinely concerned about the conduct alleged in the AC or that they would not have purchased their iOS Devices had they known of the practices alleged in the AC.  *See* AC ¶ 36.

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

1   *e.g.*, AC ¶ 72), but they still do not point to a single instance where a specific Plaintiff suffered any

2   concrete or identifiable harm due to the alleged "collection" of his or her information by the Mobile

3   Industry Defendants or otherwise.

4   **a.      Plaintiffs' "Personal Information" Theories Of Harm**

5       Plaintiffs' purportedly "new" theories of harm are, in fact, precisely the theories they set forth in

6   the previous version of their complaint, and precisely the theories that this Court squarely rejected:  "(1)

7   misappropriation or misuse of personal information; (2) diminution in value of the personal information,

8   which is an 'asset of economic value' due to its scarcity; and (3) 'lost opportunity costs' in having

9   installed the apps, and diminution in value of the [iOS]Devices because they are 'less secure' and 'less

10  valuable' in light of the privacy concerns."  Order at 6.  *See* AC ¶ 182 (alleging that Defendants

11  "misappropriated Plaintiffs' personal information"); AC ¶ 188 (alleging that Defendants "devalued

12  Plaintiffs' information" because "the scarcity of consumer information increases its value"); AC ¶ 189

13  (alleging that Defendants imposed "opportunity costs" "in the form of the loss of the opportunity to have

14  entered into value-for-value exchanges with other app providers"); *compare also* FCC ¶¶ 76-98 *with* AC

15  ¶¶ 173-96.  Plaintiffs' AC contains no additional information or explanation of any substance that would

16  suddenly make these speculative and abstract theories of harm "concrete and particularized" and "actual

17  or imminent, not conjectural or hypothetical," as required to establish Article III standing.

18      Plaintiffs continue to assert these theories even though they were soundly rejected over *ten years*

19  *ago* (albeit in a non-Article III context) in the *DoubleClick* case—a case in which the plaintiffs, like

20  Plaintiffs here, alleged that they had been harmed by the defendant's collection of information about

21  them on Internet websites.  *See DoubleClick*, 154 F. Supp. 2d at 503.  These discredited theories of harm

22  continue to be rejected by courts, including this one, now that a new generation of plaintiffs' lawyers is

23  trying to graft these theories onto the latest technology.  *See, e.g.*, *Low v. LinkedIn Corp.*, 2011 WL

24  5509848, at *4-6 (N.D. Cal. Nov. 11, 2011); *La Court v. Specific Media, Inc.*, 2011 WL 1661532, at *4-6

25  (C.D. Cal. Apr. 28, 2011); *In re JetBlue Airways Corp. Privacy Litig.*, 379 F. Supp. 2d 299, 327

26  (E.D.N.Y. 2005).

27      No matter how many different ways Plaintiffs try to recast or restate these same generic theories of

28  alleged harm, their efforts must fail.  The problem is not with the language or phrasing Plaintiffs have

1    used to describe the alleged harm; the problem is with the theories of harm themselves:  The collection

2    of demographic information to deliver advertising simply does not amount to an injury in fact for

3    purposes of Article III standing—as courts, including this one, have repeatedly recognized.  *See Fraley*

4    *v. Facebook*, 2011 WL 6303898, at *8 (N.D. Cal. Dec. 16, 2011) (Koh, J.) ("The courts in [*In re iPhone*

5    *Application, Specific Media, In re DoubleClick and Low*] found that the plaintiffs were unable to

6    articulate how they were economically injured by the use of their own information to advertise to

7    themselves and unable to articulate how the collection of demographic information was an economic

8    loss to them.").

9         Additionally, Plaintiffs still make no attempt to connect these theoretical wrongs "to themselves"

10   or to explain how any one of them actually was harmed due to the alleged collection of their device data

11   or app activity.  *See* Order at 7.  The 65-page pleading still does not identify a single, specific example of

12   a Plaintiff who "lost" specific data or suffered "harm to the value and security" of his or her information

13   or experienced in a personal way any of the abstract harms cited in the AC.

14                **b.**      **Alleged Harm To iOS Devices**

15        Well aware of the flaws in their "personal information" theories of harm, Plaintiffs also allege—

16   again without providing any supporting details (specific to a named Plaintiff or otherwise)—that as a

17   result of Defendants' conduct, "Plaintiffs had the resources of their i[OS]Device[s] consumed and

18   diminished without their permission[,] . . . includ[ing] i[OS]Device storage, battery life, and bandwidth

19   from each Plaintiff's wireless service provider." AC ¶ 3.  But Plaintiffs made virtually identical

20   allegations in their FCC.  *See, e.g.*, FCC ¶¶ 170-71.  And they reiterated these allegations during the

21   hearing on the initial motions to dismiss:

         The premium that's paid or – on the cost of the i[OS]Device – bandwidth utilization –
22       and by "bandwidth utilization," meaning it slows you down and, you know, basically
         that by this other information that was undisclosed and that you didn't expect to be
23       sending through the device, that it slows it down and costs money because, for many
         class members, they pay for data from AT&T or Verizon, for data usage; potential
24       damage to the i[OS] Device in the sense that it consumes resources; limited battery and
         memory capacity; processing power and bandwidth because moving data has a cost, has
25       a cost to the device itself; the impairment of the device; the value; the installation and
         operation of the device of the defendant's program –
26

27   Beringer Decl., Exh. C (Sept. 8, 2011 Transcript at 13:17-14:7).  Like the court in *Specific Media*, this

28   Court properly rejected Plaintiffs' vague, conclusory, implausible, and non-Plaintiff-specific

allegations of harm to their iOS Devices.  *See id*. at 14:12-17 (The Court: "It seems like your

Complaint says these are the things that *can* happen. . . .  These are hypothetical.") (emphasis added);

Order at 6; *see also Specific Media*, 2011 WL 1661532, at *5 ("If Plaintiffs are suggesting that their

computers' performance was compromised . . . they need to allege facts showing that is true.").

The AC has not cured these defects.  Once again, Plaintiffs' conclusory assertions are

unaccompanied by the "concrete and particularized" facts necessary to establish standing.  The AC is

devoid of specific facts identifying even *a single iOS Device* (belonging to a named Plaintiff or

otherwise) that was damaged in any way by the Mobile Industry Defendants' alleged conduct.  (And any

such allegations would be wholly implausible because, among other things, it literally takes seconds to

delete an unwanted app from an iOS Device.)  Nor have Plaintiffs alleged any facts—and there are

none—that would explain how any purported "harm" to their iOS Devices relates to the Mobile Industry

Defendants' supposed collection of their "information," as opposed to Plaintiffs' use of the apps

themselves (since, according to Plaintiffs' own allegations, the only information allegedly sent to the

Mobile Industry Defendants is information (or a subset of information) already being sent to the apps).

If this theory of "harm" were cognizable, Plaintiffs would have a claim against every app developer on

the planet.  But as this Court and the court in *Specific Media* recognized, that is not the law, and this

speculative and implausible theory of harm cannot save Plaintiffs' pleading from dismissal.

In sum, what this Court said in its Order regarding Plaintiffs' FCC remains equally true of the AC:

Plaintiffs have not "articulated a 'coherent and factually supported theory' of injury.  Plaintiffs have

stated general allegations about the Mobile Industry Defendants, the market for apps, and similar

abstract concepts (e.g., lost opportunity costs, value-for-value exchanges), but Plaintiffs have not

identified an actual injury to themselves sufficient for Article III standing."  Order at 7.

### c.  Plaintiffs' Assertion Of New Statutory And Constitutional Claims Does Not Satisfy Article III's Injury-In-Fact Requirement

Acutely aware of the absence of injury in fact to any named Plaintiff, and also aware that this Court

rejected Plaintiffs' previous attempts to rely upon the standing decision in *In re Facebook Privacy*

*Litigation*, 2011 WL 2039995 (N.D. Cal. May 12, 2011), on the basis that, among other things, Plaintiffs

had "not made a claim under the Wiretap Act" (Order at 8), Plaintiffs predictably have now added new

Gibson, Dunn &
Crutcher LLP

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

1    claims for violation of the Wiretap Act (against Apple) and for violation of the Stored Communications

2    Act and the right to privacy set forth in the California Constitution (against all Defendants).[7]  Plaintiffs

3    obviously hope that the mere assertion of these claims—even in the complete absence of allegations that

4    any Defendant engaged in any conduct remotely covered by these statutes—will permit them to slip their

5    foot in the courthouse door on the theory that they have pled "statutes creating legal rights, the invasion

6    of which creates standing."  Order at 5.  That is not the law, and this Court should not permit Plaintiffs to

7    make an "end run" around its previous Order.

8         First, regardless of the source of the supposed right asserted, "Art. III's requirement remains:  the

9    plaintiff still must allege a distinct and palpable injury *to himself*, even if it is an injury shared by a large

10   class of other possible litigants."[8]  *Warth v. Seldin*, 422 U.S. 490, 501 (1975) (emphasis added); *see also*

11   *Waste Mgmt.*, 862 F.2d at 1397-98 ("Absent injury, a violation of a statute gives rise merely to a

12   generalized grievance but not to standing.") (citations omitted); *Lee v. Chase Manhattan Bank*, 2008 WL

13   698482, at *5 (N.D. Cal. Mar. 14, 2008) ("[T]he mere allegation of a violation of a California statutory

14   right, without more, does not confer Article III standing.  A plaintiff invoking federal jurisdiction must

15   also allege some actual or imminent injury resulting from the violation . . . .").  That is because "the

16   requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute."

17   *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S. Ct. 1142, 1151 (2009); *see also Raines v. Byrd*, 521

18   U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by

19   statutorily granting the right to sue to a plaintiff . . . .").  Despite repeated efforts, Plaintiffs here simply

20   have not been able to allege a "distinct and palpable injury *to [themselves]*."  *Warth*, 422 U.S. at 501

21   (emphasis added).  Although Plaintiffs now identify anonymous device and demographic information

22   they allege was obtained by the Mobile Industry Defendants from certain apps, they still do not explain

23   in any concrete or personal way how (or whether) they, individually, suffered the invasion of any

24   _____

     [7]  Although Plaintiffs' Wiretap Act claim is meritless and cannot create a basis for standing against any
25   Defendant, Plaintiffs' assertion of this claim against Apple is irrelevant to the standing inquiry with
     respect to the Mobile Industry Defendants because it is well-established that at least one plaintiff must
26   have standing against each defendant.  *See Cady v. Anthem Blue Cross Life & Health Ins. Co.*, 583 F.
     Supp. 2d 1102, 1105-07 (N.D. Cal. 2008).
27   [8]  In a putative class action, the named plaintiffs purporting to represent the class must establish that
     they personally have standing to bring the action.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996).  *See*
28   *also* Order at 5-6.

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

1 statutory or constitutional right.  Instead, the AC continues to plead nothing more than a generalized

2 grievance about the nature of the mobile app industry, asserting that the use of third-party advertising

3 and analytics services in mobile apps violates the rights of every person who has ever downloaded an

4 app, irrespective of the apps' terms of service or privacy policies, the type of information at issue, or

5 how it was used.

6       Second, "the standing question in . . . cases [involving an alleged invasion of a statutory right] is

7 whether the constitutional or statutory provision on which the claim rests properly can be understood as

8 granting persons *in the plaintiff's position* a right to judicial relief."  *Warth*, 422 U.S. at 500 (emphasis

9 added).  *See also Fernandez v. Brock*, 840 F.2d 622, 630 (9th Cir. 1988) ("[T]he crucial inquiry in such a

10 situation is whether a statute that imposes statutory duties creates correlative procedural rights *in a given*

11 *plaintiff*," which in turn requires examination of the "statutory language, the statutory purpose, and the

12 legislative history.") (emphasis added).  Specifically, the court must "look to the text of [the statutory

13 provision on which the claim rests] *to determine whether it prohibited Defendants' conduct*; if it did,

14 then Plaintiff has demonstrated an injury sufficient to satisfy Article III."  *Edwards v. First Am. Corp.*,

15 610 F.3d 514, 517 (9th Cir. 2010) (emphasis added) (cert. granted June 20, 2011).  Here, as explained in

16 greater detail below, neither the SCA nor Article I of the California Constitution can be understood as

17 granting persons in Plaintiffs' position—*i.e.*, persons who allegedly had non-personally identifying, non-

18 sensitive information from their iOS devices collected by virtue of apps they authorized—a right to

19 judicial relief.  Indeed, neither the SCA nor Article I of the California Constitution is even remotely

20 applicable to the conduct alleged in the AC (which is precisely why Plaintiffs did not attempt to plead

21 those claims in their earlier complaints).  *See infra* at V.B.2-3.  The mere assertion by Plaintiffs of these

22 claims now cannot magically create Article III standing where none previously existed.  *See Fernandez*,

23 840 F.2d at 630 ("[A] plaintiff who merely claims that a defendant violated a statutory duty does not

24 necessarily satisfy the requirement of injury in fact in Article III.").  To hold otherwise would open the

25 federal courts to any plaintiff who alleges a federal statutory violation, however baseless or inapplicable

26 to the case at hand.  *See, e.g.*, Beringer Decl., Exh. D (*Robins v. Spokeo* (C.D. Cal.)) ("Mere violation of

27 the Fair Credit Reporting Act does not confer Article III standing, moreover, where no injury in fact is

28 properly pled.  Otherwise, federal courts will be inundated by web surfers' endless complaints.").

Gibson, Dunn &
Crutcher LLP

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

### 2.     Plaintiffs Have Failed To Plead Any Causal Connection Between Any Harm And Each Defendant's Conduct Or Role In That Harm

Even if Plaintiffs could establish an injury in fact (they have not and cannot), this Court put Plaintiffs on clear notice that "any amended complaint must provide specific allegations with respect to the *causal connection* between the exact harm alleged (whatever it is) *and each Defendant's conduct or role in that harm.*"  Order at 9 (emphases added).  Here, Plaintiffs have not pled any "causal connection" between any harm "and each Defendant's conduct or role in that harm," as required.  *Id.*; *see also Lujan*, 504 U.S. at 560-61 (to establish Article III standing, plaintiffs must demonstrate that "the injury [is] fairly traceable to the challenged action of the defendant"); *see also Cady*, 583 F. Supp. 2d at 1105-07 (plaintiff must establish standing to sue as against each individual defendant).  Despite this Court's clear admonition, the AC is utterly silent as to how, or whether, any specific Defendant caused identifiable harm to any particular Plaintiff.  Instead, Plaintiffs continue to allege causation in a conclusory and *en masse* fashion—asserting repeatedly that "Defendants' conduct caused harm" to "Plaintiffs" (*see* AC ¶ 72)—but without once identifying the *specific role* of each Mobile Industry Defendant in purportedly causing such "harm."  *See, e.g., id.* ("Plaintiffs have each suffered harm and economic injury as a result of each Defendants' actions which have caused Plaintiffs to pay more for their iDevices than they otherwise would have"; "Plaintiffs have each suffered harm and economic injury as a result of each Defendants' conduct which has imposed undisclosed data transmittal costs on Plaintiffs").  Such conclusory allegations fall well short of the requirements of this Court's Order and Article III and require dismissal of the AC.

### 3.     Even If Plaintiffs Could Establish Article III Standing, They Do Not Satisfy Prudential Standing Requirements

Finally, Plaintiffs also cannot satisfy prudential standing requirements, which wholly "apart from Art. III's minimum requirements, serve to limit the role of the courts in resolving public disputes." *Warth*, 422 U.S. at 500; *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) ("[O]ur standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement . . . and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction.") (internal citations and quotations omitted); *Cal. Cartage Co., Inc. v. United States*, 721 F.2d 1199, 1203 (9th Cir. 1983) (once it is established that a private cause of

Gibson, Dunn &
Crutcher LLP

action exists, inquiry shifts from whether Article III standing exists to whether prudential standing concerns are satisfied).  For claims involving federal statutory causes of action, such as Plaintiffs' SCA claim, "'prudential standing is satisfied when the injury asserted by a plaintiff arguably falls within the zone of interests to be protected or regulated by the statute.'"  *Jewel v. National Security Agency*, 2011 WL 6848406, at *8 (9th Cir. Dec. 29, 2011) (quoting *Federal Election Commission v. Akins*, 524 U.S. 11, 20 (1998)).  Here, Plaintiffs' objection to the industry-wide practice of using demographic information obtained from mobile apps to deliver advertising or compile aggregate statistics is entirely unrelated to the "zone of interests" Congress sought to protect in enacting the SCA, even under a broad view of the statutory scheme.  Indeed, courts repeatedly have held that Section 2701 of the SCA "aims to prevent *hackers* from obtaining, altering or destroying certain stored electronic communications."  *DoubleClick*, 154 F. Supp. 2d at 507 (emphasis added); *see also* Section V.B.2, *infra*.[9]  It was in no way intended to give private plaintiffs a platform to challenge routine commercial practices, as Plaintiffs seek to do here.

## B. Each Of Plaintiffs' Separate Claims Against The Mobile Industry Defendants Fails To State A Claim

Even if the Court were to overlook Plaintiffs' failure to establish Article III standing, the AC still fails to state a claim under Rule 12(b)(6) because Plaintiffs are attempting to assert claims under a series of inapplicable federal and state laws that, *inter alia*, prohibit intentional, destructive acts of computer hacking and interception and that simply cannot be construed to encompass the routine technical protocols between apps, iOS Devices, and mobile advertising and analytics providers.

### 1. Plaintiffs Fail To State A Claim Under The Computer Fraud And Abuse Act

In its previous Order, the Court identified four deficiencies in Plaintiffs' CFAA claim against the Mobile Industry Defendants: (1) Plaintiffs had failed to allege "economic harm to any Plaintiff"; (2) Plaintiffs had failed to allege "economic damages to one or more persons during any one-year period

---

[9]  Likewise, under prudential standing principles, this Court should refrain from adjudicating claims that effectively would require it to declare industry-wide standards for the use of third-party advertising and other services in mobile apps, particularly at a time when Congress is considering various proposed legislation relating to collection of certain data from mobile apps and devices.  *See, e.g.*, *Warth*, 422 U.S. at 500 ("Without such [prudential] limitations closely related to Art. III concerns but essentially matters of judicial self-governance, the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights.").

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

1   aggregating to at least $5,000 in value"; (3) Plaintiffs had "not identified the 'single act' of harm by

2   Defendants that would allow the Court to aggregate damages across victims and over time"; and (4)

3   "Plaintiffs [had] failed to sufficiently allege that Defendants accessed a protected computer 'without

4   authorization' or 'exceeded authorized access' to Plaintiffs' [iOS] devices." Order at 15-17.  The Court

5   made clear that "Plaintiffs must cure these deficiencies in any amended complaint, or risk dismissal of

6   their CFAA claim with prejudice." *Id.* at 17.  Plaintiffs have cured *none* of these deficiencies.

7           First, Plaintiffs still have not alleged—and cannot allege—that they suffered "damage or loss by

8   reason of a violation of [the CFAA]." 18 U.S.C. § 1030(g).  Beyond formulaic recitations, *see* AC

9   ¶¶ 290-91, the Amended Complaint does not allege plausibly either (1) that Plaintiffs incurred any costs

10  in responding to or as a result of the alleged unauthorized access, or (2) that Plaintiffs' devices, data, or

11  information were impaired or degraded.  *See* 18 U.S.C. § 1030(e)(8) & (11); Order at 16.

12          Second, even if the Court were to conclude that Plaintiffs had suffered some *de minimis* "damage"

13  or "loss," Plaintiffs have failed to allege facts that show or suggest that they suffered $5,000 in economic

14  damages in a one-year period, even collectively.  *See* 18 U.S.C. §§ 1030(g) & (c)(4)(A)(i)(I).

15  "Economic damages" in the context of the CFAA refer to instances in which "an individual or firm's

16  money or property are impaired in value, or money or property lost, or money [was] spent to restore or

17  maintain some aspect of a business affected by a violation." *Creative Computing v. Getloaded.com LLC*,

18  386 F.3d 930, 935 (9th Cir. 2004).  The alleged collection of Plaintiffs' "personal information" supports

19  none of these.  *DoubleClick*, 154 F. Supp. 2d at 525.  Indeed, courts routinely reject so-called "privacy"

20  claims brought under the CFAA for the very reason that, even if plaintiffs could show economic

21  damages, they cannot meet the $5,000 damage threshold.  *See, e.g.*, *id.* at 525-26; *Del Vecchio v.*

22  *Amazon.com, Inc.*, 2011 WL 6325910 (W.D. Wash. Dec. 1, 2011); *Bose v. Interclick, Inc.*, 2011 U.S.

23  Dist. LEXIS 93663, at *12-14 (S.D.N.Y. Aug. 17, 2011); *In Re Zynga Privacy Litig.*, No. C-10-04680

24  JW, at *5-6 (N.D. Cal. June 15, 2011); *Specific Media*, 2011 WL 1661532, at *6.

25          Third, even if Plaintiffs had established (i) economic damages (ii) aggregating to at least $5,000 in

26  a single year, they have "not identified the 'single act' of harm by Defendants that would allow the Court

27  to aggregate damages across victims and over time." Order at 17.  Quite the opposite—Plaintiffs

28  acknowledge that each of the five Mobile Industry Defendants and Apple is a distinct company that acts

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

independently of the others.  *See, e.g.*, AC ¶¶ 53-57.  Accordingly, even if there were damages here (and there are not), there would be no basis to aggregate them.

Fourth, Plaintiffs' CFAA claim fails as a matter of law because Plaintiffs cannot allege that the Mobile Industry Defendants accessed their iOS Devices "without authorization."  18 U.S.C. § 1030(a)(2) & (5).  Far from it:  Plaintiffs acknowledge that (i) any alleged collection of their "personal information" was by apps they voluntarily downloaded, and (ii) they received specific notice as the result of both Apple's and each app's disclosures that their "information [might be] collected by third parties, which may include such things as location data or contact details," and that they should "learn about the privacy practices of those third parties[,]" which "governed" the collection of such data.  Beringer Decl., Exh. A.  Accordingly, Plaintiffs cannot plausibly allege that Defendants accessed their iOS Devices "without authorization," nor do they have any basis to allege that Defendants "exceed[ed] authorized access."  *See, e.g.*, *In re Apple & ATTM Antitrust Litig.*, 2010 WL 3521965, at *7 (N.D. Cal. July 8, 2010) ("Voluntary installation runs counter to the notion that the alleged act was a trespass and to CFAA's requirement that the alleged act was 'without authorization' . . . .").

Finally, as the Mobile Industry Defendants noted in their previous motion, Plaintiffs' CFAA claim also should be rejected because the CFAA was never intended to criminalize standard industry practices, such as those alleged by Plaintiffs here, or to provide a vehicle for creative plaintiffs' lawyers to challenge the use of widespread technical protocols in court.  Rather, the CFAA was intended to combat destructive computer hacking, something Plaintiffs do not and could not possibly allege here.  *See LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009); *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 965-66 (D. Ariz. 2008).

## 2.    Plaintiffs Fail To State A Claim Under The Stored Communications Act

In their AC, Plaintiffs added a second federal (criminal) statute that they allege the Mobile Industry Defendants violated—the Stored Communications Act ("SCA") (18 U.S.C. § 2701).  Originally enacted in 1986—over twenty years before smartphones were introduced—the SCA "aims to prevent *hackers* from obtaining, altering or destroying certain stored electronic communications."  *DoubleClick*, 154 F. Supp. 2d at 507 (emphasis added); *see also United States v. Smith*, 155 F.3d 1051, 1058-59 (9th Cir. 1998) (explaining that the SCA permits penalties against hackers who put themselves in the position to

1   acquire a communication); *Salyer v. Salyer Am. Fresh Foods*, 2006 WL 709018, at *3 (N.D. Cal. Mar.

2   16, 2006) ("[T]he general purpose of [the] Stored Communications Act was to create a cause of action

3   against computer hackers and electronic trespassers."); *State Wide Photocopy, Corp. v. Tokai Financial*

4   *Services, Inc.*, 909 F. Supp. 137, 145 (S.D.N.Y. 1995) ("[T]he ECPA was primarily designed to provide

5   a cause of action against computer hackers, (i.e., electronic trespassers).  There are no allegations that

6   Tokai is a hacker.").  Section 2701 (asserted here) provides that "whoever . . . (1) intentionally accesses

7   without authorization a facility through which an electronic communication service is provided; or (2)

8   intentionally exceeds an authorization to access that facility; and thereby obtains, alters, or prevents

9   authorized access to a wire or electronic communication while it is in electronic storage in such system

10   shall be punished . . . ."  18 U.S.C. § 2701(a).  The SCA also contains certain statutory "exceptions," one

11   of which provides that the statute "does not apply with respect to conduct authorized—(2) by a user of

12   [an electronic communications] service with respect to a communication of or intended for that user[.]"

13   *Id.* § 2701(c)(2).

14       As discussed above, Plaintiffs' SCA claim has been included in the AC for no reason other than to

15   try to circumvent the Court's prior Article III ruling.  In fact, the claim is based *entirely* on the supposed

16   "collection" of "temporarily stored location data from the iDevice Class' iPhones" (AC ¶ 347), yet with

17   the sole exception of newly added defendant Google, Plaintiffs *do not allege* that any of the Mobile

18   Industry Defendants even collected location information.[10]  *Id.* ¶¶ 58-63.  In any event, even if Plaintiffs

19   had alleged a factual predicate for the claim, the claim fails as a matter of law because Plaintiffs have not

20   even pled (much less satisfied) *any* of the elements of an SCA claim.  And even if they could, the above-

21   referenced statutory exception applies.

22       First, Plaintiffs simply have not alleged that Defendants engaged in any conduct covered by the

23   SCA—namely, that any Mobile Industry Defendant accessed "a *facility* through which an electronic

24   communication service is provided."  18 U.S.C. § 2701(a) (emphasis added); *cf.* AC ¶ 347.  An

25   "electronic communication service" means "any *service* which provides *to users* thereof the ability to

26   send or receive wire or electronic communications."  18 U.S.C. § 2510(15) (emphases added).  Here,

27   _____

28   [10] Moreover, all apps are required by Apple to obtain express user authorization before using
    geolocation data for any purpose, and there is no allegation that any app at issue here failed to do so.

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

1   Plaintiffs do not allege, even in boilerplate, that any Defendant accessed an electronic communications

2   facility, much less to gain unlawful access to any Plaintiff's stored communications.  *See* AC ¶ 347.

3   Plaintiffs' individual iOS Devices are not "*facilit[ies]* through which an electronic communication

4   service is provided," since Plaintiffs do not *provide* an electronic communication service—they *use* such

5   services.  18 U.S.C. § 2701(a) (emphasis added).  *See, e.g.*, *Theofel v. Farey-Jones*, 359 F.3d 1066, 1077

6   n.4 (9th Cir. 2004) (expressly declining to hold that the SCA protects communications on PCs and

7   construing plaintiff's complaint to allege access to communications on third-party servers); *Crowley v.*

8   *Cybersource Corp.*, 166 F. Supp. 2d 1263, 1271 (N.D. Cal. 2001) (labeling as "destined to failure"

9   plaintiff's argument "that computers of users of electronic communication service, as opposed to

10  providers of electronic communication service, are considered facilities through which such service is

11  provided"); *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1204 (S.D. Cal. 2008) ("Baghai has

12  not presented any evidence that Enea accessed his e-mail account and read emails stored on the AT&T

13  server.  Although Enea accessed e-mail messages stored on the *laptop computer*, these actions do not

14  violate section 2701(a)(1).") (emphasis in original).  Rather, as the plain language of the statute and the

15  legislative history make clear, such "facilit[ies]" are the computer servers and other technological

16  *facilities* that enable providers of electronic communication services to provide those services to their

17  users.  *See, e.g.*, *id.*; *cf. DoubleClick*, 154 F. Supp. 2d at 512 ("This definition is consistent with

18  Congress' statements in 1986, when it passed the ECPA.  Sen. Rep. No. 99-541 (1986)'s entire

19  discussion of Title II deals only with facilities operated by electronic communications services such as

20  'electronic bulletin boards' and 'computer mail facilit[ies],' and the risk that communications

21  temporarily stored in these facilities could be accessed by hackers.  It makes no mention of individual

22  users' computers . . . .").

23      Second, Plaintiffs also have not identified any "electronic communication" supposedly accessed by

24  any Mobile Industry Defendant—from a communications facility or otherwise.  *See* 18 U.S.C. §

25  2701(a)(1).  Neither location data nor any of the other data (operating system, device type, etc.)

26  identified in the AC is an "electronic communication" because there is no allegation that it was part of a

27  "transfer" of electronic data that was "transmitted" from a Plaintiff to any intended recipient.  *See* 18

28  U.S.C. § 2510(12) (defining "electronic communication" as "*any transfer* [of electronic data] of any

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

1   nature' *transmitted* in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical

2   system") (emphases added); *see also Rene v. G.F. Fishers, Inc.*, — F. Supp. 2d —, 2011 WL 4349473, at

3   *2 (S.D. Ind. Sept. 16, 2011) ("Defendants correctly point out than an electronic communication within

4   the purview of the statute must be *transmitted* by a system that affects interstate or foreign commerce.")

5   (emphasis added).  And to the extent such data could be construed as an "electronic communication"

6   consisting of a "transfer" of such data to the apps used by Plaintiffs, the apps were free to authorize the

7   Mobile Industry Defendants to access those "communications" under Section 2701(c)(2).  *See infra.*

8       Third, Plaintiffs fail to allege that any Mobile Industry Defendant accessed an electronic

9   communication "while it [was] in electronic storage."  18 U.S.C. § 2701(a).  "Electronic storage" means

10  "(A) any *temporary, intermediate* storage of a wire or electronic communication *incidental to the*

11  *electronic transmission thereof*; and (B) any storage of such communication *by an electronic*

12  *communication service* for purposes of backup protection of such communication."  18 U.S.C.

13  § 2510(17) (emphases added).  Subsection (B) is inapplicable here because, as discussed above,

14  Plaintiffs are not an "electronic communication service" (*see, e.g.*, *DoubleClick*, 154 F. Supp. 2d at 511

15  ("Clearly, the cookies' residence on plaintiffs' computers does not fall into § 2510(17)(B) because

16  plaintiffs are not 'electronic communication service' providers.")), and Subsection (A) similarly does not

17  assist Plaintiffs because it "only protects electronic communications stored 'for a limited time' in the

18  'middle' of a transmission, *i.e.* when an electronic communication service temporarily stores a

19  communication while waiting to deliver it" (*id.* at 512).  *See id.* at 511-13 (holding that cookies placed

20  on hard drives were not in "electronic storage" for purposes of § 2701); *In re Toys R Us, Inc., Privacy*

21  *Litig.*, 2001 WL 34517252, at *3 (N.D. Cal. Oct. 9, 2001) (same; "Just as in *DoubleClick*, plaintiffs here

22  allege that the cookies at issue remain 'indefinitely' on their computers . . . and do not allege that the

23  cookies are incidentally stored in plaintiffs' computers while awaiting final transmission to another

24  location."); *Hilderman*, 551 F. Supp. 2d at 1204-5 (holding that "e-mail messages stored on the hard

25  drive [of a personal computer] do not constitute 'electronic storage' within the meaning of the Stored

26  Communications Act").

27       Fourth, even if Plaintiffs could successfully clear the above foundational hurdles (they cannot), an

28  SCA claim, like a CFAA claim, requires that a defendant's access to the "facility" be "without

1  authorization" or in "exce[ss] [of] an authorization," a showing Plaintiffs simply have not made—and

2  cannot make—for the reasons set forth above and in the Court's Order.  *See supra* at V.B.1; Order at 16

3  (noting that Plaintiffs face "serious difficult[ies]" pleading unauthorized access "[w]here the software

4  that allegedly harmed the phone was voluntarily downloaded by the user"); *see also DoubleClick*, 154 F.

5  Supp. 2d at 510 (dismissing SCA claim and noting that a "plaintiff cannot survive a motion to dismiss a

6  [SCA claim] based solely on the naked allegation that defendant's access was 'unauthorized.'  A

7  plaintiff must, allege[] and proffer[] sufficient proofs to create a colorable claim that such access was

8  'unauthorized'") (internal quotations omitted).

9      Finally, in addition to Plaintiffs' failure to plead *any* of the basic elements of an SCA claim set

10  forth in § 2701(a), their claim is barred by a statutory "exception."  Specifically, § 2701(c)(2) provides

11  that there is no violation of the SCA "with respect to conduct authorized—(2) by a user of [an electronic

12  communication] service with respect to a communication of or intended for that user[.]"  In other words,

13  if a party to the "communication" authorizes its disclosure, such conduct falls outside the scope of

14  § 2701(a)(1).  Even if all of the other fatal flaws in Plaintiffs' SCA claim were overlooked, this express

15  statutory exception would defeat Plaintiffs' claim.  Indeed, to the extent that there was any

16  "communication" of Plaintiffs' information here at all, it was "intended for" the apps, which plainly are

17  "users" of any electronic communication service that could be said to encompass Plaintiffs' activity on

18  those apps.  Because the apps necessarily authorized the Mobile Industry Defendants—entities that they

19  retained for the very purposes Plaintiffs complain of—to access Plaintiffs' "communications" with them,

20  the supposed "collection" of these "communications" by these Defendants falls squarely under the

21  "exception" contained in § 2701(c)(2).  The holding of the *DoubleClick* case from over a decade ago (in

22  the context of websites) is directly on point.  *See DoubleClick*, 154 F. Supp. 2d at 509-11 (holding "as a

23  matter of law that the DoubleClick-affiliated Web sites are 'users' of Internet access under the ECPA"

24  and that "the DoubleClick-affiliated Web sites consented to DoubleClick's access of plaintiffs'

25  communications to them"); *cf. In re Facebook Privacy Litig.*, 2011 WL 2039995, at *6 (dismissing SCA

26  claim where "[i]f the communications were sent to [Facebook], then [Facebook] was their 'addressee or

27  intended recipient,' and thus was permitted to divulge the communications to advertisers so long as it

28  had its own 'lawful consent' to do so").

1    Plaintiffs fail to allege a single statutory element under 18 U.S.C. § 2701(a), and their SCA claim

2    should be dismissed with prejudice.[11]

3            **3.        Plaintiffs Fail To State A Claim Under The California Constitution, Art. I, Sec. 1**

4       California Constitution Article I, Section 1 provides that "[a]ll people are by nature free and

5    independent and have inalienable rights.  Among these are enjoying and defending life and liberty,

6    acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and

7    privacy."  Based on this expansive language, Plaintiffs allege (for the first time) that the Mobile Industry

8    Defendants somehow have violated their state constitutional right to privacy.  *See* AC ¶¶ 243-47.  But

9    the interpretive case law *definitively establishes exactly the opposite, i.e.*, that the claim fails as a matter

10    of law.  As made clear by the California Supreme Court, "[n]otwithstanding the broad descriptions of the

11    privacy right in the ballot arguments and legislative findings . . . the right of privacy protects the

12    individual's *reasonable* expectation of privacy against a *serious* invasion."  *Pioneer Electronics (USA),*

13    *Inc. v. Superior Court*, 40 Cal. 4th 360, 370 (2007) (emphases in original).

14       To state a claim for a violation of the California constitutional right to privacy, a private plaintiff

15    must, as a threshold matter, satisfy three elements:  "(1) a legally protected privacy interest; (2) a

16    reasonable expectation of privacy in the circumstances; and (3) conduct by defendant constituting a

17    serious invasion of privacy."  *Hill v. Nat'l Collegiate Athletic Ass'n*, 7 Cal. 4th 1, 39-40 (1994).  These

18    threshold elements are used to "weed out claims that involve so insignificant or *de minimis* an intrusion

19    on a constitutionally protected privacy interest as not even to require an explanation or justification by

20    the defendant."  *Loder v. City of Glendale*, 14 Cal. 4th 846, 893 (1997).  Here, Plaintiffs can satisfy *none*

21    of the threshold elements, and their claim therefore should be dismissed.  *See, e.g.*, *Scott-Codiga v. Cnty.*

22    *of Monterey*, 2011 WL 4434812, at *7 (N.D. Cal. Sept. 23, 2011) (Koh, J.) (dismissing right to privacy

23    claim brought under the California Constitution where plaintiff failed to plead the threshold elements

24    with adequate specificity).

25

26    [11] Plaintiffs also do not have statutory standing to maintain an SCA claim because they have failed to
plead any facts that *they* personally were "*aggrieved* by any violation" of the SCA.  18 U.S.C.

27    § 2707(a) (emphasis added); 18 U.S.C. § 2510(11) (defining "aggrieved person" as "a person who was
a party to any intercepted wire, oral, or electronic communication or a person against whom the

28    interception was directed").

Gibson, Dunn &
Crutcher LLP

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

First, Plaintiffs have not pled the existence of a "legally protected privacy interest." "An apt example [of such an interest] from *Hill* is an interest 'in precluding the dissemination or misuse of *sensitive and confidential information* ('informational privacy').'" *Pioneer Electronics*, 40 Cal. 4th at 370 (quoting *Hill*; emphasis added). Thus, a person's confidential medical profile, private financial records, sexual orientation, and sexual activity may qualify. *See, e.g.*, *Leonel v. Am. Airlines, Inc.*, 400 F.3d 702, 712 (9th Cir. 2005) (medical profile); *Charles O. Bradley Trust v. Zenith Capital LLC*, 2006 WL 798991, at *1-2 (N.D. Cal. Mar. 24, 2006) (private financial records); *Nguon v. Wolf*, 517 F. Supp. 2d 1177, 1196 (C.D. Cal. 2007) (sexual orientation); *Botello v. Morgan Hill Unified Sch. Dist.*, 2009 WL 3918930, at *5 (N.D. Cal. Nov. 18, 2009) (sexual activity).

In sharp contrast, the disclosure of "mere contact information," such as names and addresses, does not "unduly interfere" with one's right to privacy. *Pioneer Electronics*, 40 Cal. 4th at 372. Similarly, "[a] person's general location is not the type of core value, informational privacy explicated in *Hill*." *Fredenburg v. City of Fremont*, 119 Cal. App. 4th 408, 423 (2004). Even in the context of private *medical* information (not implicated in the present case at all), courts have held that "Plaintiffs and the Class have no legally protected privacy interest in de-identified information as this de-identified information cannot be linked to individuals." *London v. New Albertson's, Inc.*, 2008 WL 4492642, at *8 (S.D. Cal. Sept. 30, 2008) (dismissing California Const. Art. I., Sec. 1 claim). Plaintiffs allege much less and do not come close to alleging information that gives rise to a "legally protected privacy interest."

Second, despite their conclusory allegations to the contrary, Plaintiffs have not established "a reasonable expectation of privacy in the circumstances." Just the opposite: (i) Plaintiffs made a voluntary choice to download the apps referenced in the AC; and (ii) Plaintiffs were put on clear notice by both Apple and the apps that certain information could be collected (and agreed to such collection). *See supra* at III.C. Under such circumstances, Plaintiffs had no reasonable expectation of privacy as a matter of law. *See, e.g.*, *Hill*, 7 Cal 4th at 36 ("A 'reasonable' expectation of privacy is an objective entitlement founded on broadly based and widely accepted community norms," and in determining whether an "objective entitlement" is present, "[c]ustoms, practices, and [the] physical settings surrounding particular activities" are taken into consideration, as are "*advance notice*" and "the presence or absence of opportunities to *consent voluntarily* to activities impacting privacy interests.") (emphases

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

1    added); *Berry v. Webloyalty.com, Inc.*, 2011 WL 1375665, at *10 (S.D. Cal. Apr. 11, 2011) (dismissing

2    invasion of privacy claims because plaintiff had no "reasonable expectation of privacy . . . where

3    Plaintiff consented to have his billing information shared by MovieTickets.com with Webloyalty," by

4    voluntarily enrolling on MovieTickets.com).

5         Finally, as is obvious from the face of the AC, Plaintiffs have failed to plead "a ***serious*** invasion of

6    privacy." *Hill*, 7 Cal. 4th at 40 (emphasis added).  Even if Plaintiffs could establish a *de minimis*

7    invasion of privacy—and they cannot—they have not alleged, as they must, an invasion "sufficiently

8    serious" as to constitute "an *egregious* breach of the social norms underlying the privacy right."  *See id.*

9    at 37 (emphasis added).  At most, Plaintiffs have alleged the use of routine technical protocols between

10    apps, iOS Devices, and mobile advertising and analytics providers, which clearly cannot suffice.

11    *Compare* AC ¶¶ 52-68 *with Hill*, 7 Cal. 4th at 40-41 (direct observation of urination by a monitor

12    sufficiently egregious invasion); *Egan v. Schmock*, 93 F. Supp. 2d 1090 (N.D. Cal. 2000) (stalking and

13    filming of neighbors in their home sufficiently egregious invasion).  The use of information collected

14    from consumers for purposes of delivering advertising, even "without [consumers'] knowledge or

15    permission," "is not an egregious breach of social norms, but *routine commercial behavior*."

16    *Folgelstrom v. Lamps Plus, Inc.*, 195 Cal. App. 4th 986, 992 (2011) (emphasis added) (affirming

17    dismissal of cause of action under Article I, Section 1 of the California Constitution).  The same is true

18    here.  The claim should be dismissed with prejudice.

19          **4.**      **Plaintiffs Fail To State A Claim For Trespass To Chattels**

20         "[T]he tort of trespass to chattels allows recovery for interferences with possession of personal

21    property 'not sufficiently important to be classed as conversion . . . .'"  *Intel Corp. v. Hamidi*, 30 Cal. 4th

22    1342, 1350 (2003).  "In order to prevail on a claim for trespass based on accessing a computer system,

23    the plaintiff must establish: (1) defendant intentionally and without authorization interfered with

24    plaintiff's possessory interest in the computer system; and (2) defendant's unauthorized use proximately

25    resulted in damage to plaintiff."  *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069-70 (N.D.

26    Cal. 2000) (citations omitted).  Plaintiffs here cannot plausibly make either allegation.

27         First, in its previous Order, this Court explained that under well-settled California law, there is no

28    actionable claim for trespass to chattels where there is "no actual or threatened damage to [plaintiff's]

computer hardware or software and no interference with its ordinary and intended operation." Order at

19 (quoting *Intel*, 30 Cal. 4th at 1353). Consequently, the Court put Plaintiffs on clear notice that, in any

amended pleading, Plaintiffs would be required to "amend their claim for trespass to chattels *to identify*

*actionable harm or injury.*" *Id.* (emphasis added). As discussed at length above, Plaintiffs have failed to

do so in the AC. Instead, they have pled vague, conclusory, bald, and non-Plaintiff-specific allegations

of harm, which this Court need not credit. *See* AC ¶ 308; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)

("naked assertion[s]" devoid of "further factual enhancement" are insufficient to state a claim).

Second, as also explained above, despite their conclusory, fact-free allegations to the contrary,

Plaintiffs simply have not alleged (and cannot allege) plausibly that the actions of the Mobile Industry

Defendants were "without authorization." *See supra* at V.B.1; *see also In re Apple & ATTM Antitrust*

*Litig.*, 2010 WL 3521965, at *7 ("Voluntary installation runs counter to the notion that the alleged act

was a trespass . . . ."). Moreover, Plaintiffs have not alleged any *facts* showing that the Mobile Industry

Defendants interfered with Plaintiffs' "possessory interest" in their computer systems, *i.e.*, their iOS

Devices. Plaintiffs do not, and cannot, allege that they lost possession or use of their iOS Devices or any

significant portion of their iOS Devices, as is required to state a claim for trespass to chattels. *See Intel*,

30 Cal. 4th at 1357 ("Short of dispossession, personal injury, or physical damage . . . intermeddling is

actionable only if the chattel is impaired as to its condition, quality, or value, or . . . the possessor is

deprived of the use of the chattel for a substantial time. In particular, an actionable deprivation of use

must be for a time so substantial that it is possible to estimate the loss caused thereby. A mere

momentary or theoretical deprivation of use is not sufficient unless there is a dispossession . . . .")

(citations and quotations omitted). The claim should be dismissed with prejudice.[12]

---

[12] Although the Court need not reach the issue because the claim fails under Rule 8, Plaintiffs' trespass
to chattels claim also fails because the claim sounds in fraud and Plaintiffs have failed to satisfy Rule
9(b)'s heightened pleading requirements. Specifically, Plaintiffs claim that in order to effectuate the
alleged trespass, the Mobile Industry Defendants "engaged in deception and concealment" and
"deception and misrepresentation." AC ¶¶ 301, 303. But Plaintiffs have provided none of the
particulars required under Rule 9(b). *See, e.g.*, *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103
(9th Cir. 2003) (holding that Rule 9(b) applies when a plaintiff alleges "a unified course of fraudulent
conduct and rel[ies] entirely on that course of conduct as the basis of a claim"); *Kearns v. Ford Motor
Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009).

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

### 5.   Plaintiffs Fail To State A Claim For Conversion

Plaintiffs' inclusion of a new claim for "conversion" in their AC also lacks merit.  Conversion is the "wrongful exercise of dominion over personal property of another."  5 Witkin, Summary of Cal. Law, Torts § 699 (2005).  "Dominion" has been variously defined as "perfect or complete property or ownership in a thing," "complete ownership; absolute property," and "ownership or right to property." *Hull v. Laughan*, 3 Cal. App. 2d 310, 315 (1934).

Plaintiffs' conversion claim is predicated on the notion that "Defendants have taken Plaintiffs' and Class members' specific personal property in the form of unique data about them that is private and personal," and that "Plaintiffs and Class Members have been harmed by this exercise of dominion and control over their information, for which they have not been compensated, and by which Defendants have been unjustly enriched."  AC ¶¶ 349-50.  The claim fails as a matter of law for at least three reasons.

First, as this Court recognized in its Order, "[n]umerous courts have held that a plaintiff's 'personal information' does not constitute money or property . . . ."  Order at 19-20.  *See also In re Facebook Privacy Litig.*, 2011 WL 2039995, at *6 (same); *Ruiz v. Gap, Inc.*, 540 F. Supp. 2d 1121, 1127 (N.D. Cal. 2008) (same).  Thus, Plaintiffs have not alleged any "personal property" over which the Mobile Industry Defendants hypothetically could exercise dominion.

Second, to state a claim for conversion, "there must be an interest capable of precise definition." *Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir. 2003).  But Plaintiffs have alleged no such interest. Unlike "a share of corporate stock," "a plot of land," or "a domain name," all of which are capable of conversion, the information Plaintiffs claim is protected here is not "well-defined."  *Id.*  Indeed, even a cursory review of the AC shows that the abstract set of information Plaintiffs claim was collected is far from uniform—and hence far from "well-defined."  *See* AC ¶ 64(a)-(g); *see also Boon Rawd Trading Int'l Co. v. Paleewong Trading Co.*, 688 F. Supp. 2d 940, 955 (N.D. Cal. 2010) (dismissing conversion claim because "the goodwill of a business is a highly abstract property interest that does not lend itself to the elements of conversion.  Indeed, it is difficult to fathom how one could determine whether a defendant wrongfully interfered with the claimant's possession of such abstract property.").

Third, as noted above, to state a claim for conversion, the property at issue "must be capable of *exclusive possession or control.*"  *Kremen*, 337 F.3d at 1030 (emphasis added).  Here, Plaintiffs have not

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

pled and cannot plead that the Mobile Industry Defendants exercised exclusive possession or control—

*i.e.*, dominion—over their "personal information."  To the contrary, even assuming that the Mobile

Industry Defendants collected from Plaintiffs' iOS Devices certain information (such as the model of the

iOS Device or UDID), Plaintiffs have not shown—and cannot show—that such collection prevented

them (or anyone else) from *also* using that information.  There is a mountain of case law on this point.

*See, e.g., Low,* 2011 WL 5509848, at *5 (dismissing complaint where plaintiff  "failed to allege how he

was foreclosed from capitalizing on the value of his personal data or how he was deprived of the

economic value of [his] personal information simply because [his] unspecified personal information was

purportedly collected by a third party"); *Specific Media*, 2011 WL 1661532, at *5 (same); *Folgelstrom*,

195 Cal. App. 4th at 994 ("The fact that the [plaintiff's] address had value to Lamps Plus, such that the

retailer paid Experian a license fee for its use, does not mean that its value to plaintiff was diminished in

any way."); *DoubleClick*, 154 F. Supp. 2d at 525 (observing that "although demographic information is

valued highly . . . the value of its collection has never been considered an economic loss to the subject");

*cf. FMC Corp. v. Capital Cities/ABC, Inc.*, 915 F.2d 300, 304 (7th Cir. 1990) (applying California law

and holding that "where the alleged converter has only a copy of the owner's property and the owner still

possesses the property itself, the owner is in no way being deprived of the use of his property"); *Tethys*

*Bioscience, Inc. v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 2009 WL 4722679, at *3 (N.D.

Cal. Dec. 9, 2009) (dismissing claim for conversion where plaintiff failed to "plead a legitimate claim to

exclusivity").  For this separate and independent reason, Plaintiffs' conversion claim should be

dismissed with prejudice.

### 6. Plaintiffs Fail To State A Claim For Common Counts, Assumpsit Or Restitution

Plaintiffs' final claim is a hodgepodge claim they have dubbed "common counts, unjust enrichment,

restitution and/or assumpsit."  AC ¶ 356.  The claim simply re-hashes Plaintiffs' earlier allegations and

further baldly alleges that "Defendants entered into a series of implied at law contracts with Plaintiffs . . .

that resulted in money being had and received by Defendants at the expense of Plaintiffs under

agreements in assumpsit."  AC ¶ 353.  Like the rest of the AC, the claim is baseless.

Plaintiffs' claim fails for the same reasons their other claims fail.  Courts decline to impose

implied-in-law contractual obligations where plaintiffs fail to allege actionable wrongdoing.  *See In re*

*Actimmune Mktg. Litig.*, 2009 WL 3740648, at *16 (N.D. Cal. Nov. 6, 2009) (noting that a claim for restitution cannot stand where plaintiffs fail to allege benefits "conferred by mistake, fraud, coercion, or request"); *Levine v. Blue Shield of Cal.*, 189 Cal. App. 4th 1117, 1138 (2011) (rejecting a claim for unjust enrichment where the court had also rejected the plaintiffs' tortious and statutory theories of liability); *Cadle Co. II v. Harvey*, 83 Cal. App. 4th 927, 931 n.6 (2000) (affirming demurrer to common count without leave to amend where claim was "based on [an] identical set of facts" as the breach of guaranty claim). Moreover, Plaintiffs have presented a single, conclusory allegation regarding the existence of "implied at law contracts" (AC ¶ 356)—an allegation that is plainly insufficient under *Twombly* and *Iqbal* and is belied by Plaintiffs' claims that they did not even know about the existence of the Mobile Industry Defendants.

Finally, to sue in assumpsit for an implied-in-law contract, a plaintiff must "waive the tort." *GA Escrow, LLC v. Autonomy Corp. PLC*, 2008 WL 4848036, at *7 (N.D. Cal. Nov. 7, 2008) (dismissing claims brought "in assumpsit" where plaintiffs did not waive their tort claims). Plaintiffs here have not waived their tort claims. Plaintiffs' claim for "common counts, unjust enrichment, restitution and/or assumpsit" should accordingly be dismissed with prejudice.[13]

## VI.   CONCLUSION

In its September 20 Order, this Court put Plaintiffs on clear notice of what facts they had to plead to avoid dismissal of any amended complaint. Despite being given sixty days to remedy the prior complaint's myriad substantive shortcomings, Plaintiffs have failed to cure *any* of them. This failure is not for lack of effort, creativity, or manpower. Rather, it is because the claims simply lack merit, and Plaintiffs have not been harmed by any of the conduct alleged in the AC (and thus lack standing). Allowing further amendment would be futile. The AC should be dismissed with prejudice. *See Sisseton-Wahpeton Sioux Tribe v. United States*, 90 F.3d 351, 356 (9th Cir. 1996) (affirming denial of leave to amend when further amendment "would be redundant and futile").

---

[13] Plaintiffs' claim for unjust enrichment/restitution also fails because, as this Court noted in its Order, "there is no cause of action for unjust enrichment under California law" (Order at 20), and any claim for "restitution" (which Plaintiffs would never be entitled to in any event) is a claim for a remedy (not a standalone legal claim).

Gibson, Dunn & Crutcher LLP

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

1    Dated:  January 10, 2012                    Respectfully submitted,

2                                                GIBSON, DUNN & CRUTCHER LLP

3                                                By:  /s/
                                                       S. Ashlie Beringer
4
                                                GAIL E. LEES
5                                               S. ASHLIE BERINGER
                                                JOSHUA A. JESSEN
6                                               GIBSON, DUNN & CRUTCHER LLP
                                                1881 Page Mill Road
7                                               Palo Alto, California  94304
                                                Telephone:  (650) 849-5300
8                                               Facsimile:   (650) 849-5333
                                                glees@gibsondunn.com
9                                               aberinger@gibsondunn.com
                                                jjessen@gibsondunn.com
10
                                                Attorneys for Defendant
11                                              FLURRY, INC.

12
     Dated:  January 10, 2012                    DURIE TANGRI LLP
13
                                                By:  /s/
14                                                     Michael H. Page

15                                              MICHAEL H. PAGE
                                                JOSEPH C. GRATZ
16                                              GENEVIEVE ROSLOFF
                                                DURIE TANGRI LLP
17                                              217 Leidesdorff Street
                                                San Francisco, California 94111
18                                              Telephone: (415) 362-6666
                                                Facsimile:  (415) 236-6300
19                                              mpage@durietangri.com
                                                jgratz@durietangri.com
20                                              grosloff@durietangri.com

21                                              Attorneys for Defendants
                                                GOOGLE INC. and
22                                              ADMOB, INC.

23

24

25

26

27

28

31
MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK

Dated:  January 10, 2012

COOLEY LLP

By: /s/
    Matthew D. Brown

MICHAEL G. RHODES
MATTHEW D. BROWN
COOLEY LLP
101 California Street, 5th Floor
San Francisco, California 94111
Telephone:  (415) 693-2000
Facsimile:  (415) 693-2222
rhodesmg@cooley.com
mbrown@cooley.com

Attorneys for Defendants
ADMARVEL, INC. and
MEDIALETS, INC.


## ATTORNEY ATTESTATION

Pursuant to General Order 45, I, S. Ashlie Beringer, hereby attest that the above-listed counsel have read and approved the MOTION TO DISMISS FIRST AMENDED, CONSOLIDATED CLASS ACTION COMPLAINT and consent to its filing in this action.

Dated:  January 10, 2012

GIBSON, DUNN & CRUTCHER LLP

By: /s/
    S. Ashlie Beringer

Gibson, Dunn & Crutcher LLP

MOBILE INDUSTRY DEFENDANTS' MOTION TO DISMISS
Case No. 11-MD-02250-LHK