Scott A. Kamber (*pro hac vice*)
skamber@kamberlaw.com
David A. Stampley (*pro hac vice*)
dstampley@kamberlaw.com
KamberLaw, LLC
100 Wall Street,  23rd Floor
New York, New York 10005
Telephone:  (212) 920-3072
Facsimile:   (212) 202-6364
*Interim Class Counsel*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

|  |  |
|---|---|
| IN RE IPHONE APPLICATION LITIG. | ) CASE NO. 5:11-MD-02250-LHK |
|  | ) **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:** |
|  | ) **1. CONSUMERS LEGAL REMEDIES ACT, CAL. CIV. CODE § 1750; and** |
|  | ) **2. UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200.** |
|  | ) **JURY DEMAND** |

The persons designated below as Plaintiffs ("Plaintiffs"), each on his or her own behalf and, collectively, on behalf of all others similarly situated (the putative "Classes"), pursuant to the Court's June 12, 2012 Order, assert the following allegations against Apple Inc. ("Apple") based on each Plaintiff's personal knowledge of his or her own acts and observations and, otherwise, upon information and belief based on investigation of counsel. To the extent this Second Amended Consolidated Class Action Complaint ("Complaint") refers to actions directed at Plaintiffs, such allegations also refer to actions directed at the Class Members as well.

## I.  NATURE OF CASE

1.      During the Class Periods (as defined below), Plaintiffs had personal data collected from their respective iPhones using Apple-approved mobile applications ("Apps"), or after they explicitly turned the Location Services function of their iPhones[1] "Off" to avoid such collection. The data transmitted from the Plaintiffs' iPhones is capable of identifying each of the Plaintiffs, their approximate geographic location, and/or both, and was collected for purposes unrelated to the use and functionality of their iPhones and the Apps installed on the Plaintiffs' respective devices.

2.      The Plaintiffs were neither informed of, nor consented to, the siphoning of this data from their iPhones and no mechanism was in place during the relevant time periods that provided the Plaintiffs with the ability to "opt-out" of such data transmissions. Among other data, examples of the nature of the information collected from Plaintiffs' iPhones include, but are not limited to: Plaintiffs' geolocation (i.e., current whereabouts); the unique device identifier ("UDID") assigned to Plaintiffs' iPhones; the personal name assigned to the device (e.g., "Beth's Phone"); Plaintiffs' gender, age, zip code, and time zone, as well as App-specific activity such as which functions Plaintiffs performed using the App; search terms entered; and Plaintiffs' selections of movies, songs, and restaurants.

---

[1]      Although Plaintiffs used different hardware versions of the iPhone, each Plaintiff's iPhone functioned in a substantially identical manner. The term "iPhone" and "iDevice" is used interchangeably throughout this Complaint.

3.      Furthermore, Plaintiffs' personal information transmitted through the Apps was not adequately protected pursuant to standard security practices in place at the time, and thus exposed the Plaintiffs to unexpected and unreasonable risks of interception by third parties. These poor security practices ran contrary to well-established industry practices and to specific representations made by Apple about the iPhones at the time of Plaintiffs' purchases.

4.      As a result of Apple's conduct detailed herein, each of the Plaintiffs had the resources of their iDevice consumed and diminished without their permission. Such resources were measurable and of actual objective monetary valuation, including, but not limited to iDevice storage, battery life, and bandwidth from each Plaintiff's wireless services provider. The monetary value of the resources taken from Plaintiffs is generally quantified below and provable by objective measures.

5.      Had Plaintiffs known of the actual characteristics of their iPhones, Plaintiffs would not have purchased iPhones or, would not have otherwise paid the price listed for the devices.

## II.  INTRODUCTION

**A.      The ability to access and use third party Apps (that do not surreptitiously transmit private information), is included in the purchase price of an iPhone.**

6.      Since the launch of Apple's iPhone 3G in 2008, the primary emphasis of its iPhone marketing campaigns has been on the availability in Apple's proprietary "App Store" marketplace of third party Apps available for use with the device—not the ability of the mobile phone devices to make phone calls.[2]

7.      Because of the manner in which Apple developed the iPhone and constructed the App Store, consumers are only able to use their iPhones in the confines of an environment controlled by Apple.

8.      All of Apple's iPhones consist of two inseparable components: the iPhone hardware and the operating system firmware ("iOS"). As Apple has stated, "The iPhone firmware is

---

[2]      Apple simultaneously launched its iPhone App Store to coincide with the release of the 3G iPhone.

not itself a product; it is a component of the iPhone mobile computing product."[3] Apple also stated that its iPhone 3G was purposely "designed to allow iPhone owners to safely and reliably download third party applications."[4]

9.     Apple maintains complete control over the iPhone's functionality with respect to Apps in the marketplace and strictly regulates the Apps that are available in the App Store. All Apps that are made available in the App Store can only be created using Apple-supplied and developed software development kits ("SDKs"). Moreover, the Apps can only collect information and data from Plaintiffs' iPhones as allowed by Apple, and they can only be distributed in Apple's App Store upon Apple's approval.

10.     Apple extensively promotes the privacy and security measures it uses to protect consumers who use iPhones and download Apps from the App Store.

11.     Plaintiffs purchased an iPhone for a price ranging from $199 to $399, and downloaded purportedly "free" Apps from the App Store, as detailed more fully below. Included in the purchase price of Plaintiffs' iPhones was a premium, based upon the customer's ability to access what was purported to be thousands of "free" third party Apps available in the App Store.

12.     Apple induced Plaintiffs to purchase iPhones, at least in part, by offering thousands of so-called "free" Apps in its App Store. However, during the relevant time period, Apple failed to disclose to Plaintiffs that, inter alia, those "free" apps collected Plaintiffs' information and sent it to third parties, such as mobile advertising and analytics companies, without user consent or detection by the Plaintiffs.

13.     For example, when Plaintiffs use Apps such as the Dictionary.com App, Paper Toss App, and Urban Spoon App, those Apps routinely send information about Plaintiffs to Flurry, Inc. ("Flurry"), a third-party that amasses and analyzes such data. Flurry received Plaintiffs' device identifier information which it used to uniquely identify and track Plaintiffs, as

---

[3]     Responsive Comment of Apple Inc., In the matter of Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Docket No. RM-2008-8 (U.S. Copyright Office), at 18 (Dec. 1, 2008) ("Responsive Comment").
[4]     See *id*. at 4-5.

well as other private details such as what search terms they entered, which words they looked up in the dictionary, or even whether they shook the iPhone to allow the Urban Spoon app to choose a nearby restaurant. Yet, Apple failed to give the Plaintiffs a clue that they were being watched, across their Apps, by the largest mobile analytics company in the world. Worse yet, all the information transmitted by and through the Apple approved Apps to third parties was transmitted in an unreasonably unsecure manner, in conflict with acceptable standards, and in a way that is well recognized as easily intercepted by even an unsophisticated hacker located near a wireless hotspot.

14.     During the relevant time period, Plaintiffs had no means to otherwise avoid the data collection and tracking by Apple and the third party Tracking Companies, described below. As noted above, and detailed below, Apple controls the ecosystem in which its iPhones operate, and Apple controls what data Apps can and cannot transmit to third parties. Most importantly, Apple controls the fact that its customers are kept in the dark regarding the level of spying and data collection that is actually built into Apple's ecosystem.

15.     Apple obtains revenue by marketing the ostensibly "free" Apps, and the availability of "free" Apps is tied to the availability of free data from spying on Plaintiffs and other iPhone purchasers, who had no idea what they are giving up, in terms of personal data, when they pay for an iPhone.

16.      Plaintiffs were not fully informed by Apple that, to use "free" Apps or geolocation features on their iDevices, Plaintiffs would unknowingly provide data that would allow the third parties to personally identify them, and thereafter give the third parties full access to any user data on their iDevices as detailed below.

17.     Plaintiffs purchased the iPhone believing the purchase included the advertised features provided by the plethora of "free" Apps available, unaware of the undisclosed costs imposed by Apple, including the appropriation of their iDevice resources and bandwidth, as well the exploitation of their personal information.

18.     Steve Jobs, Apple's founder and former CEO, put it most succinctly in a *Time* magazine interview in 2002: "Our job is to take responsibility for the complete user experience.

And if it's not up to par, it's our fault, plain and simple."

19. Apple should not be permitted to now disclaim liability for the duties it so publicly undertook, but failed to fulfill, or for its own active role in facilitating and fostering an environment that encouraged routine violations of Plaintiffs' reasonable expectations and Apple's own public assurances.

20. Had Plaintiffs known of such practices, they would not have purchased iPhones or would not have paid the amount that they did for the devices.

**B.    The ability to enable or disable Location Services to prevent real-time tracking of a user's movements is also included in the purchase price of an iPhone.**

21. By and through its documentation and public statements—including statements to the United States Congress—Apple claimed that iPhone customers could avoid having any geolocation information transmitted from their devices by turning the iPhone's Location Services "Off."

22. However, and in direct contravention to the statements made by Apple and its representatives, during the relevant time period Apple designed the iPhone to continue sending such data to Apple's servers—even when a user switched "Off" Location Services.

23. As a result of the above, Geolocation Class members who had their respective "Location Services" turned to "off" could not prevent Apple from collecting data about their real-time locations.

24. Had Plaintiff Gupta, an iPhone user who turned Location Services "Off", and other members of the Geolocation Class as defined below, known of such practices, they would not have purchased iPhones, or would have paid significantly less for them.

### III.  PARTIES

**A.    Plaintiffs**

25. Plaintiffs ("Plaintiffs") are United States residents who purchased mobile devices manufactured by Defendant Apple Inc., that operate using Apple's proprietary operating system, iOS.

26.     Plaintiff Dustin Freeman, a resident of Arlington, Texas, purchased an iPhone 3GS from Apple in or around December 2009, for which he paid over $200.

27.     Plaintiff Anthony Chiu, a resident of California, purchased an iPhone 4 in or around June 2010, for which he paid $299.

28.     Plaintiff Heather Kimbrel, a resident of California, purchased an iPhone 4 in or around August 2010, for which she paid $250.

29.     Plaintiff Marcia W. Burke, a resident of Alabama, purchased an iPhone in or around December 2007, for which she paid $200.

30.     Plaintiff William C. Burke III, a resident of Alabama, originally purchased an iPhone in or around December 2007, which he traded in for an upgraded iPhone in or around December 2010.

31.     Plaintiff Cameron Dwyer, a resident of California, originally purchased an iPhone in or around Summer 2010, which he replaced with an iPhone 3Gs in or around Fall 2011.

32.     As to each and every Plaintiff named above:

a.     They downloaded and used numerous free Apps from the App Store during the Class Period, and each was subjected to the collection of personal information and information about their iDevices by third party mobile advertising and analytics companies.

b.     At no time did any of the above-named Plaintiffs authorize Apple or any App to cause such information to be shared with any third-party advertising network or analytics provider, or be used for third party advertising purposes.

33.     Plaintiff Arun Gupta, a Georgia resident, purchased an iPhone 4G in or around December 2010.

34.      During the relevant time period, Mr. Gupta set the Location Services function on his iPhone to "Off." Notwithstanding his attempt to turn off geolocation tracking, it appears that data revealing his geolocation was nonetheless transmitted to Apple. Had Plaintiff Gupta known that he would be unable to effectively disable Location Services, he would have paid significantly less money for his iPhone.

**B.      Defendant Apple**

35.      Defendant Apple Inc. is a California corporation with its principal place of business at 1 Infinite Loop, Cupertino, California 95014.

36.      Apple is the maker of the Apple iPhone and the developer of iOS, the operating system that runs those devices.

37.      Apple developed and operates the Apple iTunes App Store ("App Store"). Apple also reviews and approves each and every App that it offers in the App Store.

**C.      Third Party Tracking Companies**

38.      The third party entities and companies named below, collectively referred to as the "Tracking Companies," collect personal information transmitted from Plaintiffs' iDevices, including, but not limited to, data collected and used for purposes unrelated to the functionality of Plaintiffs' iDevices or the execution of the Apps on those devices.

39.      Flurry is a Delaware corporation with its principal place of business in San Francisco, California. Flurry is an advertising content and analytics provider for mobile device applications. Specifically, Flurry assists App developers by providing "demographic, geographic and user interest data." Flurry explains that "[w]hile having age and gender is powerful, once you add geography to the mix, you have the trifecta for how any audience is described… Flurry Analytics gives you all three, automatically." In addition, Flurry touts that "Flurry shows you what other apps your consumers use…."

40.      AdMarvel, Inc. ("AdMarvel") is a Delaware corporation with its principal place of business in San Mateo, California. AdMarvel is a mobile advertising provider that partners with other advertising networks to provide mobile advertising content to mobile devices. AdMarvel schedules, serves and tracks ad units, states that it enables clients to "track and monetize [their] mobile audience," and purports to be able to target handsets, campaigns, and operating systems, and leverage demographics, page content and keywords.

41.      Google, Inc. ("Google") is a company organized and existing under the laws of the State of Delaware, with its principal place of business located in San Mateo, California. Google operates the ad network DoubleClick, and provides analytics services through Google

1    Analytics.

2        42.    AdMob, Inc. ("AdMob") is a company organized and existing under the laws of

3    the State of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Suite

4    225, Mountain View, CA 94043. AdMob, which was acquired by Google in 2009, purports to

5    be "the world's largest mobile advertising marketplace" offering "both advertisers and publish-

6    ers the ability to target and personalize advertising to their customers in 150 countries." Admob

7    offers "sophisticated targeting options [which] include demographics, interests and behavioral,

8    device and carrier, keyword and remarketing." In particular, AdMob accesses the GPS location,

9    application package name, and application version information from iDevices. Additionally, for

10   some Apps, it appears that AdMob transmits Plaintiffs' and Class Members' birthday, gender,

11   and postal code information, from which it has been demonstrated that there is an extremely

12   high probability that the unique user of the device can be determined.

13       43.    Medialets, Inc. ("Medialets"), is a Delaware corporation with its principal place

14   of business at 450 West 15th Street, Suite 200, New York, New York 10011. Medialets is a

15   provider of analytics services for mobile devices.

16       44.    Regarding third-party data analytics company, **Flurry**:

17           a.    Through Dictionary.com App, Flurry repeatedly collected the following

18   from Plaintiff Chiu during his use of the App: which words Plaintiff looked up; the titles of par-

19   ticular pages in the App Plaintiff viewed; and the particular App activities Plaintiff used (*e.g.*,

20   search, view, Word of the Day).

21           b.    Through the Urban Spoon App, which locates area restaurants, Flurry

22   collected from Plaintiff Chiu the titles of particular App pages he viewed and the particular

23   App activities in which he engaged (*e.g.,* search, view), including whether he shook his iPhone

24   to activate Urban Spoon's restaurant-suggestion function.

25           c.    Each time Flurry collected the information from Plaintiff as he used the

26   above-indicated Apps, Flurry also collected additional information from Plaintiff's iDevice that

27   included, without limitation: UDID; device type (*e.g.*, "iPhone," "iPad") and model; name of

28

Second Amended Consolidated                    9                    5:11-md-02250-LHK
Class Action Complaint

the device's operating system and operating system version; Plaintiffs' time zone; and language.[5]

45.     Regarding third-party mobile ad network, **AdMarvel**:

a.      Through the Dictionary.com App, AdMarvel repeatedly collected the following information from Plaintiff Chiu and, with each use of the app: UDID; network type (*e.g.*, 3G or WiFi); and the name of the device's operating system and operating system version. In addition, AdMarvel collected Plaintiff's carrier-assigned user name (*e.g.*, "JOHN'S PHONE").

b.      The Pandora app, which allows a user to receive streamed, customized music selections, was installed and used by Plaintiffs Dwyer, Chiu, Freeman, Kimbrel, William C. Burke III, and Marcia W. Burke. AdMarvel tracked each of the Plaintiffs using a unique identifier—not the iDevice UDID—but an identifier AdMarvel downloaded from DoubleClick, an unaffiliated third-party ad network owned by Google.

c.      In addition, the Pandora App included code causing the unaffiliated third-party ad network, AdMarvel, to be contacted and sent information regarding Plaintiffs that included: date of birth, gender, income, education level, and partners sought.

46.     Regarding third-party ad network, **DoubleClick**:

a.      Through the Pandora App, DoubleClick collected the following information from Plaintiffs Dwyer, Chiu, Freeman, Kimbrel, William C. Burke III, and Marcia W. Burke: age, gender, zip code, particular song and performer selected, and music genre, all linked to the unique identifier that DoubleClick shares with AdMarvel.

b.      Through the Flixster App, DoubleClick collected the following information from Plaintiff Chiu: an identifier for the particular movie for which Plaintiff requested information, genre, movie rating, and whether a "Certified Fresh" review was available from Flixster's Rotten Tomatoes website.

---

[5]      Reportedly, after this litigation was commenced Apple indicated that it would limit the availability of some device data in future iOS versions. Even if so, millions of iPhone purchasers continue to use a prior iOS version.

c.      In addition, through the Flixster App, DoubleClick collected Plaintiff Chiu's information regarding type of device operating system; whether or not an SD memory (data storage) card was installed on Plaintiff's iPhone; whether the iPhone was "jail-broken" (modified by users); and keywords for other data values.

d.      Through the Weather Channel App, DoubleClick collected the following information from Plaintiffs Freeman and Kimbrel: Plaintiff's zip code and iDevice model (*e.g.*, iPhone 4G).

e.      Through the Urban Spoon restaurant search App, DoubleClick collected the following information from Plaintiff Chiu: UDID and fine (GPS-based) location information. In addition, the App sent the following information about Plaintiff's use of the app: type of search and food type.

47.    Regarding third-party analytics company, **Google Analytics**:

a.      Through the Dictionary.com App, Google Analytics collected the search terms entered by Plaintiff Chiu.

b.      Through the Flixster App, Google Analytics collected the following information from Plaintiff Chiu: the particular movie for which Plaintiff requested information, Plaintiff's activity within the app, pages (including movie information and theater information pages) viewed by Plaintiff; and the name of the iDevice's operating system and operating system version.

48.    Regarding third-party mobile analytics provider, **Medialets**:

a.      Through the Weather Channel App, Medialets collected the following information from Plaintiffs Freeman, and Kimbrel: UDID; the name of the device's operating system; and iDevice model (*e.g.*, iPhone 4G), and app name.

b.      In addition, Medialets downloaded to each Plaintiffs' iDevices a 1-2 megabyte zip archive with which Medialets created an advertising-related SQLite database in Plaintiffs' iDevice's data storage area, consuming bandwidth resources for the download process and, subsequently, device storage resources.

49.     In sum, of the above-mentioned Apps downloaded and used by Plaintiffs, the information collected from each Plaintiff and transmitted to third parties included:

a.     From Plaintiff Dwyer: age, date of birth, gender, zip code, income, education level, partners sought, particular song and performer selected, and music genre, all linked to the unique identifier that DoubleClick shares with AdMarvel.

b.     From Plaintiff Chiu: fine (GPS) location information, network (e.g., 3G or WiFi), name of the device's operating system, operating system version, the amount of free storage space on iDevice, the carrier-assigned phone name (e.g., "Jim's phone"), and the phone's unique device identifier (UDID), Plaintiff's age, Plaintiff's gender, Plaintiff's app ID and password for specific App accounts, the search term entered by Plaintiff, time zone, language, Plaintiff's zip code, the name of the app, the title of particular app page viewed by Plaintiff, the particular app activity engaged by Plaintiff (*e.g.*, search, view), Plaintiff's particular media selection (*e.g.*, song, video), the genre of media selected by Plaintiff, and the performer in Plaintiff's media selection.

c.     From Plaintiff Freeman: fine (GPS) location information, name of the device's operating system, operating system version, iDevice model (e.g., iPhone 3GS), and the phone's unique device identifier (UDID), Plaintiff's age, Plaintiff's gender, Plaintiff's app ID and password for specific App accounts, Plaintiff's zip code, the name of the app, the title of particular app page viewed by Plaintiff, the particular app activity engaged by Plaintiff (e.g., search, view), Plaintiff's particular media selection (e.g., song, video), the genre of media selected by Plaintiff, and the performer in Plaintiff's media selection.

d.     From Plaintiff Kimbrel: fine (GPS) location information, name of the device's operating system, operating system version, iDevice model (e.g., iPhone 3GS), and the phone's unique device identifier (UDID), Plaintiff's age, Plaintiff's gender, Plaintiff's app ID and password for specific App accounts, Plaintiff's zip code, the title of particular app page viewed by Plaintiff, the particular app activity engaged by Plaintiff (e.g., search, view), Plaintiff's particular media selection (e.g., song, video), the genre of media selected by Plaintiff, and the performer in Plaintiff's media selection.

e.     From Plaintiff Marcia Burke: age, date of birth, gender, income, educa-tion level, partners sought, zip code, particular song and performer selected, and music genre, all linked to the unique identifier that DoubleClick shares with AdMarvel; and

f.     From Plaintiff William C. Burke, III: age, date of birth, gender, income, education level, partners sought, zip code, particular song and performer selected, and music genre, all linked to the unique identifier that DoubleClick shares with AdMarvel;

50.     In addition to the personal information transmitted to third parties, Plaintiffs' Apps were able to access and transmit Plaintiffs' personal information to the Apps themselves, including information such as: fine (GPS) location information, network (*e.g.*, 3G or WiFi), name of the device's operating system, operating system version, the amount of free storage space on the iDevice, and the phone's unique device identifier (UDID), Plaintiff's app ID and password for specific App accounts, the search term entered by Plaintiff, the title of each par-ticular app page viewed by Plaintiff, and the particular app activity engaged by Plaintiff (e.g., search, view).

51.     Not only was Plaintiffs' personal information transmitted to the above-named third parties and to the Apps themselves, but all of Plaintiffs' information listed above was transmitted "in the clear" (sometimes referred to as "plain text"), that is, without encryption.

52.     Such transmission in the clear was substandard in light of reasonably accepted security measures, exposing each Plaintiff to unreasonable risks of the interception of their per-sonal information, well understood to be associated with such poorly secured transmission.[6]

53.     Such unsecured transmissions were particularly inappropriate given the nature of mobile devices and Apps through which such information was transmitted because of the likelihood of using mobile devices and such Apps in mobile hot-spots, which often employ no

---

[6]     According to the National Institute for Standards and Technology (NIST), "Mobile de-vices have a broad attack surface including Bluetooth, Wi-Fi, and cellular communications in-terfaces as well as protocols for Web transactions," and "[s]ensitive data should be encrypted during data transmission and when stored on the device or in external memory cards." Wayne Jansen, Karen Scarfone, *Recommendations of the National Institute of Standards and Technol-ogy: Guidelines on Cell Phone and PDA Security*, U.S. Dept. of Commerce, NIST, SP 800-124 at 3-2 (Oct. 2008).

security settings to protect wireless communications,[7] and because of the likelihood that many users of such Apps will be minors.

## IV.  JURISDICTION AND VENUE

54.     This Court has subject-matter jurisdiction over this action pursuant to:

a.     Title 28, United States Code, Section 1331; and

b.     The Class Action Fairness Act of 2005, 28 U.S.C. Sections 1332(a) and (d), because there are over 100 class members, the amount in controversy exceeds $5,000,000.00 exclusive of interest and costs, and more than two thirds of the members of the Class are citizens of states different from those of Defendant.

55.     Under CAFA, the federal courts have exclusive jurisdiction over all actions with an amount in controversy in excess of $5,000,000. Here, the statutory claims have a value far in excess of that amount, which establishes jurisdiction.

56.     Venue is proper in this District under Title 28, United States Code, Section 1391(b) because Defendant's improper conduct alleged in this complaint occurred in, was directed from, and/or emanated from this judicial district, and Defendant Apple is a California corporation with its principal place of business in this district.

57.     Each of the Plaintiffs has standing to bring this case under Article III of the United States Constitution as follows:

a.     Plaintiffs have standing by virtue of alleging concrete, tangible and non-speculative injuries in fact, arising from violations of statutes at issue herein, that create legal rights, the invasion of which creates standing;

b.     Plaintiffs and the Class members are within the zone of persons sought to be protected by these statutory provisions, and if Plaintiffs cannot protect such interests and seek either remuneration or injunctive relief, they would have no mechanism available to hold Defendant accountable for such misconduct;

c.     Plaintiffs have each suffered harm and economic injury as a result of De-

---

[7]     See "US-CERT Cyber Security Tip ST05-003 – Securing Wireless Networks" at http://www.us- cert.gov/cas/tips/ST05-003.html.

1  fendant's actions which have caused Plaintiffs to pay more for their iDevices than they other-

2  wise would have;

3      d.   Plaintiffs have each suffered harm and economic injury as a result of Ap-

4  ple allowing the third party Tracking Companies to surreptitiously include in App software cer-

5  tain code components that Plaintiffs would not reasonably have expected to be included, and

6  which were installed, along with the expected software, on their devices without their permis-

7  sion, and which consumed portions of the "cache" and/or gigabytes of memory on their devic-

8  es—memory that Plaintiffs paid for the exclusive use of when they purchased their iDevices;

9      e.   Plaintiffs' personal data is property[8] that was obtained by third parties

10  that Plaintiffs did not know, and who did not have Plaintiffs' permission to access such data in

11  the absence of Plaintiffs' and Class members' knowledge or consent. Plaintiffs' personal prop-

12  erty data and/or personal data assets include but are not limited to UDID information, demo-

13  graphic information, geolocation information, and application usage habits;

14      f.   Plaintiffs have each suffered harm and economic injury as a result of De-

15  fendant's conduct which has imposed undisclosed data transmittal costs on Plaintiffs;

16      g.   Defendant's conduct caused harm to the value and security of Plaintiffs'

17  personal, and personally identifiable, information;

18      h.   Defendant's conduct caused harm by failing to disclose that the Tracking

19  Companies would use its iOS and the Apps it distributed through the App Store to collect Plain-

20  tiffs' personal information, to de-anonymize Plaintiffs and to personally identify them, and their

21  activity;

22      i.   The data collected from Plaintiffs and Class Members is raw material

23  that has an independent, objective market value to both Plaintiffs and Defendant and the Track-

---

[8]   *See* P. Schwartz; Property, Privacy and Personal Data, 177 Harvard L. Rev. 2005 (2004) (describing four hallmarks to property in the form of personal data: (1) it is inalienable in that consumers have a right to say who does and who does not have access to such information and can limit its transferability, ownership or use; (2) the right to opt in or opt out of the sharing or use of such information; (3) the right to exit out of any data trading processes once that initial selection is made; and (4) a quantifiable loss attributable to the unauthorized access to such data or using it beyond the consent provided by consumers).

ing Companies. It is separate and unique to each Plaintiff, respectively;

j.    Plaintiffs and members of the Class suffered damage and were injured in fact by having lost control of their personal data assets;

k.    The Tracking Companies have placed an independent value on such data by paying market-set prices to access Plaintiffs' data;

l.    Plaintiffs lost and have not been compensated for the value of such data, and Defendant has infringed the inherent property right to control such data;

m.    Plaintiffs possess an ownership interest in their data that belongs to them and is subject to their control and alienability, and is a valuable commodity that has a property market value to advertisers. Plaintiffs thus have had property, with an independent value taken from them, by it passing beyond their control, without compensation;

n.    As such information was taken without their full knowledge or consent, and without Plaintiffs having obtained any compensation for the raw material taken from them, such a loss constitutes a classic Article III injury in terms of an uncompensated loss for which this Court can provide redress.

58.    As with any form of property, Plaintiffs, as the owners, should be compensated for the use and exploitation thereof, and if they are not, they suffer concrete, measurable damage and injury, the exact amount of which shall be provided by Plaintiffs through expert opinion.

**V.  GENERAL ALLEGATIONS**

**A.    The Sale and Use of iDevices**

59.    Apple manufactures, licenses, distributes, and promotes iDevices, including the iPhone, throughout the country, including in the State of California.

60.    Apple materially misrepresented the true cost of the iDevices and/or omitted material information from its representations.

61.    Plaintiffs and Class Members relied upon Apple's representations with respect to the cost of their iDevices, the availability of "free" Apps, and the ability to opt-out of geolocation tracking, in making their purchasing decisions, and the omission of material facts to the

1  contrary was an important factor in their purchasing decisions.

2      62.     Apple has represented to Plaintiffs and consumers, expressly or by implication,

3  that the App Store does not permit apps that "violate[] our developer guidelines" including apps

4  containing pornography, apps that violate a users privacy, and apps that hog bandwidth.

5      63.     Apple has represented to Plaintiffs and consumers, expressly or by implication,

6  that: "Apple takes precautions—including administrative, technical, and physical measures—to

7  safeguard your personal information against loss, theft, and misuse, as well as against unauthor-

8  ized access, disclosure, alteration, and destruction."

9      64.     Plaintiffs were not informed as to the true cost of their iDevices due to the lack

10  of disclosures about third party tracking, tracking by Apple (even when Location Services were

11  set to "Off"), the data transmittal and storage costs that would be imposed, and the iDevice re-

12  sources that Apple and the Tracking Companies would secretly consume.

13      65.     Plaintiffs and Class Members would not have purchased their iDevices and/or

14  would not have paid as much for them, if Apple had disclosed the true facts that it and the

15  Tracking Companies would surreptitiously obtain personal information from their iDevices,

16  track their activity and geolocation, and consume portions of the "cache" and/or gigabytes of

17  memory on their devices—memory that Plaintiffs paid for the exclusive use of when they pur-

18  chased their iDevice.

19      66.     Because Apple did not disclose the true costs of their iDevices, Plaintiffs were

20  misled into purchasing a product that did not meet their reasonable expectations.

21      67.     Given the undisclosed costs imposed by using the iDevice, it was not as valuable

22  to Plaintiffs as the price they paid for it.

23      68.     Apple's competitors manufacture, market, and distribute comparable mobile de-

24  vices that do not collect personal information and track Plaintiffs without permission, or ade-

25  quately disclose those material facts.

26      69.     Plaintiffs and Class Members paid a premium for their iDevice, in part because

27  of Apple's material misrepresentations and omissions about the availability of a large number

28  of "free" Apps that were not actually free, as Plaintiffs reasonably believed.

70.     "Since the introduction of the App Store, overall consumer response to the iPhone itself increased dramatically."[9] While it took 74 days for Apple to sell one million units of its 1st generation iPhone, consumers purchased one million App-ready 3G iPhones in just 3 days.

71.     The Apple App Store was a market differentiator that not only set Apple iPhones apart from its handset competitors but set the newly released iPhone 3G, with its 2.0 iOS operating system apart from prior generations of iPhones. In the post 3G 2.0 iOS era, the success of Apple's iPhones sales is inextricably linked to consumers' access to its App Store.

72.     Plaintiffs and Class Members suffered actual damages as a result of Apple's acts and omissions. Specifically, as a proximate result of Apple's conduct, Plaintiffs and other Class Members suffered monetary losses, i.e., the purchase price of the iDevice, or at a minimum, the difference of the inflated price and the price Apple should have charged for a product that fully disclosed all the costs hidden by Apple.

73.     iDevices and Apps are now used by many consumers in almost all facets of their daily lives. Among others, there are Apps for business use, such as contact management and business expense tracking; for personal finance use, such as trading and banking; as well as for media, news outlets, and education (such as childbirth education and children's math learning); and entertainment, such as movie reviews and electronic games.

74.     Every App in the App Store, whether free or paid, must be approved by Apple and digitally signed by Apple. Both Apple and third-party developers create numerous Apps that are available from the App Store, whose offerings now exceed 600,000 Apps.

75.     Apple has complete discretion as to whether it will allow an App to be sold in the App Store.

76.     Apple requires that proposed Apps go through a rigorous approval process. Even if an App meets the "Program" requirements (as Apple describes it), Apple may still reject the App for any reason. It is estimated that approximately 20 percent of all third-party requests to

---

[9]     Responsive Comment, at 5.

place Apps for sale in the App Store are rejected by Apple.

77.     iDevice users are only allowed to download software specifically licensed by Apple and available on the iDevice out of the box or through the App Store.

78.     If a user installs any software not approved by Apple, the users' warranty is voided. When a user installs Apple's updates to the iDevice operating system, Apple takes the opportunity to erase any non-licensed software on the device. Apple claims this control is necessary to ensure the "tightly integrated," smooth functioning of the iDevice.

79.     Even after a user downloads an approved App, Apple maintains control by requiring that the end-user license agreement for every App include a clause giving Apple the ability to step into the shoes of the App developer and sue the end-user. To the extent Apple is a third party beneficiary of that contract, then Plaintiffs are intended third party beneficiaries of any contract between the App developer and Apple that requires the protection of, and restricts access to, personal consumer information contained on the iDevice. Specifically, the iOS Developer Agreement states:

> **9. Third Party Beneficiary:** You and the end-user must acknowledge and agree that Apple, and Apple's subsidiaries, are third party beneficiaries of the EULA, and that, upon the end-user's acceptance of the terms and conditions of the EULA, Apple will have the right (and will be deemed to have accepted the right) to enforce the EULA against the end-user as a third party beneficiary thereof.

**B.     Apple Controls the Development Process for Apps Available for iDevices**

80.     In addition to controlling the characteristics and distribution of Apps, as described above, Apple exercises substantial control over their development and functionality.

81.     A third party who wants to sell an App from the Apple App Store is required to pay to enroll in the iPhone Developer Program.

82.     The third party must also agree to the terms of Apple's iPhone Developer Program License Agreement ("iOS Developer Agreement"). The iOS Developer Agreement is, by its terms, confidential, and prohibits the third party from making any public statements about the agreement, its terms and conditions, or the third party's relationship with Apple without Apple's prior written approval.

83.     The third party must create the App using Apple's Software Development Kit software (SDK), which can only be installed on an Apple computer. An App developed using Apple's SDK will only function on iDevices and can only interact with the iDevice operating system and features in the ways permitted by the iOS Developer Agreement and SDK.

**C.    Apple Uses Plaintiffs' Personal Information to Lure Low Cost Apps to its App Store.**

84.     Apple's relationship with its App developers is clearly symbiotic—Apple needs to have a healthy stable of low cost or free Apps available in its App Store to satisfy customer demands for the ability to customize their iDevices.

85.     Apple takes steps to satisfy App developers' monetary requirements in order to encourage App developers to continue to provide a steady stream of low cost or free Apps for distribution in the App Store.  The primary way Apple has done this is by ensuring that App developers have maintained access to a steady supply of valuable information about Plaintiffs. The App developers then use that information about Plaintiffs to obtain advertising revenue from the Tracking Companies.

86.     One of the most valuable pieces of information that the Tracking Companies obtain is access to Plaintiffs' Apple-assigned UDID information. Apple knows the Tracking Companies obtain and use the UDID from Plaintiffs' iDevices, but to date, Apple has not implemented an end to that practice or meaningfully enforced any policy against it.

87.     Apple understands the significance of identifiers such as its UDID in regards to users' privacy. Indeed, internally, Apple claims that it treats UDID information as "personally identifiable information" because, if combined with other information, such as other information easily available on the iDevice, it can be used to personally identify a user. This is due to the *globally* unique nature of a UDID—no other device bears the same identifying number.

88.     That is exactly what happened with each Plaintiff in this litigation, as well as with all of the members of proposed iDevice Class: Plaintiffs' UDID information, along with other data like geographic location data was collected by each Tracking Company, such that each Tracking Company was able to personally identify each Plaintiff. Once this was accom-

1  plished, every other piece of information collected by the Tracking Companies was tied to

2  Plaintiffs' respective identities and used to further build a more complete profile of Plaintiffs.

3       89.    Because Plaintiffs' UDID is unique to each iPhone, and because each Plaintiff is

4  the only, or at least the primary, user of their iDevice, the UDID proved to be an invaluable fea-

5  ture for the Tracking Companies who were looking for a means of reliably identifying and

6  tracking Plaintiffs' online activities. It was completely foreseeable to Apple that this would oc-

7  cur and, in fact, was to Apple's direct benefit. Apple knowingly and intentionally allowed the

8  Tracking Companies to access Plaintiffs' iDevices' UDID and chose not to provide Plaintiffs

9  with any means to disable the iDevice's UDID from being tracked, or to restrict third-party ac-

10  cess to the UDID.

11       90.    Because of the items of personally identifiable information transmitted from

12  each Plaintiff, otherwise non-identifiable information then becomes associated with Plaintiffs'

13  identity, so that otherwise non-identifiable information also becomes personally identifiable in-

14  formation.

15       91.    Apple allowed third parties access to that information, yet Apple represented to

16  Plaintiffs that it did not allow Apps that violate Plaintiffs' privacy.

17       92.    Apple appeared to recognize the conflicted nature of its approach, as, in April of

18  2010, Apple amended its Developer Agreement to purportedly ban Apps from sending data to

19  third parties, except for information directly necessary for the functionality of the App. Apple's

20  revised Developer Agreement provided that "the use of third party software in Your Application

21  to collect and send Device Data to a third party for processing or analysis is expressly prohibit-

22  ed."

23       93.    However, Apple faced a mountain of criticism over this change, so in September

24  2010, it amended its Developer Agreement again for a significant exception—to allow trans-

25  mission of data for advertising purposes (but not for data compilation and analytics purposes).

26       94.    These changes were not engendered by a concern over consumers' data, howev-

27  er, but only by a concern for protection of **Apple's own device data**. Ironically, Apple discov-

28  ered that third party analytics companies such as Flurry were able to obtain device data about

1  unreleased Apple prototypes (that were used for internal purposes on the Apple campus), be-

2  cause such data was being transmitted via Apps that Apple had installed on the devices. Neither

3  of Apple's amendments to its Developer Agreements directly addressed use or misuse of UDID

4  data.

5       95.    After the filing of this lawsuit, however, Apple quietly signaled a future policy

6  change regarding third-party access to UDID information. With the introduction of its iOS

7  5operating system, Apple indicated that it was considering steps to finally stop Apps from shar-

8  ing UDID information, but not before Plaintiffs and members of the class were significantly

9  harmed.

10       96.    In June 2010, with the release of its iOS 4 operating system, Apple began inten-

11  tionally storing geographic location information (consisting of longitude and latitude coordi-

12  nates) in a file on the iDevice. The geographic location information was pulled either from wi-

13  fi towers or cell phone towers in Plaintiffs' vicinity, and in some cases from the GPS data on

14  Plaintiffs' own iDevices. This data was unknowingly uploaded by Plaintiffs every time they

15  synchronized ("synced") their iDevice to their home computer or another Apple device, by op-

16  eration of iOS. Upon information and belief, the file data was, unbeknownst to Plaintiffs, also

17  available through Apps to third party marketers.

18       97.    As Apple explains in its patent application for the iOS 4 operating system (U.S.

19  Patent Application Number 20110051665): "The location history can be used to construct a

20  travel timeline for the location aware device. The travel timeline can be displayed in a map

21  view or used by location aware applications running on the location aware device or on a net-

22  work. In some implementations, an Application Programming Interface (API) can be used by

23  an application to query the location history database."

24       98.    The data files at issue constitute a significant amount of solid-state memory

25  space on Plaintiffs' iDevices. Although the file size varies among Plaintiffs, the Plaintiffs be-

26  lieve that the range of sizes for such files for each class member is between 10 and 40 mega-

27  bytes (which is enough space to store dozens of songs or photographs).

28

99.     Based on the premium that Apple charges for its iDevices with extra solid-state memory space (i.e., 32 gigabyte models rather than 16 gigabyte models) the memory space on iDevices has a reasonable market value of $100 per 16 gigabytes.

100.    Based on this number, the amount of solid-state memory space consumed by Apple for the undisclosed geolocation file is equal to approximately twenty-three cents ($0.23), for each Plaintiff's iPhone.

101.    The storage space on Plaintiffs' iDevices is storage space Plaintiffs' paid for, and the twenty-three cents worth of storage that Apple consumes on Plaintiffs' and class members' iDevices for Apple's own purposes constitutes a taking of an asset of economic value, paid for by Plaintiffs and Class Members and to which they have a superior right of possession. Apple's use of this space renders it unavailable for use by the owners of the iDevices.

102.    Apple did not adequately disclose its practices regarding the storage of geolocation information and the iDevice resources it consumes. Plaintiffs paid Apple for these solid-state memory resources, yet Apple essentially took it back from Plaintiffs without their permission, consent or knowledge.

**D.      Apple Failed To Protect Plaintiffs' Privacy and the Security of Plaintiffs' Data as Promised**

103.    As discussed above, Apple's control of the user experience includes restrictions, such as blocking consumers from modifying devices or installing non-App-store Apps, blocking developers and researchers from publicly discussing Apple's standards for App development, and even prohibiting researchers from analyzing and publicly discussing device shortcomings such as privacy flaws.

104.    As a direct consequence of the control exercised by Apple, Plaintiffs and Class Members could not and cannot reasonably review the privacy effects of Apps and must rely on Apple to fulfill its duty to do so.

105.    Apple undertook a duty to Plaintiffs and consumers to protect their privacy, representing that it reviews all Apps available in its App Store for suitability, and that it retains broad discretion to remove an App from the App Store.

106.    A third party cannot upload an App for sale in the App Store until Apple digitally signs the App, thereby signifying Apple's review and approval of the App for sale in the App store.

107.    Apple represents that an App may not access information from or about the user stored on the user's iDevice unless the information is necessary for the advertised functioning of the App.

108.    Apple represents that it does not allow one App to access data stored by another App.

109.    Apple represents that it does not allow an App to transmit data from a user's iDevice to other parties without the user's consent.

110.    Despite its representations, and the duties to Plaintiffs and Class Members that Apple undertook to protect their personal information from being accessed and exploited by third parties like the Tracking Companies, Apple knowingly permits Apps that subject consumers to privacy exploits and security vulnerabilities to be offered in the App Store.

111.    Contrary to Apple's representations to Plaintiffs and consumers, Apple apparently does not screen App Store candidates to determine their use of proper standards in transmitting personal information or analyze the traffic generated by Apps to detect Apps that violate the privacy terms of the iOS Developer Agreement and Apple's commitments to users.[10]

112.    Apple has a duty of reasonable care that arises independent of its promises, representations and statements. Apple shares the duty everyone shares to use ordinary care to prevent others from being injured as the result of its conduct. This duty arises independently of any contractual provision.

113.    Apple also has a special relationship with Plaintiffs and its customers, that placed a duty of reasonable care to act in a reasonable manner in designing its product so as to prevent Plaintiffs from being harmed; to warn Plaintiffs of any harm of which it was aware

---

[10]    It appears that Apple did not even assure that Apps have their own privacy policies. It has been reported that only 5% of mobile Apps have privacy policies. *See*, Office of the Attorney General, News Release, February 22, 2012 (Attorney General Kamala D. Harris Secures Global Agreement to Strengthen Privacy Protections for Users of Mobile Applications).

1  might foreseeably occur or to otherwise undertake reasonable steps to prevent others from

2  causing Plaintiffs harm when that harm is reasonably foreseeable by Apple.

3    114. Apple breached each of these duties to Plaintiffs in failing to act with reasonable

4  care as outlined in the preceding sections.

5    115. Apple's breach of its duties caused foreseeable harm to Plaintiffs and was a

6  proximate cause thereof, as outlined in the preceding sections.

7  **E.** **Apple's Collection of Geolocation Data**

8    116. "You may not know it, but if you carry a smartphone in your pocket, you are

9  probably doing unpaid work for Apple… and helping [it] eventually aim more advertising di-

10  rectly at you."[11]

11    117. Apple is developing an expansive database containing information about the ge-

12  ographic location of cellular towers and wireless networks throughout the United States. This

13  information forms the underlying data necessary for a digital marketing grid that Apple can use

14  to accurately deploy targeted advertisements to mobile phone users in the future. A digital mar-

15  keting grid of this scope is highly lucrative to Apple, as the mobile phone advertising industry

16  is projected to become a $2.5 billion dollar market by 2015.

17    118. In order to collect the information needed to create the digital marketing grid de-

18  scribed above, Apple previously designed iOS to send geolocation data from customers'

19  iPhones to Apple's servers, including, *inter alia*, information revealing the unique identifiers of

20  nearby cellular towers and wireless networks.

21  **F.** **Apple Misled the Public and Plaintiffs About Opting-Out Of Its Tracking Program**

22    119. Apple's Terms and Conditions ("TAC") expressly stated that customers could

23  opt-out of Apple's tracking program and prevent geolocation information from being collected

24  from their iPhones:

25      Location Data: Apple ... may provide certain services

26      through your iPhone that rely upon location information. To pro-

27

28   [11] Apple and Google Use Location Data to Map the World, http://www.nytimes. com/2011/04/26/technology/26locate.html (last visited October 21, 2011).

vide these services, where available, Apple ... may transmit, col-

lect, maintain, process and use your location data, including the

real-time geographic location of your iPhone ... By using any lo-

cation-based services on your iPhone, you agree and consent to

Apple's ... transmission, collection, maintenance, processing and

use of your location data to provide such products and services.

*You may withdraw consent at any time by ... turning off the Loca-*

*tion Services setting on your iPhone*[.]

(Terms and Conditions, ¶ 4(b)) (emphasis added.)

120.   In a letter to the United States Congress, Apple expressly represented that if cus-

tomers turned "Off" the location-based services settings on their iPhones, then "no location-

based information will be collected or transmitted."[12]

121.   Unfortunately, despite the fact that many iPhone users, including Plaintiff Gupta,

affirmatively withdrew their consent to be tracked by turning "off" their iPhones' Location Ser-

vices, Apple still continued to collect certain geolocation information from the devices.

122.   Furthermore, it now appears that the information collected and sent from users'

iPhones to Apple can be inputted into a publicly searchable database, which in turn can poten-

tially reveal an estimate of each users' exact location.[13]

123.   As a result, Apple—or anyone with access to this geolocation data—is able to

approximate the location of thousands, if not millions, of United States citizens, even after the-

se users unequivocally believed that they had actually denied Apple access to their geolocation

information.

124.   In April of 2011—after Plaintiff Gupta's initial lawsuit exposed Apple's unlaw-

ful tracking program—Apple finally admitted that its iPhones were collecting and transmitting

its users' geolocation information to its servers, even when users turned their Location Service

---

[12]   *See*, Apple Letter to Representatives Markey and Barton, http://markey.house.
gov/docs/applemarkeybarton7-12-10.pdf (last visited October 18, 2011).
[13]   *See supra* ¶ 97, quoting Apple's U.S. Patent Application Number 20110051665.

1  settings "Off." In the wake of the exposé, Apple claimed that the issue was the result of "a

2  bug". In the same press release, Apple claimed that the "bug" would be fixed "shortly."[14]

3       125.   This admission plainly contradicts Apple's representations to its customers and

4  to the United States Congress regarding the ability to opt-out of any geolocation tracking pro-

5  gram.

6       126.   When developing iOS 4, Apple specifically included a mechanism (in program-

7  ming parlance, a "method" named locationServicesEnabled that returns a boolean value) to de-

8  termine whether or not users have disabled location services.[15] Apple requires third party App

9  developers to utilize this mechanism before collecting location data from an iPhone to ensure

10 consent has been properly obtained. Moreover, if a third party App provider disregards the cus-

11 tomers' choice to disable location services and attempts to gather such data anyway, Apple de-

12 signed iOS 4 to automatically prevent access to the data, and display a prompt to users inform-

13 ing them that an application is attempting to access location information.

14      127.   It therefore appears that Apple took steps to circumvent *its own* failsafe proce-

15 dures in order to collect and transmit location data without user consent.

16 **G.     Third Parties Exploit Access to Consumer Data**

17      128.   Notwithstanding Apple's control of the user experience, it designs the iDevices

18 to provide information about consumers to the Tracking Companies, companies that incentivize

19 App developers to provide the App Store with free Apps for iDevices and provide Apple the

20 metrics to support its claims of market leadership.

21      129.   The personal and private information is of extreme interest to many advertising

22 networks and web analytics companies, including the Tracking Companies. For this reason, the

23 Tracking Companies pay to support App development, so that many Apps are provided to con-

24 sumers ostensibly "free" or at a lower cost.

25
_____

26 [14]     Apple Q&A on Location Data, http://www.apple.com/pr/library/2011/04/27Apple-Q-A-
   on-Location-Data.html (last visited October 18, 2011).

27 [15]     Apple's iOS Developer Library, http://developer.apple.com/library/ios/#documentation/
   CoreLocation/Reference/CLLocationManager_Class/CLLocationManager/
   CLLocationManager.html#//apple_ref/occ/clm/CLLocationManager/locationServicesEnabled

28 (last visited October 24, 2011).

130.    When users download and install the Apps on their iDevices, the Tracking Companies' software accesses personal information on those devices without users' awareness or permission and transmits the information to the Tracking Companies, supplying them with details such as consumers' cellphone numbers, address books, UDIDs, and geolocation histories—highly personal details about who the consumers are, who they know, what they do, and where they are.

131.    Some Tracking Companies pay App developers to include code that causes ads to be displayed when users run the Apps. Those ads are then populated with content from the Tracking Companies and provide the communications channel for the Tracking Companies to acquire and upload users' personal information.

132.    In the wake of Apple's prohibition against sending user information to third parties, described above, objections erupted from a number of third-party advertising networks and metrics/analytics companies (who had been receiving a steady flow of user data from iDevice Apps).  Following this criticism, Apple delayed taking any meaningful steps to actually implement its changed Developer Agreement or to enforce it in any meaningful way.

133.    As a result of Apple's conduct, the Tracking Companies, through the Apps with whom they had entered into relationships and to whom they had provided code, have continued to acquire details about consumers and to track consumers on an ongoing basis, across numerous Apps, and tracking consumers when they accessed Apps from different mobile devices.

134.    With the personal information acquired, the Tracking Companies use the information to compile private, personal and sensitive information that included consumers' video application viewing choices, web browsing activities, and their personal characteristics such as gender, age, race, family status, education level, geographic location, and household income, even though the Tracking Companies require none of this information to provide the user services for which the Apps were marketed.

135.    As a result of Apple's conduct, the Tracking Companies acquired personal information and compiled profiles that were unnecessary to the Apps' stated functions but were useful to the Tracking Companies in their commercial compilation, use, and sale of consumers'

personal information.

136.    Because of Apple's and the Tracking Companies' control and coding, Plaintiffs and Class Members are unable to detect, manage, or avoid this collection and transmittal of information.

137.    Apple is aware that Apps are providing a conduit for the Tracking Companies to acquire consumers' personal information without consumers' knowledge or consent.

138.    However, because consumers are unaware of the Tracking Companies, they cannot complain to Apple about particular Apps and request that Apple remove the Apps from the App Store.

139.    Apple has continued to allow App developers to run their Apps on its iOS platform and failed to void the licensing agreements with App developers, even after it received notice of Tracking Companies' practices.

**H.      No Consent**

140.    Plaintiffs in this action consider the information from and about themselves on their iDevices to be personal and private information.

141.    Consumers using iDevices that download Apps from the App Store would reasonably consider information from and about themselves stored on their iDevices to be personal and private information that they would not expect to be collected and used by third parties without the their express consent.

142.    Plaintiffs did not expect, receive notice of, or consent to the Tracking Companies tracking their App use. Plaintiffs did not expect, receive notice of, or consent to the Tracking Companies' acquisition of Plaintiffs' personally identifiable information.

143.    The Tracking Companies' activities were in conflict with Apple's representations about what information third parties were permitted to access.

144.    The Tracking Companies' actions exceeded the scope of any authorization that could have been granted by Plaintiffs at the time of downloading and using Apps.

145.    Plaintiffs consider information about their mobile communications to be in the nature of confidential information.

146.    Plaintiffs consider information about any website they visit, or Apps they down-load, to be in the nature of confidential information that they do not expect to be shared with an unaffiliated company.

147.    The Tracking Companies sell users' personal information to, or purchase and merge user's personal information with, other personal information about the same users that is available in the commercial, secondary information market, which the information traffickers take substantial efforts to shield from the public eye.

148.    The Tracking Companies and other parties to the information market use the merger of personal information to effectively or actually de-anonymize consumers.

149.    Plaintiffs did not consent to being personally identified to the Tracking Compa-nies or for their personally identifiable information to be shared with and used on behalf of the Tracking Companies.

150.    Apple is aware that the Tracking Companies misappropriated Plaintiffs' personal information.

151.    Consumers routinely engage in online economic exchanges with the websites they visit by exchanging their personal information for the websites' content and services in a value-for-value exchange, which reduces the costs consumers would otherwise have to pay.

152.    This value-for-value exchange also takes place when an App is supported by advertising revenue, such as revenue the Tracking Companies pay App developers.

153.    Because the Tracking Companies engaged in undisclosed and/or inadequately disclosed data collection from Plaintiffs, the Plaintiffs did not receive the full value of their exchanges.

154.    In essence, Apple's conduct raised the price Plaintiffs paid to use Apps but, instead of advising Plaintiffs about the third parties' access to their data, Apple created an ecosystem that allowed the Tracking Companies simply to reach around (or through) Apps and into Plaintiffs' pockets, extracting an undisclosed premium in the form of Plaintiffs' data and private information.

155.   Because Apple imposed an undisclosed cost on Plaintiffs, by failing to disclose that the Tracking Companies take more information than they were entitled to take via Apple's APIs, Plaintiffs suffered economic harms.

156.   The scarcity of consumer information increases its value. Apple devalued Plaintiffs' information by creating an App ecosystem the very purpose of which was to facilitate the ability of third parties to take and propagate Plaintiffs' information.

157.   The consequences of Apple's practices imposed costs on consumers in the form of the loss of the opportunity to have entered into value-for-value exchanges with other App providers whose business practices better conformed to Plaintiffs' and Class Members' expectations. Thus, Apple's failure adequately to disclose the Tracking Companies' information collection practices imposed opportunity costs on Plaintiffs.

158.   Likewise, Apple and the Tracking Companies' lack of disclosure, coupled with their taking of information, imposed costs on Plaintiffs who would otherwise have exercised their rights to utilize the economic value of their information by declining to exchange it with Tracking Companies or any other App provider.

159.   Plaintiffs and Class Members have been harmed by Apple's failure to disclose the Tracking Companies' deceptive acquisition of their personal information, and in the loss of their rights to use, share, and maintain the confidentiality of their information, each according to his or her own discretion.

## I.   Tracking Companies' Harmful Use of Plaintiffs' Resources

160.   Plaintiffs were also harmed by Apple's failure to disclose that, in addition to the Tracking Companies' unauthorized, surreptitious collection of Plaintiffs' information, as alleged above, the Tracking Companies actions consumed resources to which Plaintiffs had the right of control and use.

161.   For example, in the course of the use of the Weather Channel App by Plaintiffs Chiu, Freeman, and Kimbrel, Medialets caused a compressed .zip file of approximately two megabytes in size to be downloaded to each of Plaintiffs' iDevices for purposes unrelated to those expected in the Weather Channel App. In doing so, Medialets unexpectedly utilized Plain-

1   tiffs' bandwidth resources for which Plaintiffs paid charges to their carriers, and consumed

2   storage space on their iDevices, which Plaintiffs had purchased without expectation of such un-

3   authorized resource use by Apps from the App Store.

4       162.   As to the Tracking Companies, Apple failed to disclose that their actions in col-

5   lecting information from Plaintiffs utilized power resources on Plaintiffs' iDevices, without

6   Plaintiffs' authorization.

7       163.   The rate at which battery charge was diminished on the iDevices as a result of

8   Apple's and the Tracking Companies' actions was material to Plaintiffs, particularly given the

9   power resource constraints on the iDevice: the Tracking Companies' repeated actions during

10  App executions utilized approximately two to three seconds of battery capacity with each ac-

11  tion due to the power requirements of CPU processing, file input and output actions, and Inter-

12  net connectivity.

13      164.   Not only did Tracking Companies' actions cause Plaintiffs' iDevice batteries to

14  discharge more quickly, rendering the iDevices less useful given power constraints, but Apple

15  never disclosed that the Tracking Companies' repeated actions also resulted in lasting impair-

16  ment because, by repeatedly utilizing power and causing Plaintiffs to have to re-charge their

17  iDevices batteries sooner, the Tracking Companies shortened the actual utility and life of the

18  iDevice batteries, for which charging capabilities are diminished over repeated re-chargings.

19      165.   Quantification of the effect of the Tracking Companies' impairment of the utility

20  of Plaintiffs' iDevice batteries and concomitant diminution in the value of the iDevices can be

21  discerned through discovery of Apple and the Tracking Companies and expert testimony.

## VI.  CLASS ALLEGATIONS

23      166.   Pursuant to the Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3),

24  Plaintiffs bring this action as a class action on behalf of themselves and all others similarly sit-

25  uated as members of the "iDevice Class," defined as follows:

26         All persons residing in the United States who have purchased iPhones

27         and downloaded free Apps from the App Store on a mobile device that

28         runs Apple's iOS.

1    167.    In addition, Plaintiff Gupta brings this action on behalf of himself and of all oth-

2  ers similarly situated as members of the "Geolocation Class," defined as follows:

3          All individuals and entities in the United States and its territories that have

4          turned Location Services "off" on their iPhones prior to April 27, 2011,

5          and have unwittingly, and without notice or consent transmitted location

6          data to Apple's servers.

7    168.    Excluded from the iDevice Class and Geolocation Class are Defendant, its legal

8  representatives, assigns, and successors, and any entities in which Defendant has controlling in-

9  terests. Also excluded is the judge to who this case is assigned and the judge's immediate fami-

10  ly.

11    169.    The "Class Period" is December 1, 2008 to the present for the iDevice Class,

12  and June 21, 2010 to April 27, 2011 for the Geolocation Class.

13    170.    Plaintiffs reserve the right to revise the Class definitions based on facts learned

14  in the course of litigating this matter.

15    171.    The iDevice and Geolocation Classes each consist of millions of individuals and

16  other entities, making joinder impractical.

17    172.    The claims of Plaintiffs are typical of the claims of all other iDevice and Geolo-

18  cation Class Members, respectively.

19    173.    Plaintiffs will fairly and adequately represent the interests of the other iDevice

20  Class Members, and Plaintiff Gupta will fairly and adequately represent the interests of the oth-

21  er members of the Geolocation Class. Plaintiffs have retained counsel with substantial experi-

22  ence in prosecuting complex litigation and class actions. Plaintiffs and their counsel are com-

23  mitted to prosecuting this action vigorously on behalf of iDevice and Geolocation Class Mem-

24  bers, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any in-

25  terests adverse to those of the other iDevice or Geolocation Class Members.

26    174.    Absent a class action, most Class Members would find the cost of litigating their

27  claims to be prohibitive and would have no effective remedy.

28    175.    The class treatment of common questions of law and fact is superior to multiple

individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

176.    Defendant has acted and failed to act on grounds generally applicable to Plaintiffs and other Class Members, requiring the Court's imposition of uniform relief, including injunctive and declaratory relief, to ensure compatible standards of conduct toward the Class Members.

177.    For example, each Plaintiff was presented with Apple's uniform Terms and Conditions of service, prior to their activation of their iDevices.

178.    The factual and legal bases of Defendant's liability to Plaintiffs and other Class Members are the same, resulting in injury to Plaintiffs and all of the other Class Members. Plaintiffs and other Class Members have all suffered harm and damages as a result of Defendant's wrongful conduct.

179.    There are many questions of law and fact common to Plaintiffs and the iDevice and Geolocation Class Members and those questions predominate over any questions that may affect individual Class Members. Common questions for the iDevice Class include, but are not limited to the following:

a.    Whether Apple failed to disclose that the Tracking Companies, without authorization, tracked and compiled information to which iDevice Class Members enjoyed rights of possession superior to those of the third parties;

b.    Whether the Tracking Companies, without authorization, used Apple's iOS and APIs to create personally identifiable profiles of iDevice Class Members;

c.    Whether Apple violated the statutes alleged herein;

d.    Whether Apple caused economic harm to iDevice Class Members;

e.    Whether, contrary to its representations, Apple allowed the Tracking Companies to create, or caused or facilitated the creation of, personally identifiable consumer profiles of iDevice Class Members; and

f.    Whether Apple continues to allow the Tracking Companies to retain and/or sell, valuable information assets from and about iDevice Class Members.

180.     There are many questions of law and fact common to Plaintiff Gupta and the Geolocation Class Members, and those questions predominate over any questions that may affect individual Geolocation Class Members. Common questions for the Geolocation Class include, but are not limited to the following:

a.      Whether Apple collected location data from iPhones even after the user turns "Off" the Location Services function;

b.      Whether Apple profits, or intends to profit from the collection of geolocation data described more fully herein; and

c.      Whether Apple violated the statutes alleged herein.

181.     The questions of law and fact common to Geolocation Class Members predominate over any questions affecting only individual members, and a class action is superior to all other available methods for the fair and efficient adjudication of this controversy.

### VII.  CLAIMS FOR RELIEF

182.     Based on the foregoing allegations, Plaintiffs' claims for relief include the following:

### FIRST CLAIM FOR RELIEF
**Violations of the Consumers Legal Remedies Act (California Civil Code § 1750, *et seq.*)
By Plaintiffs on Behalf of both Classes**

183.     Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

184.     The California Consumer Legal Remedies Act, Section 1750 of the California Civil Code (the "CLRA") protects consumers against fraud, unlawful practices, and unconscionable commercial practices in connection with sale of any merchandise.

185.     In violation of the CLRA, Defendant Apple has engaged, and is engaging, in unfair and deceptive acts and practices in the course of transactions with Plaintiffs, and such transactions are intended to and have resulted in the sales of goods to consumers.

186.     Plaintiffs and the Class Members are "consumers" as that term is used in the CLRA because they sought or acquired Defendant's goods, *i.e.*, Apple's iDevices, for personal, family, or household purposes. Defendant's past and ongoing acts and practices include but are not limited to Defendant's representation that its goods were of a particular standard, quality,

1  and grade when in fact, they were of another.

2      187.    In particular, as described above, Apple represented to Plaintiff Gupta and mem-

3  bers of the Geolocation Class that they could prevent Apple from collecting geolocation data

4  about them by switching the Location Services setting on their iPhones to "Off," when, in fact,

5  Apple continued to collect location information from their devices.

6      188.    Apple also made the following representations, expressly or by implication, to

7  Plaintiffs and members of the iDevice Class about the iDevice and the Apple ecosystem: (a)

8  Apple designed the iPhone to safely and reliably download third party Apps; (b) certain Apps

9  available for download by users in the App store are "free Apps;" (c) the App Store does not

10  permit Apps that "violate[] our developer guidelines" including Apps containing pornography,

11  Apps that violate a users privacy, and Apps that hog bandwidth; (c) "Apple takes precautions—

12  including administrative, technical, and physical measures—to safeguard [users'] personal in-

13  formation against loss, theft, and misuse, as well as against unauthorized access, disclosure, al-

14  teration, and destruction;" (d) Apple does not allow one App to access data stored by another

15  App; and (e) Apple does not allow an App to transmit data from a user's iDevice to other par-

16  ties without the user's consent.

17      189.    These representations were materially misleading and failed to disclose the fol-

18  lowing material facts: (a) the Apps downloaded by Plaintiffs and the iDevice Class are not

19  "free" in so far as Apple and the Tracking Companies obtain Plaintiffs and Class Members'

20  valuable information assets, and consume their bandwidth and iDevice resources, without con-

21  sent or notice, as described above; (b) Apple knowingly permits Apps that subject Plaintiffs and

22  Class Members to privacy exploits and security vulnerabilities to be offered in the App Store;

23  and (c) Apple does not analyze the traffic generated by Apps to detect Apps that violate the pri-

24  vacy terms of the iOS Developer Agreement and Apple's commitments to users.

25      190.    Plaintiffs and Class Members would not have purchased their iDevices and/or

26  would not have paid as much for them, if Apple had disclosed the true facts that it and the

27  Tracking Companies would surreptitiously obtain personal information from their iDevices,

28  track their activity and geolocation, deplete battery resources, and consume portions of the

"cache" and/or gigabytes of memory on their devices—memory that Plaintiffs paid for the exclusive use of when they purchased their iDevice.

191.    Because Apple did not disclose the true costs of their iDevices, Plaintiffs were misled into purchasing a product that did not meet their reasonable expectations.

192.    Given the undisclosed costs imposed by using the iDevice, it was not useful to Plaintiffs and was not as valuable to them as the price for which they paid for it.

193.    Plaintiffs and members of the Classes relied upon and were deceived by Apple's material misrepresentations and omissions regarding the iDevice.

194.    As a proximate and direct result of Apple's misrepresentations, omissions, and unlawful and unconscionable commercial practices, Plaintiffs and members of the Class have been injured and suffered damages in that they have purchased products that invade their privacy, render their personal information insecure, consume their valuable device storage and power resources as well as their Internet bandwidth, and are therefore less valuable products than that which they paid.

195.    Defendant's violations of Civil Code § 1770 have caused damage to Plaintiffs and the other Class Members and threaten additional injury if the violations continue. This damage includes the privacy and economic consequences set forth above, including the purchase price or premium paid for the iDevice.

196.    Pursuant to California Civil Code §1782, one or more of the Plaintiffs notified Defendant Apple in writing of the particular violations of Civil Code §1770 and demanded that it rectify the problems associated with their behavior detailed above, which acts and practices are in violation of Civil Code §1770. Apple failed to respond to that letter.

Plaintiffs request actual damages, restitution of property, punitive damages, injunctive relief and other relief that the Court deems proper, and reasonable attorneys' fees and costs, as permitted by Civil Code, Sections 1780 and 1782.

**SECOND CLAIM FOR RELIEF**
**Violations of the Unfair Competition Law (Cal. Bus. and Prof. Code § 17200, *et seq.*)**
**By Plaintiffs on Behalf of both Classes**

197.    Plaintiffs incorporate the above allegations by reference as if fully set forth herein.

198.    Apple's acts and practices as detailed herein constitute acts of unfair competition. Apple has engaged in unlawful, unfair or fraudulent business acts and/or practices within the meaning of California Business & Professions Code, section 17200, et seq. Apple need only violate one of the three prongs to be held strictly liable.

**A.    Unlawful Business Act and Practices**

199.    Apple's business acts and practices are unlawful, in part, because they violate California Business and Professions Code, Section 17500, *et seq.*, which prohibits false advertising, in that they were untrue and misleading statements relating to Apple's provision of goods and with the intent to induce consumers to enter into obligations relating to such goods, and regarding which statements Apple knew, or which by the exercise of reasonable care should have known, were untrue and misleading.

200.    Apple's business acts and practices are also unlawful in that, as set forth herein, they violate the Consumer Legal Remedies Act, California Civil Code, Section 1750, *et seq.*

201.    Plaintiffs reserve the right to identify additional provisions of the law violated by Apple as further investigation and discovery warrants.

202.    Apple is therefore in violation of the unlawful prong of the Unfair Competition Law.

**B.    Unfair Business Acts and Practices**

203.    Apple's business acts and practices are unfair because they have caused harm and injury-in-fact to Plaintiffs and Class Members and for which Apple has no justification other than to increase, beyond what Apple would have otherwise realized, its market share and revenue from sales of iDevices.

204.    Apple's conduct lacks reasonable and legitimate justification in that it has benefited from such conduct and practices while Plaintiffs and the Class Members have been misled as to the nature and integrity of Apple's iDevices and have, in fact, suffered material disad-

vantage regarding their interests in the privacy, confidentiality, and security of their personal information, in which they have a property interest, and have lost money, including the purchase price of the iDevice or, at a minimum, the difference of the inflated price and the price Apple should have charged for a product that fully disclosed all the costs hidden by Apple.

205.    Apple's conduct offends public policy in California tethered to the Consumer Legal Remedies Act, the state constitutional right of privacy, and California statutes' recognition of the need for consumers to be informed and equipped to protect their own privacy interests, such as California Civil Code, Section 1798.8, such that consumers may make informed decisions in their choices of merchants and other means of safeguarding their privacy.

206.    In addition, Apple's *modus operandi* constitutes a sharp practice in that it knew or should have known that consumers care about the status and security of personal information and privacy but are unlikely to be aware of and able to detect the means by which Apple was conducting itself in a manner adverse to its commitments and users' interests, through the undisclosed functions of iDevices and Apps and the related conduct of the Tracking Companies. Apple is therefore in violation of the unfairness prong of the Unfair Competition Law.

**C.    Fraudulent Acts and Practices**

207.    Apple's acts and practices were fraudulent within the meaning of the Unfair Competition Law because they were likely to mislead the members of the public to whom they were directed.

208.    Apple's practice of continuing to collect location data—despite its express representations that it would not do so—after a user turned "Off" Location Services, which collection was accomplished by commandeering Plaintiff Gupta's paid-for resources, was in violation of the unfairness prong of the Unfair Competition Law.

209.    By engaging in the above-described acts and practices, Apple has committed one or more acts of unfair competition within the meaning of the Unfair Competition Law and, as a result, Plaintiffs and the Class Members have suffered injury-in-fact and have lost money and property—specifically, personal information; the private and secure use of the iDevices and Apps; the expected utility and performance of their iDevices; and purchase price of the iDevice

1  or, at a minimum, the difference of the inflated price and the price Apple should have charged

2  for a product that fully disclosed all the costs hidden by Apple.

3      210.    Apple had a duty to disclose the material privacy and security characteristics of

4  the iDevice and its operation within the Apple-controlled ecosystem, including with Apps from

5  the App Store, because it (i) knew or should have known about such characteristics at the time

6  that Plaintiffs and members of the Class purchased the product, inasmuch as Apple created the

7  iDevice, the App Store, and reviewed App Store offerings; (ii) had exclusive knowledge of the-

8  se material facts, which information was not known to Plaintiffs; and (iii) made a partial repre-

9  sentation as to the iDevice's integrity in promoting Plaintiffs' privacy and security interests and

10  interests in the reasonably expected utility of their iDevices, but failed to disclose the material

11  fact that the iDevice, the App Store, the Apps, and the entire Apple ecosystem and system of

12  relationships with developers and Tracking Companies was designed to foster the unauthorized

13  taking of and profiting from Plaintiffs' personal information.

14      211.    Plaintiffs and Class Members were deceived by Apple's representations and

15  omissions; and they reasonably relied on Apple's representations and omissions as described

16  above, and the absence of any warning about the characteristics and conditions that injured

17  them, as alleged herein.

18      212.    Plaintiffs and Class Members have suffered injuries as a direct and proximate

19  result of the unlawful, unfair, and fraudulent business practices of Apple.

20      213.    Pursuant to section 17203 of the California Business and Professions Code,

21  Plaintiffs, on their own behalf and on behalf of the Class Members seek restitution and a Court

22  order enjoining Defendant from such future conduct and any other such orders that maybe nec-

23  essary to rectify the unlawful, unfair, and fraudulent business practices of Apple.

24

25

26

27

28

### THIRD CLAIM FOR RELIEF[16]
### Violations of the Stored Communications Act
### (18 USC § 2701, *et seq.*)
### By Plaintiff Gupta and the Geolocation Class Against Apple Inc.

214.    Plaintiff Gupta incorporates the foregoing allegations as if fully set forth herein.

215.    The Stored Communications Act (the "SCA") broadly defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce..." 18 U.S.C. § 2711(1); 18 U.S.C. § 2510(12).

216.    Pursuant to the SCA, "electronic storage" means any "temporary storage of a wire or electronic communication incidental to the electronic transmission thereof." 18 U.S.C. § 2711(1); 18 U.S.C. § 2510(17)(A). This type of electronic storage includes communications in intermediate electronic storage that have not yet been delivered to their recipient.

217.    Congress enacted the SCA to prevent "unauthorized persons deliberately gaining access to, and sometimes tampering with, electronic or wire communications that are not intended to be available to the public."  Senate Report No. 99–541, S. REP. 99-541, 35, 1986 U.S.C.C.A.N. 3555, 3589.

218.    As such, the SCA mandates, among other things, that it is unlawful for a person to obtain access to stored communications on another's computer system without authorization. 18 U.S.C. § 2701(a).

219.    Apple violated 18 U.S.C. § 2701(a)(1) by intentionally accessing its customers' communications without authorization and obtaining and/or altering authorized access to a wire or electronic communication while in electronic storage by collecting temporarily stored location data from Plaintiff Gupta and the Geolocation Class's iPhones after Locations Services was turned "Off." Apple had actual knowledge of, and benefited from, this practice.

---

[16]    Plaintiff Gupta recognizes that the Court dismissed his claim under 18 U.S.C. § 2701 in its June 12, 2012 Order, and reasserts the claim here for appeal purposes only.

220.    Additionally, Apple has violated 18 U.S.C. § 2701(a)(2) because it intentionally exceeded authorization to access consumers' communications and obtained, altered, or prevented authorized access to a wire or electronic communication while in electronic storage by collecting location data from Plaintiff Gupta and Geolocation Class's iPhones after Locations Services was turned "Off."  Apple had actual knowledge of, and benefited from, this practice.

221.    As a result of Apple's conduct described herein, and its violation of § 2701, Plaintiff Gupta and the Geolocation Class have suffered injuries. Plaintiff Gupta, on his own behalf and on behalf of the Geolocation Class, seek an order enjoining Apple's conduct described herein and awarding themselves and the Geolocation Class the maximum statutory and punitive damages available under 18 U.S.C. § 2707.

## VIII.  DEMAND FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for judgment against Defendant and that the Court may:

A.    certify this case as a Class action on behalf of the Classes defined above, appoint Plaintiffs as Class representatives, and appoint their counsel as Class counsel;

B.    declare that Defendant's actions violate the statutes set forth above;

C.    award injunctive and equitable relief as applicable to the Class *mutatis mutandis*, including:

   i.    prohibiting Defendant from engaging in the acts alleged above;

   ii.    requiring Defendant to provide reasonable notice and choice to consumers regarding the tracking, data collection, profiling, merger, and de-anonymization activities by Defendant, App developers and/or third party Tracking Companies;

   iii.    requiring Defendant to disgorge to Plaintiffs and Class Members, or to whomever the Court deems appropriate, all of Defendant's ill-gotten gains;

       iv.     enjoining Apple from acquiring, retaining, and transferring, whether in encrypted or unencrypted form, users' detailed location histories;

       v.     requiring Apple to seek express consent from Plaintiffs and other Class Members to capture, retain, and transfer location history information and, otherwise, to purge such information from all resident systems and identify parties that have accessed such information on users' iDevices and synchronized devices;

       vi.     awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendant through the wrongful conduct alleged above; and

       vii.     ordering an accounting and constructive trust to be imposed on the data from and about Plaintiffs and Class Members and on funds or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendant

D.     award damages, including statutory damages where applicable, to Plaintiffs and Class Members in an amount to be determined at trial;

E.     award restitution against Defendant for all money to which Plaintiffs and the Class are entitled in equity;

F.     restrain, by preliminary and permanent injunction, Defendant, its officers, agents, servants, employees, and attorneys, and those participating with them in active concert, from identifying Plaintiffs and Class Members' electronic communications, whether by personal or pseudonymous identifiers, and from monitoring, accessing, collecting, transmitting, and merging with data from other sources any information from or about Plaintiffs and Class Members;

G.     award Plaintiffs and the Class their reasonable litigation expenses and attorneys' fees; pre- and post-judgment interest to the extent allowable; restitution; dis-

1   gorgement and other equitable relief as the Court deems proper; compensatory

2   damages sustained by Plaintiffs and the Class; statutory damages, including pu-

3   nitive damages; and permanent injunctive relief prohibiting Defendant from en-

4   gaging in the conduct and practices complained of herein; and

5        H.    for such other and further relief as this Court deems just and proper.

6   Date:   July 3, 2012                  Respectfully submitted,
                                   KAMBERLAW, LLC

7

8

9                      By:     s/Scott A. Kamber
                                   _____

10                              Scott A. Kamber (*pro hac vice*)
                           KAMBERLAW, LLC
                           Interim Class Counsel

11

12   SCOTT A. KAMBER (*pro hac vice*)
DAVID A. STAMPLEY (*pro hac vice*)

13   *skamber@kamberlaw.com*
*dstampley@kamberlaw.com*

14   KAMBERLAW, LLC
100 Wall Street, 23rd Floor

15   New York, New York 10005
Telephone: (212) 920-3072

16   Facsimile:  (212) 202-6364

17

18   DEBORAH KRAVITZ (SBN 275661)
*dkravitz@kamberlaw.com*

19   KAMBERLAW, LLP
141 North St.

20   Healdsburg, California 95448
Telephone: (707) 820-4247

21   Facsimile: (212) 202-6364

22   *Interim Class Counsel*

23   WILLIAM AUDET
JONAS P. MANN

24   MICHAEL A. MCSHANE
AUDET & PARTNERS LLP

25   221 Main Street, Suite 1460
San Francisco, California 94105

26   Telephone: (415) 568-2555
Facsimile: (415) 568-2556

27

28   *Plaintiffs' Liaison Counsel*

Second Amended Consolidated        44                5:11-md-02250-LHK
Class Action Complaint

JAY EDELSON
jedelson@edelson.com
SEAN REIS
sreis@edelson.com
EDELSON MCGUIRE, LLC
350 N LaSalle Street, Suite 1300
Chicago IL 60654,
Telephone: (312) 589-6370

RICHARD A. LOCKRIDGE
ROBERT K. SHELQUIST
rlockridge@locklaw.com
rshelquist@locklaw.com
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

JEFF S. WESTERMAN (Bar No. 94559)
jwesterman@milberg.com
MILBERG LLP
One California Plaza
300 South Grand Avenue, Ste 3900
Los Angeles, California 90071
Telephone: (213) 617-1200
Facsimilie: (213) 617-1975

PETER E. SEIDMAN
ANDREI V. RADO
pseidman@milberg.com
arado@milberg.com
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

JEREMY WILSON
jeremy@wtlfirm.com
WILSON TROSCLAIR & LOVINS
302 N. Market Street, Suite 501
Dallas, Texas 75202
Telephone: (214) 430-1930

*Plaintiffs' Executive Committee*

JOSEPH MALLEY
malleylaw@gmail.com
LAW OFFICE OF JOSEPH MALLEY
1045 North Zang Blvd
Dallas TX 75208
Telephone: (214) 943-6100

DAVID PARISI
dcparisi@parisihavens.com
PARISI & HAVENS LLP
15233 Valleyheart Dr.
Sherman Oaks, CA 91403
Telephone: (818) 990-1299

MAJED NACHAWATI
mn@fnlawfirm.com
FEARS NACHAWATI LAW FIRM,
4925 Greenville Ave
Dallas TX 75206
Telephone: (214) 890-0711

JOHN F. NEVARES, ESQ.
CAMILO K. SALAS, III
jfnevares@nevareslaw.com
JOHN F. NEVARES & ASSOCIATES, P.S.C
P.O. Box 13667
San Juan
Puerto Rico

DANIEL E. BECNEL, JR.
dbecnel@becnellaw.com
NEVARES, BECNEL, SALAS
106 West Seventh Street
P.O. Drawer H
Reserve, Louisiana 70084
Telephone: (985) 536-1186

E. KIRK WOOD
ekirkwood1@bellsouth.net
WOOD LAW FIRM, LLC
P.O. Box 382434
Birmingham, AL 35238-2434
Telephone: (205) 612-0243

JOSEPH WHATLEY
jwhatley@wdklaw.com
WHATLEY, DRAKE & KALLAS, LLC
2001 Park Place North, Suite 1000

Birmingham, Alabama 35203
Telephone: (205) 328-9576
Facsimile: (205) 328-9669

JERROLD PARKER
Jerry@yourlawyer.com
PARKER WAICHMAN & ALONSO, LLP
6 Harbor Park Drive
Port Washington, NY 11050
Telephone: (516) 466-6500

FRED ROSENTHAL
frosenthal@yourlawyer.com
PARKER WAICHMAN & ALONSO, LLP
111 Great Neck Road,
Great Neck, NY 11021
Telephone: (516) 466-6500

JOHN GOODSON
KEIL & GOODSON
611 Pecan
Texarkana, TX 75501
Telephone: (870) 772-4113

ALAN MANSFIELD
alan@clgca.com
THE CONSUMER LAW GROUP
9466 Black Mountain Road
San Diego CA 92126
Telephone: (619) 308-5034

THOMAS MAURIELLO
tomm@maurlaw.com
MAURIELLO LAW FIRM APC
1181 Puerta Del Sol
San Clemente, CA 92673
Telephone: (949) 542-3555

DONALD CHIDI AMAMGBO
donald@amamgbolaw.com
AMAMGBO & ASSOCIATES
6167 Bristol Parkway
Culver City, CA 90230
Telephone: (310) 337-1137

REGINALD VON TERRELL
reggiet2@aol.com
THE TERRELL LAW GROUP
PO Box 13315
MPB # 148
Oakland CA 94661
Telephone: (510) 237-9700

GILLIAN L WADE
gwade@milsteinadelman.com
SARA D AVILA
savila@milsteinadelman.com
CORINA N. MACCARIN
MILSTEIN ADELMAN & KREGER LLP
2800 Donald Douglas Loop N
Santa Monica, CA 90405
Telephone: (310) 396-9600

RICHARD PROAPS
rproaps@aol.com
RICHARD ALAN PROAPS, ATTORNEY AT LAW
8150 Greenback Lane,
Fair Oaks, CA 95628
Telephone: (916) 722-4881

AARON C. MAYER
aaron@mayerlawgroup.com
MAYER LAW GROUP
18 Carolina St.
Charleston, SC 29403
Telephone: (843) 376-4929

HOWARD RUBINSTEIN
LAW OFFICES OF HOWARD W. RUBINSTEIN
1615 Forum Pl.
West Palm Beach, FL 33401
Telephone: (832) 715-2788;

BRIAN SMITH
bws@smithvanture.com
SMITH & VANTURE, LLP
1615 Forum Pl.
West Palm Beach, FL 33401
Telephone: (561) 684-6330

MONICA KELLY
monicakelly@ribbecklaw.com
RIBBECK LAW CHARTERED
505 North Lake Shore Drive
Chicago, IL 60611
Telephone: (312) 822-9999

ERIC QUETGLAS-JORDAN
eric@quetglaslaw.com
QUETGLAS LAW OFFICE
PO Box 16606
San Juan, PR 00908-6606
Telephone: (787) 722-7745

*Counsel for Plaintiffs*

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Date:   July 3, 2012

Respectfully submitted,
KAMBERLAW, LLC

By:      s/Scott A. Kamber

Scott A. Kamber (*pro hac vice*)
KAMBERLAW, LLC
Interim Class Counsel

SCOTT A. KAMBER (*pro hac vice*)
DAVID A. STAMPLEY (*pro hac vice*)
*skamber@kamberlaw.com*
*dstampley@kamberlaw.com*
KAMBERLAW, LLC
100 Wall Street, 23rd Floor
New York, New York 10005
Telephone: (212) 920-3072
Facsimile:  (212) 202-6364

DEBORAH KRAVITZ (SBN 275661)
*dkravitz@kamberlaw.com*
KAMBERLAW, LLP
141 North St.
Healdsburg, California 95448
Telephone: (707) 820-4247
Facsimile: (212) 202-6364

*Interim Class Counsel*

WILLIAM AUDET
JONAS P. MANN
MICHAEL A. MCSHANE
AUDET & PARTNERS LLP
221 Main Street, Suite 1460
San Francisco, California 94105
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Plaintiffs' Liaison Counsel*

JAY EDELSON
jedelson@edelson.com
SEAN REIS
sreis@edelson.com
EDELSON MCGUIRE, LLC
350 N LaSalle Street, Suite 1300
Chicago IL 60654,
Telephone: (312) 589-6370

RICHARD A. LOCKRIDGE
ROBERT K. SHELQUIST
rlockridge@locklaw.com
rshelquist@locklaw.com
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S., Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

JEFF S. WESTERMAN (Bar No. 94559)
jwesterman@milberg.com
MILBERG LLP
One California Plaza
300 South Grand Avenue, Ste 3900
Los Angeles, California 90071
Telephone: (213) 617-1200
Facsimilie: (213) 617-1975

PETER E. SEIDMAN
ANDREI V. RADO
pseidman@milberg.com
arado@milberg.com
MILBERG LLP
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

JEREMY WILSON
jeremy@wtlfirm.com
WILSON TROSCLAIR & LOVINS
302 N. Market Street, Suite 501
Dallas, Texas 75202
Telephone: (214) 430-1930

*Plaintiffs' Executive Committee*

1

2   JOSEPH MALLEY
    malleylaw@gmail.com
3   LAW OFFICE OF JOSEPH MALLEY
    1045 North Zang Blvd
    Dallas TX 75208
4   Telephone: (214) 943-6100

5
    DAVID PARISI
6   dcparisi@parisihavens.com
    PARISI & HAVENS LLP
7   15233 Valleyheart Dr.
    Sherman Oaks, CA 91403
8   Telephone: (818) 990-1299

9
    MAJED NACHAWATI
10  mn@fnlawfirm.com
    FEARS NACHAWATI LAW FIRM,
11  4925 Greenville Ave
    Dallas TX 75206
12  Telephone: (214) 890-0711

13
    JOHN F. NEVARES, ESQ.
14  CAMILO K. SALAS, III
    jfnevares@nevareslaw.com
15  JOHN F. NEVARES & ASSOCIATES, P.S.C
    P.O. Box 13667
16  San Juan
    Puerto Rico
17

18  DANIEL E. BECNEL, JR.
    dbecnel@becnellaw.com
19  NEVARES, BECNEL, SALAS
    106 West Seventh Street
20  P.O. Drawer H
    Reserve, Louisiana 70084
21  Telephone: (985) 536-1186

22
    E. KIRK WOOD
23  ekirkwood1@bellsouth.net
    WOOD LAW FIRM, LLC
24  P.O. Box 382434
    Birmingham, AL 35238-2434;
25  Telephone: (205) 612-0243

26

27

28

---

1

JOSEPH WHATLEY
jwhatley@wdklaw.com

2

WHATLEY, DRAKE & KALLAS, LLC

3

2001 Park Place North, Suite 1000
Birmingham, Alabama 35203

4

Telephone: (205) 328-9576
Facsimile: (205) 328-9669

5

6

JERROLD PARKER
Jerry@yourlawyer.com

7

PARKER WAICHMAN & ALONSO, LLP
6 Harbor Park Drive

8

Port Washington, NY 11050
Telephone: (516) 466-6500

9

10

FRED ROSENTHAL
frosenthal@yourlawyer.com

11

PARKER WAICHMAN & ALONSO, LLP
111 Great Neck Road,

12

Great Neck, NY 11021
Telephone: (516) 466-6500

13

14

JOHN GOODSON

15

KEIL & GOODSON
611 Pecan
Texarkana, TX 75501

16

Telephone: (870) 772-4113

17

ALAN MANSFIELD
alan@clgca.com

18

THE CONSUMER LAW GROUP
9466 Black Mountain Road

19

San Diego CA 92126
Telephone: (619) 308-5034

20

21

THOMAS MAURIELLO
tomm@maurlaw.com

22

MAURIELLO LAW FIRM APC
1181 Puerta Del Sol

23

San Clemente, CA 92673
Telephone: (949) 542-3555

24

25

26

27

28

DONALD CHIDI AMAMGBO
donald@amamgbolaw.com
AMAMGBO & ASSOCIATES
6167 Bristol Parkway
Culver City, CA 90230
Telephone: (310) 337-1137

REGINALD VON TERRELL
reggiet2@aol.com
THE TERRELL LAW GROUP
PO Box 13315
MPB # 148
Oakland CA 94661
Telephone: (510) 237-9700

GILLIAN L WADE
gwade@milsteinadelman.com
SARA D AVILA
savila@milsteinadelman.com
CORINA N. MACCARIN
MILSTEIN ADELMAN & KREGER LLP
2800 Donald Douglas Loop N
Santa Monica, CA 90405
Telephone: (310) 396-9600

RICHARD PROAPS
rproaps@aol.com
RICHARD ALAN PROAPS, ATTORNEY AT LAW
8150 Greenback Lane,
Fair Oaks, CA 95628
Telephone: (916) 722-4881

AARON C. MAYER
aaron@mayerlawgroup.com
MAYER LAW GROUP
18 Carolina St.
Charleston, SC 29403
Telephone: (843) 376-4929

HOWARD RUBINSTEIN
LAW OFFICES OF HOWARD W. RUBINSTEIN
1615 Forum Pl.
West Palm Beach, FL 33401
Telephone: (832) 715-2788

BRIAN SMITH
bws@smithvanture.com
SMITH & VANTURE, LLP
1615 Forum Pl.
West Palm Beach, FL 33401
Telephone: (561) 684-6330

MONICA KELLY
monicakelly@ribbecklaw.com
RIBBECK LAW CHARTERED
505 North Lake Shore Drive
Chicago, IL 60611
Telephone: (312) 822-9999

ERIC QUETGLAS-JORDAN
eric@quetglaslaw.com
QUETGLAS LAW OFFICE
PO Box 16606
San Juan, PR 00908-6606
Telephone: (787) 722-7745

*Counsel for Plaintiffs*