GIBSON, DUNN & CRUTCHER LLP
S. ASHLIE BERINGER, SBN 263977
ABeringer@gibsondunn.com
JOSHUA JESSEN, SBN 222831
JJessen@gibsondunn.com
MOLLY CUTLER, SBN 261192
MCutler@gibsondunn.com
JACOB A. WALKER, SBN 271217
JWalker@gibsondunn.com
1881 Page Mill Road
Palo Alto, California  94304
Telephone:  650.849.5300
Facsimile:  650.849.5333

Attorneys for Defendant
APPLE INC., A CALIFORNIA CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re iPhone Application Litigation | CASE NO. 11-MD-02250-LHK |
| | **CLASS ACTION** |
| | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| | **HEARING:** |
| | Date:        April 11, 2013 |
| | Time:        1:30 p.m. |
| | Place:       Courtroom 4 |
| | Judge:       The Honorable Lucy H. Koh |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 1:30 p.m. on April 11, 2013,[1] or as designated by the Court, in the courtroom of the Honorable Lucy H. Koh, 280 South First Street, San Jose, California 95113, Defendant Apple Inc. ("Apple") will and hereby does move for summary judgment on all claims in Plaintiffs' Third Amended Consolidated Class Action Complaint ("TAC" or "Third Amended Complaint") under Rule 56 of the Federal Rules of Civil Procedure. The basis for the Motion is that there is no genuine dispute as to any material fact, and Apple is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

This Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Declarations of S. Ashlie Beringer, Mark Buckley, Phillip Shoemaker, Ronald Huang, and Jeffry Bolas, and all accompanying exhibits, the Court's files in this action, the arguments of counsel, and any other matter that the Court may properly consider.

## ISSUES TO BE DECIDED

1.      Is Apple entitled to summary judgment on Plaintiffs' entire Third Amended Complaint on the ground that Plaintiffs lack Article III standing?

2.      Is Apple entitled to summary judgment on Plaintiffs' claim for alleged violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL")?

3.      Is Apple entitled to summary judgment on Plaintiffs' claim for alleged violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA")?

---

[1]  If this Court elects to sequence the hearing dates for the parties' respective motions, Apple respectfully submits that the interests of efficiency and judicial economy would be better served were the Court to address Apple's dispositive motion for summary judgment before considering class certification. Apple will address these issues further in the parties' forthcoming administrative motion.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

## TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND............................................. 3

    A.    Named Plaintiffs ........................................................................................ 3

    B.    Apple Devices and iOS ............................................................................. 3

    C.    The App Store and Third-Party Apps ....................................................... 3

    D.    Apple's Privacy Policy and App Store Terms and Conditions .................. 5

    E.    Plaintiffs' Agreements With Specified App Developers ........................... 6

    F.    iDevice Plaintiffs' Claims ........................................................................ 7

        1.    Third-Party Companies' Alleged Use of UDIDs To Track ............ 7

        2.    iDevice Plaintiffs' Specific "Tracking" Allegations...................... 8

        3.    Allegations of Harm ....................................................................... 9

    G.    Geolocation Plaintiffs' Claims ................................................................. 9

        1.    Narrowed Allegations That "Location Data" Was Transmitted from Ms. Capiro's iPhone When Location Services Was Off................... 9

        2.    Allegations of Harm...................................................................... 11

    H.    Plaintiffs' Admissions and the Undisputed Facts Establish That Plaintiffs' Claims Lack Any Factual or Evidentiary Bases ...................... 11

        1.    Plaintiffs Concede They Suffered No Injury Or Detrimental Reliance ......... 12

        2.    There Is No Evidence That the Specified Apps (or Any Apps) Sent Plaintiffs' UDIDs With Personal Information to The Third-Party Companies........................................................................................ 14

        3.    There Is No Evidence To Support Isabella Capiro's Geolocation Claims...... 15

            a.    Despite an Obscure Software Bug, Apple Did Not Collect Location Data From Any iPhone When Location Services Was Off ................................................................................. 16

            b.    There Is No Evidence That Ms. Capiro Turned Off Location Services Before Upgrading to iOS 4.3.3 ........................... 18

            c.    Ms. Capiro Lacks Evidence That Any Location Data Was Collected From Her iPhone When Location Services Was Off.......... 19

III.  SUMMARY JUDGMENT STANDARD................................................................ 20

i

Gibson, Dunn &
Crutcher LLP

IV.   ARGUMENT ........................................................................................................... 20

    A.   Plaintiffs Lack Article III Standing................................................................ 20

    B.   Apple Is Entitled To Summary Judgment On Plaintiffs' UCL Claim ....................... 22

        1.   Plaintiffs Lack Standing Under The UCL....................................................... 22

        2.   Plaintiffs Lack Evidence To Support The Essential Elements Of Their UCL "Fraud" Claim ........................................................................................ 24

            a.   Plaintiffs Admit That They Did Not Review, Much Less Rely On, The Alleged Misrepresentations.................................................... 24

            b.   There Is No Evidence Of A Material Misrepresentation Or Nondisclosure.......................................................................... 25

                (i)   iDevice "Fraud" Claims ................................................. 26

                (ii)   Geolocation Claims ....................................................... 29

        3.   Plaintiffs Cannot Meet Their Burden To Demonstrate A Triable Issue Of Material Fact Under The UCL's "Unfairness" Prong............................... 31

        4.   Because There Is No Genuine Dispute That Apple's Conduct Was Not Unlawful, Apple Is Entitled To Summary Judgment On Plaintiffs' UCL "Unlawful" Claim .................................................................................. 33

    C.   Apple Is Entitled To Summary Judgment On Plaintiffs' CLRA Claim..................... 33

V.   CONCLUSION............................................................................................................ 35

Gibson, Dunn &
Crutcher LLP

ii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott v. Chem. Trust*,
  No. 01-2049-JWL, 2001 WL 492388 (D. Kan. Apr. 26, 2001)...................................................28

*Baghdasarian v. Amazon.com Inc.*,
  458 Fed. App'x 622 (9th Cir. 2011)........................................................................................25

*Birdsong v. Apple, Inc.*,
  590 F.3d 955 (9th Cir. 2009)............................................................................................22, 30

*Bower v. AT&T Mobility, LLC*,
  196 Cal. App. 4th 1545 (2011) .................................................................................................26

*Brosnan v. Tradeline Solutions, Inc.*,
  681 F. Supp. 2d 1094 (N.D. Cal. 2010) ...................................................................................23

*Brownfield v. Bayer Corp.*,
  No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035 (E.D. Cal. July 6, 2009) ...........................34

*Butler v. Adoption Media, LLC*,
  486 F. Supp. 2d 1022 (N.D. Cal. 2007) ...................................................................................23

*Caro v. Proctor & Gamble Co.*,
  18 Cal. App. 4th 644 (1993) .....................................................................................................34

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)..................................................................................................................20

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
  20 Cal.4th 163 (1999) ...............................................................................................................32

*Clemens v. DaimlerChrysler Corp.*,
  534 F.3d 1017 (9th Cir. 2008).............................................................................................25, 31

*Contreras v. Toyota Motor Sales USA, Inc.*,
  No. C 09-06024 JSW, 2010 WL 2528844 (N.D. Cal. Jun. 18, 2010), *affirmed in
  relevant part,* No. 10-16556, 2012 WL1997802 (9th Cir. June 5, 2012) .................................33

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012).............................................................................................31, 33

*Express, LLC v. Fetish Group, Inc.*,
  464 F. Supp. 2d 965 (C.D. Cal. 2006) ....................................................................................27

*Feezor v. Patterson*,
  Civ. No. S-10-1165 KJM GGH, 2012 WL 4764412 (E.D. Cal. Oct. 5, 2012)...........................21

*Ferrington v. McAfee, Inc.*,
  No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) ................................26, 34

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

*Freeman v. Time, Inc.*,
   68 F.3d 285 (9th Cir. 1995) ............................................................................................. 26, 29

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ................................................................................................................ 21

*Frogface v. Network Solutions, Inc.*,
   No. C-00-3854-WHO, 2002 WL 202371 (N.D. Cal Jan. 14, 2002) ..................................... 32

*Gutierrez v. Kaiser Found. Hosp., Inc.*,
   No. C 11-3428 CW, 2012 WL 5372607 (N.D. Cal. Oct. 30, 2012) ..................................... 23

*In re Actimmune Mktg. Litig.*,
   No. C 08-02376-MHP, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) .................................. 27

*In re Facebook Privacy Litigation*,
   791 F. Supp. 2d 705 (N.D. Cal. 2011) .................................................................................. 35

*In re Sony Gaming Networks and Consumer Data Security Breach Litig.*,
   No. 11-md-02258-AJB-MDD, 2012 WL 4849054 (S.D. Cal. Oct. 11, 2012) ................. 24, 29

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ....................................................................................................... 23, 24

*Janda v. T-Mobile USA, Inc.*,
   378 F. App'x 705 (9th Cir. 2010) ..................................................................................... 26, 29

*Johns v. Bayer Corp.*,
   No. 09-1935 DMS, *2010 WL* 476688 (S.D. Cal. Feb. 9, 2010) .......................................... 35

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) .................................................................................................... 22

*Kwikset Corp v. Sup. Ct.*,
   51 Cal. 4th 310 (2011) ............................................................................................................. 2

*La Mar v. H & B Novelty & Loan Co.*,
   489 F.2d 461 (9th Cir. 1973) .................................................................................................. 21

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003) ................................................................................................ 26

*Lozano v. AT&T Wireless Services, Inc.*,
   504 F.3d 718 (9th Cir. 2007) .................................................................................................. 31

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................................................... 20, 21

*Marilao v. McDonald's Corp.*,
   632 F. Supp. 2d 1008 (S.D. Cal. 2009) ................................................................................. 24

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ................................................................................................................ 20

*McDonald v. Coldwell Banker*,
   543 F.3d 498 (9th Cir. 2008) .................................................................................................. 32

iv

*McKell v. Washington Mut., Inc.*,
   49 Cal. Rptr. 3d 227 (2006) ...................................................................... 31

*Meyer v. Sprint Spectrum L.P.*,
   45 Cal. 4th 634 (2009) ............................................................................... 33

*Millett v. Experian Info. Solutions, Inc.*,
   319 Fed. App'x 562 (9th Cir. 2009)........................................................... 33

*Pfizer v. Superior Court*, 182 Cal. App. 4th 622 (2010),.............................. 25

*Plotkin v. Sajahtera, Inc.*,
   106 Cal.App.4th 953 (2003) ...................................................................... 30

*Rivera v. Wyeth-Ayerst Laboratories*,
   283 F.3d 315 (5th Cir. 2002)...................................................................... 21

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010).............................................................. 31, 32

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal. App. 4th 861 (1999) ...................................................................... 31

*S.D. Myers, Inc. v. City and County of San Francisco*,
   253 F.3d 461 (9th Cir. 2001)...................................................................... 20

*Schauer v. Mandarin Gems of Cal., Inc.*,
   125 Cal. App. 4th 949 (2005) .................................................................... 35

*Scott v. Harris*,
   550 U.S. 372 (2007).................................................................................... 20

*Searle v. Wyndham Int'l, Inc.*,
   102 Cal. App. 4th 1327 (2002) .................................................................. 27

*Shalaby v. Bernzomatic*,
   281 F.R.D. 565 (S.D. Cal. 2012)............................................................... 31

*Shvarts v. Budget Group*,
   81 Cal. App. 4th 1153 (2000) .................................................................... 30

*Smith v. Chase Mortg. Credit Group*,
   653 F. Supp. 2d 1035 (E.D. Cal. 2009)..................................................... 32

*Spiegler v. Home Depot U.S.A., Inc.*,
   552 F. Supp. 2d 1036 (C.D. Cal. 2008) .................................................... 28

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011).................................................................... 24

*Summers v. Teichert & Son, Inc.*,
   127 F.3d 1150 (9th Cir. 1997).................................................................... 20

*Swift v. Zynga Game Network, Inc.*,
   805 F. Supp. 2d 904 (N.D. Cal. 2011) ........................................................ 6

v

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) .................................................................................... 33

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003) .................................................................................... 34

*TW Elec. Serv. v. Pac. Elec. Contractors*,
   809 F. 2d 626 (9th Cir. 1987) ..................................................................................... 25

*Van Ness v. Blue Cross of Cal.*,
   87 Cal. App. 4th 364 (2001) ....................................................................................... 28

*Webb v. Carter's Inc.*,
   272 F.R.D. 489 (C.D. Cal. 2011) ............................................................................... 23

*Williams v. Purdue Pharma Co.*,
   297 F. Supp. 2d 171 (D.D.C. 2003) ........................................................................... 22

*Xavier v. Philip Morris USA Inc.*,
   787 F. Supp. 2d 1075 (N.D. Cal. 2011) ..................................................................... 34

**Statutes**

Cal. Bus. & Prof. Code § 17200 ....................................................................................... 22

Cal. Bus. & Prof. Code § 17204 ....................................................................................... 22

Cal. Civ. Code § 1761 ....................................................................................................... 35

**Rules**

Fed. R. Civ. P. 56 .............................................................................................................. 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

On September 20, 2011, this Court dismissed Plaintiffs' First Consolidated Complaint ("FCC") for lack of Article III standing.  The Court found, among other things, that Plaintiffs had "not identified a concrete harm from the alleged collection and tracking of their personal information sufficient to create injury in fact" and had failed to "allege injury in fact to *themselves*."  Dkt. No. 8 (9-20-11 Order) at 6-7 (emphasis in original).  The Court observed that the allegations of harm were "especially slim with respect to Defendant Apple," and further noted that since "there [was] no allegation that Apple," in contrast to the Mobile Industry Defendants, had "misappropriated data, [] there [was] no nexus between the alleged harm and Apple's conduct."  *Id.* at 6, 9.  The Court put Plaintiffs on clear notice that in any amended complaint Plaintiffs needed to specify (1) the "apps they downloaded that access/track their information," (2) the "harm (if any) [that] resulted from the access or tracking of their personal information," and (3) "the causal connection between the exact harm alleged (whatever it is) and each Defendant[']s conduct or role in that harm."  *Id.*

On June 12, 2012, after Apple and the Mobile Industry Defendants moved to dismiss Plaintiffs' First Amended Complaint ("FAC"), the Court held that all of Plaintiffs' claims except two (the UCL and CLRA claims against Apple) failed to state a claim upon which relief could be granted.  *See* Dkt. No. 69 (6-12-12 Order) at 44.  With respect to Article III standing, however, the Court found that "Plaintiffs [had] addressed the concerns identified in the Court's September 20 Order and [had] articulated a particularized harm as to themselves" by alleging, among other things, "which apps they downloaded that accessed or tracked their personal information" and "what harm resulted from the access or tracking of their personal information."  *Id.* at 10.  Thus, the Court found that "as a matter of *pleading* Article III standing, Plaintiffs [had] sufficiently articulated the alleged injury is fairly traceable to the conduct of both [sets of] Defendants."  *Id.* at 12 (emphasis added).  Importantly, with respect to the two surviving claims against Apple, the Court noted that Plaintiffs' allegations "may prove false," but "at this stage . . . [were] sufficient to state a claim."  *Id.* at 34, 38-39.

The Court's observation that Plaintiffs' allegations "may prove false" was prescient.  Apple now has deposed all four of the named Plaintiffs and has conducted a forensic analysis of Plaintiffs'

iPhones.  That discovery has revealed the following undisputed facts, which are fatal as a matter of law both to Plaintiffs' standing under Article III and the UCL and to Plaintiffs' two surviving claims:

(1)   Contrary to their allegations, Plaintiffs **admit** they have not suffered any injury in fact. Specifically, ***Plaintiffs admit they have suffered no harm whatsoever***—not in "consumed iDevice resources" or in any other way.

(2)   Plaintiffs **admit** they have not lost any money or property.

(3)   Plaintiffs **admit** that they still have *no idea* whether their "personal information" or "location data" was "tracked," or was *in fact* collected or sent from their phones (neither Plaintiffs nor their counsel investigated these facts before filing suit or amending their complaints).  And a forensic analysis of Plaintiffs' iPhones reveals that ***there is no evidence that any of Plaintiffs' "personal information" or "location data" was, in fact, transmitted to the Mobile Industry Defendants or Apple***.  These allegations were simply manufactured to overcome this Court's September 20, 2011 Order.

(4)   Plaintiffs **admit** that the handful of alleged misrepresentations they identify in the TAC had nothing to do with their decision to purchase iPhones.  In fact, Plaintiffs **admit** they ***never even saw, much less relied upon, any statement by Apple*** before purchasing their iPhones.  These admissions are fatal to Plaintiffs' "overpayment" theory of Article III and UCL standing (as well as to their two substantive claims)—a theory that Plaintiffs borrowed from recent case law (*e.g.*, *Kwikset Corp. v. Sup. Ct.*, 51 Cal. 4th 310 (2011)) but that ***never had any basis in fact***.

(5)   Even if Plaintiffs had relied on any statement by Apple (the evidence is undisputed that they did not), the alleged misrepresentations were not deceptive or misleading *at all*.  Plaintiffs ***cannot point to a shred of evidence that Apple's statements were likely to deceive*** the general public.

Because each of the foregoing facts is undisputed—and because Plaintiffs have failed to adduce evidence that could create a genuine issue of fact on any element of their two surviving claims— Apple is entitled to summary judgment on Plaintiffs' entire Third Amended Complaint.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

**A.      Named Plaintiffs**

The Third Amended Complaint was filed on behalf of four named Plaintiffs.  The so-called iDevice Plaintiffs consist of:  (1) Anthony Chiu, a California resident who "purchased an iPhone 4 in or around June 2010" (and recently received an iPhone 4S, which his counsel purchased for him on May 15, 2012), and (2) Cameron Dwyer, a California resident who "originally purchased an iPhone in or around Summer 2010, which he replaced with an iPhone 3G[S] in or around Fall 2011," months *after* this action was filed.  TAC ¶¶ 26-27; Declaration of S. Ashlie Beringer (hereinafter "Beringer Decl."), Ex. B (Aug. 15, 2012 Chiu Deposition Transcript (hereinafter "Chiu Dep.")) at 24:13-26:9.  Dwyer's counsel purchased him an iPhone 4S in August 2012.  Beringer Decl., Ex. A (Aug. 14, 2012 Dwyer Deposition Transcript (hereinafter "Dwyer Dep.")) at 32:3-21, 33:23-34:2.

The Geolocation Plaintiffs are Alejandro Capiro and his daughter, Isabella Capiro, California residents who each acquired an iPhone 4 in or around December 2010 (Alejandro bought both phones, but the claims are limited to Isabella's phone).  TAC ¶¶ 29-30; Beringer Decl., Ex. D (Oct. 30, 2012 Isabella Capiro Deposition Transcript (hereinafter "I. Capiro Dep.")) at 8:1-6; Beringer Decl., Ex. C (Oct. 29, 2012 Alejandro Capiro Deposition Transcript (hereinafter "A. Capiro Dep.")) at 7:8-8:6, 9:2-9.  The Capiros were added as Plaintiffs to the Third Amended Complaint after previous Geolocation Plaintiff, Arun Gupta, dropped out of the case shortly after being deposed.

**B.      Apple Devices and iOS**

Apple is a California corporation that manufactures iPhones and other devices.  TAC ¶¶ 31-32.  Apple has developed a mobile operating system software called iOS, which is analogous to traditional operating systems that run on PCs, such as Windows or Mountain Lion.  Declaration of Phillip Shoemaker (hereinafter "Shoemaker Decl."), ¶ 2.  Apple frequently issues updates to iOS, and users can install new versions of iOS as they become available, without cost.  *Id.* ¶ 3.  As such, there is no correlation between the hardware version of a particular iPhone (e.g., iPhone 4) and the iOS software version running on the device (e.g., iOS 5).  *Id.* ¶ 4.

**C.      The App Store and Third-Party Apps**

While iOS is the underlying software that controls the device itself, users can choose to

1    download software applications (often called "apps" for short) to add a broad range of customized

2    functions to their device. *Id.* ¶ 5. Users can find and download third-party apps from the "App

3    Store," an electronic shopping environment where app developers can sell (or give away) their

4    software. *Id.* ¶ 6. More than 700,000 third-party software apps currently are available in the App

5    Store, offering a staggering variety of different software features. *Id.* ¶¶ 5-6.

6         When a user chooses to download an app from the App Store, she is downloading a piece of

7    standalone software, distributed through the App Store, but programmed and controlled entirely by

8    the third-party app developer. *Id.* ¶¶ 7-8. Apple's role is that of an electronics store: it creates the

9    digital storefront where users can browse and download apps, but it does not create, control, or have

10   access to, the software inside the application. *Id.* Indeed, Apple has no greater visibility into what

11   happens inside an app that is running on a user's device than a PC manufacturer has when a user is

12   running printer or photo editing software on a home computer. *Id.*

13        To enable third parties to develop software that runs on iOS mobile devices, Apple has

14   created programming guides and tools that explain to developers how their software can interact with

15   iOS. *Id.* ¶ 9. Apple thus designs the "application programing interfaces" ("APIs")—i.e., the specific

16   commands that allow third-party apps to "talk to" and interact with the iOS software on a user's

17   device. *Id.* For example, special printing APIs allow application developers to handle

18   communications between a device and a printer through iOS, rather than having to reprogram that

19   functionality inside their app. *Id.* APIs are part of all modern computer systems. *Id.* Developers can

20   pick and choose from hundreds of different approved APIs when creating their unique applications.

21   *Id.* ¶ 10. As described below, the iDevice Plaintiffs' claims against Apple center on the ability of app

22   developers to request a unique serial number associated with a particular device called the Unique

23   Device Identifier (or "UDID") through an API created by Apple.

24        All developers who offer apps in the App Store are required to agree to the iOS Developer

25   Program License Agreement ("PLA"). TAC ¶ 78. The PLA is a ***confidential agreement*** between

26   Apple and developers that imposes certain contractual requirements on app developers, including a

27   requirement that developers obtain consent before collecting any user or device data through their

28   apps. Shoemaker Decl. ¶ 13. The PLA is available only to registered developers. *Id.*

Apple also provides third-party developers with App Store Review Guidelines that include more than 120 separate provisions on matters ranging from functionality (e.g., do not drain battery life) to content restrictions (e.g., avoid realistic depictions of violence) to legal provisions (e.g., do not enable illegal file sharing). *Id.* ¶¶ 14-15. Although Apple performs a basic review of all apps before they may be distributed in the App Store (a process that is necessarily constrained by the sheer number of apps—more than 700,000 approved to date), it does not have access to the source code that would indicate how, whether, or when a specific app collects and transmits data from the device. *Id.* ¶¶ 7-8. If Apple detects a violation of the guidelines during its review process, it may reject the app. *Id.* As with the iOS Developer PLA, these review guidelines are available only to developers. *Id.* ¶ 16.

**D.     Apple's Privacy Policy and App Store Terms and Conditions**

Users who purchase an iOS device do not automatically have the ability to download apps from the App Store. Declaration of Mark Buckley (hereinafter "Buckley Decl."), ¶ 12. Rather, in order to access the App Store and purchase or download an app (including a free app), a user must first create an Apple ID and affirmatively agree to the iTunes and App Store Terms and Conditions ("App Store Terms and Conditions" or "Terms"), which include Apple's Privacy Policy, by scrolling through the Terms and clicking "Agree." *Id.*

Importantly, Apple's Privacy Policy (to which each Plaintiff affirmatively agreed) states up front that it applies solely to how *Apple* "collect[s], use[s], disclose[s], transfer[s], and store[s]" user information—and not to the practices of third-party app developers. *Id.* ¶ 12, Exs. K-L. In addition, Apple's Privacy Policy clearly discloses that third-party apps may collect information from users' iOS devices depending on the app developers' privacy practices:

> Our products and services may also use or offer products or services from third parties – **for example, a third-party iPhone app. Information collected by third parties, which may include such things as location data or contact details, is governed by their privacy practices.** We encourage you to learn about the privacy practices of those third parties.

*Id.* ¶ 20, Exs. E-L (emphasis added).

Likewise, the App Store Terms and Conditions specifically provide that "Apple is not responsible for examining or evaluating the content or accuracy and Apple does not warrant and will

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

1   not have any liability or responsibility for any third-party materials," which specifically include

2   "[p]roducts that have been developed, and are licensed to you, by a third party developer." *Id.* ¶¶ 13-

3   14, Exs. E-J.  Similarly, Plaintiffs' agreement with Apple contains several express disclaimers

4   relieving Apple of any liability for the content and practices of third-party apps. *Id*. ¶¶ 13-15.

5   **E.      Plaintiffs' Agreements With Specified App Developers**

6          While the App Store Terms and Conditions govern Plaintiffs' use of the App Store itself,

7   separate end user license agreements (or "EULAs") and privacy policies with an app's developer

8   apply to their use of specific apps.  Beringer Decl. ¶¶ 7, 10.  Some developers may require users to

9   affirmatively agree to the app's privacy policy and EULA before the user may use the app, such as

10  the Flixster app. *Id*. ¶ 10, Ex. I.  Others may provide notice of the app's terms on the page where the

11  user consents to install the app (e.g., the Dictionary.com app). *Id.* ¶ 7, Ex. F; *cf. Swift v. Zynga Game*

12  *Network, Inc.*, 805 F. Supp. 2d 904, 911-12 (N.D. Cal. 2011) (assent to gaming app's terms of service

13  where "plaintiff was provided notice and an opportunity to review terms of service prior to

14  acceptance").

15         Despite Plaintiffs' assertion that certain apps collected UDIDs and "personal information"

16  without consent (TAC ¶ 28), the agreements governing their use of these apps belies this claim.  For

17  example, although Plaintiff Chiu alleges that the Dictionary.com app collected and shared device

18  information (such as UDID and device type) and information about his app activities without consent

19  (TAC ¶¶ 40-43), Dictionary.com's EULA and privacy policy require all users (including Chiu) to

20  consent to these data practices.  Beringer Decl. ¶ 8-9, Exs. G, H; *see also* Chiu Dep. 149:4-18

21  (acknowledging continued use of app).  Indeed, the Dictionary.com Privacy Policy clearly provides

22  that (1) when one "uses [its] apps," Dictionary.com "automatically collect[s] and store[s] …

23  information includ[ing] … type of device, web browser or operating system … time zone, language

24  … [the] mobile device's unique ID number … URL of the last web page [the user] visited before

25  visiting [a Dictionary.com site] … words [the user] ha[s] looked up and results [the user] selected …

26  [and] which services and features [were] used," and (2) it "allow[s] analytics companies to use

27  tracking technologies to collect information about [its] users' … mobile devices and their online

28  activities[.]"  Beringer Decl. ¶ 8, Ex. G (Dictionary.com Privacy Policy (emphasis added)); *see also*

Gibson, Dunn &
Crutcher LLP

*id.* ¶ 9, Ex. H (Dictionary.com EULA) ("Advertisers and advertising networks … may also collect, store and use … information about … usage of the App, ... general geographic area and interaction with ads <u>and to link this data with your UDID for their own usage</u>, including targeting ads to you."); *id.* ¶ 11, Ex. J (Flixster Privacy Policy obtains users' consent to the use of their information in accordance with the policy); Chiu Dep. 149:4-18.

Although Plaintiffs Chiu and Dwyer could not recall during their depositions whether they reviewed specific apps' terms of service, they conceded that their use of apps was governed by separate license agreements with the app developers and, further, that they sometimes reviewed these terms before downloading or updating their apps.  Chiu Dep. 63:15-64:1, 67:6-70:8; Dwyer Dep. 68:13-70:20.

**F.      iDevice Plaintiffs' Claims**

The iDevice Plaintiffs—Messrs. Chiu and Dwyer—allege that five free apps that they chose to download and use (specifically, Dictionary.com, Flixster, Pandora, Weather Channel, and Urban Spoon (together, the "Specified Apps")) transmitted supposedly "personal information" from their iPhones without their consent to certain third-parties—specifically, five mobile advertising and/or analytics companies, which Plaintiffs dub the Tracking Companies (hereinafter, "Third-Party Companies").  TAC ¶¶ 35-46.  More particularly, Plaintiffs' claims against Apple focus on the Specified Apps' alleged use of an Apple-approved API to access the phone's UDID (along with other anonymous device information such as iOS and hardware version) and transmission of the UDID together with "personal information" (provided by Plaintiffs) to the Third-Party Companies.  TAC ¶¶ 40-42, 44, 46, 82-87, 126-135.

Notably, the Court previously found that even if "this information"—i.e., "the unique device identifier number, personal data, and geolocation information from Plaintiffs' iDevices"—"was transmitted without Plaintiffs' knowledge and consent, a fact disputed by Defendants, such disclosure does not constitute an egregious breach of social norms," but rather "routine commercial behavior." Dkt. No. 69 (6-12-12 Order) at 23 (citation omitted).

**1.      Third-Party Companies' Alleged Use of UDIDs To Track**

Importantly, the iDevice Plaintiffs have not alleged or adduced any evidence that Apple *itself*

collected or transmitted any Plaintiff's UDID or purported "personal information." Instead, Plaintiffs' claims focus on the fact that apps are able to request a UDID from iOS through one of hundreds of APIs created by Apple. Shoemaker Decl. ¶¶ 9-11; *see* TAC ¶ 85. Plaintiffs cannot refute the fact that apps may request a UDID for any number of valid reasons that do not implicate their claims, including for fraud protection, content delivery, or as part of a security solution. Beringer Decl. Ex. N (Nov. 30, 2012 Neuenschwander Deposition Transcript (hereinafter "Neuenschwander Dep.")) 67:10-69:8.

Critically, Plaintiffs do not complain about *all* uses by app developers of the UDID, but instead limit their claims to a specific concern that some developers may (1) combine the UDID with personally-identifiable information, and (2) share that information with third parties who can use that information to "track" their activities across different apps and platforms. Specifically, Plaintiffs assert that the "Apple-assigned UDID information" is "[o]ne of the most valuable pieces of information" available to the Third-Party Companies "because, *if combined with other information, such as other information easily available on the iDevice, it can be used to personally identify a user.*" TAC ¶¶ 82-83 (emphasis added). And, Plaintiffs allege, "[t]hat is exactly what happened with each Plaintiff in this litigation"—namely, "*Plaintiffs' UDID information, along with other data like geographic location data[,] was collected by each Tracking Company, such that each Tracking Company was able to personally identify each Plaintiff.*" *Id.* ¶ 84 (emphasis added).

### 2. iDevice Plaintiffs' Specific "Tracking" Allegations

In response to the Court's September 20, 2011 Order, and specifically to cross over the Article III hurdle, Plaintiffs amended their complaint to specify how each Plaintiff's personal information supposedly had been "tracked." FAC ¶¶ 58-63; *see also* Dkt. No. 8 (9-20-11 Order) at 5-6 (dismissing FCC due to, *inter alia*, Plaintiffs' failure to "allege concrete particularized injury in fact to *themselves*," including by "identif[ying] which Defendant (if any) accessed or tracked their personal information [and] . . . which apps they downloaded that access/track their personal information"). Specifically, Plaintiffs amended their complaint to detail more than fifty (50) pieces of information that particular Specified Apps supposedly had transmitted to specific Third-Party Companies. These allegations are summarized in the chart attached as Appendix A.

Several critical points emerge from these allegations.  **First**, most of the categories of "personal information" Plaintiffs allege were tracked by the Third-Party Companies cannot be obtained through an Apple-approved API.  Bolas Decl. ¶¶ 12-13, 35-71.  Instead, such data (such as age, gender, etc.) must be provided directly by the end user to the app, and Apple has no knowledge about or involvement in apps' collection or transmission of this information.  *Id*.

**Second**, Plaintiff Dwyer does not even allege that the Specified Apps transmitted a UDID or any other information obtained through an Apple-approved API; instead, his claims are directed entirely to information he voluntarily provided to Pandora, and an alleged identifier created by DoubleClick—allegations that, on their face, have nothing to do with Apple.  *See* TAC ¶ 41-42.

**Finally**, despite Plaintiffs' allegations that as a result of the transmission of this data (1) "each Tracking Company was able to personally identify each Plaintiff" (TAC ¶ 84), and (2) "every other piece of information collected by the Tracking Companies was tied to Plaintiffs' respective identities and used to further build a more complete profile of Plaintiffs" (*id*.), not a single piece of information allegedly transmitted may be used to "personally identify" any Plaintiff.  *See* Appendix A.

### 3.     Allegations of Harm

Beyond adding pages of new "facts" in their amended complaint to support allegations that they *themselves* had been "tracked," Plaintiffs added several allegations specifying how they supposedly had suffered from these alleged practices.  First, the iDevice Plaintiffs alleged that the collection and disclosure of their "personal information" to the Tracking Companies had consumed the "iDevice storage, battery life, and bandwidth from *each Plaintiff's* wireless services provider." TAC ¶ 4 (emphasis added).  Second, borrowing a page from recent California case law (*Kwikset*), they allege that "Plaintiffs . . . would not have purchased their iDevices and/or would not have paid as much for them, if Apple had disclosed" the way that Third-Party Companies collect information. TAC ¶¶ 186-189; *see also* Dkt. No. 69 (6-12-12 Order) at 33-34, 38.

### G.     Geolocation Plaintiffs' Claims

### 1.     Narrowed Allegations That "Location Data" Was Transmitted from      Ms. Capiro's iPhone When Location Services Was Off

The Geolocation Plaintiffs—Alejandro and Isabella Capiro—purport to assert claims

stemming from allegations that unspecified "geolocation information" was transmitted from Ms. Capiro's iPhone to Apple's servers after she turned off the Location Services feature on her phone. TAC ¶¶ 29-30, 163.  Like the iDevice Plaintiffs, the Capiros assert two claims against Apple under the UCL and CLRA.[2]

In permitting the Geolocation Claims to go forward under the UCL and CLRA, the Court relied on former Plaintiff Gupta's false "assert[ion] that Apple designed its iOS 4 software to retrieve and transmit geolocation information located on its customers' iPhones to Apple's servers [and] that Apple intentionally collected and stored Plaintiffs' precise geographic location."  Dkt. No. 69 (6-12-12 Order) at 9-12.  Like each of the current Plaintiffs, Mr. Gupta conceded that neither he nor his counsel ever investigated these claims.  Beringer Decl., Ex. E (Aug. 4, 2012 Gupta Deposition Transcript (hereinafter "Gupta Dep.")) at 177:12-178:15.  Mr. Gupta and his counsel have since withdrawn from this case, shortly after Mr. Gupta was deposed.  *See* Dkt. No. 104 (TAC); Dkt. 112.

Since this Court's June 12 Order, Plaintiffs have substantially narrowed the theory of the "geolocation" claims based on information Apple furnished to Plaintiffs.  *See* Beringer Decl., Exs. L-M.  Abandoning claims that Apple tracked the location of individual iPhones, collected Plaintiffs' precise geographic location, and stored that information in a "consolidated.db" file on Plaintiffs' iPhones containing "a timeline and map of Plaintiffs' every move" (Apple did none of these things) (FAC ¶¶ 116, 142-44, 151-52), Plaintiffs now allege merely that "it appears" certain anonymous "location data" was transmitted from Plaintiff Isabella Capiro's iPhone to Apple's servers, "[n]otwithstanding her attempt to turn off [L]ocation Services."  TAC ¶ 30.

Plaintiffs' allegations are the misguided response to an April 24, 2011 news report that iPhones appeared to cache information about the location of publicly-broadcasting cell towers and WiFi hotspots when Location Services was off on the device.  Declaration of Ronald Huang (hereinafter "Huang Decl."), Ex. A (Jennifer Valentino-Devries, *iPhone Stored Location in Test Even*

---

[2]  Plaintiffs also reassert a claim for "Violations of the Stored Communications Act" (which this Court dismissed with prejudice) on behalf of the putative Geolocation Class as a "Third Claim for Relief," "for appeal purposes only."  TAC ¶ 39 n.16.  Although Apple disagrees that this is necessary to preserve this claim for appeal, Plaintiffs have confirmed that they are not pursuing this dismissed claim.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

*if Disabled,* WALL ST. J. Apr. 24, 2011).  As explained in detail below and in the accompanying declaration of Apple senior engineer Ron Huang, this news report led to Apple's same-day investigation and discovery of an obscure software bug that (i) was triggered in very rare circumstances; (ii) did not involve the transmission of any location data to Apple; and (iii) was quickly resolved by Apple.  *Id.* at ¶ 13-15.  Notably, Plaintiffs have dropped unsupported (and incorrect) allegations from their earlier pleadings insinuating that Apple was lying when it attributed this behavior to the operation of an unintentional bug (*see* FAC ¶¶ 145-49)—and indeed, Apple has produced irrefutable evidence that Apple was not aware of this software bug until it investigated the issue raised in the WSJ article.  *See* Huang Decl. ¶ 13.

### 2.  Allegations of Harm

In addition to alleging that unspecified "location data" may have been transmitted to Apple when she "attempted" to turn Location Services off, Plaintiff Isabella Capiro alleged that this transmission caused her to lose "solid-state memory space," "battery resources," and "portions of the 'cache' and/or gigabytes of memory" on her device.  TAC ¶¶ 94-98, 186.  The Court relied on similar claims—i.e., that "Apple intentionally collected and stored Plaintiffs' precise geographic location, and that this led to loss of storage space on their iDevices"—when finding the former Geolocation Plaintiff had alleged harm "fairly traceable to Apple's conduct."  Dkt. No. 69 (6-12-12 Order) at 12.

Like the iDevice Plaintiffs, the Geolocation Plaintiffs further alleged that they "*relied* upon Apple's representations with respect to . . . the ability to opt-out of geolocation tracking, *in making their purchasing decisions*."  TAC ¶¶ 57-59, 116, 183-89, 207 (emphases added).

## H.  Plaintiffs' Admissions and the Undisputed Facts Establish That Plaintiffs' Claims Lack Any Factual or Evidentiary Bases

Following the Court's June 12 Order, which resulted in the dismissal of most of Plaintiffs' claims, Plaintiffs filed their Second Amended Complaint on July 3, 2012.  *See* Dkt. No. 74 (SAC).  Plaintiffs filed the operative Third Amended Complaint on October 4, 2012 (in response to the Court's order advising Plaintiffs that they would have one final opportunity to amend their complaint to add new plaintiffs).  *See* Dkt. No. 104 (TAC); Dkt. No. 88 (Minute and Case Management Order issued 8-8-2012, setting October 4, 2012 as deadline for Plaintiffs to amend complaint).

Gibson, Dunn &
Crutcher LLP

In the months since the Court's June 12 Order, Apple has deposed each of the four named Plaintiffs and performed a forensic analysis of their iPhones and related back-up files.  This discovery has revealed that each of the specific "facts" Plaintiffs added to their pleadings—and, in particular, the allegations this Court cited when sustaining Plaintiffs' UCL and CLRA claims—were *without a factual basis*.  Accordingly, as a matter of undisputed fact, Plaintiffs (1) lack standing to maintain their claims and (2) lack factual support for any element of their UCL and CLRA claims.

### 1.      Plaintiffs Concede They Suffered No Injury Or Detrimental Reliance

Critically, Plaintiffs each *admitted* in sworn deposition testimony that they cannot identify *any harm whatsoever* due to the alleged practices they challenge here.  For example, iDevice Plaintiff Chiu agreed that he could not "identify any harm that [he] personally experienced due to the alleged collection of information and transmission of information from [his] phone."  Chiu Dep. 147:16-148:11 ("Q.  Is the answer no you cannot identify any harm, sitting here today?  A. Correct."); *see also* Dwyer Dep. 243:5-16.  Likewise, Isabella Capiro—the sole Plaintiff who alleges that geolocation information was transmitted from her iPhone when Location Services was off— conceded that she could not identify a single instance of harm relating to her claims against Apple:

> Q.      Can you identify any harm that you personally have experienced due to anything having to do with Location Services? . . .
> A.      No.

I. Capiro Dep. 101:9-14; *id.* 91:11-21, 99:4-9; A. Capiro Dep. 131:23-132:4; *id.* 132:6-17, 135:11-19.

More troubling, Plaintiffs do not even know whether their data actually was "tracked" as they allege—and as explained below, *there is no evidence that it was*.  For example, Plaintiff Chiu testified:

> Q.      And did you at any point in time come to believe that you specifically had personal information collected about you and sent to third parties?
> A.      Again, not that I know of.
> Q.      So sitting here today, you still don't know whether any of the apps that you've installed onto your iPhones, in fact, collected personal information about you and sent that to third parties? . . .
> A.      No.

Chiu Dep. 112:18-113:2; *id.*104:13-24, 112:12-113:2, 118:15-119:15,140:10-142:25; *see also* Dwyer Dep. 176:17-179:6, 179:19-180:8, 180:14-183:11, 242:4-12; I. Capiro Dep. 94:7-95:12, 97:12-17,

91:3-9, 92:9-14; A. Capiro Dep. 163:14-164:3, 131:7-21, 144:9-20.

Moreover, *none of the Plaintiffs recalls reading, much less relying on, any statement or representation from Apple* (including any of the statements they cite in the TAC).  *See* A. Capiro Dep. 16:12-17:6, 158:3-12; I. Capiro Dep. 11:6-12; Dwyer Dep. 17:23-18:2, 19:6-9, 31:9-12; Chiu Dep. 42:21-43:13.  And Plaintiffs concede that their decisions to purchase iPhones had nothing to do with any privacy statement by Apple (which they admittedly did not read) or with any of the issues they complain about here.  Thus, for example, Plaintiff Alejandro Capiro—the sole Plaintiff who purchased the iPhones that are the subject of the Geolocation Claims—testified that he was not even aware of Location Services at the time he purchased these phones, and certainly was not aware of any statements concerning the effect of turning Location Services off:

> Q. So is it fair to say that at the time you purchased your iPhone and the iPhones for Isabella and Andres, the functionality around Location Services was not a consideration in your decision to purchase the iPhones?
> A. Correct.

A. Capiro. Dep. 20:17-22; *id.* 20:7-16, 112:22-25; *see also* I. Capiro Dep. 11:6-12, 72:18-20. Likewise, iDevice Plaintiff Chiu testified that he based his purchasing decisions entirely on word of mouth and third-party sources—and not on any putative representations about privacy:

> Q. [A]side from speaking to people who had been using the iPhone and reviewing reviews on CNet, can you think of anything else that you reviewed or researched as part of your decision to purchase the iPhone 3G?
> A. No.

Chiu Dep. 18:24-19:4*; see also* Dwyer Dep. 17:23-18:2 ("Q. [A]side from the reviews . . ., was there anything else that you read . . . before purchasing the iPhone . . . ? A.  No, no.").

Tellingly, even after filing the Third Amended Complaint—after Plaintiffs were fully aware of the alleged concerns regarding app data collection and Location Services—Plaintiffs have continued to purchase or acquire new Apple devices and to use the exact same apps and location-based services at the heart of their claims.  Chiu Dep. 25:5-26:14 (acquired iPhone 4S after filing complaint); *Id*. 149:4-18 ("Q. [Y]ou continue to use [Urban Spoon, Flixster, and Dictionary.com apps] . . . since filing this lawsuit?  A.  Yes."); TAC ¶ 27 (Dwyer purchased new iPhone 3GS after filing complaint); Dwyer Dep. 31:24-32:21 (acquired iPhone 4S after filing complaint), 27:4-6,

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

260:18-23 ("Q. [Y]ou continue to download and use free apps, knowing that there is a possibility that apps [are sharing personal information without your consent]? . . . A. Yes."), 261:25-262:3 ("Q. [M]ost of the apps that you downloaded onto your new phone in the last four or five weeks are free apps?  A. Yes."); I. Capiro Dep. 60:25-61:8 (plaintiff had Location Services turned on at the time of the deposition); A. Capiro Dep. 20:17-22 ("Q.  [Y]ou have not . . . turned the Location Services setting off at any point since acquiring an iPhone in December 2010?  A. . . . However it came is the way it is.").

### 2.      There Is No Evidence That the Specified Apps (or Any Apps) Sent Plaintiffs' UDIDs With Personal Information to The Third-Party Companies

When a user installs an app onto her iPhone, Apple does not receive any information or data about the activities of that app on the user's device, including what data the app may collect from the user or transmit to third parties.  Shoemaker Decl. ¶ 8.  Because Plaintiffs failed to conduct any live network analysis of their phones prior to filing their complaint, the only possible source of evidence concerning the data that was collected and transmitted in the past by apps running on Plaintiffs' iPhones are the data files on the devices themselves.  Bolas Decl. ¶¶ 18, 20-21.

After initially resisting production of Plaintiffs' iPhones, Plaintiffs' counsel eventually agreed to permit a third-party forensic expert to create forensic images of Plaintiffs' iPhones.  Forensic expert Jeff Bolas conducted a comprehensive analysis of the forensic images of iDevice Plaintiff Chiu's and Dwyer's iPhones, including referrer logs and other data that reflects the transmission of data from their iPhones to third parties.  Bolas Decl. ¶¶ 24-25.  This analysis revealed that there is ***no evidence whatsoever to support Plaintiffs' claims that the Specified Apps transmitted an "Apple-assigned UDID" to the Third-Party Companies***.  TAC ¶¶ 82-84; Bolas Decl. ¶¶ 47, 67.  Likewise, there is no support for Plaintiffs' claims that other pieces of information (provided voluntarily by Plaintiffs directly in the app) were transmitted to the Third-Party Companies.  *Id.*  Mr. Bolas' analysis is summarized in the table attached as Appendix A.

In short, a forensic analysis of the iPhones used by iDevice Plaintiffs Dwyer and Chiu reveals that there is ***no evidentiary basis whatsoever*** for Plaintiffs' claims that the Specified Apps transmitted a UDID or other device information obtained through Apple APIs to a Third-Party

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

Company, much less in combination with "personal information."  *See* Appendix A.  Similarly, despite Plaintiffs' claim that a ".zip file of approximately two megabytes" was downloaded by Medialets to Mr. Chiu's phone through the Weather Channel app, TAC ¶ 157, Mr. Bolas' analysis found no trace of this file on Mr. Chiu's device.  Bolas Decl. ¶ 61.

The lack of factual support for Plaintiffs' claims is not surprising, since Plaintiffs Dwyer and Chiu candidly admitted during their depositions that ***neither they, nor their counsel, have ever performed any investigation to determine whether any app that they had used transmitted data to a third party without their consent***.  *See*, e.g., Chiu Dep. 39:18-40:4, 134:15-21; Dwyer Dep. 33:23-35:5, 172:8-10, 174:1-175:3, 185:1-22.  Each conceded that ***he had no factual basis at all*** for the detailed claims made in the TAC.  *See* Chiu Dep. 140:10-142:25; Dwyer Dep. 180:14-183:11, 242:4-12.

Even more troubling, Plaintiff Dwyer *had not even used the Pandora app*—the sole app he complains about in the TAC—at the time he filed his claims.  In fact, Mr. Dwyer first used the Pandora app (and first provided Pandora with the allegedly "personal information" he complains the app transmitted) when he created his Pandora profile along with various radio stations,  *four days after he filed his complaint.*  Dwyer Dep. 148:10–149:11 (Dwyer first used Pandora when he set up specific radio stations); Bolas Decl. ¶¶ 72-74 (Dwyer's public Pandora profile demonstrates those stations were created on July 7, 2012, and there is no evidence of Pandora activity on Mr. Dwyer's phone prior to July 7, 2012).  In other words, Plaintiffs simply made up claims that "[t]hrough the Pandora App, [third parties] collected . . . Plaintiff[] Dwyer['s] . . . age, gender, zip code, particular song and performer selected, and music genre, all linked to [a] unique identifier"—and *Dwyer had not even used Pandora when he made these allegations*.  Dkt. No. 74 (SAC filed 7-3-12) ¶ 46(a); *see also* TAC ¶ 45(a).  And data on Mr. Dwyer's phone suggests that he used Pandora for a mere twenty-one (21) minutes after filing his claims—and never used the app again—raising the troubling specter that he used this app for the sole purpose of "backfilling" the factual allegations he made in filing the TAC.  Bolas Decl. ¶ 73; Dwyer Dep. 148:10-152:24.

### 3.   There Is No Evidence To Support Isabella Capiro's Geolocation Claims

Likewise, there is no factual basis for Plaintiff Isabella Capiro's core contention that

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

"[n]otwithstanding her attempt to turn off [L]ocation Services, it appears that location data was nonetheless transmitted to Apple."  TAC ¶ 30.  Irrefutable evidence establishes that Apple never collected or received "location data" from any user when Location Services was off, and Plaintiffs can offer no evidence that it did.  Moreover, *there is no evidence whatsoever that Ms. Capiro ever turned Location Services off* on her iPhone during the relevant time period (indeed, all backups of her iPhone show Location Services turned on) and Ms. Capiro admitted that she cannot recall whether or when she turned Location Services off during that time.

### a.    Despite an Obscure Software Bug, Apple Did Not Collect Location Data From Any iPhone When Location Services Was Off

Ms. Capiro's first iPhone, which she received as a Christmas gift from her father (Plaintiff Alejandro Capiro) in December 2010, contained iOS version 4.2.1.  I. Capiro Dep. 11:13-22, 19:11-23; Buckley Decl. ¶ 25, Ex. M.  She received free replacements for that iPhone in January and February 2011, and she upgraded the iOS software version on her device to iOS 4.3.3 on June 11, 2011.  I. Capiro Dep. 21:6-11, 22:1-23:8, Buckley Decl. ¶¶ 25-27, Exs. M-O.

The iOS software running on Ms. Capiro's iPhones between December 26, 2010 and June 11, 2011 (when she upgraded to iOS 4.3.3) contained an obscure software bug that caused iOS to begin requesting data that it could use to estimate its location in certain circumstances, even if Location Services was off.  Huang Decl., ¶ 11.  All iPhones have built-in functionality in iOS that allows users to consent to provide their current location to apps or to Apple so as to receive a variety of location-based services, such as turn-by-turn directions, virtual golf caddy services, or nearby restaurant locations.  *Id.* ¶ 3.  For example, Ms. Capiro explicitly consented to provide her device's real-time location to Maps because she "use[s] that app quite a lot and it doesn't work without it."  I. Capiro Dep. 60:25-61:8; *see also id.* 78:5-19, 82:15-83:2.

Before an app or Apple may receive a device's location, however, the user must specifically consent to provide that information both by (1) turning Location Services on, and (2) authorizing the specific app to receive location.  Huang Decl., ¶ 4.  *At no time——including in the iOS versions running on Ms. Capiro's iPhones—could an app or Apple receive a user's location information unless the user had consented to this by turning Location Services "On."*  Id.

16

Apps are able to request a device's location through a series of Apple-approved APIs. *Id*. ¶ 2. Apps make this request directly to iOS on the device, and likewise, it is the device's iOS (not Apple) that determines the current location of the device. *Id*. ¶ 5. Because it can take a long time for the device to obtain GPS-data concerning its precise location, iOS is able to estimate its own location using a variety of input signals on the device, in conjunction with information about the location of publicly-broadcasting WiFi routers and cell towers in range of the device. *Id*. Since it would not be practical to store data concerning the location of the billions of publicly broadcasting routers and cell towers directly on the device (and because those locations frequently change), iOS is programmed to look up this information from Apple when estimating its location. *Id*.

Specifically, to estimate its own location in response to an app's (or Apple's) location request, iOS performs a quick scan to obtain the serial numbers for all publicly broadcasting WiFi routers and cell towers that the device can "hear," which could include routers and cell towers up to 100 miles away from the device. *Id*. ¶¶ 5-6. To the extent that such data is not already stored on the device, iOS sends a list of these public serial numbers to Apple's servers, which quickly look up the locations for the identified cell towers and routers and send that information back to the device. *Id*. ¶ 6. Once it has information about the locations of cell towers and routers in range from Apple, the device is able to use this data (and other information contained on the device) to estimate its own location. *Id*. ¶ 5. Critically, ***iOS does not send any location data to Apple—or any information about the user, device or device's location—as part of this WiFi/cell tower look up***. *Id*.

As a result of an unknown software bug, in certain rare and fact-specific circumstances, certain iOS versions could begin the process of looking up the location of WiFi routers and cell towers from Apple's servers while Location Services was turned off. *Id*. ¶ 11. In these rare circumstances, iOS would transmit a list of the serial numbers of Wi-Fi routers and cell towers that were within range of the iPhone to a database maintained by Apple, and the database in turn provided information about the estimated location of those Wi-Fi routers and cell towers to iOS. *Id*. The only information transmitted from the iPhone to Apple's servers in these circumstances was a list of serial numbers (e.g., 17:AB:F0:47:62) for publicly-broadcasting WiFi routers and cell towers; the ***iPhone did not transmit any information about the user or the device, nor did it transmit any data about***

*the location of the device or any other location information*.  *Id.*  Moreover, Apple did not store these look up requests or in any way use the transmitted information beyond returning the location of the identified routers and hot spots to the requesting device.  *Id.* ¶¶ 9, 15.  Although this bug caused iOS to begin this process in certain instances when Location Services was off, it *never provided the location of the device or user to Apple or any app when Location Services was off.  Id.* ¶ 12.

Apple discovered this bug when investigating claims made in the *Wall Street Journal* article published on April 24, 2011.  *Id.* ¶ 13, Ex. A.  It resolved that issue and other unrelated issues in a free software update (iOS 4.3.3) issued two weeks later, on May 4, 2011.  *Id.*

>    **b.**    **There Is No Evidence That Ms. Capiro Turned Off Location Services Before Upgrading to iOS 4.3.3**

It is undisputed that on June 11, 2011, Ms. Capiro upgraded her iPhone to iOS version 4.3.3, which resolved the WiFi/cell tower look up bug that gives rise to Plaintiffs' misguided geolocation claims.  Critically, however, Plaintiffs have no evidence that Ms. Capiro ever turned Location Services off on her iPhone prior to June 11, 2011.

As a threshold matter, Apple has no information or records showing whether or when Ms. Capiro turned Location Services on or off on her iPhones; this setting is controlled entirely on the device.  *Id.* ¶ 20.  Plaintiff Capiro concedes that since receiving her first iPhone as a gift—and up through the present—her practice generally has been to turn Location Services on in order to receive the benefits of location-based services on her iPhone.  I. Capiro Dep. 60:16-61:8, 61:24-62:6.  She further acknowledges that she specifically gave several apps permission to access location before she upgraded to iOS 4.3.3.  *Id.* 74:24-88:6.  Indeed, even after filing this lawsuit and asserting false claims that Apple collected her location data when Location Services was off, Ms. Capiro has continued to turn Location Services "On," generally and for specific apps.  *Id.* 57:23-58:2, 60:16-20.

Although Plaintiff Capiro claims that she has turned Location Services off on a handful of instances (probably ten or fewer) during the past two years, she has absolutely no memory of when or whether she did so at any given point in time.  *Id.* 43:13-17.  Ms. Capiro also does not know whether she in fact turned Location Services off during the five month period before she upgraded to iOS 4.3.3.  *Id.* 45:10-21, 43:22-24, 44:16-25, 45:7-9.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Importantly, the data captured from Ms. Capiro's iPhone and iTunes back-up files establish that ***Ms. Capiro had turned Location Services on every time that she backed up her iPhone, including for each of the back-ups that occurred before she upgraded to iOS 4.3.3.***  Bolas Decl. ¶¶ 93-96.  In addition, these files demonstrate that Ms. Capiro had affirmatively approved Location Services for multiple different applications during the time period she was running iOS 4.2-4.3.2.  *Id.* Based on his forensic analysis, Mr. Bolas confirmed:  "After a thorough forensic analysis," there is "no support" for the claim that "the Location Services master switch on any of [Capiro's] phones was ever turned off prior to October 24, 2012" (the day Ms. Capiro's phone was examined).  *Id.* ¶ 100. Plaintiff is unable to produce a shred of evidence to the contrary.

### c.    Ms. Capiro Lacks Evidence That Any Location Data Was Collected From Her iPhone When Location Services Was Off

Not surprisingly, Ms. Capiro also has been unable to offer any evidence to support her claim that Apple collected location data about her or her device when Location Services was off.  TAC ¶ 183.  Indeed, Plaintiff concedes that neither she nor her counsel ever investigated this issue or analyzed her iPhone to determine whether there was a factual basis for this claim, either before filing her complaint or at any time since.  I. Capiro Dep. 54:22-55:13, 56:15-23, 91:3-9, 92:9-14, 97:12-17, 94:7-95:12.  And as detailed above, Apple did not collect location data from any user who had Location Services turned off (and there is no evidence that it did).  *See supra*, pp. 17-19.

Moreover, Ms. Capiro testified that the only times that she turned Location Services off (and she cannot recall specifically when she may have done so) were at times that she also turned off her Internet connection, in order to save battery life on her phone (not to prevent the transmission of data to Apple).  I. Capiro Dep. 45:22-46:3, 31:5-32:16.  Thus, even if Ms. Capiro had turned Location Services off before upgrading to 4.3.3 (and there is no evidence that she did), iOS could not have engaged in the WiFi/cell tower look up under these conditions, as an active Internet connection was one of many conditions required for the bug to be triggered.  Huang Decl. ¶ 14.

\* \* \*

In sum, Plaintiffs' Third Amended Complaint rests entirely on fact-free claims that Plaintiffs invented to overcome this Court's September 20, 2011 dismissal order.  Not only are Plaintiffs'

claims devoid of any factual support, but they are directly contradicted by Plaintiffs' own admissions and the data on their iPhones.  Summary judgment is therefore warranted.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has identified evidence that demonstrates the absence of a triable issue of material fact, the burden then shifts to the non-moving party to "come forward with '*specific facts* showing that there is *a genuine issue for trial*.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (first emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  To do so, the opposing party must not rely upon the allegations in its pleading and "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (ellipsis in original).  "[A] mere 'scintilla' of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Summers v. Teichert & Son, Inc.,* 127 F.3d 1150, 1152 (9th Cir. 1997).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### IV.  ARGUMENT

#### A.    Plaintiffs Lack Article III Standing

Plaintiffs bear the burden of proving standing under Article III of the United States Constitution "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to support standing.  *Id.*; *see also S.D. Myers, Inc. v. City and Cnty. of San Francisco*, 253 F.3d 461, 474 (9th Cir. 2001) ("To meet [the

standing] burden at the summary judgment stage, [the plaintiff] 'must set forth by affidavit or other evidence specific facts' supporting each element.") (internal quotations omitted).  Specifically, Plaintiffs have the burden to establish each and every element of constitutional standing—that "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Lujan*, 504 U.S. at 560-61.

Although the Court previously found that Plaintiffs had *alleged* a sufficient basis for Article III standing in their pleading, Plaintiffs' binding admissions and the undisputed evidence conclusively establish that Plaintiffs have not sustained any injury at all, much less a "concrete," "particularized," and "actual" injury in fact that is "fairly traceable" to Apple.  *See id.*

*First*, as explained above, all of the Plaintiffs admitted in sworn deposition testimony that they had not been harmed by Apple's alleged conduct in any way, and have therefore suffered no "injury in fact."  *See* Section II(H)(1) *supra*.  These admissions alone are dispositive.  *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 464 (9th Cir. 1973) ("[T]he courts [will] not be available to those who have suffered no harm at the hands of them against whom they complain.  They have no standing to sue."); *Feezor v. Patterson*, Civ. No. S-10-1165 KJM GGH, 2012 WL 4764412, at *5 (E.D. Cal. Oct. 5, 2012) (granting summary judgment on ADA claim for lack of Article III standing, as plaintiff's deposition testimony indicated he had not been deterred from visiting defendant's store and therefore had not "suffered 'actual injury' for standing purposes") (quotations omitted).

*Second*, as also discussed above, (1) Plaintiffs admit they do not have evidence that any of their "personal information" ever was collected or transmitted (with or without a UDID) to the Third-Party Companies or, in the case of the Geolocation Plaintiffs, that their "location data" ever was transmitted to Apple when Location Services was off, and (2) their iPhones (which are the only places such evidence might reside) contain no evidence whatsoever that the alleged transmissions occurred.  *See* Section II(H)(2)-(3) *supra*; *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315, 319-20 (5th Cir. 2002) (reversing class certification and dismissing case for lack of Article III standing where

1  plaintiffs claimed defendant failed to issue satisfactory safety warnings but conceded they were not

2  among the injured).

3       **Finally**, Plaintiffs' theory that they overpaid for their iPhones cannot satisfy Article III

4  requirements because all of the Plaintiffs admitted that they never even read, much less relied upon,

5  any alleged misrepresentations when deciding to purchase their iPhones.  *See* Section II(H)(1) *supra*.

6  Because Plaintiffs purchased their iPhones for reasons *completely unrelated* to the alleged

7  misrepresentations, they cannot logically ascribe the reasons for their purchases (at any price) to

8  Apple's alleged misconduct.  *See Katz v. Pershing, LLC*, 672 F.3d 64, 77 (1st Cir. 2012) (To satisfy

9  Article III, "injury alleged . . . must be ascribable to the defendant's misrepresentations;" causation

10  requires "plaintiff [to] plausibly allege a direct causal relationship between her overpayment and the

11  defendant's purportedly misleading statements) (citations omitted); *Williams v. Purdue Pharma Co.*,

12  297 F. Supp. 2d 171, 177 (D.D.C. 2003) (no injury in fact where plaintiffs alleged false advertising

13  but failed to allege they "were in any way deceived—or even saw—any of that advertising").

14  **B.**    **Apple Is Entitled To Summary Judgment On Plaintiffs' UCL Claim**

15       Even if the TAC could survive an Article III challenge at the summary judgment stage (and it

16  cannot), Plaintiffs' UCL claim fails as a matter of law for two reasons.  First, separate and apart from

17  their inability to establish constitutional standing under Article III, Plaintiffs lack statutory standing

18  to maintain a UCL claim because they concede that they have not lost money or property, as required

19  for UCL standing.  Second, the undisputed facts demonstrate as a matter of law that Apple's conduct

20  is not "unlawful, unfair or fraudulent."  Cal. Bus. & Prof. Code § 17200.

21       **1.**    **Plaintiffs Lack Standing Under The UCL**

22       Under California's UCL, a private person has standing to bring a UCL action only if he or she

23  "has suffered injury in fact *and* has lost money or property as a result of the unfair competition."  Cal.

24  Bus. & Prof. Code § 17204 (emphasis added); *see also Birdsong v. Apple, Inc.*, 590 F.3d 955, 959

25  (9th Cir. 2009) (under the UCL plaintiffs lacked standing where "plaintiffs [did] not allege that Apple

26  made any representations that iPod users could safely listen to music at high volumes for extended

27  periods of time" and "plaintiffs' alleged injury in fact [was] premised on the loss of a 'safety' benefit

28  that was *not part of the bargain to begin with*") (emphasis added) (citing cases).

This Court already rejected Plaintiffs' initial theory that "Plaintiffs' personal information [w]as a type of 'currency' or a 'form of property,' that was taken from Plaintiffs as a result of Defendants' business practices." Dkt. No. 69 at 35*; see also* Dkt. No. 8 at 19-20 (noting that "[n]umerous courts have held that a plaintiff's 'personal information' does not constitute money or property under the UCL" and collecting cases). Plaintiffs therefore pivoted in their amended complaints to "a more traditional theory of a UCL violation." Dkt. No. 69 at 35. But Plaintiffs have since admitted that they have not suffered any injury in fact, and they similarly cannot establish any loss of money or property, including under a manufactured "overpayment" theory. *See* Section II(H)(1) *supra*; *In re Tobacco II Cases*, 46 Cal. 4th 298, 325-26 (2009) (Proposition 64 requires UCL plaintiffs to show actual reliance on the alleged misrepresentation, as a result of which the lost money or property was sustained, rather than a mere factual nexus between conduct and injury).

Accordingly, summary judgment on Plaintiffs' UCL claim is appropriate on this basis alone. *See, e.g.*, *Gutierrez v. Kaiser Found. Hosp., Inc.*, No. C 11-3428 CW, 2012 WL 5372607, at *10 (N.D. Cal. Oct. 30, 2012) (granting defendants' motion for summary judgment on UCL claim where "[Plaintiff] could not likely establish an 'injury in fact'"); *Brosnan v. Tradeline Solutions, Inc.*, 681 F. Supp. 2d 1094, 1103 (N.D. Cal. 2010) (granting defendant's motion for summary judgment on UCL claim where "[b]ased upon the undisputed facts, including the admissions of Plaintiff . . . there [was] no evidence to support a finding that Plaintiff [had] standing to pursue these claims [because] [t]here [was] no evidence in the record before [the] Court of damage to Plaintiff as a result of Defendant's actions"); *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1062 (N.D. Cal. 2007) (granting defendants' motion for summary judgment on UCL claim as theories of injury "[could not] be considered a 'loss of money or property'" and were "not the kind of loss of money or property that is necessary for standing under [the UCL]").

Ms. Capiro lacks UCL standing for the separate and independent reason that she never purchased an iPhone at all; rather, the iPhone she used was a gift from her father. *See* I. Capiro Dep. 10:20-22, 11:16-22, 33:20-22; *Webb v. Carter's Inc.*, 272 F.R.D. 489, 498 (C.D. Cal. 2011) ("[C]lass members who 'acquired,' rather than 'purchased,' the [allegedly defective goods] plainly did not suffer any injury from 'pa[ying] good money' for defective goods" under the UCL); *Marilao v.*

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

1   *McDonald's Corp.*, 632 F. Supp. 2d 1008, 1013 (S.D. Cal. 2009) (plaintiff lacked standing to

2   maintain UCL claim where, *inter alia*, "Plaintiff did not expend money on [product], as he alleges

3   that he received it as a gift").

4       **2.**    **Plaintiffs Lack Evidence To Support The Essential Elements Of Their UCL**

5       **"Fraud" Claim**

6       Additionally, Plaintiffs' claim under the UCL's "fraud" prong fails because Plaintiffs concede

7   that they lack any evidence to establish the essential elements of this claim—namely, (1) Plaintiffs

8   admit that they did not review or rely on any alleged misrepresentation or omission; (2) Plaintiffs

9   have no evidence that Apple made any misrepresentation or omission; and (3) clear disclosures in

10  Plaintiffs' contracts with Apple preclude reasonable reliance as a matter of law.

11      **a.**    **Plaintiffs Admit That They Did Not Review, Much Less Rely On, The**

12      **Alleged Misrepresentations**

13      Plaintiffs cannot establish fraud under the UCL because they concede that they never saw or

14  relied on any statement made by Apple when purchasing their iPhones.  The California Supreme

15  Court has held that a plaintiff alleging UCL fraud must prove that "the defendant's

16  misrepresentations were" an immediate cause of the injury-producing conduct.  *In re Tobacco II*

17  *Cases*, 46 Cal. 4th at 326-27; *see also id.* at 306 (plaintiff "proceeding on a claim of

18  misrepresentation as the basis of [a] UCL action [requires] actual reliance on the allegedly deceptive

19  or misleading statements."); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011)

20  (California Supreme Court "had no doubt that California law [required] a person who sought to be a

21  class representative … to show some additional factors as to himself, including . . . causation."); *In re*

22  *Sony Gaming Networks and Consumer Data Security Breach Litig.*, No. 11-md-02258-AJB-MDD,

23  2012 WL 4849054, at *18 (S.D. Cal. Oct. 11, 2012) ("For [UCL] fraud-based claims … named Class

24  members must allege actual reliance").

25      Although Plaintiffs *alleged* in the TAC (and its predecessors) that each of them relied on

26  putative misrepresentations in making their iPhone purchasing decisions (*see* TAC ¶¶ 57, 189, 207),

27  their binding testimony defeats this claim.  In fact, Plaintiffs confirmed during their depositions that

28  (1) they did not review a single statement by Apple relating to app privacy or Location Services

either before or after purchasing their iPhones; (2) their decisions to purchase and use iPhones were driven by a range of factors wholly unrelated to Apple's statements and the issues in this case; and (3) even after becoming aware of the practices they challenge in this case, they continued to acquire new iPhones, use Location Services, and download and use free apps on their iPhones (including the Specified Apps they complain about here).  *See Section* II(H)(1) *supra.*

Under well-settled UCL law, these admissions are fatal to Plaintiffs' UCL fraud claim.  The Ninth Circuit's decision in *Baghdasarian v. Amazon.com Inc.*, 458 Fed. App'x 622 (9th Cir. 2011), is particularly instructive.  There, the Court of Appeal affirmed summary judgment dismissing plaintiff's UCL fraud claim because:

> [w]hen deposed, [plaintiff] Baghdasarian testified that his decision to purchase books through the Marketplace was driven by total cost and security, *factors that are unrelated to Amazon's alleged misrepresentation.*  He also testified that even if he had been aware of Amazon's practices with regard to the shipping and handling fee, he would not have been deterred from making the purchases.  Although Baghdasarian asserts he believed and relied upon Amazon's [alleged mis]representations regarding the shipping and handling fee, no evidence indicates that those representations were an "immediate cause" or "substantial factor" in his decision to purchase books through the Marketplace.  Indeed, given Baghdasarian's testimony that in making his purchasing decisions he shops comparatively to pay the lowest cost, including shipping, the existence of a hidden "holdback fee" in Amazon's price was not a factor that could have affected his decision to purchase on the Marketplace.

*Id.* at 623-24 (emphasis added); *see also Pfizer v. Superior Court*, 182 Cal. App. 4th 622, 625 (2010) (plaintiff could not demonstrate actual reliance under UCL given testimony that he did not purchase product based on any of the allegedly misleading television commercials or other advertisements).  Because Plaintiffs' deposition testimony establishes that they did not review any statements by Apple, and that Apple's statements did not factor at all into their purchasing decisions, Apple is entitled to summary judgment on Plaintiffs' UCL fraud claim.

**b.**     **There Is No Evidence Of A Material Misrepresentation Or Nondisclosure**

To survive a summary judgment motion, a UCL fraud plaintiff must also come forward with "significant probative evidence" from which a rational trier of fact could conclude that a reasonable consumer was *likely to be deceived* by the advertising at issue.  *TW Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630-31 (9th Cir. 1987); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (plaintiffs bringing UCL fraud claim must produce "evidence showing 'a

likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care'") (citation omitted); s*ee also Janda v. T-Mobile USA, Inc.*, 378 F. App'x 705, 707-08 (9th Cir. 2010); *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995); *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 WL 3910169, at *9 (N.D. Cal. Oct. 5, 2010).  Apart from Plaintiffs' failure to demonstrate that any of them personally reviewed or relied on any alleged misstatement, Apple separately is entitled to summary judgment because Plaintiffs have failed to come forward with a shred of evidence that any of Apple's public statements were "likely to deceive."  *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 508-13 (2003) (affirming summary judgment on UCL claim where "plaintiff … failed to show … commercials were likely to deceive").

### (i)      iDevice "Fraud" Claims

The Third Amended Complaint identifies two categories of putative misrepresentations in support of the iDevice Plaintiffs' UCL fraud theory:  (1) a provision in Apple's Privacy Policy that "Apple takes precautions—including administrative, technical, and physical measures—to safeguard [users'] ***personal information*** against loss, theft, and misuse, as well as against unauthorized access, disclosure, alteration, and destruction," and (2) non-public statements to developers (not consumers) concerning their contractual obligations to Apple.  TAC ¶ 184 (emphasis added); ¶¶ 8, 12, 57-60; *see also* Dkt. No. 69 (6-12-12 Order) at 33 ("Plaintiffs' [CLRA] theory with respect to the iDevice Class rests on [this provision in Apple's Privacy Policy]"), 38 (same for UCL).[3]  For multiple reasons, the undisputed evidence shows that none of these statements were "likely to deceive" a reasonable consumer.

### 1)      Developer Communications and Contracts

---

[3]  Plaintiffs also allege, but have not even attempted to show, that Apple misrepresented that "Apple designed the iPhone to safely and reliably download third party Apps" and that "certain Apps available for download by users in the App store are 'free Apps'" (both entirely true statements). TAC ¶¶ 8, 184.  The first statement, derived from a filing by Apple's attorneys with the U.S. Copyright Office in 2008, is (1) not consumer-facing and was not viewed or relied on by any Plaintiff or consumer, and (2) could not reasonably be interpreted to contain a promise that Apple would prevent third-party apps from collecting UDIDs or other information.  With respect to the second putative statement (the source of which Plaintiffs have not identified), there is no evidence that a reasonable consumer would have considered apps for which he or she incurred no out-of-pocket cost to be anything but "free."  *See, e.g., Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1545-55 (2011) (sales tax charged on "free" cell phone sold as part of bundled wireless service not fraudulent or misleading business practice).

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

As a threshold matter, Plaintiffs cannot establish that Apple's non-public statements and confidential contractual arrangements with app developers were "likely to deceive" consumers because it is undisputed that those statements were made to developers—and were not directed or generally available to consumers. *See In re Actimmune Mktg. Litig.*, No. C 08-02376-MHP, 2009 WL 3740648, at *11 (N.D. Cal. Nov. 6, 2009) (plaintiffs' allegations that doctors were exposed generally to drug marketing  were insufficient for purposes of UCL fraud claim; plaintiffs "[did] not identify any particular article, symposium, meeting … or any other vehicle" where there was *actual* exposure); *Express, LLC v. Fetish Group, Inc.*, 464 F. Supp. 2d 965, 980 (C.D. Cal. 2006) (granting summary judgment on UCL fraud claim because plaintiff did not "point to any evidence suggesting that [defendant's] representations … were disseminated to the public, let alone likely to deceive the public"); *Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1335 (2002) (affirming demurrer without leave to amend; potentially misleading billing protocols for tipping did not deceive patrons, as non-public contractual arrangements between hotel and employees could not provide basis for deception under UCL's fraud prong).

### 2)     Privacy Policy Provision Regarding "Personal Information"

Plaintiffs also cannot prove that the provision in Apple's Privacy Policy that "Apple takes precautions—including administrative, technical, and physical measures—to safeguard your personal information against loss, theft, and misuse, as well as against unauthorized access, disclosure, alteration or destruction" was in any way "likely to deceive."  TAC ¶ 59, 82, 85-87.

*First*, Apple's Privacy Policy states up front that it applies only to information collected and used by Apple—and **not** to data collected by third parties, such as app developers.  Buckley Decl. ¶ 21, Exs. K-L.  Thus, apps' alleged collection and transmission of "personal information" (and, more specifically, information Plaintiffs provided to the apps) does not implicate Apple's promise to "take[] precautions" to safeguard "personal information" that is collected and maintained by *Apple*. *Id.*  Indeed, it is undisputed that Apple itself did not collect, store, or use the UDID or other information allegedly transmitted by the Specified Apps here.  *See* Section II(F)(1) *supra*.

*Second*, by its own terms, this provision is expressly limited to "personal information," which the Privacy Policy defines as "data that can be used to uniquely identify or contact a single person,"

such as a consumer's "name, mailing address, phone number, email address, contact preferences, and credit card information."  Buckley Decl. ¶ 23, Exs. K-L.  Critically, the Privacy Policy *specifically provides that a UDID is "non-personal information,"* which falls outside the scope of the provision Plaintiffs rely on here.  *Id.* ¶ 24, Exs. K-L (emphasis added) ("non-personal information" includes "information such as occupation, language, zip code, area code, *unique device identifier*, [and] location") (emphasis added).  As such, Plaintiffs cannot establish that apps' access to a UDID or other device data in any way conflicts with a provision relating to the "precautions" Apple takes to "safeguard … *personal information,*" since UDIDs are "non-personal information" under the plain language of the Policy.  *See Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1046-47 (C.D. Cal. 2008) (plaintiffs did not state a claim under fraud prong of UCL because their assertions were belied by the terms of the governing contracts; "the UCL cannot be used to rewrite … contracts or to determine whether the terms of … contracts are fair"); *Abbott v. Chem. Trust*, No. 01-2049-JWL, 2001 WL 492388, at *13 (D. Kan. Apr. 26, 2001) (granting summary judgment in favor of defendant on UCL unfairness claim because defendant bank acted "within the contours of the custodian agreement and fulfilled its obligations thereunder"); *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 375-76 (2001) (affirming summary judgment in favor of defendant on UCL fraud claim where language in the health insurance policy and related materials clearly stated terms of coverage, notwithstanding plaintiff's assertion that he was misled).

*Third*, Plaintiffs lack evidence that even a single piece of "personal information" as defined in the Privacy Policy was collected or transmitted by an app.  *See* Section II(H)(2) *supra*.

*Finally*, clear disclosures in Apple's Privacy Policy foreclose Plaintiffs' argument that this statement was tantamount to a promise to prevent apps from accessing user or device data without consent.  Indeed, the Privacy Policy *specifically* advises that third-party apps may collect data such as contacts:

> **Third Party Sites And Services**
> Our products and services may also use or offer products or services from third parties – for example, a third-party iPhone app.  Information collected by third parties, which may include such things as location data or contact details, is governed by their privacy practices.  We encourage you to learn about the privacy practices of those third parties.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Buckley Decl. ¶ 20, Exs. K-L (emphasis added).  Likewise, the App Store Terms and Conditions (which Plaintiffs were required to agree to before downloading any app) clearly informed Plaintiffs that Apple "is not responsible for examining or evaluating the content or accuracy and Apple does not warrant and will not have any liability or responsibility for any third-party materials or websites, or for any other materials, products, or services of third parties."  *Id.* ¶ 13, Exs. E-J.

These clear contractual disclosures defeat Plaintiffs' UCL fraud claim.  For example, in *Freeman v. Time, Inc.*, the Ninth Circuit upheld dismissal of a UCL claim involving a mailer that suggested the plaintiff had won a sweepstakes because that communication was "qualified by language in smaller type indicating that [the plaintiff] would win only if he returned a winning prize number."  68 F.3d 285, 287 (9th Cir. 1995); *see also Janda*, 378 Fed. App'x at 707-08 (affirming dismissal of UCL fraud claim with prejudice because it was undisputed that T-Mobile's service agreement disclosed that monthly service rate excluded regulatory fees).  Likewise, in *In re Sony Gaming Networks*, the court dismissed a claim that Sony misrepresented the quality of its network security, as its privacy policy advised it could not "ensure or warrant the security of any information transmitted to [it]."  2012 WL 4849054, at *17 (statements that certain Sony devices could access the internet and specific online services were not "likely to deceive"—Sony "never represented that the [products] would 'always' be able to access the internet and/or connect to other online services").  Likewise, because Apple's Privacy Policy at all times clearly informed Plaintiffs that (1) Apple is not responsible for the data collection of practices of third-party apps, and (2) apps may collect users' information (even personal information, such as "contact details") depending on "their privacy practices," no reasonable consumer could read the Privacy Policy as promising to safeguard Plaintiffs' UDID or other information from third-party apps.

### (ii)   Geolocation Claims

Likewise, the Geolocation Plaintiffs have adduced no evidence that Apple made any statements "likely to deceive" consumers.  Plaintiffs focus their UCL and CLRA "fraud" claims on the following provision in the iOS Software License Agreement ("SLA") (which they admittedly never read):

**Location Data:** Apple . . . may provide certain services through your iPhone that rely

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

upon location information.  To provide these services, where available, Apple . . . may transmit, collect, maintain, process, and use your location data, including the real-time geographic location of your iPhone . . . *By using any location-based services on your iPhone, you agree and consent to Apple's . . . transmission, collection, maintenance, processing and use of **your location data**[4] to provide such products and services.  You may withdraw consent at any time by . . . turning off the Location Services setting on your iPhone[.]*

TAC ¶ 115 (incorrectly identified as Apple's "Term and Conditions"); Buckley Decl. ¶ 8, Exs. A-C (emphasis added); *see also* TAC ¶ 116 (citing Apple Letter to Representatives Markey and Barton stating that location data would not be collected or transmitted while location services was turned off); Dkt. No. 69 at 38 ("Plaintiffs allege that both in Apple's [SLA] and in a letter to Congress, Apple has represented that consumers may opt-out of the geo-tracking feature of the iDevice by turning off the Location Services setting on the phone.").

Plaintiffs cannot establish that this provision concerning consent to Apple's collection and use of "your location data"—or the ability to withdraw that consent by turning Location Services off—was in any way "likely to deceive."  Most fundamentally, as detailed above, Apple never collected or used *any* user's "location data" when Location Services was off.  *See* Section II(H)(3)(a) *supra*. Likewise, the Geolocation Plaintiffs are unable to offer a shred of evidence that "[Isabella Capiro's] location data" was transmitted to Apple when Location Services was off—or even to support the claim that Ms. Capiro turned Location Services off on her iPhone during the relevant period.  *See* Section II(H)(3)(b)-(c) *supra*; *Birdsong*, 590 F.3d at 960 (affirming dismissal of UCL claim where "plaintiffs do not ever claim that they used their iPods in a way that exposed them to the alleged risk of hearing loss.").

Accordingly, Plaintiffs cannot meet their burden of showing that the SLA "Location Data" provision (or analogous statement to Congress) was in any way "likely to deceive."  *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 965-66 (2003) (affirming summary judgment on UCL claim where valet parking ticket provided reasonable notice of charge; "public was not likely to be deceived"); *Shvarts v. Budget Group*, 81 Cal. App. 4th 1153, 1159-60 (2000) (affirming demurrer

---

[4]  It is undisputed that "your location data" refers back to the "real time geographic location of your iPhone."  Beringer Decl. Ex. O (Oct. 2, 2012 Guy "Bud" Tribble Deposition Transcript) at 24:12-27:9.

Gibson, Dunn &
Crutcher LLP

1   without leave to amend because defendant car rental company's "refueling" option was not "likely to

2   mislead;" "[e]ach … payment option[] is clearly printed, in boldface, in the rental agreement

3   provided to [customers] at the time of rental").

4   **3.**      **Plaintiffs Cannot Meet Their Burden To Demonstrate A Triable Issue Of**

5   **Material Fact Under The UCL's "Unfairness" Prong**

6   Plaintiffs' UCL "unfairness" claim also fails based on Plaintiffs' admissions and the

7   undisputed facts.  Although the Ninth Circuit has provided guidance, what constitutes an actionable

8   "unfair business practice" under the UCL remains unsettled in California courts.  *See Lozano v.*

9   *AT&T Wireless, Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007) (noting that "California courts have not

10   yet determined how to define 'unfair' in the consumer action context after *Cel-Tech*," but rejecting

11   three-pronged "FTC" test for UCL unfairness in the context of anti-consumer claims).  Regardless,

12   Plaintiffs' claim cannot stand under **either** of the two tests endorsed by the Ninth Circuit.  *See Davis*

13   *v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012) (court need not "resolve [this]

14   question … [where] [plaintiff] fails to state a claim under either definition").

15   **First**, to find unfairness under the "balancing test" set forth in *S. Bay Chevrolet v. Gen.*

16   *Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 (1999), the court must "weigh the utility of

17   the defendant's conduct against the gravity of the harm to the alleged victim."  *Id.*; *see also Rubio v.*

18   *Capital One Bank*, 613 F.3d 1195, 1204-05 (9th Cir. 2010) ("[T]he balancing test to which some

19   courts adhere" requires "harm to the consumer … outweigh[ing] [the conduct's] utility") (quotations

20   omitted); *McKell v. Washington Mut., Inc.*, 49 Cal. Rptr. 3d 227, 240 (2006) (Plaintiff must show

21   practice is "immoral, unethical, oppressive or unscrupulous and causes injury to consumers which

22   outweighs its benefits").  Here, Plaintiffs concede that they suffered *no harm at all* due to Apple's

23   alleged conduct.  *See* Section II(H)(1) *supra*.  In fact, they admit that they actually *benefit from* the

24   use of free apps and Location Services, and have voluntarily continued to use these apps and services

25   even after filing their claims in this case.  *Id.*  These admissions defeat Plaintiffs' UCL "unfairness"

26   claim.  *See id.*; *see also Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1026-27 (9th Cir. 2008)

27   (affirming grant of summary judgment on UCL unfairness claim for lack of harm); *Shalaby v.*

28   *Bernzomatic*, 281 F.R.D. 565, 575-76 (S.D. Cal. 2012) (denying claim for injunctive relief under the

UCL, finding no "actual injury" as required under the UCL and no irreparable harm because "Plaintiff admit[ted] that he … [had] continued to use Defendants' product [since the alleged occurrence of injury] … and [had] alleged no new injuries"); *Smith v. Chase Mortg. Credit Group*, 653 F. Supp. 2d 1035, 1046-47 (E.D. Cal. 2009) (denying summary judgment for plaintiff on UCL unfairness claim, as "plaintiff has not shown that defendant's conduct had any adverse impact on him," and plaintiff "directed the court to no facts indicating the harm he suffered by [defendant's] practice").[5]

**Second**, Plaintiffs also cannot meet the alternate standard outlined in *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, which requires a showing that the allegedly "unfair" business practice is "tethered" to a violation of a legislatively declared policy.  20 Cal. 4th 163, 186-187 (1999); *see also Rubio*, 613 F.3d at 1204-05 ("[T]he alternative test … requires a plaintiff to show that a practice violates public policy as declared by specific constitutional, statutory, or regulatory provisions") (quotations omitted).  Plaintiffs baldly assert that Apple's alleged conduct offends public policy as reflected in the CLRA (discussed below) and the "state constitutional right of privacy."  TAC ¶ 201.  But this Court has already rejected this argument, holding that the alleged disclosure of "the unique device identifier number, personal data, and geolocation information . . . [e]ven assuming [it] . . . was transmitted without Plaintiffs' knowledge and consent . . . does not constitute an egregious breach of social norms."  Dkt. No. 69 at 23; s*ee also McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008) (affirming summary judgment in favor of defendants where plaintiffs' UCL unfairness claim cited "no evidence which would allow a reasonable jury" to find that alleged discrimination constituted practice "offend[ing] an established public policy").

Because Plaintiffs have adduced no evidence that would permit a reasonable trier of fact to conclude that Apple's conduct violates the "unfairness" prong of the UCL under any test, Apple is entitled to summary judgment on Plaintiffs' UCL "unfairness" claim.

---

[5]  Moreover, an inadvertent software bug cannot constitute an "unfair" business practice.  *See Frogface v. Network Solutions, Inc.*, No. C-00-3854-WHO, 2002 WL 202371, at *2 (N.D. Cal Jan. 14, 2002) (granting summary judgment where "evidence shows, in fact, that the delay in deleting [a domain name] from the registry was due to a computer synchronization error, not [defendant's] business practice").

4.      **Because There Is No Genuine Dispute That Apple's Conduct Was Not Unlawful, Apple Is Entitled To Summary Judgment On Plaintiffs' UCL "Unlawful" Claim**

Plaintiffs' claim under the UCL's "unlawful" prong falls with their untenable CLRA claim (discussed below), as that claim (along with a fact-free allegation that Apple violated California's False Advertising Law[6]) is the sole basis for their UCL "unlawful" claim.  *See Davis*, 691 F.3d at 1168 (UCL "unlawfulness" requires violations of other state, federal, or local laws); *Sybersound Records*, *Inc*. *v*. *UAV Corp*., 517 F.3d 1137, 1152-53 (9th Cir. 2008) (affirming dismissal of UCL claim because alleged conduct was not independently unlawful).

C.      **Apple Is Entitled To Summary Judgment On Plaintiffs' CLRA Claim**

Although the TAC is vague on specifics, Plaintiffs predicate their CLRA claim on the same alleged "misrepresentations" as their deficient UCL "fraud" claim.  See TAC ¶¶ 183-85.  Like their UCL claim, Plaintiffs' CLRA claim fails for a number of independent reasons.

*First*, "in order to establish standing [to assert a] CLRA claim Plaintiffs must establish that they suffered an actual injury as a result of [defendant's] alleged conduct."  *Contreras v. Toyota Motor Sales USA, Inc.*, No. C 09-06024 JSW, 2010 WL 2528844, at *4 (N.D. Cal. Jun. 18, 2010) (citing cases), *affirmed in relevant part,* No. 10-16556, 2012 WL1997802 (9th Cir. June 5, 2012).  Because Plaintiffs concede that none of them "suffered an actual injury" due to Apple's alleged conduct (*see* Section II(H)(1)), Apple is entitled to summary judgment on this basis alone.  *Millett v. Experian Info. Solutions, Inc.*, 319 Fed. App'x 562, 563 (9th Cir. 2009) (affirming summary judgment for defendant because "[s]he did not purchase Credit Manager and, therefore, lacks standing under the [CLRA]"); *cf. Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 638 (2009) (sustaining demurrer; "We conclude that a plaintiff has no standing to sue under the CLRA without some allegation that he or she has been damaged by an alleged unlawful practice").

*Second*, California "requires a plaintiff suing under the CLRA for misrepresentations in connection with a sale to plead and prove she relied on a material misrepresentation."  *Brownfield v.*

---

6      *See* TAC ¶ 195.  Plaintiffs cannot make out a claim under the FAL for the same reasons that their UCL fraud claim fails: there were no misrepresentations, and even if there had been, Plaintiffs concede that they did not rely on them.  *See, supra,* Section IV(B)(2).

*Bayer Corp.*, No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035, at *3 (E.D. Cal. July 6, 2009)

(citing *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (1993)).  Here, as detailed above,

Plaintiffs concede that they did not rely on any alleged misrepresentation in deciding to purchase

their iPhones.  *See* Section II(H)(1) *supra; Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075,

1085 (N.D. Cal. 2011) (granting judgment on the pleadings on CLRA claim for defendant, as

plaintiffs did not rely on defendant's statements and instead "plaintiffs testified that their smoking

decisions were based on social influences and the enjoyable taste of Marlboro cigarettes").

      *Third*, Plaintiffs' CLRA claim relates to the use of third-party software apps or certain iOS

software versions, *not* the purchase of goods (including the purchase of an iPhone) or services.  It is

well-settled that software is neither a "good" nor a "service" under the CLRA.  *See Ferrington*, 2010

WL 3910169, at *19; *see also Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003) (CLRA only

applies to a "limited set of [consumer] transactions" and is "not a law of general applicability").

Indeed, the iDevice Claims relate entirely to data collected and transmitted by third-party apps—

software that Plaintiffs voluntarily installed on their mobile devices.  Dkt. No. 69 at 29 (noting, with

respect to the iDevice Class, that "the *software* or 'apps' that allegedly harmed the phone were

voluntarily downloaded by the user") (emphasis added).  Plaintiffs concede that there is no nexus

between the purchase of their iPhones and their subsequent and independent decisions to download

the Specified Apps.  *See* Section II(C) *supra*.

      Likewise, the Geolocation Plaintiffs' claims focus entirely on an alleged defect in particular

versions of iOS (specifically, iOS 4.2-4.3.2)–operating system *software*.  *See, e.g.*, Dkt. No. 69 at 26

("Apple rightly argues that class members 'voluntarily installed' the *software* that caused users'

iDevices to maintain, synchronize, and retain detailed, unencrypted location history files") (emphasis

added).  Indeed, their claims focus on alleged misstatements in their *Software License Agreement*

with Apple.  *See* Section IV(B)(2)(b)(ii) *supra*.  Moreover, the iOS software at issue is entirely

distinct from the hardware it runs on; there is no correlation between a particular hardware version

and the iOS version running on the device.  Indeed, Plaintiff Capiro routinely updated the iOS

software on her various iPhones after receiving her first iPhone as a gift.  I. Capiro Dep. 68:6-9,

68:23-69:5, 65:9-65:11, 70:6-70:9, 70:18-71:6.

***Finally***, Plaintiffs are not "consumers" within the meaning of the CLRA because they admittedly did not purchase or lease the apps or iOS software that give rise to their claims.  Cal. Civ. Code § 1761(d) ("consumer" defined as "an individual who seeks or acquires, *by purchase or lease*, any goods or services for personal, family, or household purposes") (emphasis added).  Indeed, the iDevice Plaintiffs direct their claims entirely to *free* apps that they downloaded at no cost—not to any tangible "good" or "service" they acquired as consumers."  *See In re Facebook Privacy Litigation*, 791 F. Supp. 2d 705, 717 (N.D. Cal. 2011).  And Plaintiff Isabella Capiro—the sole Plaintiff who alleges that "location data" was transmitted from her iPhone to Apple—did not purchase her phone; she received her first iPhone as a gift and received free replacements of that phone from Apple. I. Capiro Dep. 11:13-22, 8:1-6, 21:6-11, 22:1-23:8; *see Schauer v. Mandarin Gems of Cal., Inc.*, 125 Cal. App. 4th 949, 960 (2005) (nonpurchaser of a ring was not "consumer" who could maintain CLRA claim).  Because Plaintiffs are not "consumers," their CLRA claim fails for this independent reason.  *See, e.g.*, *Johns v. Bayer Corp.*, No. 09-1935 DMS, 2010 WL 476688, at *12-13 (S.D. Cal. Feb. 9, 2010) (purchaser of one vitamin product lacked standing to sue on behalf of purchasers of a different vitamin product made by the same defendant under CLRA and UCL because plaintiff "cannot expand the scope of his claims to include a product he did not purchase").

## V.   CONCLUSION

This lawsuit never should have been brought.  There was never a factual basis for it, never a law broken, and never a person harmed.  Plaintiffs invented "facts" to circumvent the Court's September 20, 2011 Order dismissing the complaint for lack of standing.  Discovery has now definitively established those alleged "facts" to be without a basis.  Accordingly, summary judgment should be granted.

///

///

///

///

///

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Dated:  December 14, 2012

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP


By: __/s/_____
                   S. Ashlie Beringer

Attorney for Defendant
APPLE INC.

101426376.1

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK