GIBSON, DUNN & CRUTCHER LLP
S. ASHLIE BERINGER, SBN 263977
ABeringer@gibsondunn.com
JOSHUA JESSEN, SBN 222831
JJessen@gibsondunn.com
MOLLY CUTLER, SBN 261192
MCutler@gibsondunn.com
JACOB A. WALKER, SBN 271217
JWalker@gibsondunn.com
1881 Page Mill Road
Palo Alto, California  94304
Telephone:  650.849.5300
Facsimile:  650.849.5333

Attorneys for Defendant
APPLE INC., A CALIFORNIA CORPORATION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re iPhone Application Litigation | CASE NO. 11-MD-02250-LHK |
| | **CLASS ACTION** |
| | **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** |
| | **HEARING:** |
| | Date:      April 11, 2013 |
| | Time:      1:30 p.m. |
| | Place:     Courtroom 4 |
| | Judge:     The Honorable Lucy H. Koh |

1

## NOTICE OF MOTION AND MOTION

2 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3      **PLEASE TAKE NOTICE** that at 1:30 p.m. on April 11, 2013,[1] or as designated by the

4 Court, in the courtroom of the Honorable Lucy H. Koh, 280 South First Street, San Jose, California

5 95113, Defendant Apple Inc. ("Apple") will and hereby does move for summary judgment on all

6 claims in Plaintiffs' Third Amended Consolidated Class Action Complaint ("TAC" or "Third

7 Amended Complaint") under Rule 56 of the Federal Rules of Civil Procedure.  The basis for the

8 Motion is that there is no genuine dispute as to any material fact, and Apple is entitled to judgment as

9 a matter of law.  Fed. R. Civ. P. 56(a).

10      This Motion is based on this Notice of Motion and Motion, the supporting Memorandum of

11 Points and Authorities, the Declarations of S. Ashlie Beringer, Mark Buckley, Phillip Shoemaker,

12 Ronald Huang, and Jeffry Bolas, and all accompanying exhibits, the Court's files in this action, the

13 arguments of counsel, and any other matter that the Court may properly consider.

14

## ISSUES TO BE DECIDED

15      1.      Is Apple entitled to summary judgment on Plaintiffs' entire Third Amended Complaint

16 on the ground that Plaintiffs lack Article III standing?

17      2.      Is Apple entitled to summary judgment on Plaintiffs' claim for alleged violations of

18 California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL")?

19      3.      Is Apple entitled to summary judgment on Plaintiffs' claim for alleged violations of

20 California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA")?

21

22

23

24

25

26

27

28

---

[1]  Counsel for Apple and Plaintiffs have agreed to a synchronized briefing schedule on Apple's summary judgment motion and Plaintiffs' class certification motion and agree that it would be appropriate for the Court to address both motions at the same hearing.  If this Court elects to sequence the hearing dates for the parties' respective motions, however, Apple respectfully submits that the interests of efficiency and judicial economy would be best served were the Court to address Apple's dispositive motion for summary judgment before considering class certification.  Apple will address these issues further in the parties' forthcoming administrative motion.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND ............................................ 2

    A.    Named Plaintiffs ............................................................................................ 2

    B.    Apple Devices and iOS ................................................................................. 3

    C.    The App Store and Third-Party Apps ........................................................... 3

    D.    Apple's Privacy Policy and App Store Terms and Conditions ..................... 4

    E.    iDevice Plaintiffs' Claims ............................................................................ 4

        1.    Third-Party Companies' Alleged Use of UDIDs To "Track".............. 5

        2.    iDevice Plaintiffs' Specific "Tracking" Allegations......................... 5

        3.    Allegations of Harm.......................................................................... 6

    F.    Geolocation Plaintiffs' Claims ..................................................................... 6

        1.    Narrowed Allegations That Anonymous "Location Data" Was
Transmitted from Ms. Capiro's iPhone When Location Services Was
Off ...................................................................................................... 6

        2.    Allegations of Harm.......................................................................... 7

    G.    Undisputed Facts Establish That Plaintiffs' Claims Lack Any Evidentiary
Basis .............................................................................................................. 8

        1.    Plaintiffs Concede They Suffered No Injury Or Detrimental Reliance ............ 8

        2.    There Is No Evidence That the Specified Apps (or Any Apps) Sent
Plaintiffs' UDIDs With Personal Information to The Third-Party
Companies.......................................................................................... 10

        3.    There Is No Evidence To Support Isabella Capiro's Geolocation Claims...... 11

            a.    Despite an Obscure Software Bug, Apple Did Not Collect
Location Data From Any iPhone When Location Services Was
Off........................................................................................... 11

            b.    There Is No Evidence That Ms. Capiro Turned Off Location
Services Before Upgrading to iOS 4.3.3 ............................... 13

            c.    Ms. Capiro Lacks Evidence That Any Location Data Was
Collected From Her iPhone When Location Services Was Off.......... 14

III.  SUMMARY JUDGMENT STANDARD................................................................ 15

i

Gibson, Dunn &
Crutcher LLP

IV.   ARGUMENT ................................................................................................ 15

    A.   Plaintiffs Lack Article III Standing................................................................ 15

    B.   Apple Is Entitled To Summary Judgment On Plaintiffs' UCL Claim ...................... 17

        1.   Plaintiffs Lack Standing Under The UCL........................................................ 17

        2.   Plaintiffs Lack Evidence To Support The Essential Elements Of Their UCL "Fraud" Claim ..................................................................................... 18

            a.   Plaintiffs Admit That They Did Not Review, Much Less Rely On, The Alleged Misrepresentations................................................... 18

            b.   There Is No Evidence Of A Material Misrepresentation Or Nondisclosure........................................................................... 19

                (i)   iDevice "Fraud" Claims .................................................. 19

                (ii)   Geolocation Claims ...................................................... 22

        3.   Plaintiffs' UCL "Unfairness" Prong Claim Also Fails ................................. 23

        4.   Apple Is Entitled To Summary Judgment On Plaintiffs' UCL "Unlawful" Claim ..................................................................................... 24

    C.   Apple Is Entitled To Summary Judgment On Plaintiffs' CLRA Claim..................... 24

V.   CONCLUSION ............................................................................................. 25

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Baghdasarian v. Amazon.com Inc.*,
 458 Fed. App'x 622 (9th Cir. 2011)..................................................................................... 19

*Birdsong v. Apple, Inc.*,
 590 F.3d 955 (9th Cir. 2009).................................................................................... 17, 23

*Bower v. AT&T Mobility, LLC*,
 196 Cal. App. 4th 1545 (2011) ........................................................................................ 20

*Brosnan v. Tradeline Solutions, Inc.*,
 681 F. Supp. 2d 1094 (N.D. Cal. 2010) ........................................................................... 17

*Brownfield v. Bayer Corp.*,
 No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035 (E.D. Cal. July 6, 2009) ............................. 25

*Butler v. Adoption Media, LLC*,
 486 F. Supp. 2d 1022 (N.D. Cal. 2007) ........................................................................... 18

*Caro v. Proctor & Gamble Co.*,
 18 Cal. App. 4th 644 (1993) ........................................................................................... 25

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986)........................................................................................................ 15

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
 20 Cal.4th 163 (1999) .................................................................................................... 24

*Clemens v. DaimlerChrysler Corp.*,
 534 F.3d 1017 (9th Cir. 2008).................................................................................... 19, 23

*Contreras v. Toyota Motor Sales USA, Inc.*,
 No. C 09-06024 JSW, 2010 WL 2528844 (N.D. Cal. Jun. 18, 2010), *affirmed in*
 *relevant part*, No. 10-16556, 2012 WL1997802 (9th Cir. June 5, 2012) ....................................... 24

*Davis v. HSBC Bank Nevada, N.A.*,
 691 F.3d 1152 (9th Cir. 2012)................................................................................... 23, 24

*Express, LLC v. Fetish Group, Inc.*,
 464 F. Supp. 2d 965 (C.D. Cal. 2006) .............................................................................. 20

*Feezor v. Patterson*,
 Civ. No. S-10-1165 KJM GGH, 2012 WL 4764412 (E.D. Cal. Oct. 5, 2012) ............................ 16

*Ferrington v. McAfee, Inc.*,
 No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) ....................................... 25

*Freeman v. Time, Inc.*,
 68 F.3d 285 (9th Cir. 1995)............................................................................................. 22

iii

Gibson, Dunn &
Crutcher LLP

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................................ 16

*Frogface v. Network Solutions, Inc.*,
    No. C-00-3854-WHO, 2002 WL 202371 (N.D. Cal Jan. 14, 2002) ............................ 23

*Gutierrez v. Kaiser Found. Hosp., Inc.*,
    No. C 11-3428 CW, 2012 WL 5372607 (N.D. Cal. Oct. 30, 2012) ............................ 17

*In re Actimmune Mktg. Litig.*,
    No. C 08-02376-MHP, 2009 WL 3740648 (N.D. Cal. Nov. 6, 2009) .......................... 20

*In re Sony Gaming Networks and Consumer Data Security Breach Litig.*,
    No. 11-md-02258-AJB-MDD, 2012 WL 4849054 (S.D. Cal. Oct. 11, 2012) ............... 18, 22

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ....................................................................................... 17, 18

*Janda v. T-Mobile USA, Inc.*,
    378 F. App'x 705 (9th Cir. 2010) ............................................................................ 22

*Katz v. Pershing, LLC*,
    672 F.3d 64 (1st Cir. 2012) ..................................................................................... 16

*La Mar v. H & B Novelty & Loan Co.*,
    489 F.2d 461 (9th Cir. 1973)................................................................................... 16

*Lozano v. AT&T Wireless Services, Inc.*,
    504 F.3d 718 (9th Cir. 2007).................................................................................... 23

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 15, 16

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ................................................................................................ 15

*McDonald v. Coldwell Banker*,
    543 F.3d 498 (9th Cir. 2008).................................................................................... 24

*Millet v. Experian Info Solutions, Inc.*,
    319 Fed. App'x 562 (9th Cir. 2009).......................................................................... 25

*Pfizer v. Superior Court*,
    182 Cal. App. 4th 622 (2010),.................................................................................. 19

*Plotkin v. Sajahtera, Inc.*,
    106 Cal.App.4th 953 (2003) .................................................................................... 23

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010)................................................................................... 23

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal. App. 4th 861 (1999) .................................................................................... 23

*Searle v. Wyndham Int'l, Inc.*,
    102 Cal. App. 4th 1327 (2002) ................................................................................. 20

iv

*Shalaby v. Bernzomatic*,
    281 F.R.D. 565 (S.D. Cal. 2012).................................................................. 23

*Shvarts v. Budget Group*,
    81 Cal. App. 4th 1153 (2000) .................................................................... 23

*Smith v. Chase Mortg. Credit Group*,
    653 F. Supp. 2d 1035 (E.D. Cal. 2009)..................................................... 23

*Spiegler v. Home Depot U.S.A., Inc.*,
    552 F. Supp. 2d 1036 (C.D. Cal. 2008) .................................................... 21

*Stearns v. Ticketmaster Corp.*,
    655 F.3d 1013 (9th Cir. 2011)................................................................... 18

*Sybersound Records, Inc. v. UAV Corp.*,
    517 F.3d 1137 (9th Cir. 2008)................................................................... 24

*Ting v. AT&T*,
    319 F.3d 1126 (9th Cir. 2003)................................................................... 25

*TW Elec. Serv. v. Pac. Elec. Contractors*,
    809 F. 2d 626 (9th Cir. 1987).................................................................... 19

*Van Ness v. Blue Cross of Cal.*,
    87 Cal. App. 4th 364 (2001) ...................................................................... 21

*Williams v. Purdue Pharma Co.*,
    297 F. Supp. 2d 171 (D.D.C. 2003) .......................................................... 16

*Xavier v. Philip Morris USA Inc.*,
    787 F. Supp. 2d 1075 (N.D. Cal. 2011) ..................................................... 25

**Statutes**

Cal. Bus. & Prof. Code § 17200 .......................................................................... 17

Cal. Bus. & Prof. Code § 17204 .......................................................................... 17

**Rules**

Fed. R. Civ. P. 56 ................................................................................................. 15

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

On September 20, 2011, this Court dismissed Plaintiffs' First Consolidated Complaint ("FCC") for lack of Article III standing, on grounds, *inter alia*, that Plaintiffs had "not identified a concrete harm from the alleged collection and tracking of their personal information sufficient to create injury in fact" and had failed to "allege injury in fact to *themselves*." Dkt. No. 8 (9-20-11 Order) at 6-7. The Court further found that since "there [was] no allegation that Apple," in contrast to the Mobile Industry Defendants, had "misappropriated data, [] there [was] no nexus between the alleged harm and Apple's conduct." *Id.* at 6, 9. The Court made clear that any amended complaint would need to specify (1) the "apps downloaded that access/track [Plaintiffs'] information," (2) the "harm (if any) [that] resulted from the access or tracking of their personal information," and (3) "the causal connection between the exact harm alleged (whatever it is) and each Defendant[']s conduct or role in that harm." *Id.*

On June 12, 2012, the Court dismissed all but two claims of Plaintiffs' First Amended Complaint ("FAC"). *See* Dkt. No. 69 (6-12-12 Order) at 44. With respect to Article III standing, however, the Court found that "Plaintiffs [had] addressed the concerns identified in the Court's September 20 Order and [had] articulated a particularized harm as to themselves" by alleging "which apps they downloaded that accessed or tracked their personal information" and "what harm resulted from the access or tracking of their personal information." *Id.* at 10. Thus, the Court found that "as a matter of *pleading* Article III standing, Plaintiffs [had] sufficiently articulated the alleged injury is fairly traceable to the conduct of both [sets of] Defendants." *Id.* at 12 (emphasis added). With respect to the UCL and CLRA claims against Apple, the Court noted that Plaintiffs' allegations "may prove false," but "at this stage . . . [were] sufficient to state a claim." *Id.* at 34, 38-39.

The Court's observation that Plaintiffs' allegations "may prove false" was prescient. Apple has since deposed all four named Plaintiffs and conducted a forensic analysis of Plaintiffs' iPhones. That discovery has established the following undisputed facts:

(1)   Contrary to their allegations, Plaintiffs ***admit*** they suffered no harm whatsoever—not in "consumed iDevice resources" or in any other way.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

(2)    Plaintiffs *admit* they have not lost any money or property.

(3)    Plaintiffs *admit* that they still have no idea whether their "personal information" or "location data" was actually "tracked."  And a forensic analysis of Plaintiffs' iPhones *confirmed* that there is no evidence that any of Plaintiffs' "personal information" or "location data" was in fact transmitted to the Third-Party Companies or Apple.  These allegations were simply manufactured—with no investigation by Plaintiffs or their counsel—to overcome this Court's September 20, 2011 Order.

(4)    Plaintiffs *admit* that the handful of alleged misrepresentations they identify in the Third Amended Complaint ("TAC") had nothing to do with their decision to purchase iPhones.  In fact, Plaintiffs *admit* they never even saw, much less relied upon, any statement by Apple.

(5)    There is *not a shred of evidence* that the alleged misrepresentations were deceptive or likely to deceive the general public.

These undisputed facts are fatal as a matter of law to Plaintiffs' standing under Article III and the UCL and to Plaintiffs' two surviving claims.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   Named Plaintiffs

The TAC was filed on behalf of four named Plaintiffs: (1) "iDevice Plaintiff" Anthony Chiu, a California resident who "purchased an iPhone 4 in or around June 2010" (and recently received an iPhone 4S, which his counsel purchased for him on May 15, 2012); (2) "iDevice Plaintiff" Cameron Dwyer, a California resident who "originally purchased an iPhone in or around Summer 2010, which he replaced with an iPhone 3G[S] in or around Fall 2011," months *after* this action was filed; and (3) and (4) "Geolocation Plaintiffs" Alejandro Capiro and his daughter Isabella Capiro, California residents who each acquired an iPhone 4 in or around December 2010 (Alejandro bought both phones, but the claims are limited to Isabella's phone).  TAC ¶¶ 26-27; Declaration of S. Ashlie Beringer ("Beringer Decl."), Ex. B (Aug. 15, 2012 Chiu Deposition Transcript ("Chiu Dep.")) at 24:13-26:9; TAC ¶¶ 29-30; Beringer Decl., Ex. D (Oct. 30, 2012 Isabella Capiro Deposition Transcript ("I. Capiro Dep.")) at 8:1-6; Beringer Decl., Ex. C (Oct. 29, 2012 Alejandro Capiro

1  Deposition Transcript ("A. Capiro Dep.")) at 7:8-8:6, 9:2-9.

2  **B.  Apple Devices and iOS**

3  Apple is a California corporation that manufactures iPhones and other devices.  TAC ¶¶ 31-

4  32.  Apple has developed mobile operating system software called iOS that is analogous to traditional

5  computer-based operating systems such as Windows or Mountain Lion.  Declaration of Phillip

6  Shoemaker ("Shoemaker Decl."), ¶ 2.  Apple frequently issues updates to iOS, and users can install

7  new versions of iOS as they become available, without cost.  *Id*. ¶ 3.

8  **C.  The App Store and Third-Party Apps**

9  While iOS controls the device itself, users can choose to download software applications

10  (called "apps" for short) to add a broad range of customized functions to their device.  *Id*. ¶ 5.  Users

11  can find and download more than 700,000 third-party apps from the "App Store."  *Id*. ¶ 6.  When a

12  user downloads an app, she is downloading a piece of standalone software that is programmed and

13  controlled entirely by the app developer.  *Id*. ¶¶ 7-8.  Apple's role is that of an electronics store:  it

14  creates the digital storefront where users can browse and download apps, but it does not create,

15  control, or have access to, the software inside the app.  *Id*.  Indeed, Apple has no more visibility into

16  what happens inside an app running on a user's device than a PC manufacturer has when a user is

17  running printer or photo editing software on a home computer.  *Id*.

18  To enable third parties to develop software that runs on iOS devices, Apple has created

19  programming guides and tools that explain to developers how their software can interact with iOS.

20  *Id*. ¶ 9.  Apple thus designs the "application programing interfaces" ("APIs")—i.e., the specific

21  commands that allow third-party apps to "talk to" and interact with the iOS software on a user's

22  device.  *Id*.  APIs are part of all modern computer systems, and developers can pick and choose from

23  hundreds of approved APIs when creating their unique applications.  *Id*. ¶¶ 9-10.

24  All developers who offer apps in the App Store agree to the iOS Developer Program License

25  Agreement ("PLA").  TAC ¶ 78.  The PLA is a ***confidential*** contract that, among other things,

26  requires developers to obtain consent before collecting user or device data.  Shoemaker Decl. ¶ 13.

27  Apple also provides developers with App Store Review Guidelines (available only to developers) that

28  include more than 120 separate provisions concerning the requirements for apps in the App Store.  *Id*.

¶¶ 14-15.  Although Apple performs a basic review of all apps before distribution (a process necessarily constrained by the sheer number of apps) and may reject apps for violations it detects, it has no access to the source code that would indicate how, whether, or when an app collects or transmits data from the device.  *Id.* ¶¶ 7-8.

**D.    Apple's Privacy Policy and App Store Terms and Conditions**

Users who purchase an iOS device do not automatically have the ability to download apps from the App Store.  Declaration of Mark Buckley ("Buckley Decl."), ¶ 12.  Rather, to download an app (including a free app) from the App Store, a user must first create an Apple ID and affirmatively agree to the App Store Terms and Conditions, which include Apple's Privacy Policy, by scrolling through the Terms and clicking "Agree."  *Id.*

Apple's Privacy Policy clearly states that it applies solely to data that *Apple* "collect[s], use[s], disclose[s], transfer[s], and store[s]"—and not to data collected by third parties.  *Id.* ¶ 12, Exs. K-L.  The Policy discloses that apps may collect data from users' devices:[2]

> Our products and services may also use or offer products or services from third parties
> **– for example, a third-party iPhone app.  Information collected by third parties,**
> **which may include such things as location data or contact details, is governed by**
> **their privacy practices.**  We encourage you to learn about the privacy practices of
> those third parties.

*Id.* ¶ 20, Exs. E-L (emphasis added).  Likewise, the App Store Terms and Conditions specifically provide that "Apple is not responsible for examining or evaluating the content or accuracy and Apple does not warrant and will not have any liability or responsibility for any third-party materials," which specifically include "[p]roducts that have been developed, and are licensed to you, by a third party developer."  *Id.* ¶¶ 13-14, Exs. E-J.

**E.    iDevice Plaintiffs' Claims**

The iDevice Plaintiffs—Messrs. Chiu and Dwyer—allege that five free apps that they chose to download and use (specifically, Dictionary.com, Flixster, Pandora, Weather Channel, and Urban

---

[2]  Although Plaintiffs Chiu and Dwyer could not recall whether they reviewed specific apps' terms of service, they conceded their use of apps was governed by separate license agreements with app developers and that they sometimes reviewed these terms before downloading or updating apps.  Chiu Dep. 63:15-64:1, 67:6-70:8; Beringer Decl., Ex. A (Aug. 14, 2012 Dwyer Deposition Transcript (hereinafter "Dwyer Dep.") 68:13-70:20.

Spoon (together, the "Specified Apps")) transmitted supposedly "personal information" from their iPhones without their consent to five mobile advertising and/or analytics companies, which Plaintiffs dub the Tracking Companies (hereinafter, "Third-Party Companies")).  TAC ¶¶ 35-46.  Plaintiffs' claims against Apple focus on the Specified Apps' alleged use of an Apple-approved API to access the UDID, and transmission of the UDID together with "personal information" (provided by Plaintiffs) to the Third-Party Companies.  TAC ¶¶ 40-42, 44, 46, 82-87, 126-135.

### 1.   Third-Party Companies' Alleged Use of UDIDs To "Track"

There is no evidence that Apple *itself* transmitted any Plaintiff's device UDID or "personal information."  Instead, Plaintiffs' claims focus on the fact that apps are able to request a UDID from iOS through one of hundreds of APIs created by Apple.  Shoemaker Decl. ¶¶ 9-11; *see* TAC ¶ 85.  Apps may request a UDID for any number of valid reasons that do not implicate Plaintiffs' claims, including for fraud protection, content delivery, or security reasons.  Beringer Decl. Ex. N (Nov. 30, 2012 Neuenschwander Deposition Transcript ("Neuenschwander Dep.")) 67:10-69:8.

Critically, Plaintiffs do not complain about *all* uses of the UDID, but limit their claims to a specific concern that some developers may (1) combine the UDID with personally-identifiable information, and (2) share that data with third parties that use the UDID to "track" their activities across various apps.  Plaintiffs assert that "Apple-assigned UDID information" is "[o]ne of the most valuable pieces of information" available to the Third-Party Companies "because, *if combined with other information,* such as other information easily available on the iDevice, *it can be used to personally identify a user.*"  TAC ¶¶ 82-83 (emphasis added).  They further claim, "[t]hat is exactly what happened with each Plaintiff in this litigation"—i.e., "*Plaintiffs' UDID information, along with other data like geographic location data[,] was collected by each Tracking Company, such that each Tracking Company was able to personally identify each Plaintiff.*"  *Id.* ¶ 84 (emphasis added).

### 2.   iDevice Plaintiffs' Specific "Tracking" Allegations

In response to the Court's September 20, 2011 Order, and specifically to cross over the Article III hurdle, Plaintiffs amended their complaint to specify how each Plaintiff's "personal information" supposedly had been "tracked."  FAC ¶¶ 58-63.  As is summarized in Appendix A, Plaintiffs detailed more than 50 pieces of information that particular Specified Apps supposedly had

transmitted from their iPhones to the Third-Party Companies.

Several critical points emerge from these allegations.  **First**, most types of information Plaintiffs allege was tracked by the Third-Party Companies cannot be procured through an Apple-approved API; instead, this data is provided by the user directly to the app.  Declaration of Jeffrey Bolas ("Bolas Decl.") ¶¶ 12-13, 35-71.  **Second**, Plaintiff Dwyer does not even *allege* that the Specified Apps transmitted a UDID or any other information obtained through an Apple API; instead, his claims are directed entirely to information he voluntarily provided to Pandora and an alleged identifier created by DoubleClick—allegations that, on their face, have nothing to do with Apple.  *See* TAC ¶ 41-42.  **Finally**, despite Plaintiffs' allegations to the contrary (TAC ¶ 84), not a single piece of information allegedly transmitted may be used to "personally identify" any Plaintiff.  *See* Appendix A.

### 3.   Allegations of Harm

Plaintiffs' amended complaints added several allegations purporting to specify their injuries.  The iDevice Plaintiffs alleged that the collection and disclosure of "personal information" to the Third Party Companies consumed "iDevice storage, battery life, and bandwidth from *each Plaintiff's* wireless services provider."  TAC ¶ 4 (emphasis added).  They further alleged that they "would not have purchased their iDevices and/or would not have paid as much for them if Apple had disclosed" the app practices at issue.  TAC ¶¶ 186-189; *see also* Dkt. No. 69 (6-12-12 Order) at 33-34, 38.

### F.   Geolocation Plaintiffs' Claims

#### 1.   Narrowed Allegations That Anonymous "Location Data" Was Transmitted from Ms. Capiro's iPhone When Location Services Was Off

The Geolocation Plaintiffs assert UCL and CLRA claims against Apple based on the allegation that unspecified "geolocation information" was transmitted from Ms. Capiro's iPhone to Apple's servers after she turned Location Services off on her phone.  TAC ¶¶ 29-30, 163.

The Capiros first appeared as Plaintiffs in the TAC, after former Plaintiff Gupta (who conceded that neither he nor his counsel ever investigated these claims, *see* Beringer Decl., Ex. E (Aug. 4, 2012 Gupta Deposition Transcript ("Gupta Dep.")) at 177:12-178:15), and his counsel withdrew from the litigation.  *See* Dkt. Nos. 104, 112.  In permitting the Geolocation Claims to go

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

forward, this Court relied on Mr. Gupta's false "assert[ion] that Apple designed its iOS 4 software to retrieve and transmit geolocation information located on its customers' iPhones to Apple's servers [and] that Apple intentionally collected and stored Plaintiffs' precise geographic location."  Dkt. No. 69 (6-12-12 Order) at 9-12.

Plaintiffs since have substantially narrowed their geolocation theory based on information furnished by Apple—and have abandoned earlier, false claims that Apple tracked the location of individual iPhones, collected Plaintiffs' precise geographic location, and stored that information in a "consolidated.db" file on Plaintiffs' iPhones.  *See* Beringer Decl., Exs. L-M; former allegations in FAC ¶¶ 116, 142-44, 151-52.  Plaintiffs now allege that "it appears" anonymous "location data" was transmitted from Plaintiff Isabella Capiro's iPhone to Apple's servers, "[n]otwithstanding her attempt to turn off [L]ocation Services" (TAC ¶ 30)—allegations that also are demonstrably false.

The Geolocation Claims are a misguided response to an April 24, 2011 news report that iPhones appeared to cache information about the location of cell towers and Wi-Fi hotspots when Location Services was off.  Declaration of Ronald Huang ("Huang Decl."), Ex. A.  As explained in detail below and in the accompanying declaration of Apple senior engineer Ron Huang, this news report led to Apple's same-day investigation and discovery of an obscure software bug that (i) was triggered in very rare circumstances; (ii) did not involve the transmission of any location data to Apple; and (iii) was resolved by Apple in a few weeks.  *Id.* at ¶ 13-15.  Plaintiffs have dropped unsupported (and incorrect) allegations from their earlier pleadings insinuating that Apple was lying when it attributed this behavior to the operation of an unintentional bug (*see* FAC ¶¶ 145-49).

### 2.      Allegations of Harm

To plead injury, Plaintiff Isabella Capiro alleged that the transmission of "location data" to Apple's servers caused her to lose "solid-state memory space," "battery resources," and "portions of the 'cache' and/or gigabytes of memory" on her device.  TAC ¶¶ 94-98, 186.  The Court relied on similar claims—i.e., that "Apple intentionally collected and stored Plaintiffs' precise geographic location, and that this led to loss of storage space on their iDevices"—when finding the former Geolocation Plaintiff had alleged harm "fairly traceable to Apple's conduct."  Dkt. No. 69 (6-12-12 Order) at 12.  Like the iDevice Plaintiffs, the Geolocation Plaintiffs further alleged that they "*relied*

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

upon Apple's representations with respect to . . . the ability to opt-out of geolocation tracking, *in making their purchasing decisions*." TAC ¶¶ 57-59, 116, 183-89, 207 (emphases added).

## G. Undisputed Facts Establish That Plaintiffs' Claims Lack Any Evidentiary Basis

Following the Court's June 12 Order, which dismissed of most of Plaintiffs' claims, Plaintiffs filed their SAC on July 3, 2012. *See* Dkt. No. 74 (SAC). Plaintiffs filed the operative TAC on October 4, 2012. *See* Dkt. No. 104 (TAC); Dkt. No. 88 (Minute and Case Management Order issued 8-8-2012, setting October 4, 2012 as deadline to amend complaint to add new plaintiffs). In the months since the Court's June 12 Order, Apple has deposed each of the four named Plaintiffs and performed a forensic analysis of their iPhones and related back-up files. This discovery has revealed that each of the specific "facts" Plaintiffs added to their pleadings—in particular, the allegations this Court cited when sustaining Plaintiffs' UCL and CLRA claims—**had no factual basis**.

### 1. Plaintiffs Concede They Suffered No Injury Or Detrimental Reliance

Critically, Plaintiffs each **admitted** in sworn deposition testimony that they cannot identify **any harm whatsoever** resulting from the challenged practices. For example, iDevice Plaintiff Chiu agreed that he could not "identify any harm that [he] personally experienced due to the alleged collection of information and transmission of information from [his] phone." Chiu Dep. 147:16-148:11 ("Q. Is the answer no you cannot identify any harm, sitting here today? A. Correct."); *see also* Dwyer Dep. at 243:5-16. Likewise, Isabella Capiro—the sole Plaintiff who alleges that geolocation information was transmitted from her iPhone when Location Services was off—conceded that she could not identify a single instance of harm relating to her claims against Apple:

> Q.    Can you identify any harm that you personally have experienced due to anything having to do with Location Services? . . .
> A.    No.

I. Capiro Dep. 101:9-14; *id.* 91:11-21; A. Capiro Dep. 131:23-132:4; 132:6-17, 135:11-19.

More troubling, Plaintiffs do not even know whether their data actually was "tracked" as they allege—and **there is no evidence that it was**. For example, Plaintiff Chiu testified:

> Q.    And did you at any point in time come to believe that you specifically had personal information collected about you and sent to third parties?
> A.    Again, not that I know of.
> Q.    So sitting here today, you still don't know whether any of the apps that you've

installed onto your iPhones, in fact, collected personal information about you
and sent that to third parties?  . . .
A.     No.

Chiu Dep. 112:18-113:2; 140:10-142:25; *see also* Dwyer Dep. 176:17-179:6, 180:14-183:11;

I. Capiro Dep. 94:7-95:12, 97:12-17, 91:3-9; A. Capiro Dep. 163:14-164:3.

Moreover, **none of the Plaintiffs recalls reading, much less relying on, any statement or**

**representation from Apple**.  *See* A. Capiro Dep. 16:12-17:6, 158:3-12; I. Capiro Dep. 11:6-12;

Dwyer Dep. 17:23-18:2, 19:6-9; Chiu Dep. 42:21-43:13.  And Plaintiffs concede that their decisions

to purchase iPhones had nothing to do with any of the issues they complain about here.  Thus, for

example, Plaintiff Alejandro Capiro—who purchased the iPhones for both the Geolocation

Plaintiffs—testified that he was not even aware of Location Services when he purchased these

phones:

Q.     So is it fair to say that at the time you purchased your iPhone and the iPhones
for Isabella and Andres, the functionality around Location Services was not a
consideration in your decision to purchase the iPhones?
A.     Correct.

A. Capiro. Dep. 20:17-22, 20:7-16; *see also* I. Capiro Dep. 72:18-20.  Likewise, iDevice Plaintiff

Chiu testified that he based his purchasing decisions entirely on word of mouth and third-party

sources—and not on any putative representations about privacy:

Q.     [A]side from speaking to people who had been using the iPhone and reviewing
reviews on CNet, can you think of anything else that you reviewed or researched as
part of your decision to purchase the iPhone 3G?
A.     No.

Chiu Dep. 18:24-19:4*; see also* Dwyer Dep. 17:23-18:2 ("Q. [A]side from the reviews . . ., was there

anything else that you read . . . before purchasing the iPhone . . . ? A.  No, no.").

Tellingly, even after filing the Third Amended Complaint—after Plaintiffs were fully aware

of the allegations regarding app data collection and Location Services—Plaintiffs have continued to

purchase or acquire new Apple devices and to use the exact same apps and location-based services at

the heart of their claims.  Chiu Dep. 25:5-26:14 (acquired iPhone 4S after filing complaint); 149:4-18

(continues to use Specified Apps); TAC ¶ 27 (Dwyer purchased new iPhone 3GS after filing

complaint); Dwyer Dep. 31:24-32:21 (acquired iPhone 4S after filing complaint), 27:4-6, 260:18-23,

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

261:25-262:3 ("Q. [Y]ou continue to download and use free apps, knowing that there is a possibility that apps [are sharing personal information without your consent]? . . . A. Yes."); I. Capiro Dep. 60:25-61:8 (Plaintiff had Location Services On at time of deposition); A. Capiro Dep. 20:17-22.

### 2. There Is No Evidence That the Specified Apps (or Any Apps) Sent Plaintiffs' UDIDs With Personal Information to The Third-Party Companies

Critically, Apple does not receive any data about the activities of apps running on iPhones, including what data the apps may collect from users or transmit to third parties. Shoemaker Decl. ¶ 8. Because Plaintiffs failed to conduct any live network analysis of their phones, the only possible sources of evidence concerning what data was collected and transmitted from Plaintiffs' iPhones by the Specified Apps are the data files on the devices themselves. Bolas Decl. ¶¶ 18, 20-21.

After initially resisting production of Plaintiffs' iPhones, Plaintiffs' counsel eventually agreed to permit a third-party forensic expert to create forensic images of Plaintiffs' devices. A comprehensive analysis of the forensic images of iDevice Plaintiff Chiu's and Dwyer's iPhones revealed that there is *no evidence whatsoever to support Plaintiffs' claims that the Specified Apps transmitted an "Apple-assigned UDID" to the Third-Party Companies.* TAC ¶¶ 82-84; Bolas Decl. ¶¶ 24-25, 47, 67. Likewise, there is no support for Plaintiffs' claims that other pieces of information (provided voluntarily by Plaintiffs to the Specified Apps) were transmitted to the Third-Party Companies. *Id.* In short, as is summarized in Appendix A, there is no evidentiary basis whatsoever for Plaintiffs' claims that the Specified Apps transmitted a UDID or other device information obtained through Apple APIs to a Third-Party Company, much less in combination with their "personal information." *See* Appendix A. Similarly, despite Plaintiffs' claim that a ".zip file of approximately two megabytes" was downloaded by Medialets to Mr. Chiu's phone through the Weather Channel app, TAC ¶ 157, there is no trace of this file on his device. Bolas Decl. ¶ 61.

The lack of factual support for Plaintiffs' claims is unsurprising, as Messrs. Dwyer and Chiu candidly admitted during depositions that *neither they nor their counsel ever performed any analysis to see if any app transmitted data from their phones without consent*. *See, e.g.*, Chiu Dep. 39:18-40:4, 134:15-21; Dwyer Dep. 33:23-35:5, 174:1-175:3. Both conceded *they had no factual basis* for the TAC's detailed claims. *See* Chiu Dep. 140:10-142:25; Dwyer Dep. 180:14-183:11.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Even more troubling, Plaintiff Dwyer *had not even used the Pandora app*—the sole app he complains about—at the time he filed his claims.  In fact, Mr. Dwyer first used the Pandora app (and first gave Pandora the allegedly "personal information" he complains the app transmitted), *four days after he filed his complaint.*  Dwyer Dep. 148:10–149:11 (Dwyer first used Pandora when he set up specific radio stations); Bolas Decl. ¶¶ 72-74 (Dwyer's Pandora stations were created July 7, 2012, and there is no evidence of Pandora activity on Dwyer's phone prior to July 7, 2012).  In other words, Plaintiffs simply made up claims that "[t]hrough the Pandora App, [third parties] collected . . . Plaintiff[] Dwyer['s] . . . age, gender, zip code, particular song and performer selected, and music genre, all linked to [a] unique identifier"—and *Dwyer had not even used Pandora when he made these allegations*.  Dkt. No. 74 (SAC filed 7-3-12) ¶ 46(a); *see also* TAC ¶ 45(a).  Moreover, data on Mr. Dwyer's phone suggests he used Pandora for a mere 21 minutes *after* filing his claims—never using the app again—raising the specter that he did so for the sole purpose of "backfilling" his factual allegations.  Bolas Decl. ¶ 73; Dwyer Dep. 148:10-152:24.

### 3.	There Is No Evidence To Support Isabella Capiro's Geolocation Claims

Likewise, there is no factual basis for Plaintiff Isabella Capiro's core contention that "[n]otwithstanding her attempt to turn off [L]ocation Services, it appears that location data was nonetheless transmitted to Apple."  TAC ¶ 30.  Irrefutable evidence establishes that Apple never collected or received "location data" from any user when Location Services was off.  And there is ***no evidence whatsoever that Ms. Capiro ever turned Location Services off*** during the relevant time period:  all backups of her iPhone show Location Services turned on, and Ms. Capiro testified that she cannot recall whether or when she turned Location Services off during that time.

### a.	Despite an Obscure Software Bug, Apple Did Not Collect Location Data From Any iPhone When Location Services Was Off

Ms. Capiro's first iPhone, which she received as a Christmas gift from her father (Plaintiff Alejandro Capiro) in December 2010, contained iOS version 4.2.1.[3]  I. Capiro Dep. 11:13-22; Buckley Decl. ¶ 25, Ex. M.  She upgraded the iOS software version on her device to iOS 4.3.3 on June 11, 2011.  I. Capiro Dep. 21:6-11, 22:1-23:8, Buckley Decl. ¶¶ 25-27, Exs. M-O.

---

[3]  Ms. Capiro received two free, replacement iPhones in January and February 2011.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

The iOS software running on Ms. Capiro's iPhones between December 26, 2010 and June 11, 2011 (when she upgraded to iOS 4.3.3) contained an obscure software bug that caused iOS to begin requesting data that it could use to estimate its location in certain circumstances, even if Location Services was off.  Huang Decl. ¶ 11.  iOS has built-in functionality that allows users to consent to provide their current location to apps or to Apple so as to receive a variety of location-based services, such as turn-by-turn directions or virtual golf caddy services.  *Id.* ¶ 3.  For example, Ms. Capiro consented to provide her device's real-time location to Maps because she "use[s] that app quite a lot and it doesn't work without it."  I. Capiro Dep. 60:25-61:8.

A user must specifically consent to provide their device's location to an app or Apple both by (1) turning Location Services on, and (2) authorizing the specific app to receive location.  Huang Decl. ¶ 4.  ***At no time——including in the iOS versions running on Ms. Capiro's iPhones—could an app or Apple receive a user's location information unless the user had consented to this by turning Location Services "On."***  *Id.*

Apps are able to request a device's location through a series of Apple-approved APIs.  *Id.* ¶ 2.  Apps make this request directly to iOS on the device, and likewise, it is the device's iOS (not Apple) that determines the device's current location.  *Id.* ¶ 5.  Because it can take a long time for the device to obtain GPS data, iOS also estimates location using input signals on the device, along with information about the location of publicly-broadcasting Wi-Fi routers and cell towers in the device's range.  *Id.*  Since it would be impractical to store data concerning the locations of billions of public routers and cell towers on the device, iOS is programmed to look up this information from Apple.  *Id.*

Precisely, to estimate its own location in response to an app's location request, iOS performs a quick scan to obtain the serial numbers for all publicly broadcasting Wi-Fi routers and cell towers that the device can "hear," which could include routers and cell towers up to 100 miles away.  *Id.* ¶¶ 5-6.  To the extent that such data is not already stored on the device, iOS sends a list of these public serial numbers to Apple's servers, which look up and return the locations for the identified cell towers and routers.  *Id.* ¶ 6.  With this information (and other information contained on the device), the device may estimate its own location.  *Id.* ¶ 5.  Critically, iOS does not send *any* location data to Apple—or any data about the user, device, or device location—as part of this Wi-Fi/cell tower look

up.  *Id.*

As a result of an unknown software bug, in certain rare and fact-specific circumstances, certain iOS versions might look up the location of Wi-Fi routers and cell towers from Apple's servers while Location Services was turned off.  *Id.* ¶ 11.  In these rare circumstances, iOS would transmit a list of the serial numbers of Wi-Fi routers and cell towers that were within range of the iPhone to Apple's servers, which in turn provided information about the estimated location of those Wi-Fi routers and cell towers to the device.  *Id.*  The only information transmitted from the iPhone to Apple's servers in these circumstances was a list of serial numbers (e.g., 17:AB:F0:47:62) for public Wi-Fi routers and cell towers; the iPhone did not transmit any information about the user or the device, or any location information.  *Id.*  Apple did not store or use these look up requests in any way beyond returning the location of the identified routers and hot spots to the requesting device.  *Id.* ¶¶ 9, 15.  In sum, although this bug caused iOS to begin the Wi-Fi/cell tower look up  in certain instances when Location Services was off, it ***never provided the location of the device or user to Apple or any app when Location Services was "Off."***  *Id.* ¶ 12.

Apple discovered this bug when investigating claims made in a *Wall Street Journal* article published on April 24, 2011.  *Id.* ¶ 13, Ex. A.  It resolved that issue and other unrelated issues in a free software update (iOS 4.3.3) issued two weeks later, on May 4, 2011.  *Id.*

> **b.**     **There Is No Evidence That Ms. Capiro Turned Off Location Services Before Upgrading to iOS 4.3.3**

It is undisputed that on June 11, 2011, Ms. Capiro upgraded her iPhone to iOS version 4.3.3, which resolved the Wi-Fi/cell tower look up bug that gives rise to Plaintiffs' misguided geolocation claims.  Critically, however, Plaintiffs have no evidence that Ms. Capiro ever turned Location Services off on her iPhone prior to June 11, 2011.

As a threshold matter, Apple has no information or records showing whether or when Ms. Capiro turned Location Services On or Off; this setting is controlled entirely on the device.  Huang Decl. ¶ 20.  Plaintiff Capiro concedes that since receiving her first iPhone as a gift—and up through the present—her practice has been to turn Location Services On in order to receive the benefits of location-based services.  I. Capiro Dep. 60:16-61:8.  She further admits that she specifically

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

authorized several apps to access location before she upgraded to iOS 4.3.3.  *Id.* 74:24-88:6.  Even after filing this lawsuit and asserting false claims that Apple collected her location data when Location Services was off, Ms. Capiro has continued to turn Location Services on, generally and for specific apps.  *Id.* 57:23-58:2.

Although Plaintiff Capiro claims that she has turned Location Services off on a handful of instances (probably ten or fewer) during the past two years, she has absolutely no memory of when or whether she did so at any given point in time—or whether she in fact turned Location Services off before upgrading to iOS 4.3.3.  *Id.* 43:14-24, 44:16-25, 45:1-21.

Importantly, the data captured from Ms. Capiro's iPhone and iTunes back-up files establish that ***Ms. Capiro had turned Location Services on every time that she backed up her iPhone, including for each of the back-ups that occurred before she upgraded to iOS 4.3.3.***  Bolas Decl. ¶¶ 93-96.  In addition, these files demonstrate that Ms. Capiro affirmatively approved Location Services for multiple different applications during the time period she was running iOS 4.2-4.3.2.  *Id.* Based on his forensic analysis, Mr. Bolas confirmed:  "After a thorough forensic analysis," there is "no support" for the claim that "the Location Services master switch on any of [Capiro's] phones was ever turned off prior to October 24, 2012" (the day Ms. Capiro's phone was examined).  *Id.* ¶ 100. Plaintiff is unable to produce a shred of evidence to the contrary.

### c.     Ms. Capiro Lacks Evidence That Any Location Data Was Collected From Her iPhone When Location Services Was Off

Not surprisingly, Ms. Capiro also has been unable to offer any evidence to support her claim that Apple collected location data about her or her device when Location Services was off.  TAC ¶ 183.  Indeed, Plaintiff concedes that neither she nor her counsel has ever investigated this issue or analyzed her iPhone to determine whether there was a factual basis for this claim.  I. Capiro Dep. 54:22-55:13, 94:7-95:12.  And as detailed above, Apple did not collect location data from any user who had Location Services turned off (and there is no evidence that it did).  *See supra*, pp. 11-13.

Moreover, Ms. Capiro testified that the only times that she turned Location Services off (and she cannot recall specifically when she may have done so) were at times that she *also* turned off her Internet connection, in order to save battery life on her phone (not to prevent the transmission of data

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

to Apple).  I. Capiro Dep. 45:22-46:3.  Thus, even if Ms. Capiro had turned Location Services off before upgrading to 4.3.3 (and there is no evidence that she did), iOS could not have engaged in the Wi-Fi/cell tower look up under these conditions, as an active Internet connection was one of many conditions required for the bug to be triggered.  Huang Decl. ¶ 14.

In sum, Plaintiffs' Third Amended Complaint rests entirely on fact-free claims that Plaintiffs invented to overcome this Court's September 20, 2011 dismissal order.  Not only are Plaintiffs' claims devoid of any factual support, but they are directly contradicted by Plaintiffs' own admissions and the data on their iPhones.  Summary judgment is therefore warranted.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Once the moving party has identified evidence that demonstrates the absence of a triable issue of material fact, the burden then shifts to the non-moving party to "come forward with '*specific facts* showing that there is *a genuine issue for trial*.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (first emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### IV.  ARGUMENT

#### A.    Plaintiffs Lack Article III Standing

Plaintiffs bear the burden of proving standing under Article III of the United States Constitution "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts'" to support standing.  *Id.*  Specifically, Plaintiffs have the burden to establish each and every element of constitutional standing—that "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or

imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Lujan*, 504 U.S. at 560-61.

Although the Court previously found that Plaintiffs had *alleged* a sufficient basis for Article III standing in their pleading, Plaintiffs' binding admissions and the undisputed evidence conclusively establish that Plaintiffs have not sustained any injury at all, much less a "concrete," "particularized," and "actual" injury in fact that is "fairly traceable" to Apple.  *See id.*

All of the Plaintiffs have now admitted that they were not harmed by Apple's alleged conduct in any way and therefore suffered no "injury in fact."  *See* Section II(G)(1) *supra*.  These admissions alone are dispositive.  *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 464 (9th Cir. 1973); *Feezor v. Patterson*, Civ. No. S-10-1165 KJM GGH, 2012 WL 4764412, at *5 (E.D. Cal. Oct. 5, 2012) (granting summary judgment for lack of Article III standing where plaintiff's deposition testimony indicated he had not "suffered 'actual injury' for standing purposes") (quotations omitted). Plaintiffs also admit they have no evidence that any "personal information" or "location data" was ever transmitted to Third-Party Companies or to Apple when Location Services was off, and that their iPhones (the only place such evidence might reside) contain no evidence whatsoever that the alleged transmissions occurred.  *See* Section II(G)(2)-(3) *supra*.

Moreover, Plaintiffs' theory that they overpaid for their iPhones cannot satisfy Article III because they admit that they never even read, much less relied upon, any alleged misrepresentations when purchasing their iPhones.  *See* Section II(G)(1) *supra*.  Since Plaintiffs purchased their iPhones for reasons *completely unrelated* to the issues here, they cannot logically or legally ascribe their purchases (at any price) to Apple's alleged misconduct.  *See Katz v. Pershing, LLC*, 672 F.3d 64, 77 (1st Cir. 2012) (To satisfy Article III, "injury alleged . . . must be ascribable to the defendant's misrepresentations;" plaintiff must "plausibly allege a direct causal relationship between her overpayment and [the] purportedly misleading statements) (citations omitted); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177 (D.D.C. 2003) (no injury in fact where plaintiffs alleged false advertising but failed to allege they "were in any way deceived—or even saw—any of [it]").

16

**B.     Apple Is Entitled To Summary Judgment On Plaintiffs' UCL Claim**

Separately, Apple is entitled to summary judgment on Plaintiffs' UCL claim for two reasons. First, Plaintiffs lack statutory standing to maintain a UCL claim because they concede that they have not lost money or property, as required for UCL standing.  Second, the undisputed facts demonstrate that Apple's conduct is not "unlawful, unfair or fraudulent."  Cal. Bus. & Prof. Code § 17200.

**1.     Plaintiffs Lack Standing Under The UCL**

Under California's UCL, a private person has standing only if he or she "has suffered injury in fact *and* has lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204 (emphasis added); *see also Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009) (UCL plaintiffs lacked standing where "plaintiffs [did] not allege that Apple made any representations that iPod users could safely listen to music at high volumes for extended periods of time" and "plaintiffs' alleged injury in fact [was] premised on the loss of a 'safety' benefit that was *not part of the bargain to begin with*") (emphasis added) (citing cases).

This Court rejected Plaintiffs' initial theory that "Plaintiffs' personal information [w]as a type of 'currency' or a 'form of property,' that was taken from Plaintiffs as a result of Defendants' business practices."  Dkt. No. 69 at 35*; see also* Dkt. No. 8 at 19-20 (noting that "[n]umerous courts have held that a plaintiff's 'personal information' does not constitute money or property under the UCL" and collecting cases).  Plaintiffs then pivoted in their amended complaints to "a more traditional theory of a UCL violation."  Dkt. No. 69 at 35.  But Plaintiffs have since admitted that they have not suffered any injury in fact or any loss of money or property under a manufactured "overpayment" theory.  *See* Section II(G)(1) *supra; In re Tobacco II Cases*, 46 Cal. 4th 298, 325-26 (2009) (Proposition 64 requires UCL plaintiffs to show actual reliance on the alleged misrepresentation, as a result of which the lost money or property was sustained, rather than a mere factual nexus between conduct and injury).  Summary judgment on Plaintiffs' UCL claim is appropriate on this basis alone.  *See, e.g., Gutierrez v. Kaiser Found. Hosp., Inc.*, No. C 11-3428 CW, 2012 WL 5372607, at *10 (N.D. Cal. Oct. 30, 2012) (granting motion for summary judgment on UCL claim where "[Plaintiff] could not likely establish an 'injury in fact'"); *Brosnan v. Tradeline Solutions, Inc.*, 681 F. Supp. 2d 1094, 1103 (N.D. Cal. 2010) (granting summary judgment on UCL

claim where "[b]ased upon the undisputed facts, including the admissions of Plaintiff . . . there [was] no evidence to support a finding that Plaintiff [had] standing to pursue these claims [because] [t]here [was] no evidence in the record before [the] Court of damage to Plaintiff as a result of Defendant's actions"); *Butler v. Adoption Media, LLC*, 486 F. Supp. 2d 1022, 1062 (N.D. Cal. 2007).

### 2.     Plaintiffs Lack Evidence To Support The Essential Elements Of Their UCL "Fraud" Claim

Additionally, Plaintiffs' claim under the UCL's "fraud" prong fails because Plaintiffs concede that they lack any evidence to establish the essential elements of this claim—namely, (1) Plaintiffs admit that they did not review or rely on any alleged misrepresentation or omission; (2) Plaintiffs have no evidence that Apple made any misrepresentation or omission; and (3) clear disclosures in Plaintiffs' contracts with Apple preclude reasonable reliance as a matter of law.

### a.     Plaintiffs Admit That They Did Not Review, Much Less Rely On, The Alleged Misrepresentations

Plaintiffs cannot establish fraud under the UCL because they concede that they never saw or relied on any statement made by Apple when purchasing their iPhones.  A UCL fraud Plaintiff must prove that "the defendant's misrepresentations were" an immediate cause of the injury-producing conduct.  *In re Tobacco II Cases*, 46 Cal. 4th at 326-27; *see also id.* at 306 ("proceeding on a claim of misrepresentation as the basis of [a] UCL action [requires] actual reliance on the allegedly deceptive or misleading statements."); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (California Supreme Court "had no doubt that California law [required] a person who sought to be a class representative … to show some additional factors as to himself, including . . . causation."); *In re Sony Gaming Networks and Consumer Data Security Breach Litig.*, No. 11-md-02258-AJB-MDD, 2012 WL 4849054, at *18 (S.D. Cal. Oct. 11, 2012) ("For [UCL] fraud-based claims … named Class members must allege actual reliance").

Although Plaintiffs *alleged* that they each relied on putative misrepresentations in making their iPhone purchasing decisions (*see* TAC ¶¶ 57, 189, 207), they conceded during their depositions that (1) they did not review a single statement by Apple relating to app privacy or Location Services before or after purchasing their iPhones; (2) their purchasing decisions were driven by a range of factors wholly unrelated to Apple's statements and the issues in this case; and (3) even after

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

becoming aware of the practices they challenge here, they continued to acquire new iPhones and use free apps and use Location Services, just as before.  *See Section* II(G)(1) *supra.*

These admissions are fatal to Plaintiffs' UCL fraud claim.  The Ninth Circuit's decision in *Baghdasarian v. Amazon.com Inc.*, 458 Fed. App'x 622 (9th Cir. 2011), is particularly instructive. There, the Ninth Circuit affirmed summary judgment dismissing plaintiff's UCL fraud claim because:

> [w]hen deposed, [plaintiff] Baghdasarian testified that his decision to purchase books through the Marketplace was driven by total cost and security, *factors that are unrelated to Amazon's alleged misrepresentation*.  He also testified that even if he had been aware of Amazon's practices with regard to the shipping and handling fee, he would not have been deterred from making the purchases.  Although Baghdasarian asserts he believed and relied upon Amazon's [alleged mis]representations regarding the shipping and handling fee, no evidence indicates that those representations were an "immediate cause" or "substantial factor" in his decision to purchase books through the Marketplace.  Indeed, given Baghdasarian's testimony that in making his purchasing decisions he shops comparatively to pay the lowest cost, including shipping, the existence of a hidden "holdback fee" in Amazon's price was not a factor that could have affected his decision to purchase on the Marketplace.

*Id.* at 623-24 (emphasis added); *see also Pfizer v. Superior Court*, 182 Cal. App. 4th 622, 625 (2010). Because Plaintiffs' testimony establishes that Apple's statements (or "omissions") did not factor into their purchasing decisions, Apple is entitled to summary judgment on Plaintiffs' UCL fraud claim.

### b.  There Is No Evidence Of A Material Misrepresentation Or Nondisclosure

To survive summary judgment, a UCL fraud plaintiff must also come forward with "significant probative evidence" from which a rational trier of fact could conclude that a reasonable consumer was *likely to be deceived* by the advertising at issue.  *TW Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630-31 (9th Cir. 1987); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (plaintiffs bringing UCL fraud claim must produce "evidence showing 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care'") (citation omitted).  Apart from Plaintiffs' case-ending failure to demonstrate that they personally reviewed or relied on any alleged misstatement, Plaintiffs have failed to come forward with a shred of evidence that any of Apple's statements were "likely to deceive" users.

### (i)  iDevice "Fraud" Claims

The iDevice Plaintiffs identify two categories of putative misrepresentations: (1) a provision in Apple's Privacy Policy that "Apple takes precautions . . . to safeguard [users'] ***personal***

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

*information*" and (2) non-public statements to developers (not users) about their contracts with Apple.  TAC ¶ 184 (emphasis added); ¶¶ 8, 12, 57-60; *see also* Dkt. No. 69 (6-12-12 Order) at 33, 38 (finding Plaintiffs' CLRA and UCL claims "rest[] on" the Privacy Policy provision).[4]  But the undisputed evidence now demonstrates that none of these statements were "likely to deceive."

### 1) Developer Communications and Contracts

As a threshold matter, Plaintiffs cannot establish that Apple's non-public statements or confidential contractual arrangements with app developers were "likely to deceive" users, because it is undisputed that those statements were not directed or generally available to users.  *See, e.g., In re Actimmune Mktg. Litig.*, No. C 08-02376-MHP, 2009 WL 3740648, at *11 (N.D. Cal. Nov. 6, 2009) (allegations that doctors were exposed generally to drug marketing were insufficient for purposes of UCL fraud claim where there was not actual exposure to a particular misstatement); *Express, LLC v. Fetish Group, Inc.*, 464 F. Supp. 2d 965, 980 (C.D. Cal. 2006) (granting summary judgment on UCL fraud claim since plaintiff did not "point to any evidence suggesting that [defendant's] representations … were disseminated to the public, let alone likely to deceive the public"); *Searle v. Wyndham Int'l, Inc.*, 102 Cal. App. 4th 1327, 1335 (2002).

### 2) Privacy Policy Provision Regarding "Personal Information"

Plaintiffs also cannot show that the provision in Apple's Privacy Policy that "Apple takes precautions—including administrative, technical, and physical measures—to safeguard your personal information against loss, theft, and misuse, as well as against unauthorized access, disclosure, alteration or destruction" was in any way "likely to deceive."  TAC ¶ 59, 82, 85-87.

*First*, Apple's Privacy Policy states up front that it only covers information collected and used

---

[4]  Plaintiffs also allege, but have not even attempted to show, that Apple misrepresented that "Apple designed the iPhone to safely and reliably download third party Apps" and that "certain Apps available for download by users in the App store are 'free Apps'" (both entirely true statements).  TAC ¶¶ 8, 184.  The first statement, derived from a filing by Apple's attorneys with the U.S. Copyright Office in 2008, is (1) not consumer-facing and was not viewed or relied on by any Plaintiff or consumer, and (2) could not reasonably be interpreted to contain a promise that Apple would prevent third-party apps from collecting UDIDs or other information.  With respect to the second putative statement (the source of which Plaintiffs have not identified), there is no evidence that a reasonable consumer would have considered apps for which he or she incurred no out-of-pocket cost to be anything but "free."  *See, e.g., Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th 1545, 1545-55 (2011) (sales tax charged on "free" cell phone sold as part of bundled wireless service not fraudulent or misleading business practice).

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

by Apple—and **not** data collected by third parties, such as app developers.  Buckley Decl. ¶ 21,

Exs. K-L.  It is undisputed that Apple itself did not collect, store, or use the UDID or other data

allegedly transmitted from Plaintiffs' iPhones.  *See* Section II(E)(1) *supra*.

      *Second*, by its own terms, this provision is expressly limited to "personal information,"

defined as "data that can be used to uniquely identify or contact a single person," such as "name,

mailing address, phone number, email address, contact preferences, and credit card information."

Buckley Decl. ¶ 23, Exs. K-L.  Critically, the Privacy Policy ***specifically provides that a UDID is***

***"non-personal information,"*** which is not covered by the provision Plaintiffs rely on here.  *Id.* ¶ 24,

Exs. K-L (emphasis added).  Plaintiffs therefore cannot establish that apps' access to a UDID or other

device data in any way conflicts with a provision relating to the "precautions" Apple takes to

"safeguard … ***personal information,***" since UDIDs are "non-personal information" under the

Policy.  *See Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1046-47 (C.D. Cal. 2008)

(plaintiffs did not state a claim under UCL fraud prong because assertions were belied by the terms of

the governing contracts; "the UCL cannot be used to rewrite … contracts or to determine whether the

terms of … contracts are fair"); *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 375-76 (2001)

(affirming summary judgment in favor of defendant on UCL fraud claim where language in policy

and related materials clearly stated terms of coverage, despite plaintiff's assertion he was misled).

      *Third*, Plaintiffs lack evidence that even a single piece of "personal information" as defined in

the Privacy Policy was collected or transmitted without their consent.  *See* Section II(G)(2) *supra*.

      *Finally*, clear disclosures in Apple's Privacy Policy foreclose Plaintiffs' argument that Apple

promised to prevent apps from accessing device data.  Indeed, the Privacy Policy *specifically advises*

that third-party apps may collect such data:

> **Third Party Sites And Services**
> Our products and services may also use or offer products or services from third parties
> <u>– for example, a third-party iPhone app.  Information collected by third parties, which
> may include such things as location data or contact details, is governed by their
> privacy practices.</u>  We encourage you to learn about the privacy practices of those
> third parties.

Buckley Decl. ¶ 20, Exs. K-L (emphasis added).  The App Store Terms also advise that Apple "is not

responsible for examining or evaluating the content or accuracy and Apple does not warrant and will

not have any liability or responsibility for any third-party materials . . . . ."  *Id.* ¶ 13, Exs. E-J.

These clear contractual disclosures defeat Plaintiffs' UCL fraud claim.  For example, in *Freeman v. Time, Inc.*, the Ninth Circuit upheld dismissal of a UCL claim involving a mailer that suggested the plaintiff had won a sweepstakes because it was "qualified by language in smaller type indicating that [the plaintiff] would win only if he returned a winning prize number."  68 F.3d 285, 287 (9th Cir. 1995); *see also Janda v. T-Mobile USA, Inc.*, 378 Fed. App'x 705, 707-08 (9th Cir. 2010).   Likewise, in *In re Sony Gaming Networks*, the court dismissed a claim that Sony misrepresented the quality of its network security, as its privacy policy advised it could not "ensure or warrant the security of any information transmitted to [it]."  2012 WL 4849054, at *17.  Because Apple's Privacy Policy at all times clearly informed Plaintiffs that (1) Apple is not responsible for the data collection practices of third-party apps, and (2) apps may collect users' information (even personal information, such as "contact details"), no reasonable consumer could read the Privacy Policy as promising to safeguard UDID or other information from third-party apps.

### (ii)     Geolocation Claims

Likewise, the Geolocation Plaintiffs have adduced no evidence that Apple made any statements "likely to deceive" consumers.  Plaintiffs focus their "fraud" claims on a single provision in the iOS Software License Agreement ("SLA"):

> **Location Data:**  Apple . . . may provide certain services through your iPhone that rely upon location information.  To provide these services, where available, Apple . . . may transmit, collect, maintain, process, and use your location data, including the real-time geographic location of your iPhone . . . *By using any location-based services on your iPhone, you agree and consent to Apple's . . . transmission, collection, maintenance, processing and use of **your location data** to provide such products and services.  You may withdraw consent at any time by . . . turning off the Location Services setting on your iPhone[.]*

TAC ¶ 115 (incorrectly identified as Apple's "Term and Conditions"); Buckley Decl. ¶ 8, Exs. A-C (emphasis added); *see also* TAC ¶ 116 (citing Apple Letter to Representatives Markey and Barton reiterating SLA provision); Dkt. No. 69 at 38 ("Plaintiffs allege that both in Apple's [SLA] and in a letter to Congress, Apple has represented that consumers may opt-out of the geo-tracking feature of the iDevice by turning off the Location Services setting on the phone.").

Plaintiffs cannot establish that this SLA provision was in any way "likely to deceive."  There is no evidence that Apple collected or used *any* user's "location data" when Location Services was

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

off.  *See* Section II(G)(3)(a) *supra*.  Likewise, Plaintiffs are unable to offer a shred of evidence that "[Ms. Capiro's] location data" was sent to Apple when Location Services was off —or even to show that Ms. Capiro turned Location Services off during the relevant period.  *See* Section II(G)(3)(b)-(c) *supra*; *cf. Birdsong*, 590 F.3d at 960 (affirming dismissal of UCL claim where "plaintiffs do not ever claim that they used their iPods in a way that exposed them to the alleged risk of hearing loss.").  As such, Plaintiffs cannot meet their burden of showing that the SLA "Location Data" provision (or analogous statement to Congress) was in any way "likely to deceive."  *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 965-66 (2003); *Shvarts v. Budget Group*, 81 Cal. App. 4th 1153, 1159-60 (2000).

### 3.    Plaintiffs' UCL "Unfairness" Prong Claim Also Fails

In addition, the undisputed facts and Plaintiffs' admissions establish that Plaintiffs' UCL "unfairness" claim cannot stand under *either* of the tests endorsed by the Ninth Circuit.  *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012) (court need not "resolve [this] question … [where] [plaintiff] fails to state a claim under either definition"); *Lozano v. AT&T Wireless, Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007).

To find unfairness under the "balancing test" set forth in *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 (1999), the court must "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Id.*; *see also Rubio v. Capital One Bank*, 613 F.3d 1195, 1204-05 (9th Cir. 2010).  Here, Plaintiffs concede that they suffered *no harm at all* due to Apple's alleged conduct, and admit that they actually *benefit from* the use of the free apps and Location Services at issue, even after filing this case.  *See* Section II(G)(1) *supra*; *see also Clemens v. DaimlerChrysler Corp.,* 534 F.3d 1017, 1026-27 (9th Cir. 2008); *Shalaby v. Bernzomatic*, 281 F.R.D. 565, 575-76 (S.D. Cal. 2012) (denying claim for injunctive relief under the UCL, finding no "actual injury" as required under the UCL and no irreparable harm because "Plaintiff admit[ted] that he … [had] continued to use Defendants' product [since the alleged occurrence of injury] … and [had] alleged no new injuries"); *Smith v. Chase Mortg. Credit Group*, 653 F. Supp. 2d 1035, 1046-47 (E.D. Cal. 2009).[5]

---

[5]  Further, an inadvertent software bug is not an "unfair" business practice.  *See Frogface v. Network Solutions, Inc.*, No. C-00-3854-WHO, 2002 WL 202371, at *2 (N.D. Cal Jan. 14, 2002)

*(Cont'd on next page)*

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn & Crutcher LLP

Plaintiffs also cannot meet *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*'s alternate standard, which requires a showing that the "unfair" business practice is "tethered" to a violation of a legislatively declared policy.  20 Cal. 4th 163, 186-187 (1999).  This Court already rejected the notion that Apple's alleged conduct offends public policy as reflected in the "state constitutional right of privacy" (TAC ¶ 201), finding that any disclosure of "the unique device identifier number, personal data, and geolocation information . . . [e]ven assuming [it] . . . was transmitted without Plaintiffs' knowledge and consent . . . does not constitute an egregious breach of social norms."  Dkt. No. 69 at 23; s*ee also McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008).

Because Plaintiffs have adduced no evidence that would permit a reasonable trier of fact to conclude that Apple's conduct violates the "unfairness" prong of the UCL under any test, Apple is entitled to summary judgment on Plaintiffs' UCL "unfairness" claim.

**4.      Apple Is Entitled To Summary Judgment On Plaintiffs' UCL "Unlawful" Claim**

Plaintiffs' claim under the UCL's "unlawful" prong falls with their untenable CLRA claim (discussed below), as that claim (along with a fact-free allegation that Apple violated California's False Advertising Law[6]) is the sole basis for their UCL "unlawful" claim.  *See Davis*, 691 F.3d at 1168; *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1152-53 (9th Cir. 2008).

**C.      Apple Is Entitled To Summary Judgment On Plaintiffs' CLRA Claim**

Plaintiffs predicate their CLRA claim on the same alleged "misrepresentations" as their deficient UCL "fraud" claim.  See TAC ¶¶ 183-85.  This claim fails for numerous reasons.

***First***, to satisfy CLRA standing, "Plaintiffs must establish that they suffered an actual injury as a result of [defendant's] alleged conduct."  *Contreras v. Toyota Motor Sales USA, Inc.*, No. C 09-06024 JSW, 2010 WL 2528844, at *4 (N.D. Cal. Jun. 18, 2010) (citing cases), *aff'd in relevant part*, No. 10-16556, 2012 WL1997802 (9th Cir. June 5, 2012).  Since Plaintiffs concede that none of them

---

*(Cont'd from previous page)*

(granting summary judgment as "evidence shows … the delay in deleting [a domain name] from the registry was due to a computer synchronization error, not [defendant's] business practice").

[6]  *See* TAC ¶ 195.  Plaintiffs cannot make out a claim under the FAL for the same reasons that their UCL fraud claim fails: there were no misrepresentations, and even if there had been, Plaintiffs concede that they did not rely on them.  *See, supra,* Section IV(B)(2).

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

"suffered an actual injury" due to Apple's alleged conduct (*see* Section II(G)(1)), Plaintiffs' CLRA claim must fail.  *Millett v. Experian Info. Solutions, Inc.*, 319 Fed. App'x 562, 563 (9th Cir. 2009).

**Second**, California "requires a plaintiff suing under the CLRA for misrepresentations in connection with a sale to plead and prove she relied on a material misrepresentation." *Brownfield v. Bayer Corp.*, No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035, at *3 (E.D. Cal. July 6, 2009) (citing *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (1993)).  Here, Plaintiffs concede that they did not rely on any alleged misrepresentation.  *See* Section II(G)(1) *supra*; *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1085 (N.D. Cal. 2011) (granting judgment on the pleadings on CLRA claim for defendant, as plaintiffs did not rely on defendant's statements).

**Finally**, Plaintiffs' CLRA claim relates to the use of third-party software apps or certain iOS software versions, which are neither a "good" nor a "service" under the CLRA.  *See Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 WL 3910169, at *19 (N.D. Cal. Oct. 5, 2010); *see also Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003).  Plaintiffs concede that there was no nexus between the purchase of their iPhones and their subsequent and independent decisions to download the Specified Apps.  *See* Section II(C) *supra*.  Likewise, the Geolocation Plaintiffs' claims focus entirely on an alleged defect in particular versions of iOS *software*, including iOS versions Ms. Capiro installed *after* acquiring her device.  *See, e.g.*, Dkt. No. 69 at 26 ("Apple rightly argues that class members 'voluntarily installed' the *software* that caused users' iDevices to maintain, synchronize, and retain detailed, unencrypted location history files") (emphasis added).  Indeed, Plaintiffs' claims focus on alleged misstatements in Apple's *Software License Agreement* with Apple.

## V.   CONCLUSION

This lawsuit never should have been brought.  There was never a factual basis for it, never a law broken, and never a person harmed.  Discovery has definitively established that the "facts" Plaintiffs invented to circumvent the Court's September 20, 2011 Order have no basis.  Accordingly, summary judgment should be granted.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

1

Dated:  December 18, 2012                    Respectfully submitted,

2

GIBSON, DUNN & CRUTCHER LLP

3

By:  _/s/_____

4

S. Ashlie Beringer

5

Attorney for Defendant
APPLE INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28