1  GIBSON, DUNN & CRUTCHER LLP
   S. ASHLIE BERINGER, SBN 263977
2  ABeringer@gibsondunn.com
   JOSHUA A. JESSEN, SBN 222831
3  JJessen@gibsondunn.com
   JESSICA S. OU, SBN 280534
4  JOu@gibsondunn.com
   1881 Page Mill Road
5  Palo Alto, California  94304
   Telephone:  650.849.5300
6  Facsimile:  650.849.5333

7  Attorneys for Defendant
   APPLE INC., A CALIFORNIA CORPORATION

8

9              UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12 | In re iPhone Application Litigation | CASE NO. 11-MD-02250-LHK |

13 **CLASS ACTION**

14 **DEFENDANT APPLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES**

17 **HEARING:**
   Date:        November 7, 2013
18 Time:        1:30 p.m.
   Place:       Courtroom 8 – 4th Floor
19 Judge:       The Honorable Lucy H. Koh

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that at 1:30 p.m. on November 7, 2013,[1] or as designated by the Court, in the courtroom of the Honorable Lucy H. Koh, 280 South First Street, San Jose, California 95113, Defendant Apple Inc. ("Apple") will and hereby does move for summary judgment on all claims in Plaintiffs' Third Amended Consolidated Class Action Complaint ("TAC" or "Third Amended Complaint") under Rule 56 of the Federal Rules of Civil Procedure.  The basis for the Motion is that there is no genuine dispute as to any material fact, and Apple is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

This Motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Declarations of S. Ashlie Beringer, Mark Buckley, Phillip Shoemaker, Ronald Huang, and Jeffrey Bolas, and all accompanying exhibits, the Court's files in this action, the arguments of counsel, and any other matter that the Court may properly consider.

## ISSUES TO BE DECIDED

1.      Is Apple entitled to summary judgment on Plaintiffs' entire Third Amended Complaint on the ground that Plaintiffs lack Article III standing?

2.      Is Apple entitled to summary judgment on Plaintiffs' claim for alleged violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL")?

3.      Is Apple entitled to summary judgment on Plaintiffs' claim for alleged violations of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA")?

---

[1]   Given the overlap between the issues presented by Apple's Motion for Summary Judgment and Plaintiffs' eventual motion for class certification, and if it is agreeable to the Court and convenient for the Court's calendar, Apple respectfully requests that the Court hear this Motion on the same day as Plaintiffs' motion for class certification, October 31, 2013, as discussed at the April 10th case management conference.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ........................................ 1

II.    FACTUAL AND PROCEDURAL BACKGROUND ............................................. 2

    A.     Named Plaintiffs ................................................................. 2

    B.     Apple Devices and iOS ........................................................ 2

    C.     The App Store and Third-Party Apps ........................................ 2

    D.     Apple's Privacy Policy and App Store Terms and Conditions ................ 3

    E.     iDevice Plaintiffs' Claims .................................................... 4

        1.     Third-Party Companies' Alleged Use of UDIDs To "Track" ........... 4

        2.     iDevice Plaintiffs' Specific "Tracking" Allegations ................. 5

        3.     Allegations of Harm ..................................................... 5

    F.     Geolocation Plaintiffs' Claims ............................................... 6

        1.     Narrowed Allegations That Anonymous "Location Data" Was
            Transmitted from Ms. Capiro's iPhone When Location Services Was
            Off ....................................................................... 6

        2.     Allegations of Harm ..................................................... 6

    G.     Undisputed Facts Establish That Plaintiffs' Claims Lack Any Evidentiary
        Basis ........................................................................ 7

        1.     Plaintiffs Concede They Suffered No Injury Or Detrimental Reliance ........... 7

        2.     There Is No Evidence That the Specified Apps (or Any Apps) Sent
            Plaintiffs' UDIDs With Personal Information to The Third-Party
            Companies ................................................................. 9

        3.     There Is No Evidence To Support Isabella Capiro's Geolocation Claims ...... 10

            a.     Despite an Obscure Software Bug, Apple Did Not Collect
                Location Data From Any iPhone When Location Services Was
                Off ................................................................. 11

            b.     There Is No Evidence That Ms. Capiro Turned Off Location
                Services Before Upgrading to iOS 4.3.3 ............................. 12

            c.     Ms. Capiro Lacks Evidence That Any Location Data Was
                Collected From Her iPhone When Location Services Was Off ......... 13

III.   SUMMARY JUDGMENT STANDARD ........................................................ 14

i

Gibson, Dunn &
Crutcher LLP

IV.   ARGUMENT ................................................................................................................. 14

    A.   Plaintiffs Lack Article III Standing............................................................................ 14

    B.   Apple Is Entitled To Summary Judgment On Plaintiffs' UCL Claim ....................... 17

        1.   Plaintiffs Lack Standing Under The UCL....................................................... 17

        2.   Plaintiffs Lack Evidence To Support The Essential Elements Of Their UCL "Fraud" Claim ....................................................................................... 18

            a.   Plaintiffs Admit That They Did Not Read, Much Less Rely On, The Alleged Misrepresentations ......................................................... 18

            b.   There Is No Evidence Of A Material Misrepresentation Or Nondisclosure .................................................................................... 19

                (i)   iDevice "Fraud" Claims ....................................................... 20

                (ii)   Geolocation Claims .............................................................. 22

        3.   Plaintiffs' UCL "Unfairness" Prong Claim Also Fails ................................... 23

        4.   Apple Is Entitled To Summary Judgment On Plaintiffs' UCL "Unlawful" Claim ............................................................................................ 24

    C.   Apple Is Entitled To Summary Judgment On Plaintiffs' CLRA Claim..................... 24

V.   CONCLUSION ............................................................................................................. 25

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Baghdasarian v. Amazon.com Inc.*,
    458 F. App'x 622 (9th Cir. 2011) ............................................................................................. 19

*Birdsong v. Apple, Inc.*,
    590 F.3d 955 (9th Cir. 2009) ............................................................................................ 17, 23

*Bower v. AT&T Mobility, LLC*,
    196 Cal. App. 4th 1545 (2011) ................................................................................................ 20

*Brosnan v. Tradeline Solutions, Inc.*,
    681 F. Supp. 2d 1094 (N.D. Cal. 2010) .................................................................................. 18

*Brownfield v. Bayer Corp.*,
    No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035 (E.D. Cal. July 6, 2009) ........................... 25

*Caro v. Proctor & Gamble Co.*,
    18 Cal. App. 4th 644 (1993) .................................................................................................... 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ................................................................................................................ 14

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    20 Cal. 4th 163 (1999) ............................................................................................................ 24

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ...................................................................................................... 15, 16

*Clemens v. DaimlerChrysler Corp.*,
    534 F.3d 1017 (9th Cir. 2008) .......................................................................................... 19, 23

*Contreras v. Toyota Motor Sales USA, Inc.*,
    No. C 09-06024 JSW, 2010 WL 2528844 (N.D. Cal. June 18, 2010), *affirmed in
    relevant part*, No. 10-16556, 2012 WL1997802 (9th Cir. June 5, 2012) ................................. 25

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) .......................................................................................... 23, 24

*Feezor v. Patterson*,
    No. S-10-1165 KJM GGH, 2012 WL 4764412 (E.D. Cal. Oct. 5, 2012) ................................. 16

*Ferrington v. McAfee, Inc.*,
    No. 10-CV-01455-LHK, 2010 WL 3910169 (N.D. Cal. Oct. 5, 2010) ..................................... 25

*Freeman v. Time, Inc.*,
    68 F.3d 285 (9th Cir. 1995) ..................................................................................................... 22

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ................................................................................................................ 15

iii

*Frogface v. Network Solutions, Inc.*,
   No. C-00-3854-WHO, 2002 WL 202371 (N.D. Cal Jan. 14, 2002) ............................................ 24

*Gutman v. Klein*,
   No. 03-CV-1570, 2008 U.S. Dist. LEXIS 92398  (E.D.N.Y. Oct. 15, 2008) .............................. 10

*In re Google Android Consumer Privacy Litig.*,
   No. 11-MD-02264 JSW, 2013 WL 1283236 (N.D. Cal. Mar. 26, 2013) .................................... 17

*In re LinkedIn User Privacy Litig.*,
   No. 12-CV-03088 EJD, 2013 WL 844291 (N.D. Cal. Mar. 6, 2013) ........................................ 17

*In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.*,
   No. 11-md-02258-AJB-MDD, 2012 WL 4849054 (S.D. Cal. Oct. 11, 2012) ...................... 18, 22

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) ............................................................................................................ 18

*Janda v. T-Mobile USA, Inc.*,
   378 F. App'x 705 (9th Cir. 2010) ............................................................................................ 22

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) ..................................................................................................... 16

*La Mar v. H & B Novelty & Loan Co.*,
   489 F.2d 461 (9th Cir. 1973) .................................................................................................. 16

*Lozano v. AT&T Wireless Servs., Inc.*,
   504 F.3d 718 (9th Cir. 2007) .................................................................................................. 23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................................... 14, 15

*McDonald v. Coldwell Banker*,
   543 F.3d 498 (9th Cir. 2008) .................................................................................................. 24

*Millet v. Experian Info Solutions, Inc.*,
   319 F. App'x 562 (9th Cir. 2009) ............................................................................................ 25

*Pfizer v. Superior Court*,
   182 Cal. App. 4th 622 (2010), ................................................................................................ 19

*Pirozzi v. Apple Inc.*,
   No. 12-cv-01529-YGR, 2012 WL 6552453 (N.D. Cal. Dec. 20, 2012) .................................... 17

*Plotkin v. Sajahtera, Inc.*,
   106 Cal. App. 4th 953 (2003) ................................................................................................. 23

*Rubio v. Capital One Bank*,
   613 F.3d 1195 (9th Cir. 2010) ................................................................................................ 23

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
   72 Cal. App. 4th 861 (1999) ................................................................................................... 23

*Shalaby v. Bernzomatic*,
   281 F.R.D. 565 (S.D. Cal. 2012) ............................................................................................. 23

iv

Gibson, Dunn &
Crutcher LLP

*Shvarts v. Budget Grp.*,
   81 Cal. App. 4th 1153 (2000) ........................................................................... 23

*Smith v. Chase Mortg. Credit Grp.*,
   653 F. Supp. 2d 1035 (E.D. Cal. 2009) ........................................................... 24

*Spiegler v. Home Depot U.S.A., Inc.*,
   552 F. Supp. 2d 1036 (C.D. Cal. 2008) ........................................................... 21

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ......................................................................... 18

*Sybersound Records, Inc. v. UAV Corp.*,
   517 F.3d 1137 (9th Cir. 2008) ......................................................................... 24

*Ting v. AT&T*,
   319 F.3d 1126 (9th Cir. 2003) ......................................................................... 25

*TW Elec. Serv. v. Pac. Elec. Contractors*,
   809 F.2d 626 (9th Cir. 1987) ........................................................................... 19

*Van Ness v. Blue Cross of Cal.*,
   87 Cal. App. 4th 364 (2001) ........................................................................... 21

*Williams v. Purdue Pharma Co.*,
   297 F. Supp. 2d 171 (D.D.C. 2003) ................................................................ 16

*Xavier v. Philip Morris USA Inc.*,
   787 F. Supp. 2d 1075 (N.D. Cal. 2011) ......................................................... 25

*Yunker v. Pandora Media, Inc.*,
   No. 11-CV-03113 JSW, 2013 WL 1282980 (N.D. Cal. Mar. 26, 2013) .............. 15, 25

**Statutes**

Cal. Bus. & Prof. Code § 17204 ................................................................................ 17

**Rules**

Fed. R. Civ. P. 56 ..................................................................................................... 14

Gibson, Dunn &
Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

On September 20, 2011, this Court dismissed Plaintiffs' First Consolidated Complaint ("FCC") for lack of Article III standing on the ground, *inter alia*, that Plaintiffs had "not identified a concrete harm from the alleged collection and tracking of their personal information sufficient to create injury in fact" and had failed to "allege injury in fact to *themselves*." Dkt. No. 8 at 6-7.  The Court further found that since "there [was] no allegation that Apple," in contrast to other Defendants, had "misappropriated data, [] there [was] no nexus between the alleged harm and Apple's conduct." *Id.* at 6, 9.  The Court made clear that any amended complaint would need to specify (1) the "apps downloaded that access/track [Plaintiffs'] information;" (2) the "harm (if any) [that] resulted from the access or tracking of their personal information;" and (3) "the causal connection between the exact harm alleged (whatever it is) and each Defendant[']s conduct or role in that harm." *Id.*

On June 12, 2012, the Court dismissed all but two claims of Plaintiffs' First Amended Complaint ("FAC").  *See* Dkt. No. 69 at 44.  With respect to Article III standing, however, the Court found that "Plaintiffs [had] addressed the concerns identified in the Court's September 20 Order and [had] articulated a particularized harm as to themselves" by alleging "which apps they downloaded that accessed or tracked their personal information" and "what harm resulted from the access or tracking of their personal information."  *Id.* at 10.  With respect to the UCL and CLRA claims against Apple, the Court noted that Plaintiffs' allegations "may prove false," but "at this stage . . . [were] sufficient to state a claim."  *Id.* at 34, 38-39.

The Court's observation that Plaintiffs' allegations "may prove false" was prescient. Discovery has established the following undisputed facts:

(1)   Contrary to their allegations, Plaintiffs *admit* they suffered no harm whatsoever—not in "consumed iDevice resources" or in any other way.

(2)   Plaintiffs *admit* they have not lost any money or property.

(3)   Plaintiffs *admit* that they still have no idea whether their "personal information" or "location data" was actually "tracked."  And a forensic analysis of Plaintiffs' iPhones—and the testimony of each of Plaintiffs' experts—*confirmed* that there is no

1    evidence whatsoever that any of Plaintiffs' "personal information" or "location data"

2    was in fact transmitted to the Third-Party Companies or Apple.

3    (4)    Plaintiffs *admit* that the handful of alleged "misrepresentations" they identify in the

4    Third Amended Complaint ("TAC") had nothing to do with their decisions to

5    purchase their iPhones.  In fact, Plaintiffs *admit* they never even read, much less relied

6    upon, any statement by Apple, and they have continued to acquire new iPhones,

7    download and use third-party apps, and use Location Services even after filing suit.

8    (5)    There is *not a shred of evidence* that the alleged misrepresentations were deceptive or

9    likely to deceive the general public.

10    These undisputed facts are fatal both to Plaintiffs' standing and to Plaintiffs' two surviving claims.

11    ## II.    FACTUAL AND PROCEDURAL BACKGROUND

12    ### A.    Named Plaintiffs

13    The TAC was filed on behalf of four named Plaintiffs:  (1) "iDevice Plaintiffs" Anthony Chiu

14    and Cameron Dwyer, each a California resident; and (2) "Geolocation Plaintiffs" Alejandro Capiro

15    and his daughter Isabella Capiro, California residents who each acquired an iPhone 4 in or around

16    December 2010 (Alejandro bought both phones, but the claims are limited to Isabella's phone).  TAC

17    ¶¶ 26-27, 29-30; Declaration of S. Ashlie Beringer ("Beringer Decl."), Ex. B (Oct. 30, 2012 Isabella

18    Capiro Deposition Transcript ("I. Capiro Dep.")) at 8:1-6; Beringer Decl., Ex. C (Oct. 29, 2012

19    Alejandro Capiro Deposition Transcript ("A. Capiro Dep.")) at 7:8-8:6, 9:2-9.

20    ### B.    Apple Devices and iOS

21    Apple manufactures iPhones and other devices.  TAC ¶¶ 31-32.  Apple has developed mobile

22    operating system software called iOS that is analogous to traditional computer-based operating

23    systems.  Declaration of Phillip Shoemaker ("Shoemaker Decl.") ¶ 2.  Apple frequently issues iOS

24    updates, and users can install new versions of iOS as they become available, without cost.  *Id*. ¶ 3.

25    ### C.    The App Store and Third-Party Apps

26    Users can choose to download software applications ("apps") to add a broad range of

27    customized functions to their device.  *Id*. ¶ 5.  Users can download more than 800,000 third-party

28    apps from the "App Store."  *Id*. ¶ 6.  When a user downloads an app, she is downloading stand-alone

software that is programmed and controlled entirely by the app developer.  *Id.* ¶¶ 7-8.  Apple's role is that of an electronics store:  it creates a digital storefront where users can browse and download apps, but it does not create, control, or have access to, the software inside the app.  *Id.*  Indeed, Apple has no more visibility into what happens inside an app running on a user's device than a PC manufacturer has when a user is running printer or photo-editing software on a home computer.  *Id.*

To enable third parties to develop iOS-compatible software, Apple has created "application programing interfaces" ("APIs")—specific commands that allow third-party apps to interact with the iOS software on a user's device.  *Id.*  APIs are part of all modern computer systems, and developers can choose from hundreds of approved APIs when creating their unique applications.  *Id.* ¶¶ 9-10.

All developers who offer apps in the App Store must agree to the iOS Developer Program License Agreement ("PLA"), a ***confidential*** contract that, among other things, requires developers to obtain consent before collecting user or device data.  TAC ¶ 78; Shoemaker Decl. ¶ 13.  Apple also provides developers with App Store Review Guidelines that include more than 120 provisions concerning requirements for apps in the App Store.  *Id.* ¶¶ 14-15.  Although Apple performs a basic review of all apps and may reject apps for violations it detects, it has no access to the source code that would indicate how, whether, or when an app collects or transmits data from the device.  *Id.* ¶¶ 7-8.

### D.    Apple's Privacy Policy and App Store Terms and Conditions

Users who purchase an iOS device do not automatically have the ability to download apps from the App Store.  Declaration of Mark Buckley ("Buckley Decl.") ¶ 10.  Rather, to download an app (including a free app) from the App Store, a user must first create an Apple ID and affirmatively agree to the App Store Terms and Conditions, which include Apple's Privacy Policy, by scrolling through the Terms and clicking "Agree."  *Id.*

Apple's Privacy Policy clearly states that it applies solely to data that *Apple* itself "collect[s], use[s], disclose[s], transfer[s], and store[s]"—and not to data collected by third parties, such as apps.  *Id.* ¶ 19, Exs. J-K.  The Policy further discloses that apps may collect data from users' devices:[2]

---

[2]  Although Plaintiffs Chiu and Dwyer could not recall whether they reviewed specific apps' terms of service, they conceded that their use of apps was governed by separate license agreements with app developers and that they sometimes reviewed these terms before downloading or updating apps. Beringer Decl., Ex. A (Aug. 15, 2012 Chiu Deposition Transcript ("Chiu Dep.")) at 63:15-64:1,

*(Cont'd on next page)*

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

> Our products and services may also use or offer products or services from third parties – **for example, a third-party iPhone app. Information collected by third parties, which may include such things as location data or contact details, is governed by their privacy practices.** We encourage you to learn about the privacy practices of those third parties.

*Id.* ¶ 18, Exs. D-K (emphasis added). Likewise, the App Store Terms and Conditions specifically provide that "Apple is not responsible for examining or evaluating the content or accuracy and Apple does not warrant and will not have any liability or responsibility for any third-party materials," which specifically include "[p]roducts that have been developed, and are licensed to you, by a third party developer." *Id.* ¶¶ 11-12, Exs. D-I.

### E.  iDevice Plaintiffs' Claims

The iDevice Plaintiffs allege that five free apps they chose to download and use (Flixster, Dictionary.com, Pandora, Weather Channel, and Urban Spoon (together, the "Specified Apps")) transmitted "personal information" without their consent to five mobile advertising and/or analytics companies ( "Third-Party Companies"), supposedly in violation of a provision in Apple's Privacy Policy. TAC ¶¶ 35-46. Plaintiffs' claims focus on the Specified Apps' alleged use of an Apple-approved API to access the UDID and transmission of the UDID with "personal information" (provided by Plaintiffs) to the Third-Party Companies. *Id.* ¶¶ 40-42, 44, 46, 82-87, 126-135.

#### 1.  Third-Party Companies' Alleged Use of UDIDs To "Track"

There is no evidence that Apple *itself* transmitted any Plaintiff's device UDID or "personal information." Instead, Plaintiffs' claims focus on the fact that apps are able to query iOS to obtain a UDID through one of hundreds of APIs Apple created. Shoemaker Decl. ¶¶ 9-11; *see* TAC ¶ 85. As Plaintiffs' expert concedes, apps may request a UDID for any number of valid reasons that do not implicate Plaintiffs' claims, including fraud protection, content delivery, or security. Beringer Decl. Ex. E (Nov. 30, 2012 Neuenschwander Deposition Transcript ("Neuenschwander Dep.")) 67:10-69:8; Beringer Decl. Ex. F (Jan. 9, 2013 Egele Deposition Transcript ("Egele Dep.") 89:16-94:3.

Critically, Plaintiffs do not complain about *all* uses of the UDID, but limit their claims to a

---

*(Cont'd from previous page)*

67:6-70:8; Beringer Decl., Ex. D (Aug. 14, 2012 Dwyer Deposition Transcript ("Dwyer Dep.") 68:13-70:20.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

specific concern that some developers may (1) combine the UDID with personally identifiable information, and (2) share that data with third parties that use the UDID to "track" their activities across various apps.  Plaintiffs assert that "Apple-assigned UDID information" is "[o]ne of the most valuable pieces of information" available to the Third-Party Companies "because, *if combined with other information,* such as other information easily available on the iDevice, *it can be used to personally identify a user*."  TAC ¶¶ 82-83 (emphasis added).  They further claim "[t]hat is exactly what happened with each Plaintiff in this litigation"—i.e., "*Plaintiffs' UDID information, along with other data like geographic location data[,] was collected by each Tracking Company, such that each Tracking Company was able to personally identify each Plaintiff*."  *Id.* ¶ 84 (emphasis added).

### 2.    iDevice Plaintiffs' Specific "Tracking" Allegations

In response to the Court's September 20, 2011 Order, and specifically to cross over the Article III hurdle, Plaintiffs amended their complaint to specify how each Plaintiff's "personal information" supposedly had been "tracked."  FAC ¶¶ 58-63.  As is summarized in Appendix A, Plaintiffs detailed more than 50 pieces of information that particular Specified Apps supposedly had transmitted from their iPhones to the Third-Party Companies.  Yet, not a single piece of information allegedly transmitted may be used to "personally identify" any Plaintiff.  *See* Appendix A.

### 3.    Allegations of Harm

Plaintiffs' amended complaints included several allegations purporting to specify their injuries.  The iDevice Plaintiffs alleged that the collection and disclosure of "personal information" to the Third-Party Companies consumed "iDevice storage, battery life, and bandwidth from *each Plaintiff's* wireless services provider."  TAC ¶ 4 (emphasis added).  They further alleged that they "relied upon and were deceived by Apple's material misrepresentations and omissions regarding the iDevice[s]," and that "[a]s a proximate and direct result of Apple's misrepresentations, omissions, and unlawful and unconscionable commercial practices, they and members of the Class ha[d] been injured and suffered damages[.]"  *Id.* ¶¶ 189-190; *see also* Dkt. No. 69 at 33-34, 38.

**F.      Geolocation Plaintiffs' Claims**

     **1.      Narrowed Allegations That Anonymous "Location Data" Was Transmitted from Ms. Capiro's iPhone When Location Services Was Off**

The Geolocation Plaintiffs assert UCL and CLRA claims against Apple based on the allegation that unspecified "geolocation information" was transmitted from Ms. Capiro's iPhone to Apple's servers after she turned Location Services off on her phone.  TAC ¶¶ 29-30, 163.

The Capiros first appeared as Plaintiffs in the TAC, after former Plaintiff Gupta (who conceded that neither he nor his counsel ever investigated his claims, *see* Beringer Decl., Ex. G at 177:12-178:15), and his counsel withdrew from the litigation.  *See* Dkt. Nos. 104, 112.  In permitting the Geolocation Claims to go forward, this Court relied on Mr. Gupta's incorrect "assert[ion] that Apple designed its iOS 4 software to retrieve and transmit geolocation information located on its customers' iPhones to Apple's servers [and] that Apple intentionally collected and stored Plaintiffs' precise geographic location."  Dkt. No. 69 (6-12-12 Order) at 9-12.

Plaintiffs since have substantially narrowed their geolocation theory based on information furnished by Apple—and have abandoned earlier, incorrect claims that Apple tracked the location of individual iPhones, collected Plaintiffs' precise geographic location, and stored that information in a "consolidated.db" file on Plaintiffs' iPhones.  FAC ¶¶ 116, 142-44, 151-52.  Plaintiffs now allege that "it appears" anonymous "location data" was transmitted from Plaintiff Isabella Capiro's iPhone to Apple's servers, "[n]otwithstanding her attempt to turn off [L]ocation Services."  TAC ¶ 30.

The Geolocation Claims are a misguided response to an April 24, 2011 news report that iPhones appeared to cache information about the location of cell towers and Wi-Fi hotspots when Location Services was off.  Declaration of Ronald Huang ("Huang Decl."), Ex. A.  As explained in detail below and in the accompanying declaration of Apple senior engineer Ron Huang, this news report led to Apple's same-day investigation and discovery of an obscure software bug that (i) was triggered in very rare circumstances; (ii) did not involve the transmission of any location data to Apple; and (iii) was resolved by Apple in a few weeks.  *Id.* ¶¶ 13-15.

     **2.      Allegations of Harm**

To plead injury, Plaintiff Isabella Capiro alleged that the transmission of "location data" to Apple's servers caused her to lose "solid-state memory space," "battery resources," and "portions of

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

the 'cache' and/or gigabytes of memory" on her device. TAC ¶¶ 94-98, 186. Like the iDevice Plaintiffs, the Geolocation Plaintiffs further alleged that they "*relied* upon Apple's representations with respect to . . . the ability to opt-out of geolocation tracking, *in making their purchasing decisions.*" *Id.* ¶¶ 57-59, 116, 183-89, 207 (emphases added).

## G. Undisputed Facts Establish That Plaintiffs' Claims Lack Any Evidentiary Basis

Apple has deposed each of the four named Plaintiffs and performed a forensic analysis of their iPhones and related backup files. This discovery has revealed that each of the specific "facts" Plaintiffs added to their pleadings—in particular, the allegations this Court cited when sustaining Plaintiffs' UCL and CLRA claims—*had no factual basis*.

### 1. Plaintiffs Concede They Suffered No Injury Or Detrimental Reliance

Critically, Plaintiffs each *admitted* in sworn deposition testimony that they cannot identify *any harm whatsoever* resulting from the challenged practices. For example, iDevice Plaintiff Chiu agreed that he could not "identify any harm that [he] personally experienced due to the alleged collection of information and transmission of information from [his] phone." Chiu Dep. 147:16-148:11 ("Q. Is the answer no you cannot identify any harm, sitting here today? A. Correct."); *see also* Dwyer Dep. 243:5-16. Likewise, Isabella Capiro—the sole Plaintiff who alleges that geolocation information was transmitted from her iPhone when Location Services was off—conceded that she could not identify a single instance of harm relating to her claims against Apple:

> Q. Can you identify any harm that you personally have experienced due to anything having to do with Location Services? . . .
> A. No.

I. Capiro Dep. 101:9-14, 91:11-21; A. Capiro Dep. 131:23-132:4, 132:6-17, 135:11-19.[3]

---

[3] *See also* Chiu Dep. 146:14-25 (never ran out of storage capacity), 147:5-14 (never exceeded a data plan), 35:11-15 (never incurred any out-of-pocket expenses related to his iPhone); Dwyer Dep. 243:5-16 (". . . Q. But can you actually point to harm that you did experience that's not hypothetical as a result of that happening? . . . A. Personally, I cannot, no."); 246:3-9 (never ran out of storage capacity), 20:3-6 (could not have exceeded his data plan); A. Capiro Dep. 131:23-132:4 ("Q. And am I correct that you aren't aware of any harm that you experienced due to the collection of any information by these apps on your device? . . . A. It's the same answer. I don't know."), 132:6-17, 135:11-19 (could not identify any money or property he lost in connection with his use of apps or the App Store); I. Capiro Dep. 91:11-21 ("Q. Are you aware of having been harmed at all by your use of any of the apps that you've installed on your iPhones? A. I'm

*(Cont'd on next page)*

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn & Crutcher LLP

Moreover, Plaintiffs do not even know whether their data actually was "tracked" as they allege—and ***there is no evidence that it was***.  For example, Plaintiff Chiu testified:

> Q.    And did you at any point in time come to believe that you specifically had personal information collected about you and sent to third parties?
> A.    Again, not that I know of.
> Q.    So sitting here today, you still don't know whether any of the apps that you've installed onto your iPhones, in fact, collected personal information about you and sent that to third parties? . . .
> A.    No.

Chiu Dep. 112:18-113:2, 140:10-142:25; *see also* Dwyer Dep. 176:17-179:6, 180:14-183:11; I. Capiro Dep. 94:7-95:12, 97:12-17, 91:3-9; A. Capiro Dep. 163:14-164:3.

Furthermore, ***none of the Plaintiffs read, much less relied on, any representation from Apple***.  *See* A. Capiro Dep. 16:12-17:6, 158:3-12; I. Capiro Dep. 11:6-12; Dwyer Dep. 17:23-18:2, 19:6-9; Chiu Dep. 42:21-43:13.  And Plaintiffs concede that their decisions to purchase iPhones had nothing to do with any of the issues they complain about here.  Thus, for example, Mr. Capiro testified that he was not even aware of Location Services when he purchased the phones:

> Q.    So is it fair to say that at the time you purchased your iPhone and the iPhones for Isabella and Andres, the functionality around Location Services was not a consideration in your decision to purchase the iPhones?
> A.    Correct.

A. Capiro. Dep. 20:17-22, 20:7-16; *see also* I. Capiro Dep. 72:18-20.  Likewise, iDevice Plaintiff Chiu testified that he based his purchasing decisions entirely on word of mouth and third-party sources—and not on any putative representations about privacy:

> Q.    [A]side from speaking to people who had been using the iPhone and reviewing reviews on CNet, can you think of anything else that you reviewed or researched as part of your decision to purchase the iPhone 3G?
> A.    No.

Chiu Dep. 18:24-19:4*; see also* Dwyer Dep. 17:23-18:2 ("Q. [A]side from the reviews . . ., was there anything else that you read . . . before purchasing the iPhone . . . ? A.  No, no.").

Tellingly, even after filing the Third Amended Complaint—after Plaintiffs were fully aware

---

*(Cont'd from previous page)*

not sure.  Q. You're not sure meaning you . . . can't think of any way in which you've been harmed if that happened?  A. Correct."), 34:8-12 (never ran out of storage capacity).

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

of the allegations regarding app data collection and Location Services—Plaintiffs have continued to purchase or acquire new Apple devices and to use the exact same apps and location-based services at the heart of their claims.  Chiu Dep. 25:5-26:14 (acquired iPhone 4S after filing complaint); 149:4-18 (continues to use Specified Apps); TAC ¶ 27 (Dwyer purchased new iPhone 3GS after filing complaint); Dwyer Dep. 31:24-32:21 (acquired iPhone 4S after filing complaint), 27:4-6, 260:18-23, 261:25-262:3 ("Q. [Y]ou continue to download and use free apps, knowing that there is a possibility that apps [are sharing personal information without your consent]? . . . A. Yes."); I. Capiro Dep. 60:25-61:8 (Plaintiff had Location Services on at time of deposition); A. Capiro Dep. 20:17-22.

### 2. There Is No Evidence That the Specified Apps (or Any Apps) Sent Plaintiffs' UDIDs With Personal Information to The Third-Party Companies

It is undisputed that Apple does not receive any data about the activities of apps running on iPhones, including what data the apps may collect from users or transmit to third parties.  Shoemaker Decl. ¶ 8; Egele Dep. 230:9-18, 216:13-17, 195:22-196:18, 216:13-22, 229:8-231:16.  Because Plaintiffs failed to conduct any live network analysis of their phones, the only possible sources of evidence concerning what data may have been collected and transmitted from Plaintiffs' iPhones by the Specified Apps are the data files on the devices themselves.  Bolas Decl. ¶¶ 18, 20-21.

A comprehensive analysis of the forensic images of iDevice Plaintiffs Chiu's and Dwyer's iPhones revealed that there is *no evidence to support Plaintiffs' claims that the Specified Apps transmitted an "Apple-assigned UDID" to the Third-Party Companies*.  TAC ¶¶ 82-84; Bolas Decl. ¶¶ 24-25, 47, 67.  Likewise, the data logs on Plaintiffs' devices do not support Plaintiffs' claims that these Apps transmitted "personal information" to the Third-Party Companies.  *Id*.  In short, as summarized in Appendix A, there is no evidentiary basis for Plaintiffs' claims that the Specified Apps transmitted a UDID or other device information obtained through Apple APIs to a Third-Party Company, much less in combination with "personal information."  *See* Appendix A.  Similarly, despite Plaintiffs' claim that Medialets downloaded a ".zip file of approximately two megabytes" to Mr. Chiu's phone through the Weather Channel app, TAC ¶ 157, there is no trace of this file on his

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

1   device.  Bolas Decl. ¶ 61.[4]

2          Plaintiffs' own experts, Dr. Egele and Dr. Marziale. substantiated these undisputed facts.

3   Egele testified that *he did not encounter a single instance of an app from the App Store collecting or*

4   *transmitting a UDID in combination with personal information*, despite analyzing more than 800 free

5   apps in several months of intensive graduate research.  Egele Dep. 230:9-18, 216:13-17, 195:22-

6   196:18, 216:13-22, 229:8-231:16.  And Marziale similarly conceded that *he did not detect a single*

7   *instance of an app used by Plaintiff collecting or sending personal information*. *Id.* at 94:11-25;[5]

8   Beringer Decl., Ex. H (Feb. 2, 2012 Marziale Deposition Transcript ("Marziale Dep.")) 93:24-94:25.

9          The lack of factual support for Plaintiffs' claims is unsurprising, as Messrs. Dwyer and Chiu

10  candidly admitted during depositions that ***neither they nor their counsel ever performed any***

11  ***analysis to see if any app transmitted data from their phones without consent***.  *See, e.g.*, Chiu Dep.

12  39:18-40:4, 134:15-21; Dwyer Dep. 33:23-35:5, 174:1-175:3.  Both conceded ***they had no factual***

13  ***basis*** for the TAC's detailed claims.  *See* Chiu Dep. 140:10-142:25; Dwyer Dep. 180:14-183:11.[6]

14      **3.      There Is No Evidence To Support Isabella Capiro's Geolocation Claims**

15          Likewise, there is no factual basis for Plaintiff Isabella Capiro's core contention.  TAC ¶ 30.

16  Plaintiffs' own experts agree that Apple never collected or received "location data" from any user

---

[4]  Apple's expert, Jeffrey Bolas, is an eminently qualified computer forensic examiner whose testimony has been accepted by numerous courts.  *See, e.g.*, *Gutman v. Klein*, No. 03-CV-1570, 2008 U.S. Dist. LEXIS 92398, at *6 (E.D.N.Y. Oct. 15, 2008) (agreeing with Bolas's expert opinion and noting that "[a]mong his various accomplishments, Bolas . . . conducted numerous data acquisitions and digital forensic analyses; led the firm's response in several data breach investigations; and received training in the use of digital forensic investigative tools."); Beringer Decl., Ex. I (Jan. 16, 2013 Jeffrey Bolas Deposition Transcript ("Bolas Dep.")) 96:10-20 (Bolas testified in court as an expert three times and authored approximately 12 expert reports).

[5]  Marziale found *no evidence* that it was even *possible* for the specific apps used by Plaintiffs to transmit the majority of data that Plaintiffs allege had been collected and sent from their devices, and he could not identify a single piece of "personal information" that was collected or transmitted by one of these apps.  Marziale Dep. 79:16-80:11.

[6]  Plaintiff Dwyer *had not even used the Pandora app*—the sole app he complains about—at the time he filed his claims. Mr. Dwyer first used the Pandora app (and first gave Pandora the allegedly "personal information" he complains the app transmitted) *four days after he filed his complaint*.  Dwyer Dep. 148:10–149:11 (Dwyer first used Pandora when he set up specific radio stations); Bolas Decl. ¶¶ 72-74 (Dwyer's Pandora stations were created July 7, 2012, and there is no evidence of Pandora activity on Dwyer's phone prior to July 7, 2012).  Moreover, data on Mr. Dwyer's phone suggests he used Pandora for a mere 21 minutes *after* filing his claims—never using the app again—raising the specter that he did so for the sole purpose of "backfilling" his factual allegations.  Bolas Decl. ¶ 73; Dwyer Dep. 148:10-152:24.

when Location Services was off.  *See infra* pp. 11-12.  And there is ***no evidence whatsoever that Ms. Capiro ever turned Location Services off*** during the relevant time period:  all backups of her iPhone show Location Services turned on, and Ms. Capiro testified that she cannot recall whether or when she turned Location Services off during that time.  *See infra* pp. 13-14.

      a.      **Despite an Obscure Software Bug, Apple Did Not Collect Location Data From Any iPhone When Location Services Was Off**

Ms. Capiro's first iPhone, which she received as a Christmas gift from her father (Plaintiff Alejandro Capiro) in December 2010, contained iOS version 4.2.1.[7]  I. Capiro Dep. 11:13-22; Buckley Decl. ¶ 23, Ex. L.  She upgraded the iOS software version on her device to iOS 4.3.3 on June 11, 2011.  I. Capiro Dep. 21:6-11, 22:1-23:8, Buckley Decl. ¶¶ 23-25, Exs. L-N.

iOS has built-in functionality that allows users to provide their current location to apps or to Apple to receive a variety of location-based services, such as turn-by-turn directions .  Huang Decl. ¶ 3.  For example, Ms. Capiro consented to provide her device's location to Maps because she "use[s] that app quite a lot and it doesn't work without it."  I. Capiro Dep. 60:25-61:8.  A user must specifically consent to provide her device's location to an App or  both by (1) turning Location Services on, and (2) authorizing the specific app to receive the location.  Huang Decl. ¶ 4.  ***At no time——including in the iOS versions running on Ms. Capiro's iPhones—could an app or Apple receive a user's location information unless the user had consented to this by turning Location Services "On."***  *Id.*

Apps are able to request a device's location through a series of Apple-approved APIs.  *Id.* ¶ 2.  Apps make this request directly to iOS on the device, and likewise, it is the device's iOS (not Apple) that determines the device's current location.  *Id.* ¶ 5.  Because it can take a long time for the device to obtain GPS data, iOS also estimates location using input signals on the device, along with information about the location of publicly broadcasting Wi-Fi routers and cell towers in the device's range.  *Id.*  Since it would be impractical to store data concerning the locations of billions of public routers and cell towers on the device, iOS is programmed to look up this information from Apple.  *Id.*

Precisely, to estimate its own location in response to an app's location request, iOS performs a

---

[7]  Ms. Capiro received two free replacement iPhones in January and February 2011.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

quick scan to obtain the serial numbers for all publicly broadcasting Wi-Fi routers and cell towers that the device can "hear," which could include routers and cell towers many miles away.  *Id.* ¶¶ 5-6.  To the extent that such data is not already stored on the device, iOS sends a list of these public serial numbers to Apple's servers, which look up and return the locations for the identified cell towers and routers.  *Id.* ¶ 6.  With this information (and other information contained on the device), the device may estimate its own location.  *Id.* ¶ 5.  Critically, ***iOS does not send any location data to Apple—or any data about the user, device, or device location—as part of this Wi-Fi/cell tower look up***.  *Id.*

The iOS software running on Ms. Capiro's iPhones between December 26, 2010 and June 11, 2011 (when she upgraded to iOS 4.3.3) contained an obscure software bug that caused iOS to begin requesting data to estimate its location in certain circumstances, even with Location Services off.  *Id.* ¶ 11.  Specifically, and rarely, certain iOS versions might look up the location of Wi-Fi routers and cell towers from Apple's servers while Location Services was off.  *Id.*  In these limited situations, iOS would transmit a list of serial numbers of Wi-Fi routers and cell towers that were within range of the iPhone to Apple's servers, which in turn provided information about the estimated location of those Wi-Fi routers and cell towers to the device.  *Id.*  The only information transmitted from the iPhone to Apple's servers in these circumstances was a list of serial numbers (e.g., 17:AB:F0:47:62) for public Wi-Fi routers and cell towers; *it is undisputed that the iPhone did not transmit any information about the user or the device, or any location information.*  *Id.*  Apple did not store or use these look up requests in any way beyond returning the location of the identified routers and hot spots to the requesting device.  *Id.* ¶¶ 9, 15.  In sum, although this bug caused iOS to begin the Wi-Fi/cell tower look up in certain instances when Location Services was off, it *never provided the location of the device or user to Apple or any app when Location Services was off.*  *Id.* ¶ 12.

Apple discovered this bug when investigating claims made in a *Wall Street Journal* article published on April 24, 2011.  *Id.* ¶ 13, Ex. A.  It resolved that issue and other unrelated issues in a free software update (iOS 4.3.3) issued two weeks later, on May 4, 2011.  *Id.*

**b.    There Is No Evidence That Ms. Capiro Turned Off Location Services Before Upgrading to iOS 4.3.3**

It is undisputed that on June 11, 2011, Ms. Capiro upgraded her iPhone to iOS 4.3.3, which

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

1    resolved the Wi-Fi/cell tower look up bug that gives rise to Plaintiffs' misguided claims. Critically,

2    Plaintiffs have no evidence that Ms. Capiro ever turned Location Services off before June 11, 2011.

3    Apple has no information or records showing whether or when Ms. Capiro turned Location

4    Services on or off; this setting is controlled entirely on the device. Huang Decl. ¶ 20. Ms. Capiro

5    concedes that since receiving her first iPhone as a gift, her practice has been to turn Location Services

6    on in order to receive the benefits of location-based services. I. Capiro Dep. 60:16-61:8. She further

7    admits that she specifically authorized several apps to access location before she upgraded to iOS

8    4.3.3. *Id.* 74:24-88:6. Even after filing this lawsuit, Ms. Capiro continues to turn Location Services

9    on, generally and for specific apps. *Id.* 57:23-58:2. Although she claims that she has turned Location

10   Services off on a handful of instances (probably ten or fewer) during the past two years, she has

11   absolutely no memory of when or whether she did so at any given point in time—or whether she

12   turned Location Services off before upgrading to iOS 4.3.3. *Id.* 43:14-24, 44:16-25, 45:1-21.

13   Importantly, the data captured from Ms. Capiro's iPhone and iTunes backup files establish

14   that ***Ms. Capiro had turned Location Services on every time that she backed up her iPhone,***

15   ***including for each of the backups that occurred before she upgraded to iOS 4.3.3.*** Bolas Decl.

16   ¶¶ 93-96. In addition, these files demonstrate that Ms. Capiro affirmatively approved Location

17   Services for multiple different applications during the time period she was running iOS 4.2-4.3.2. *Id.*

18   Based on his forensic analysis, Mr. Bolas confirmed: "After a thorough forensic analysis," there is

19   "no support" for the claim that "the Location Services master switch on any of [Capiro's] phones was

20   ever turned off prior to October 24, 2012" (the day Ms. Capiro's phone was examined). *Id.* ¶ 100.

21   Plaintiff is unable to produce a shred of evidence to the contrary.

             **c.    Ms. Capiro Lacks Evidence That Any Location Data Was Collected From
22                   Her iPhone When Location Services Was Off**

23   Ms. Capiro also has been unable to offer any evidence to support her claim that Apple

24   collected location data about her or her device when Location Services was off. TAC ¶ 183. She

25   concedes that neither she nor her counsel investigated this issue or analyzed her iPhone to determine

26   whether there was a factual basis for this claim. I. Capiro Dep. 54:22-55:13, 94:7-95:12. And as

27   detailed above, Apple did not collect location data from any user who had Location Services turned

28

off (and there is no evidence that it did). *See supra* pp. 11-13.

In fact, it remains undisputed that the only information even possibly transmitted to Apple was not "your location data" (information Location Services controls) but publicly broadcast Wi-Fi router and cell tower serial numbers, which Plaintiffs concede are not location information. *See* Dkt. 134, Huang Decl. ¶¶ 117, 17; Marziale Dep. 116:17-117:4. Indeed, Plaintiffs' experts agreed that such serial numbers are not location information and do not constitute "your location data, including the real-time geographic location of your iPhone" within the meaning of the SLA. Egele Dep. 161:15-162:3 (serial numbers of Wi-Fi routers and cell towers are not location information); 165:2-19 (location information was not transmitted to Apple when Location Services was off); Marziale Dep. 116:17-117:4 (transmitted information could not identify individuals or their location); Buckley Decl., Ex. A at 4.

In sum, Plaintiffs' TAC rests entirely on fact-free claims that Plaintiffs invented to overcome this Court's September 20, 2011 dismissal order. Not only are Plaintiffs' claims devoid of any factual support, but they are directly contradicted by Plaintiffs' own admissions, the testimony of their experts, and the data on their iPhones. Summary judgment is therefore warranted.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.   ARGUMENT

### A.      Plaintiffs Lack Article III Standing

Plaintiffs bear the burden of proving standing under Article III of the United States Constitution "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," but "[i]n response to a summary judgment motion, . . . the plaintiff can no longer rest on such 'mere allegations,' but

must 'set forth' by affidavit or other evidence 'specific facts'" to support standing.  *Id.*  Specifically, Plaintiffs have the burden to establish each and every element of constitutional standing—that "(1) [the plaintiff] has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *see also Lujan*, 504 U.S. at 560-61.

The United States Supreme Court recently reaffirmed the necessity that a plaintiff establish a concrete, imminent injury in *Clapper v. Amnesty International USA*, a privacy suit brought by individuals in the United States who argued that there was an objectively reasonable likelihood that their communications with their foreign contacts would be unlawfully intercepted by the United States government.  133 S. Ct. 1138, 1143 (2013).  Explaining that "[n]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," the Court held that plaintiffs lacked standing because they had failed to establish injury in fact.  *Id.* at 1146, 1155.  "Although imminence is concededly a somewhat elastic concept," the Court observed, "it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending.  Thus, we have repeatedly reiterated that 'threatened injury must be *certainly impending* to constitute injury in fact,' and that '[a]llegations of *possible* future injury' are not sufficient." *Id.* at 1147.  A theory of standing that "relies on a highly attenuated chain of possibilities," the Court held, "does not satisfy the requirement that threatened injury must be certainly impending."  *Id.* at 1148; *see also Yunker v. Pandora Media, Inc.*, No. 11-CV-03113 JSW, 2013 WL 1282980, at *5 (N.D. Cal. Mar. 26, 2013) (rejecting Article III standing based on increased threat of future harm where plaintiff alleged app collected his personally identifiable information and "did not anonymize" it).

Although this Court previously found that Plaintiffs had *alleged* a sufficient basis for Article III standing, Plaintiffs' binding admissions and the undisputed evidence conclusively establish that Plaintiffs have not sustained any injury at all, much less a "concrete," "particularized," and "actual"

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

or "imminent" injury in fact that is "fairly traceable" to Apple.  *See Clapper*, 133 S. Ct. at 1147.

All of the Plaintiffs have now admitted that they were not harmed by Apple's alleged conduct in any way and therefore suffered no "injury in fact."  *See supra* pp. 7-9.  These admissions alone are dispositive.  *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 464 (9th Cir. 1973); *Feezor v. Patterson*, No. S-10-1165 KJM GGH, 2012 WL 4764412, at *5 (E.D. Cal. Oct. 5, 2012) (granting summary judgment for lack of Article III standing where plaintiff's deposition testimony indicated he had not "suffered 'actual injury' for standing purposes").  Plaintiffs—and their experts—also admit they have no evidence that any "personal information" or "location data" was ever transmitted to Third-Party Companies or to Apple when Location Services was off, and that their iPhones contain no evidence whatsoever that the alleged transmissions occurred.  *See supra* pp. 9-12.[8]

Moreover, Plaintiffs' theory that they overpaid for their iPhones cannot satisfy Article III because they admit that they never even read, much less relied upon, any alleged misrepresentations when purchasing their iPhones.  *See supra* p. 8.  Since Plaintiffs purchased their iPhones for reasons *completely unrelated* to the issues here, they cannot logically or legally ascribe their purchases (at any price) to Apple's alleged misconduct.  *See Katz v. Pershing, LLC*, 672 F.3d 64, 77 (1st Cir. 2012) (To satisfy Article III, "injury alleged . . . must be ascribable to the defendant's misrepresentations"; plaintiff must "plausibly allege a direct causal relationship between her overpayment and [the] purportedly misleading statements) (citations omitted); *Williams v. Purdue Pharma Co.*, 297 F. Supp. 2d 171, 177 (D.D.C. 2003) (no injury in fact where plaintiffs alleged false advertising but failed to allege they "were in any way deceived—or even saw—any of [it]").

Indeed, at the February 28 hearing on Plaintiffs' motion for class certification, Plaintiffs' counsel was forced to admit what the evidence makes plain:  Plaintiffs neither saw, nor read, nor relied upon the alleged misrepresentations before purchasing their phones.  Beringer Decl., Ex. J

---

[8]  Plaintiffs also have offered no evidence that they experienced an adverse impact to their devices' resources due to the alleged data transmissions.  No Plaintiff testified to such harm.  *Supra* pp. 7-9.  And Plaintiffs' expert, Dr. Egele, conceded that he made no attempt to determine whether or not Plaintiffs—or anyone—experienced diminished resources as a result of the challenged data transmissions.  Egele Dep. 165:20-166:4, 167:4-25, 185:14-186:20.  In fact, Dr. Egele could only speculate that the resources possibly consumed by the data transmissions here would be more than *100,000 times smaller* than those consumed when sending a single photograph—confirming the *lack* of any discernible resource consumption here.  *Id.* at 193:19-195:1.

Gibson, Dunn & Crutcher LLP

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

(Feb. 28, 2013 Hearing Transcript) at 37:7-13 ("THE COURT:  Give me any evidence that anyone [read the representations] before they bought the phone, that class members would have looked at an iTunes Terms and Conditions Privacy Policy before they bought the device.  MR. KAMBER:  I don't think that is—I have no evidence.").  This is fatal to Plaintiffs' manufactured "overpayment" theory. *See Pirozzi v. Apple Inc.*, No. 12-cv-01529-YGR, 2012 WL 6552453, at \*4 (N.D. Cal. Dec. 20, 2012) (holding that plaintiff lacked Article III standing on an overpayment theory where she "fail[ed] to allege specifically which statements she found material to her decision to purchase an Apple Device or App"); *In re Google Android Consumer Privacy Litig.*, No. 11-MD-02264 JSW, 2013 WL 1283236, at \*6 (N.D. Cal. Mar. 26, 2013) ("Plaintiffs do not identify what statements were material to their decision to purchase an Android device or to download or use any given App.  The Court finds that Plaintiffs have not alleged sufficient facts to show an injury based on the theory that they overpaid for these devices."); *In re LinkedIn User Privacy Litig.*, No. 12-CV-03088 EJD, 2013 WL 844291, at \*4 (N.D. Cal. Mar. 6, 2013) (holding that where plaintiffs did "not even allege that they actually read the alleged misrepresentation," they lacked standing "[b]ecause a causal connection between a defendant's actions and plaintiff's alleged harm is required for standing").

**B.      Apple Is Entitled To Summary Judgment On Plaintiffs' UCL Claim**

       **1.      Plaintiffs Lack Standing Under The UCL**

Under California's UCL, a private person has standing only if he or she "has suffered injury in fact and has lost money or property as a result of the unfair competition."  Cal. Bus. & Prof. Code § 17204; *see also Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009).

This Court rejected Plaintiffs' initial theory that "Plaintiffs' personal information [w]as a type of 'currency' or a 'form of property,' that was taken from Plaintiffs as a result of Defendants' business practices."  Dkt. No. 69 at 35; *see also* Dkt. No. 8 at 19-20 (noting that "[n]umerous courts have held that a plaintiff's 'personal information' does not constitute money or property under the UCL" and collecting cases).  Plaintiffs then pivoted in their amended complaints to "a more traditional theory of a UCL violation."  Dkt. No. 69 at 35.  But Plaintiffs have since admitted that they have not suffered any injury in fact or any loss of money or property— under a manufactured "overpayment" theory or otherwise.  *See supra* pp. 7-9; *In re Tobacco II Cases*, 46 Cal. 4th 298, 325-

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

26 (2009) (Proposition 64 requires UCL plaintiffs to show actual reliance on the alleged misrepresentation rather than a mere factual nexus between conduct and injury).  Summary judgment on Plaintiffs' UCL claim is appropriate on this basis alone.  *See, e.g.*, *Brosnan v. Tradeline Solutions, Inc.*, 681 F. Supp. 2d 1094, 1103 (N.D. Cal. 2010) (granting summary judgment on UCL claim where "[b]ased upon the undisputed facts, including the admissions of Plaintiff . . . there [was] no evidence to support a finding that Plaintiff [had] standing to pursue these claims [because] [t]here [was] no evidence in the record before [the] Court of damage to Plaintiff as a result of Defendant's actions").

### 2. Plaintiffs Lack Evidence To Support The Essential Elements Of Their UCL "Fraud" Claim

Additionally, Plaintiffs' claim under the UCL's "fraud" prong fails because Plaintiffs concede that they lack any evidence to establish the essential elements of this claim—namely, (1) Plaintiffs admit that they did not review or rely on any alleged misrepresentation or omission; (2) Plaintiffs have no evidence that Apple made any misrepresentation or omission; and (3) clear disclosures in Plaintiffs' contracts with Apple preclude reasonable reliance as a matter of law.

### a. Plaintiffs Admit That They Did Not Read, Much Less Rely On, The Alleged Misrepresentations

Plaintiffs cannot establish fraud under the UCL because they concede that they never read or relied on any statement made by Apple when purchasing their iPhones.  A UCL fraud Plaintiff must prove that "the defendant's misrepresentations were" an immediate cause of the injury-producing conduct.  *In re Tobacco II Cases*, 46 Cal. 4th at 326-27; *see also id.* at 306 ("proceeding on a claim of misrepresentation as the basis of [a] UCL action [requires] actual reliance on the allegedly deceptive or misleading statements."); *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1020 (9th Cir. 2011) (California Supreme Court "had no doubt that California law [required] a person who sought to be a class representative . . . to show some additional factors as to himself, including . . . causation."); *In re Sony Gaming Networks & Consumer Data Sec. Breach Litig.*, No. 11-md-02258-AJB-MDD, 2012 WL 4849054, at *18 (S.D. Cal. Oct. 11, 2012).

Although Plaintiffs *alleged* that they each relied on putative misrepresentations in making their iPhone purchasing decisions (*see* TAC ¶¶ 57, 189, 207), they conceded during their depositions that (1) they did not review a single statement by Apple relating to app privacy or Location Services

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

before or after purchasing their iPhones; (2) their purchasing decisions were driven by a range of factors wholly unrelated to Apple's statements and the issues in this case; and (3) even after becoming aware of the practices they challenge here, they continued to purchase new iPhones and use free apps and use Location Services, just as before. *See supra* pp. 8-9.

These admissions are fatal to Plaintiffs' UCL fraud claim.  The Ninth Circuit's decision in *Baghdasarian v. Amazon.com Inc.*, 458 F. App'x 622 (9th Cir. 2011), is particularly instructive. There, the Ninth Circuit affirmed summary judgment dismissing plaintiff's UCL fraud claim because:

> [w]hen deposed, [plaintiff] Baghdasarian testified that his decision to purchase books through the Marketplace was driven by total cost and security, *factors that are unrelated to Amazon's alleged misrepresentation*.  He also testified that even if he had been aware of Amazon's practices with regard to the shipping and handling fee, he would not have been deterred from making the purchases.  Although Baghdasarian asserts he believed and relied upon Amazon's [alleged mis]representations regarding the shipping and handling fee, no evidence indicates that those representations were an "immediate cause" or "substantial factor" in his decision to purchase books through the Marketplace.  Indeed, given Baghdasarian's testimony that in making his purchasing decisions he shops comparatively to pay the lowest cost, including shipping, the existence of a hidden "holdback fee" in Amazon's price was not a factor that could have affected his decision to purchase on the Marketplace.

*Id.* at 623-24 (emphasis added); *see also Pfizer v. Superior Court*, 182 Cal. App. 4th 622, 625 (2010). Because Plaintiffs' testimony establishes that Apple's statements (or "omissions") did not factor into their purchasing decisions, Apple is entitled to summary judgment on Plaintiffs' UCL fraud claim.

### b.    There Is No Evidence Of A Material Misrepresentation Or Nondisclosure

To survive summary judgment, a UCL fraud plaintiff also must come forward with "significant probative evidence" from which a rational trier of fact could conclude that a reasonable consumer was *likely to be deceived* by the advertising at issue.  *TW Elec. Serv. v. Pac. Elec. Contractors*, 809 F.2d 626, 630-31 (9th Cir. 1987); *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008) (plaintiffs bringing UCL fraud claim must produce "evidence showing 'a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care'").  Apart from Plaintiffs' case-ending failure to demonstrate that they personally read or relied on any alleged misstatement, Plaintiffs have failed to offer a shred of evidence that any of

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
Case No. CV 11-MD-02250-LHK

1   Apple's statements were "likely to deceive" users.[9]

2               **(i)      iDevice "Fraud" Claims**

3               The iDevice Plaintiffs initially identified two categories of putative misrepresentations: (1) a

4   provision in Apple's Privacy Policy that "Apple takes precautions . . . to safeguard [users'] ***personal***

5   ***information***"; and (2) nonpublic statements to developers (not users) about their contracts with

6   Apple.  TAC ¶ 184 (emphasis added); ¶¶ 8, 12, 57-60; *see also* Dkt. No. 69 at 33, 38 (finding

7   Plaintiffs' CLRA and UCL claims "rest[] on" the Privacy Policy provision).[10]  However, during the

8   February 28th class certification hearing, Plaintiffs clarified that their UCL claim rests entirely on the

9   Privacy Policy provision.  Beringer Decl., Ex. J at 4:13-6:17.  Yet the undisputed evidence

10  demonstrates that the provision in Apple's Privacy Policy that "Apple takes precautions—including

11  administrative, technical, and physical measures—to safeguard your personal information against

12  loss, theft, and misuse, as well as against unauthorized access, disclosure, alteration or destruction"

13  was not in any way "likely to deceive."  TAC ¶¶ 59, 82, 85-87.

14              ***First***, Apple's Privacy Policy states up front that it only covers information collected and used

15  by Apple—and ***not*** data collected by third parties, such as app developers.  Buckley Decl. ¶ 19,

16  Exs. J-K.  It is undisputed that Apple itself did not collect, store, or use the UDID or other data

17  allegedly collected and transmitted by apps from Plaintiffs' iPhones.  *See supra* pp. 9-10.

18              ***Second***, by its own terms, this provision is expressly limited to "personal information,"

19  _____

20  [9]  Plaintiffs cannot predicate their claim on Apple's purported failure to disclose material
    information because they have not identified any actionable omissions, despite numerous
21  opportunities to do so.  And even if Plaintiffs had specified an omission, any claim is foreclosed
    as a matter of law because they have not established (and cannot establish) that any alleged
22  omission relates to a safety concern or was material to them.  *See* Dkt. No. 204.

23  [10]  Plaintiffs also allege, but have not even attempted to show, that Apple misrepresented that "Apple
    designed the iPhone to safely and reliably download third party Apps" and that "certain Apps
    available for download by users in the App store are 'free Apps'" (both entirely true statements).
24  TAC ¶¶ 8, 184.  The first statement, derived from a filing by Apple's attorneys with the U.S.
    Copyright Office in 2008, is (1) not consumer-facing and was not viewed or relied on by any
25  Plaintiff or consumer, and (2) could not reasonably be interpreted to contain a promise that Apple
    would prevent third-party apps from collecting UDIDs or other information.  With respect to the
26  second putative statement (the source of which Plaintiffs have not identified), there is no evidence
    that a reasonable consumer would have considered apps for which he or she incurred no out-of-
27  pocket cost to be anything but "free."  *See, e.g., Bower v. AT&T Mobility, LLC*, 196 Cal. App. 4th
    1545, 1545-55 (2011) (sales tax charged on "free" cell phone sold as part of bundled wireless
28  service not fraudulent or misleading business practice).

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

defined as "data that can be used to uniquely identify or contact a single person," such as "name, mailing address, phone number, email address, contact preferences, and credit card information." Buckley Decl. ¶ 21, Exs. J-K.  Critically, the Privacy Policy **specifically provides that a UDID is "non-personal information,"** which is not covered by the provision Plaintiffs rely on here.  *Id.* ¶ 22, Exs. J-K (emphasis added).  Plaintiffs therefore cannot establish that apps' access to a UDID or other device data in any way conflicts with a provision relating to the "precautions" Apple takes to "safeguard . . . **personal information**," since UDIDs are "non-personal information" under the Policy.  *See Spiegler v. Home Depot U.S.A., Inc.*, 552 F. Supp. 2d 1036, 1046-47 (C.D. Cal. 2008) (plaintiffs did not state a claim under UCL fraud prong because assertions were belied by the terms of the governing contracts; "the UCL cannot be used to rewrite . . . contracts or to determine whether the terms of . . . contracts are fair"); *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 375-76 (2001) (affirming summary judgment in favor of defendant on UCL fraud claim where language in policy and related materials clearly stated terms of coverage, despite plaintiff's assertion he was misled).[11]

Third, Plaintiffs lack evidence that even a single piece of "personal information" as defined in the Privacy Policy was collected or transmitted without their consent.  *See supra* pp. 9-10.

**Finally**, clear disclosures in Apple's Privacy Policy foreclose Plaintiffs' argument that Apple promised to prevent apps from accessing device data.  Indeed, the Privacy Policy *specifically advises* that third-party apps may collect such data:

> Our products and services may also use or offer products or services from third parties – for example, a third-party iPhone app.  Information collected by third parties, which may include such things as location data or contact details, is governed by their privacy practices.  We encourage you to learn about the privacy practices of those third parties.

Buckley Decl. ¶ 18, Exs. D-K (emphasis added).  The App Store Terms also advise that Apple "is not responsible for examining or evaluating the content or accuracy and Apple does not warrant and will not have any liability or responsibility for any third-party materials."  *Id.* ¶ 11, Exs. D-I.

---

[11]  Plaintiffs' own experts conceded this point.  Dr. Egele admitted that "personal information" in Apple's Privacy Policy refers only to data that "allows a party to uniquely identify or contact a user," and admitted that UDID is not personal information unless combined with other identifying information.  Egele Dep. 28:24-30:2.  And Plaintiffs' second expert, Dr. Marziale, agreed and confirmed the he did not find evidence that even a single Specified App installed on Plaintiffs' devices collected such personal information.  Marziale Dep. 31:19-33:1, 93:24-94:25.

These clear contractual disclosures defeat Plaintiffs' UCL fraud claim.  For example, in *Freeman v. Time, Inc.*, the Ninth Circuit upheld dismissal of a UCL claim involving a mailer that suggested the plaintiff had won a sweepstakes because it was "qualified by language in smaller type indicating that [the plaintiff] would win only if he returned a winning prize number."  68 F.3d 285, 287 (9th Cir. 1995); *see also Janda v. T-Mobile USA, Inc.*, 378 F. App'x 705, 707-08 (9th Cir. 2010).  Likewise, in *In re Sony Gaming Networks*, the court dismissed a claim that Sony misrepresented the quality of its network security, as its privacy policy advised it could not "ensure or warrant the security of any information transmitted to [it]."  2012 WL 4849054, at *17.  Because Apple's Privacy Policy at all times clearly informed Plaintiffs that (1) Apple is not responsible for the data collection practices of third-party apps, and (2) apps may collect users' information (even personal information, such as "contact details"), no reasonable consumer could read the Privacy Policy as promising to safeguard UDID or other information from third-party apps.

### (ii)        Geolocation Claims

Likewise, the Geolocation Plaintiffs have adduced no evidence that Apple made any statements "likely to deceive" consumers.  Plaintiffs focus their "fraud" claims on a single provision in the iOS Software License Agreement ("SLA"):

> **Location Data:**  Apple . . . may provide certain services through your iPhone that rely upon location information.  To provide these services, where available, Apple . . . may transmit, collect, maintain, process, and use your location data, including the real-time geographic location of your iPhone . . . *By using any location-based services on your iPhone, you agree and consent to Apple's . . . transmission, collection, maintenance, processing and use of **your location data** to provide such products and services.  You may withdraw consent at any time by . . . turning off the Location Services setting on your iPhone[.]*

TAC ¶ 115 (incorrectly identified as Apple's "Term and Conditions"); Buckley Decl. ¶ 7, Exs. A-C (emphasis added); *see also* TAC ¶ 116; Dkt. No. 69 at 38.

Plaintiffs admittedly lack any evidence that this SLA provision was in any way "likely to deceive."  Plaintiffs' experts admit that there is no evidence that Apple collected or used *any* user's "location data" when Location Services was off.  *See supra* pp. 11-12.  *It is undisputed* that the only information even possibly transmitted to Apple was not "your location data" (the information referenced in the Location Services provision at issue) but publicly broadcasted *serial numbers* of Wi-Fi routers and cell towers, which are not location information, much less a "[user's] location

1   data" (as Plaintiffs' experts admitted).[12]  *See* Huang Decl. ¶¶ 11, 17; Marziale Dep. 116:17-117:4.

2   Likewise, Plaintiffs are unable to offer a shred of evidence that "[Ms. Capiro's] location data" was

3   sent to Apple when Location Services was off—or even to show that Ms. Capiro turned Location

4   Services off during the relevant period.  *See supra* pp. 12-13; *cf. Birdsong*, 590 F.3d at 960.  As such,

5   Plaintiffs cannot meet their burden of showing that the SLA "Location Data" provision was in any

6   way "likely to deceive."  *Plotkin v. Sajahtera, Inc.*, 106 Cal. App. 4th 953, 965-66 (2003); *Shvarts v.*

7   *Budget Grp.*, 81 Cal. App. 4th 1153, 1159-60 (2000).

8   **3.      Plaintiffs' UCL "Unfairness" Prong Claim Also Fails**

9   In addition, the undisputed facts and Plaintiffs' admissions establish that Plaintiffs' UCL

10  "unfairness" claim cannot stand under *either* of the tests endorsed by the Ninth Circuit.  *See Davis v.*

11  *HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1170 (9th Cir. 2012) (court need not "resolve [this]

12  question . . . [where] [plaintiff] fails to state a claim under either definition"); *Lozano v. AT&T*

13  *Wireless Servs., Inc.*, 504 F.3d 718, 735-36 (9th Cir. 2007).

14  To find unfairness under the "balancing test" set forth in *S. Bay Chevrolet v. Gen. Motors*

15  *Acceptance Corp.*, 72 Cal. App. 4th 861, 886-87 (1999), the court must "weigh the utility of the

16  defendant's conduct against the gravity of the harm to the alleged victim."  *Id.*; *see also Rubio v.*

17  *Capital One Bank*, 613 F.3d 1195, 1204-05 (9th Cir. 2010).  Here, Plaintiffs concede that they

18  suffered *no harm at all* due to Apple's alleged conduct, and admit that they continue to *benefit from*

19  the use of the free apps and Location Services at issue, even after filing this case.  *See supra* pp. 8-9;

20  *see also Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026-27 (9th Cir. 2008); *Shalaby v.*

21  *Bernzomatic*, 281 F.R.D. 565, 575-76 (S.D. Cal. 2012) (denying claim for injunctive relief under the

22  UCL, finding no "actual injury" and no irreparable harm because "Plaintiff admit[ted] that he …

23  [had] continued to use Defendants' product [since the alleged occurrence of injury] … and [had]

24  alleged no new injuries"); *Smith v. Chase Mortg. Credit Grp.*, 653 F. Supp. 2d 1035, 1046-47 (E.D.

25

26  [12]  Plaintiffs' experts conceded that such serial numbers are not location information and do not
        constitute "your location data, including the real-time geographic location of your iPhone" within
27      the meaning of the SLA.  Egele Dep. 161:15-162:3 (serial numbers of Wi-Fi routers and cell
        towers are not location information), 165:2-19 (location information was not transmitted to Apple
28      when Location Services was off); Marziale Dep. 116:17-117:4 (transmitted information could not
        identify individuals or their location).

1    Cal. 2009).[13]

2           Plaintiffs also cannot meet *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*'s alternate

3    standard, which requires a showing that the "unfair" business practice is "tethered" to a violation of a

4    legislatively declared policy.  20 Cal. 4th 163, 186-187 (1999).  This Court already rejected the

5    notion that Apple's alleged conduct offends public policy as reflected in the "state constitutional right

6    of privacy" (TAC ¶ 201), finding that any disclosure of "the unique device identifier number,

7    personal data, and geolocation information . . . [e]ven assuming [it] . . . was transmitted without

8    Plaintiffs' knowledge and consent . . . does not constitute an egregious breach of social norms."  Dkt.

9    No. 69 at 23; s*ee also McDonald v. Coldwell Banker*, 543 F.3d 498, 506 (9th Cir. 2008).

10          Because Plaintiffs have adduced no evidence that would permit a reasonable trier of fact to

11   conclude that Apple's conduct violates the "unfairness" prong of the UCL under any test, Apple is

12   entitled to summary judgment on Plaintiffs' UCL "unfairness" claim.

13          **4.      Apple Is Entitled To Summary Judgment On Plaintiffs' UCL "Unlawful" Claim**

14          Plaintiffs' claim under the UCL's "unlawful" prong falls with their untenable CLRA claim

15   (discussed below), as that claim (along with a fact-free allegation that Apple violated California's

16   False Advertising Law)[14] is the sole basis for their UCL "unlawful" claim.  *See Davis*, 691 F.3d at

17   1168; *Sybersound Records*, *Inc. v. UAV Corp.*, 517 F.3d 1137, 1152-53 (9th Cir. 2008).

18   **C.     Apple Is Entitled To Summary Judgment On Plaintiffs' CLRA Claim**

19          Plaintiffs predicate their CLRA claim on the same alleged "misrepresentations" as their

20   deficient UCL "fraud" claim.  *See TAC ¶¶ 183-85.*  This claim fails for numerous reasons.

21          ***First***, to satisfy CLRA standing, "Plaintiffs must establish that they suffered an actual injury

22   as a result of [defendant's] alleged conduct."  *Contreras v. Toyota Motor Sales USA, Inc.*, No. C 09-

23   06024 JSW, 2010 WL 2528844, at *4 (N.D. Cal. June 18, 2010) (citing cases), *aff'd in relevant part,*

---

24

25   [13]  Further, an inadvertent software bug is not an "unfair" business practice.  *See Frogface v.
     Network Solutions, Inc.*, No. C-00-3854-WHO, 2002 WL 202371, at *2 (N.D. Cal Jan. 14, 2002)

26   (granting summary judgment as "evidence shows . . . the delay in deleting [a domain name] from
     the registry was due to a computer synchronization error, not [defendant's] business practice").

27   [14]  *See TAC ¶ 195.*  Plaintiffs cannot make out a claim under the FAL for the same reasons that their
     UCL fraud claim fails: there were no misrepresentations, and even if there had been, Plaintiffs

28   concede that they did not rely on them.  *See supra* pp. 7-9.

DEFENDANT APPLE'S MOTION FOR SUMMARY JUDGMENT
CASE NO. CV 11-MD-02250-LHK

Gibson, Dunn &
Crutcher LLP

No. 10-16556, 2012 WL1997802 (9th Cir. June 5, 2012).  Since Plaintiffs concede that none of them "suffered an actual injury" due to Apple's alleged conduct (*see supra* pp. 7-9), Plaintiffs' CLRA claim must fail.  *Millett v. Experian Info. Solutions, Inc.*, 319 F. App'x 562, 563 (9th Cir. 2009).

**Second**, California "requires a plaintiff suing under the CLRA for misrepresentations in connection with a sale to plead and prove she relied on a material misrepresentation." *Brownfield v. Bayer Corp.*, No. 2:09-cv-00444-JAM-GGH, 2009 WL 1953035, at *3 (E.D. Cal. July 6, 2009) (citing *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 668 (1993)).  Here, Plaintiffs concede that they did not rely on any alleged misrepresentation.  *See supra* pp. 7-9; *Xavier v. Philip Morris USA Inc.*, 787 F. Supp. 2d 1075, 1085 (N.D. Cal. 2011) (granting judgment on the pleadings on CLRA claim for defendant, as plaintiffs did not rely on defendant's statements).

**Finally**, Plaintiffs' CLRA claim relates to the use of third-party software apps or certain iOS software versions, which are neither a "good" nor a "service" under the CLRA.  *See Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2010 WL 3910169, at *19 (N.D. Cal. Oct. 5, 2010); *Yunker*, 2013 WL 1282980, at *13 (dismissing CLRA claim premised on plaintiff's use of defendant's app, as the app was not a CLRA "good"); *see also Ting v. AT&T*, 319 F.3d 1126, 1148 (9th Cir. 2003).

Plaintiffs concede that there was no nexus between the purchase of their iPhones and their subsequent and independent decisions to download the Specified Apps.  *See supra* pp. 7-9.  Likewise, the Geolocation Plaintiffs' claims focus entirely on an alleged defect in particular versions of iOS *software*, including iOS versions Ms. Capiro installed *after* acquiring her device.  *See, e.g.*, Dkt. No. 69 at 26 ("Apple rightly argues that class members 'voluntarily installed' the *software* that caused users' iDevices to maintain, synchronize, and retain detailed, unencrypted location history files") (emphasis added).  Indeed, Plaintiffs' claims focus on alleged misstatements in Apple's *Software License Agreement* with Apple.  *See supra* pp. 20-22.

## V.   CONCLUSION

This lawsuit never should have been brought.  There was never a factual basis for it, never a law broken, and never a person harmed.  Discovery of the Plaintiffs and their phones has definitively established that the "facts" Plaintiffs invented to circumvent the Court's September 20, 2011 Order have no basis.  Accordingly, summary judgment should be granted.

1

2    Dated:  May 17, 2013                    Respectfully submitted,

3                                            GIBSON, DUNN & CRUTCHER LLP

4
                                             By:    /s/ S. Ashlie Beringer
5                                                        S. Ashlie Beringer

6                                            Attorneys for Defendant
                                             APPLE INC.
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26