# Ex. I

1           UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5

6

7   IN RE iPhone APPLICATION     ) CASE NO.:

8   LITIGATION,                  ) 5:11-MD-02550-LHK

9   _____)

10

11

12               **CONFIDENTIAL**

13

14

15

16    VIDEOTAPED DEPOSITION OF JEFFREY G. BOLAS

17          LOS ANGELES, CALIFORNIA

18        WEDNESDAY, JANUARY 16, 2013

19

20

21

22

23   REPORTED BY:

24   CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR

25   JOB 57342

1

2

3

4

5

6

7                        Wednesday, January 16, 2013

8                        8:54 a.m.

9

10

11

12

13   Deposition of Jeffrey Bolas, taken on

14   behalf of Plaintiffs, held at the offices

15   of Gibson, Dunn & Crutcher,

16   2029 Century Park East, Los Angeles,

17   California, before Christy A. Cannariato,

18   CSR #7954, RPR, CRR.

19

20

21

22

23

24

25

```
 1                     A P P E A R A N C E S
 2
 3    REPRESENTING THE INTERIM CLASS FOR CONSOLIDATED
      PLAINTIFFS:
 4
      KAMBERLAW, LLC
 5    BY:  SCOTT KAMBER, ESQ.
      100 WALL STREET, 23RD FLOOR
 6    NEW YORK, NEW YORK 10005
 7    -AND-
 8    PARISI & HAVENS LLP
      BY:  DAVID PARISI, ESQ.
 9    15233 VALLEYHEART DRIVE
      SHERMAN OAKS, CALIFORNIA 91403
10
11
12    REPRESENTING THE DEFENDANT APPLE, INC. AND THE
      WITNESS:
13
      GIBSON, DUNN & CRUTCHER LLP
14    BY:  JOSHUA JESSEN, ESQ.
      3161 MICHELSON DRIVE
15    IRVINE, CALIFORNIA 92612
      -AND-
16    BY: JACOB WALKER, ESQ.
      1881 PAGE MILL ROAD
17    PALO ALTO, CALIFORNIA 94304
18
19
20    ALSO PRESENT:
      CHRIS JORDAN, VIDEOGRAPHER, TSG REPORTING, INC.
21
22
23
24
25
```

1

I N D E X

2

EXAMINATION BY                                          PAGE

3   MR. KAMBER                                              7

4

5   --------------------------------------------------------

6                           EXHIBITS

7   EXHIBIT DESCRIPTION                                    PAGE

8   Plaintiffs' Exhibit 61

9   Jeffrey G. Bolas' Responses and Objections to

10  Subpoena to Produce Documents, Information,

11  or Objects or to Permit Inspection of Premises

12  in a Civil Action                                       8

13

14  Plaintiffs' Exhibit 62

15  Declaration of Jeffrey Bolas in Support of

16  Apple Inc's Motion for Summary Judgment                 8

17

18  Plaintiffs' Exhibit 63

19  "Overview of Account for period ending

20  December 31, 2012, BOLAS 000038-39                      24

21

22  Plaintiffs' Exhibit 64

23  Plaintiff's Notice of Subpoenas                         33

24

25

1                           EXHIBITS

2    EXHIBIT DESCRIPTION                                PAGE

3

4    Plaintiffs' Exhibit 65

5    Appendix A, Summary of Forensic Analysis of

6    Plaintiffs' Claims                                  256

7

8

9    ----------------------------------------------------

10             QUESTIONS INSTRUCTED NOT TO ANSWER

11                          214:22

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   on all -- on a 29-page document without sort of

2   going through it, and it doesn't --

3               MR. KAMBER:  Well --

4               MR. JESSEN:  -- seem like a fair

5   question.

6       Q.    BY MR. KAMBER:  Let me rephrase.  I'm

7   not meaning to ask it as an unfair question in any

8   way.  I believe it was something as a review he

9   already did.

10              You've stated that "this declaration is

11  based upon my own personal knowledge except where

12  otherwise indicated."

13              You said that that is an accurate

14  statement.

15      A.    (Nods head up and down.)

16      Q.    So, to your knowledge, there is no place

17  in this document that is not based upon your

18  personal knowledge that it's not indicated that it's

19  not based upon your personal knowledge?

20              MR. JESSEN:  Objection.  That was like a

21  double or triple negative.

22      Q.    I will rephrase.

23              The statement that you read from

24  paragraph 1, you've stated that that statement is

25  true.  As you sit here, is there anywhere -- is

1      there anywhere in this document in which that

2      statement is -- for which that statement would not

3      be true?

4          A.     I think that everything that is covered

5      in my declaration involves forensic analysis

6      performed directly by me or people working at my

7      direction or whose work I directly reviewed or

8      verified in a way that I can personally testify to

9      the accuracy of the facts herein.  And I'm

10     comfortable with the statement in paragraph 1.

11         Q.     Who are the -- in your answer to your

12     last question you said "performed directly by me or

13     people working at my direction."  I will deal with

14     the first part of that sentence first.

15                Who worked at your direction on this

16     report?

17         A.     On the report?

18         Q.     Or on the information contained in the

19     report.

20         A.     A team of forensic examiners in multiple

21     locations worked on this matter in the preservation

22     and analysis of data from various iPhones from

23     plaintiffs.

24         Q.     How many people?

25         A.     There were a total of four forensic

1   examiners, including myself.

2        Q.     What are their names?

3        A.     There's me.  There is Daniel Blank,

4   James Hung, and a Jason Novak.

5        Q.     For each could you spell their name and

6   what office they worked from.

7        A.     I work in the New York office.  My name

8   is Jeffrey Bolas, J-e-f-f-r-e-y  B-o-l-a-s.

9              Daniel Blank, D-a-n-i-e-l B-l-a-n-k,

10  also works in the New York office.

11             James Hung, J-a-m-e-s H-u-n-g, works out

12  of the Stroz Friedberg Los Angeles office.

13             And Jason Novak, J-a-s-o-n  N-o-v-a-k,

14  works out of our Chicago office.

15       Q.     What are the number of hours that each

16  of those examiners worked on this report?

17       A.     I don't know that offhand.

18       Q.     Is there any document that would have

19  that record?

20             MR. JESSEN:  I'm just going to object.

21  He said a number of hours they worked on the report.

22       Q.     Okay.

23       A.     Thank you.

24       Q.     That's a fair -- okay.  Of the four

25  examiners, how many hours did they work on this

1    project regarding this litigation?

2        A.    I don't have information to break that

3    down.

4        Q.    Does that information exist?

5        A.    Yes.

6        Q.    And where would it exist?

7        A.    It would exist in billing or invoicing

8    information.

9        Q.    Would that bill have been provided to

10   your client in this case?

11            MR. JESSEN:  Objection.  Calls for

12   speculation.

13       Q.    Do you know who your client is in this?

14       A.    Yes, our client is Gibson Dunn.

15       Q.    Okay.  Do you know if Gibson Dunn was

16   provided a bill for the services of Stroz Friedberg

17   in this matter?

18       A.    I believe, yes, we bill our clients for

19   our services.

20       Q.    Did you see the bill in this matter?

21       A.    I have -- yes, I have.

22            (Plaintiffs' Exhibit 63 marked for

23             identification.)

24       Q.    Mark this document as Plaintiffs'

25   Exhibit 63.  Thank you.

1    Q.    Turning to your CV for a moment again.

2 Feel free to refer to it for this question.  Have

3 you ever -- in a prior version of your CV, you

4 listed preservation work you did in Mexico.  It's

5 not in this version.  It's in a prior version of

6 your CV.

7    A.    Is that a question?

8    Q.    Yeah.  The question is:  Do you recall

9 that in a prior version of your CV that it listed

10 work -- preservation and harvesting work in Mexico

11 from a server in scores of laptops and removal of

12 storage devices in a high stakes civil litigation?

13    A.    I recall the work.  I don't specifically

14 recall all case work that was mentioned in every

15 version of the CV, but I'm familiar with the

16 reference.

17    Q.    Okay.  Do you know why that would not be

18 in the CV that you have?

19    A.    We revise the CV over time as I do more

20 case work.  And, you know, I make an effort to try

21 to keep it, you know, relatively current and

22 relevant.  And that was a case that I worked in, I

23 believe, 2006.  So it was really a matter of it kind

24 of falling off the shelf.

25    Q.    And when you say relevant, do you mean

1   relevant to this engagement?

2        A.     Excuse me.  I do not mean to suggest

3   that the CV is designed to be relevant to any

4   particular engagement but merely to provide a fair

5   and accurate representation of my technical

6   experience and past case work, with some

7   understanding that things several years old are

8   going to be less emphasized than more recent case

9   work.

10       Q.     On how many occasions have you provided

11  expert testimony?

12       A.     On three occasions I have testified in

13  court.

14       Q.     And how many times have you signed or

15  been the primary or otherwise been the primary

16  author of an expert report?

17       A.     Of written testimony of some form?

18       Q.     Yes.

19       A.     Probably -- probably a dozen times,

20  approximately.

21       Q.     And how many times have you given

22  deposition?

23       A.     This is my first deposition.

24       Q.     In addition to the three occasions that

25  you have listed on your CV as having provided oral

1   testimony, could you provide the other occasions

2   that you provided written testimony or report as you

3   just answered?

4       A.    Are you asking for an inventory of

5   those?

6       Q.    Yes.

7       A.    No, I don't know that I could off the

8   top of my head.  One of the complications is that we

9   often in case work will write a written report or

10   prepare a document and don't always know whether

11   it's filed or not.  So I would have to go back and

12   determine for each such instance whether or not

13   there's a publicly-available document.  So I'm not

14   sure I could answer that right now.

15       Q.    Do you recall any of them?

16       A.    Yes, I do.

17       Q.    Which ones do you recall?

18       A.    Well, again, there are some -- this is

19   some case work I have done that I believe is filed

20   under seal, so I'm uncertain whether I am -- whether

21   I'm permitted to allude to it or not.

22       Q.    How many of them were filed under seal?

23   I'm not asking -- again, let's be clear.  I'm not

24   asking you at this point --

25       A.    Yep.

1    company Cellebrite, which allows us to make a

2    logical as well as full physical preservations of

3    data from iPhones.

4              Cellebrite also has a software package

5    that allows you then to analyze and generate reports

6    summarizing data, different kinds of data that are

7    recovered, either active or deleted, from iPhones

8    and other mobile devices.  It's a generalized tool

9    that can be applied to many kinds of mobile devices

10   and not just iOS devices.

11             Other tools that we use include EnCase,

12   which is, as I described before, a widely-accepted

13   and common forensic software package for the

14   analysis of binary data, which allows us to analyze

15   the file system from an iOS device and look at the

16   contents of the various files plists and databases

17   that might exist on an iOS system.

18             As well as to search through the

19   physical memory of the phone, if we have a physical

20   preservation, to find deleted content as well.

21             Another very common tool that we use is

22   a software package called Epilogue, which is a

23   SQLite database record recovery tool, which allow us

     to recover records from SQLite databases that may

24   have been deleted.  And that's important for iOS

25   activity and iOS forensic analysis, because there

1   are many databases on iPhones and other iOS devices

2   that are maintained in SQLite format.

3        Q.     During your time -- during your time at

4   Stroz, what proportion of your overall engagements

5   that you've been involved with are iPhone related?

6        A.     It's increased over time.  Clearly, you

7   know, it's a newer technology, and the adoption of

8   iPhones as a common computing platform has increased

9   significantly between, you know, 2007 when they were

10  first introduced, and essentially there were none of

11  them in the public, until today.  So the answer to

12  that question changes over time.

13           I would say that it's an increasing --

14  increasing percentage of the cases that we handle do

15  involve, if not exclusively, at least in part,

16  mobile devices, including iOS.

17       Q.     Okay.  Of the total, understanding your

18  testimony that it has increased over time, of the

19  total engagements proportionally of the total

20  engagements you have been involved with, --

21       A.     Mm-hmm.

22       Q.     -- how many of them dealt with -- how

23  proportionately -- I'm not asking you a memory test

24  of how many -- but proportionally, what proportion

25  of your total engagements you've been involved with

1    involve iPhones?

2              MR. JESSEN:  Go ahead, if you can

3    understand it.

4         A.    I understand the question.  It's very

5    difficult to answer, because it involves an estimate

6    of an inventory of all the cases that I have worked

7    on or otherwise coordinated the work for,

8    supervised.  And I think that the case that I

9    referenced before involving deleted text messages

10   has been a major case that I have devoted a lot of

11   time to in the past year or two.

12             So in the most recent time frame of the

13   past year or two, it has been a significant

14   percentage.  But going back in time before that, it

15   diminishes because there were simply fewer iPhones

16   out there.

17        Q.    I'm not asking you about the amount of

18   your time but just the number of the engagements,

19   the engagement history.  Do you have an opinion as

20   to what proportion of your engagements that you'd

21   been involved with involved related to iPhones?

22        A.    I can only guess.  I can't speculate on

23   that.  I don't know.

24        Q.    Besides the text message case that you

25   referred to for the Department of Justice, are there

1    any other cases, besides the present engagement and
2    that one, that you were involved with that involve
3    iPhones?
4              MR. JESSEN:  Objection.  Asked and
5    answered and misleading.  You can answer.
6         A.    Yes.  Other cases I have worked with
7    have involved iPhones.
8         Q.    You're presently working on?  Your
9    present caseload?
10             MR. JESSEN:  That's different from the
11   question you asked him, but if you want to change
12   it, fine.
13        Q.    He understands it.  And he answered yes.
14   He answered yes.  And then I said -- and then I
15   asked presently, you know.  He said yes.  Then I
16   said, okay, presently are there any involved -- are
17   there any others besides your current engagement and
18   the one involving the Department of Justice that
19   relate to iPhones.
20        A.    Okay.  At the moment I am heavily
21   involved in the two cases that we have described,
22   and I have supervisory responsibilities over other
23   examiners who are themselves conducting the work on
24   myriad other cases, which are generally smaller
25   cases, either by the amount of evidence or, you

1  know, the duration of the case.

2          And it is certainly true that a

3  reasonable percentage of those other cases where I

4  am not doing the direct forensic analysis but rather

5  supervising, providing guidance, and, you know, sort

6  of QC oversight on, do involve iPhones.

7      Q.     You refer to "other smaller cases."  Do

8  you consider this a larger case?

9      A.     It's occupied a fair amount of my time

10 recently.  Yeah.

11     Q.     Is it a significant case to you in your

12 current workload?

13     A.     I am devoting the full day today in

14 deposition, so I would answer yes.

15     Q.     Looking through paragraphs 8 through 12

16 -- I'm sorry -- 8 through 11 of your declaration, is

17 your basis for those paragraphs anything besides

18 your own personal work experience with the iPhone?

19         MR. JESSEN:  Obviously feel free to take

20 your time and read those.

21     A.     With respect to paragraph 8, I have

22 already answered that that paragraph is based on my

23 personal and professional experience.

24         The same is true for paragraph 9.  And

25 the same is true for paragraphs 10 and 11 with the

1    additional observation that paragraph 11 is where I

2    introduce the concept of the application programming

3    interface or the API.

4            And I would note that my review of the

5    UI device class, the publicly-available website --

6    web page that we already referenced, informed, I

7    believe was your question, my understanding.

8        Q.    Okay.  And with respect, then, to -- is

9    it accurate to state that paragraphs 11, 12, and 13

10   are based upon your own professional work experience

11   and informed by that particular web page that you

12   just cited to?

13       A.    Yes.

14       Q.    Do you know whether anyone at Apple or

15   affiliated with Apple reviewed paragraphs 8 through

16   13 or the information contained in paragraphs 8

17   through 13 to determine their accuracy?

18       A.    I have no idea.

19       Q.    Directing your attention to paragraph 15

20   of your declaration, is your understanding in that

21   paragraph based upon any information besides your

22   own personal experience and the reading of the

23   complaints in this action?

24       A.    I read the complaints in this action.  I

25   also discussed the case, as you might expect, with

1  management, would suggest that these programs do

2  change over time, and that getting into addressing

3  the question of what software exists on those

4  servers would require essentially deep code review

5  and cooperation from all of the parties involved,

6  which, given the general understanding of the scope

7  of work -- my understanding of the scope of work we

8  had to do, was just not feasible for this case.

9      Q.      Even if the server programs that were

10  used by the tracking companies or by the app

11  developers are now down, wouldn't a dynamic analysis

12  show the HTTPS req -- HTTPS requests going out to

13  them?

14      A.      I'm not sure I understood the first part

15  of your question.  Even if --

16      Q.      The server programs we're talking about.

17  You just used the term "server program."

18      A.      Yes.

19      Q.      For the third parties or for the app

20  developers.  So even if those server programs that

21  were used by the tracking companies are now changed

22  or down, or however you want to characterize it,

23  even under those circumstances you describe it,

24  wouldn't the dynamic analysis show the HTTP and

25  HTTPS requests going out to them?

1    A.    Are you referring to a dynamic analysis

2    of the current version that we have to test now?

3    Q.    I'm stating that just looking at the --

4    just looking at the single variable of the server

5    programs -- okay?

6    A.    Okay.

7    Q.    So making the assumption that you had

8    the correct app version and the correct iOS version.

9    A.    Or more accurately, all correct app and

10   iOS versions that might have been in use over a

11   broad period of time.

12   Q.    Well, I'm saying -- I'm saying take any

13   -- take one of the particular apps so we're not, you

14   know, trying to complicate things here.

15         If the server programs that were used by

16   a tracking company are now down or changed, --

17   A.    Mm-hmm.

18   Q.    -- and if the iOS and the particular app

19   that was being analyzed were versions that were in

20   place during the class period, wouldn't a dynamic

21   analysis show the HTTP or HTTPS requests going out

22   to the third-party server?

23   A.    By HTTP or HTTPS request, you say the

24   HTTPS request, and that's important, because the

25   request that might hypothetical -- this is a

1  hypothetical situation you're describing.  And in

2  this hypothetical, there are requests that might go

3  out in testing that we perform today is in no way

4  reliable as a way to recreate any requests that

5  might have gone out at an earlier point in time.

6         Because there's another factor involved,

7  and that's how I test the program today and the

8  actions that I take with that program can't

9  necessarily be relied upon as a recreation of what

10 Mr. Chiu or Mr. Dwyer did at any of the various

11 earlier points in time.

12         So the observation, the mere observation

13 of such a request doesn't inform or speak in any

14 useful way to the forensic analysis that I would

15 need to perform in order to assess whether the

16 claims you make of historical transmissions are

17 valid.  Which is why instead we did static analysis

18 and found that the majority of the claims are not

19 supported by the evidence.

20    Q.    What is your basis for believing that

21 all or any HTTP or HTTPS requests are dependent upon

22 the specific actions of the user in that app?

23    A.    Well, there were countless apps that do

24 countless things.  And each of the apps that is --

25 is designed -- including the many apps that are not

1  named in your Complaint -- have myriad uses or ways

2  that people can use them.  So the specific requests

3  that may or may not be triggered by certain user

4  actions I think will also be myriad in number.

5         So the specific -- so I think it's -- I

6  think it's just a reasonable understanding that

7  complicated programs with multiple uses may generate

8  different network traffic based upon how they're

9  used, which is another reason why dynamic analysis

10 wouldn't be a feasible way of assessing historical

11 transmission.

12      Q.     When you say the word "may," that the

13 program may generate different network traffic, but

14 wouldn't one have to look at the specific outcome of

15 the dynamic analysis and the particular requests to

16 see if those requests are dependent upon user

17 activity?

18      A.     If I were doing some sort of analysis of

19 all of the different functions of a particular app,

20 that might be a useful exercise.  But that exercise

21 doesn't inform what my task and scope was in this

22 case, which was a focus on historical data.

23      Q.     What was it about your task that would

24 not make that useful?  How is it that you define the

25 engagement that would -- how is it that you define

1   in your last answer you defined the engagement by

2   saying even if the HTTP or HTTPS requests were to

3   show -- to show requests going out to the servers

4   for information, blah, blah, blah.

5       A.      Mm-hmm.

6       Q.      You say, well, it doesn't matter because

7   that was not what my engagement was.

8               So how is it that you're defining your

9   engagement that makes it that that doesn't matter?

10      A.      Okay.  So the question is how am I --

11  how did we -- how did we define the question that we

12  had to answer?

13      Q.      Yes.

14      A.      The question we had to answer in the

15  case of the Chiu and Dwyer phones is what evidence

16  exists on the iPhones that were provided for our

17  analysis that supports the specific claim -- the

18  specific allegations made in the complaint of

19  specific data elements being transmitted

20  historically by specific apps on specific phones to

21  specific third parties.

22              That was what our -- the scope and

23  definition of our forensic analysis was.

24      Q.      But there are circumstances in which a

25  dynamic analysis may enlighten or provide additional

1    looked at the application-specific data on Dwyer

2    iPhone, and we also reviewed information and

3    publicly-available web pages for Mr. Dwyer's Pandora

4    account.

5              In the documents we have produced to

6    you, we have screenshots of that available

7    information that we saw and reviewed.  And in our

8    review of the various dates recorded and displayed

9    in those web pages, we see that the earliest known

10   reference of use in the publicly-available web pages

11   is July 7th, 2012.

12             Now, furthermore, we also looked at

13   operating system information in the form of a

14   database.  There's an iOS database called the AD

15   data store database, which records information about

16   specific instances when certain apps are run.

17             What we found in reviewing that

18   document, the output of which I believe also was

19   produced to you, is that the only references in the

20   forensic evidence available to us of use by that

21   particular -- by Mr. Dwyer of that particular app

22   occurred on two days, July 7th and July 8th.  And

23   furthermore, the database in question records the

24   number of minutes, total minutes of usage.

25             And we found that Mr. -- Mr. Dwyer used

1    the app on his phone, according to this data, for

2    approximately 13 and 8 minutes on those two

3    respective dates.

4         Q.       Where does the data come from in the AD

5    data store database?

6         A.       It comes from the iOS operating system.

7         Q.       Well, and how is the data reset inside

8    of that database?

9         A.       What do you mean by "reset"?

10        Q.       What events cause the entries to -- the

11   prior entries to reset to look as if there hasn't

12   been any prior usage?

13        A.       I don't -- I don't know.  I think that

14   that is a question for Apple.  I can tell you that

15   in my experience performing forensic analyses on

16   iPhones, the AD data store database covers a limited

17   period of time and isn't a full audit of all app

18   usage over time.

19        Q.       And what's the basis of your

20   understanding of how the ADD -- AD data store

21   database works?

22        A.       How it works.  I have an understanding

23   that the -- the iOS system --

24        Q.       No, no.  I'm not asking what your

25   understanding.  I'm not asking how it works.  I'm

1    asking upon what is your understanding of how it
2    works based?
3         A.    Oh, it's based on my experience in
4    multiple forensic analyses of iOS systems.
5         Q.    Have you -- can you point to any
6    literature that you've read regarding the -- how
7    that database?
8         A.    No.
9         Q.    Did you review anything on the developer
10   database for the usage of that database or the
11   ability or means to reset the data contained
12   therein?
13        A.    No.
14        Q.    Are you aware of whether or not that
15   data -- whether the data store database resets when
16   there's an update to an application?
17        A.    I don't know for certain.
18        Q.    What, in your experience, what is the
19   length of -- the limited length of time as you
20   described it that the AD data store database
21   contains usage information?
22        A.    That's a difficult question to answer
23   because it requires recalling the specific ranges of
24   time covered in different AD data store databases
25   that I have reviewed on different iPhones in

1  different cases over time.  I don't think I could

2  give you an approximation.

3          I can tell you that in this case the

4  data available in the AD data store regarding Mr. --

5  the use on Mr. Dwyer's iPhone of Pandora only

6  recorded activity on two days among the available

7  data in the data store database records at the time

8  of preservation and that those two dates correlate

9  very nicely with the publicly-available information,

10  which records no earlier activity of dates available

11  on public web pages before July 7th.

12      Q.     Did you ask to review Mr. Dwyer's

13  testimony regarding his usage of Pandora when he

14  contends he used Pandora?

15      A.     No, I did not.

16      Q.     Are you aware of the update history of

17  Pandora?

18      A.     On Mr. Dwyer's iPhone, the app update?

19      Q.     The app update available not just on

20  Mr. Dwyer's phone, but whether on Mr. Dwyer's phone

21  or otherwise.  Are you aware of the updates that

22  were provided by Pandora?

23          MR. JESSEN:  Object to form.

24      Q.     Do you know if Pandora was updated --

25  prior -- when the last time Pandora was updated

1                    REPORTER'S CERTIFICATE

2

3

4          I, CHRISTY A. CANNARIATO, CSR #7954, RPR,

5     CRR, Certified Shorthand Reporter, certify:

6

7          That the witness was placed under oath by

8     me;

9

10         That the foregoing proceedings were taken

11    before me at the time and place therein set forth;

12

13         That the foregoing is a true and correct

14    transcript of my shorthand notes so taken;

15

16         That the witness or other party

17    communicated to me before the close of the

18    deposition the wish to reserve the right to review

19    the transcript and make corrections, if any, within

20    30 days pursuant to FRCP 30(e)(2);

21

22         Dated this 22nd day of January, 2013.

23

24

      _____

25    CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR

Page 312

1

2   NAME OF CASE:

3   DATE OF DEPOSITION:

4   NAME OF WITNESS:

5   Reason Codes:

6        1.  To clarify the record.

         2.  To conform to the facts.

7        3.  To correct transcription errors.

8   Page _____  Line _____  Reason _____

9   From _____ to _____

10  Page _____  Line _____  Reason _____

11  From _____ to _____

12  Page _____  Line _____  Reason _____

13  From _____ to _____

14  Page _____  Line _____  Reason _____

15  From _____ to _____

16  Page _____  Line _____  Reason _____

17  From _____ to _____

18  Page _____  Line _____  Reason _____

19  From _____ to _____

20  Page _____  Line _____  Reason _____

21  From _____ to _____

22  Page _____  Line _____  Reason _____

23  From _____ to _____

24

25                      _____