KAMBERLAW, LLC
SCOTT A. KAMBER (pro hac vice)
skamber@kamberlaw.com.com
DAVID A. STAMPLEY (pro hac vice)
dstampley@kamberlaw.com
100 Wall Street, 23rd Flr.
New York, NY 10005
Telephone: 212.920.3072
Facsimile: 212.202.6364

*Interim Class Counsel*

(Additional Counsel listed on signature page)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE iPHONE APPLICATION LITIGATION | CASE NO. 11-MD-02250-LHK |
| | **PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** |
| | <u>**Hearing**</u><br>Date:  October 31, 2013<br>Time:  1:30 pm<br>Courtroom:  8 – 4th Floor<br>Judge – Hon. Lucy H. Koh |

## **TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................... 1

II.    THE CLASSES ARE PROPERLY DEFINED AND THE REVISIONS MADE BY
       PLAINTIFFS WERE APPROPRIATE ......................................................................... 2

III.   APPLE'S COMMON REPRESENTATIONS AND OMISSIONS ................................ 3

       A.    The Privacy Policy Was Read and Agreed to By All Members of the Putative
             Classes .............................................................................................................. 3

       B.    Apple Cannot Resolve Ambiguities in its Adhesion Agreements in its Favor ............ 3

IV.    PLAINTIFFS' EVIDENCE WARRANTS CERTIFICATION OF CLASSES SEEKING
       23(B)(2) INJUNCTIONS AND/OR DECLARATORY RELIEF ............................................ 5

       A.    Apple's Misrepresentations and Omissions Regarding Persistent Identifiers .............. 5

             1.    Apple Collected UDIDs From Plaintiffs and Class Members for at Least
                   17 Different Systems But Its Chief Privacy Officer Does Not Know Why
                   They Were Collected Or How They Were Treated........................................... 7

             2.    Apple Knew Risks of Allowing Apps, Advertising Networks, and
                   Analytics Companies Free Access UDIDs.......................................................... 8

       B.    Apple's Misrepresentations And Omissions Regarding App Privacy ......................... 9

       C.    Apple's Misrepresentations Regarding Data Security ................................................. 10

       D.    Apple's Misrepresentations Regarding Unauthorized Transmissions of Personal
             Information Resulting in Battery Drain and Costly Bandwidth Usage........................ 11

       E.    Apple's Attempts To Defeat Certification of the Geolocation Subclass By
             Minimizing Its Breach as a "Harmless, Obscure, Bug" Defies Reality...................... 12

V.     PLAINTIFFS' SATISFY ALL REQUIREMENTS OF BRINGING CLASS CLAIMS ....... 13

VI.    APPLE'S ATTACK ON THE FRCP 23(B)(3) BATTERY LIFE/BANDWIDTH
       CLASS CLAIMS MISAPREHENDS THE BASIS OF CERTIFICATION ......................... 16

VII.   CONCLUSION ............................................................................................................. 16

1
2

<u>**TABLE OF AUTHORITIES**</u>

3

**Page(s)**

**FEDERAL CASES**

4
5

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*
   133 S. Ct. 1184, 185 L. Ed. 2d 308 (2013) ............................................................................ 5

6

*Comb v. PayPal, Inc.*
   218 F. Supp. 2d 1165 (N.D. Cal. 2002) .................................................................................. 4

7
8

*Delarosa v. Boiron, Inc.*
   275 F.R.D. 582 (C.D. Cal. 2011) ........................................................................................... 15

9
10

*In re Napster, Inc. Copyright Litig.*
   No. C MDL-00-1369 MHP, 2005 WL 1287611 (N.D. Cal. June 1, 2005) ............................ 15

11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
   267 F.R.D. 583 (N.D. Cal. 2010) ............................................................................................ 2

12
13

*In Re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*
   722 F.3d 838 (6th Cir. 2013) ................................................................................................ 16

14
15

*Lozano v. AT&T Wireless Servs.*
   504 F.3d 718 (9th Cir. 2007) ................................................................................................ 14

16
17

*McPhail v. First Command Financial Planning, Inc.*
   247 F.R.D. 598 (S.D. Cal. 2007) ................................................................................ 2, 13, 14

18

*Munoz v. PHH Corp.*
   1:08-CV-0759-AWI-BAM, 2013 WL 2146925 (E.D. Cal. May 15, 2013) ......................... 16

19
20

*Ries v. Arizona Beverages USA LLC*
   No. 10-01139 RS, 2012 WL 5975247 (N.D. Cal. Nov. 27, 2012) .................................. 14, 15

21
22

*Tait v. BSH Home Appliances Corp.*
   2012 U.S. Dist. LEXIS 183649 (C.D. Cal. Dec. 20, 2012) ................................................. 14

23
24

*United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*
   593 F.3d 802 (9th Cir. 2010) .................................................................................................. 5

25

*Wal-Mart Stores, Inc. v. Dukes*
   131 S. Ct. 2541 (2011) ..................................................................................................... 13, 14

26

**CALIFORNIA CASES**

27

*Badie v. Bank of America*
   67 Cal.App.4th 779 (1998) ...................................................................................................... 4

28

*Cal. Grocers Ass'n v. Bank of Am.*
   22 Cal.App.4th 205 (1994) ......................................................................... 4

*Garcia v. Truck Ins. Exch.*
   36 Cal. 3d 426 (1984) ............................................................................... 4

*Gray v. Zurich Ins. Co.*
   65 Cal.2d 263 (1965) ................................................................................. 4

*Htay Htay Chin v. Advanced Fresh Concepts Franchise Corp.*
   194 Cal.App.4th 704 (2011) ....................................................................... 4

*Sunniland Fruit, Inc. v. Verni*
   233 Cal. App. 3d 892. (1991) ..................................................................... 4

*Vasquez v. Super. Ct.*
   4 Cal.3d 800 (1971) ................................................................................. 14

**CALIFORNIA STATUTES**

California's Online Privacy Act. ...................................................................... 10

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23 ........................................................................... 2, 5, 17

Fed. R. Civ. P. 23(B)(3) ...................................................................... 16

## I.      INTRODUCTION

Irrespective of how many times Apple puts the same unfair characterizations of Plaintiffs' evidence in bold, it cannot escape the fact that (a) Plaintiffs reading of the terms of the SLA and Privacy Policy are reasonable and provide the predicate for Plaintiffs claims; (b) Apple made misrepresentations and omissions regarding its SLA and Privacy Policy as to UDIDs, third-party data collection, security, resource usage, and Location Services; and (c) the complained-of harms have not been fully redressed and still require injunctive relief.

Apple's efforts to have this Court accept a particularly tortured reading of its own privacy policy is showcased in the declaration of its Director of Global Privacy (Jane Horvath). (Dkt. No. 258).  However, on cross-examination, Plaintiffs exposed fatal flaws in her declaration, including:[1]

- Horvath has no personal knowledge of the drafting of the Privacy Policy[2] (Kravitz Reply Decl. Ex. 1 at 5:16-17)
- While Horvath swore in her declaration that Apple's practice regarding UDIDs complied with the Privacy Policy, on cross-examination it was revealed that that the witness had knowledge of ███████████████████████████ (*Id.* at 92:20-100:1);
- "Affiliate" is undefined within the Privacy Policy, and was defined by Horvath in terms of Apple's SEC filings (*Id.* at 56:7-12).

Apple's defense of its privacy practices vis-à-vis Apps is predicated upon the declaration of its Director of App Technology (Phillip Shoemaker) (Dkt. No. 260), which also did not hold up:

- While Shoemaker swore in his declaration on personal knowledge that Apple had rejected 1000's of Apps for privacy reasons, in fact his knowledge came ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ See, e.g., Kravitz Reply Decl. Ex. 18 Apple_9599664 at UDID worksheet.);
- ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████ (See Kravitz Reply Decl. Ex. 12, 121:18-23 & 216:7-8.);

---

[1] After initially resisting, Apple provided Ms. Horvath on October 4, 2013, and Mr. Shoemaker on October 4 & 7, 2013.  In conjunction with these depositions, in the last six days Apple has produced 530 documents, some the day of the depositions, including 242 documents today.  *See* Declaration of Scott Kamber in Support of Plaintiffs' Class Certification Reply ("Kamber Reply Decl.") ¶ 3.

[2] Excerpts from the transcript of the deposition testimony of Jane Horvath are attached as Exhibit 1 to the Declaration of Deborah Kravitz in Support of Plaintiffs' Reply ("Kravitz Reply Decl.").

- ███████████████████████████████████████████████ (Kravitz Reply Decl. Ex. 2 at 125:17-21; 126:24-127:22)[5].

Apple has chosen to permit counsel to engage in gamesmanship by presenting half-truths, rather than present evidence that would directly bear on the veracity of Plaintiffs' claims[4]. Such gamesmanship should not be permitted to free Apple from having to answer for its misconduct.

## II.     THE CLASSES ARE PROPERLY DEFINED AND THE REVISIONS MADE BY PLAINTIFFS WERE APPROPRIATE

Apple seeks to alter the standards of class certification by arguing in several instances that the changes made to class definitions are fatal because they were "not pled by Plaintiffs" and none of the Plaintiffs has standing to represent the classes as revised. It is neither uncommon nor impermissible for a class to be certified which differs from that previously pled. *See, e.g.*, *McPhail v. First Command Financial Planning, Inc.*, 247 F.R.D. 598, 608 (S.D. Cal. 2007) (approving class definition and certifying same, though different from definition contained in operative complaint). Plaintiffs' claims have already survived a Motion to Dismiss and no new claims have been added since. The task before the Court now is not to test the pleadings, but rather to determine whether Plaintiffs' proposed Classes, including the (b)(3) Class, meet the requirements of Rule 23. As set forth herein, the class definitions are precise, objective, presently ascertainable, and readily satisfy the requirements of Rule 23[5]

As shown below, each member of the Classes necessarily read and agreed to the Privacy Policy when they created an iTunes account prior to their purchase of an iDevice. Thus Plaintiffs and

---

[3] Mr. Shoemaker's deposition testimony is in three exhibits to correlate with the portions of three separate days over which he was deposed.

[4] As Plaintiffs expose in their opposition to summary judgment, the testimony of Apple's "expert," Jeffrey Bolas, is also fatally flawed. (Dkt. No. 266 at 2-4). In addition, the dynamic analysis criticized by Mr. Bolas is the precise type of analysis utilized by Apple itself when it conducts Technical Investigations of Apps. (Kravitz Reply Decl. Ex. 3, 193:6-194:8.)

[5] Plaintiffs here slightly modify the class definitions so as to limit the iDevice class to individuals who opened an iTunes account prior to the purchase of an iDevice. This will reduce the number of class members somewhat and make more cohesive classes whose members all agreed to the Privacy Policy prior to the iDevice purchase by the mechanism described by Horvath, and as experienced by each of the proposed class representatives. This change, like the prior change, is permitted because the "proposed modifications [which] are minor, require no additional discovery, and cause no prejudice to defendants," and is proper pre-certification. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 591 (N.D. Cal. 2010).

each member of the class were subject to the same material misrepresentations and omissions.

## III.    APPLE'S COMMON REPRESENTATIONS AND OMISSIONS

### A.    The Privacy Policy Was Read and Agreed to By All Members of the Putative Classes

Plaintiffs and Apple agree that at all relevant times all iOS users with an iTunes account were presented with Apple's Privacy Policy by the identical mechanism, which required users to scroll through the document and click a separate box that states they have read and agreed to the terms and conditions. Kravitz Reply Decl. Ex. 1 at 36:20-37:6; 40:11-14. Apple utilizes this mechanism "To show that they have read the agreement." *Id.* at 36:12-36:15. Any revisions to the privacy policy during the class period did not impact the provisions at issue here. *Id.* at 46:14-47:3.

Plaintiffs Chiu, Dwyer and I. Capiro each opened an iTunes account. These accounts were opened on July 4, 2005 (Chiu), March 10, 2008 (Dwyer), and July 19, 2007 (Isabella Capiro), respectively. Kravitz Reply Decl. Ex. 4, Apple_0004009, Ex. 5, Apple_0004060, Ex. 6, Apple_0027546. Each of these Plaintiffs opened an iTunes account and agreed to the Privacy Policy prior to the purchase of any iOS device. *Id.*

Included in the packaging for each iOS device was a copy of the iOS Software Licensing Agreement (the "SLA"). This was true at all relevant times. (Buckley Decl., ¶¶2-9 (Dkt. No. 257).) Plaintiffs and each member of the class received the SLA through this mechanism. While the versions of the SLA varied over time depending on the current version of the iOS, those changes are not material to this case.

### B.    Apple Cannot Resolve Ambiguities in its Adhesion Agreements in its Favor

In June 2012, this Court considered several aspects of the Privacy Policy in denying, in part, Apple's Motion to Dismiss. (Dkt No. 69 at 41-42).   After review of the Privacy Policy under applicable California Law, this Court considered and rejected Apple's argument that a UDID cannot be personal information under the Privacy Policy.  *Id.* at 42 ("Plaintiffs have a colorable argument that the terms of the privacy agreement were ambiguous and do not necessarily foreclose the remaining claims against Apple.").  This Court further rejected Apple's argument that by the terms of the Privacy Policy it did not have responsibility for third party materials, websites or services.  *Id.* at 42-43 ("[W]hile Apple claimed not to have any liability or responsibility for any third party materials, websites or

1  services, Apple also made affirmative representations that it takes precautions to protect consumer

2  privacy.").

3       In an attempt to circumvent the prior findings of the Court, Apple submitted the Horvath

4  Declaration that purported to provide incontrovertible evidence on both of these points. Horvath Decl.

5  ¶ 12 (Dkt. No. 258) (UDID defined to not be personal information); *id.* ¶ 10 (Privacy Policy does not

6  apply to App developers). *See* Def.'s Br. at 5:5-15; 7, n. 5; 20:20-25 (Dkt. No. 254). However, on cross

7  examination, it was revealed that the Horvath Declaration was based solely on the fact that Horvath

8  had reviewed the Privacy Policy and did nothing more than communicate what she believed was its

9  plain reading to the Court. Kravitz Reply Decl. Ex. 1 at 50:8-24. Apple's attorney's subjective

10  understanding is simply inadmissible to prove an intent different from the terms of the agreement or

11  the parties' mutual understanding. *Sunniland Fruit, Inc. v. Verni,* 233 Cal. App. 3d 892, 898. (1991).

12  Furthermore, while testimony by the attorney who actually negotiated and drafted a particular

13  provision may be admissible to explain its meaning (if the provision is reasonably susceptible to the

14  interpretation placed upon it by the attorney), Ms. Horvath was **not** the drafter of the agreement in

15  question nor even employed by Apple at the time. *Garcia v. Truck Ins. Exch.,* 36 Cal. 3d 426, 435

16  (1984).

17       Apple has no basis to "resolve" the ambiguities in its favor. The Privacy Policy is a classic

18  example of a contract of adhesion, since it was drafted by Apple and "offered to the customer without

19  negotiation." *Cal. Grocers Ass'n v. Bank of Am.,* 22 Cal.App.4th 205, 215 (1994); *Comb v. PayPal,*

20  *Inc.*, 218 F. Supp. 2d 1165, 1172-1173 (N.D. Cal. 2002). When a court construes an adhesion contract

21  it "must ascertain that meaning of the contract which [weaker party] would reasonably expect." *Gray*

22  *v. Zurich Ins. Co.*, 65 Cal.2d 263, 269-70 (1965); *See Htay Htay Chin v. Advanced Fresh Concepts*

23  *Franchise Corp.*, 194 Cal.App.4th 704 (2011). Likewise, "a contract must be interpreted most strongly

24  against the party who prepared it" applies with "particular force in the case of adhesion contracts."

25  *Badie v. Bank of America*, 67 Cal.App.4th 779, 801 (1998).

26       Upon closer examination, Horvath's testimony demonstrates that Apple's interpretation of its

27  own Privacy Policy is completely at odds with what customers, the weaker party to the transaction,

28  would reasonably expect. *See Badie*, 67 Cal.App.4th at 801. Horvath admits she:

- Read the policy relying upon her skills as a privacy lawyer (Kravitz Reply Decl. Ex. 1 at 50:23-24);

- Knew what a third party was in context of privacy policy through a review of Apple's SEC filings (*id.* at 56:7-12);

- Although she believed "affiliates" was defined in the Privacy Policy through a hyperlink, in fact, "affiliates" was undefined in the Privacy Policy and Horvath was *recalling the hyperlink definition provided in Google's Privacy Policy*, where she previously served as Chief Privacy Officer (*id.* at 51:19-52:18).

Horvath went on to admit the following points regarding the narrowness of Apple's definition of personal information:

- The FTC believes that personal information should include more than Apple includes (*id.* at 60:20-61:1);

- Other companies have substantively different definitions of personal information than Apple (*id.* at 62:18-21).

Horvath then continued to provide the rather shocking conclusion that she reads the Privacy Policy as qualifying its protection of personal information with the word "your," thus leaving the following information unprotected:

- Address book entries for anyone except for the Customer (*id.* at 64:13-64:17);

- Photographs of anyone that is not the Customer (*id.*at 64:18-64:20).

This is plainly at odds with a fair reading of the adhesive Privacy Policy.

## IV.   PLAINTIFFS' EVIDENCE WARRANTS CERTIFICATION OF CLASSES SEEKING 23(B)(2) INJUNCTIONS AND/OR DECLARATORY RELIEF

While Plaintiffs bear the burden of submitting to the Court evidence in support of their claims, at this juncture it is not the Court's function to "go so far … as to judge the validity of these claims." *United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union v. ConocoPhillips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010). Indeed, as the Supreme Court stated, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1194-95, 185 L. Ed. 2d 308 (2013). Each of the following five scenarios was previously proffered by Plaintiffs and support certification.

### A.   Apple's Misrepresentations and Omissions Regarding Persistent Identifiers

On its face the Privacy Policy defines personal information as "data that can be used to uniquely identify or contact a single person." Kamber Reply Decl. Ex. C. It goes on ¾ of a page later to define non-personal information as "data in a form that does not permit direct association with any

specific individual." *Id.*   Apple's examples of personal information include name, phone number, credit card, and addresses, electronic and physical. *Id.*   Examples of non-personal data include occupation, language, zip code, and unique device identifiers.   *Id.*   If non-personal information is combined with personal data Apple represents that it will treat it all as personal.   *Id.*

A UDID should be treated as personal information under the Privacy Policy. Apple's own documentation shows that it understood that ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████   ██████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████

In the Privacy Policy published by Apple, the operative question is whether a UDID is data that permits "direct association with any specific individual" *by Apple*.   That answer must be "yes" because, for every iDevice owner with an iTunes account, Apple maintains for an indefinite period a ███████████████████████████████████████

████████████████   Kravitz Reply Decl. Exs. 4-6. With this database, not only does a UDID permit the direct association with an individual, the UDID can be used at any time by Apple (or any government agency with access to the database) to uniquely identify or contact a single person. As a result, UDIDs are necessarily personal information in the hands of Apple. This reading of the Privacy Policy is

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

Kravitz Reply Decl. Ex. 16 at ¶17.4.

It was a material omission for Apple to not more fully describe the UDID in its Privacy Policy so it would be understandable to the user. It was also a material omission for Apple to not identify the UDID more clearly as personal information, and to not fully disclose that all App developers had access to the UDID API and could use it for multiple purposes, including tracking and advertising.

In opposing class certification, Apple has taken the position that the UDID is not personal data and it need only be treated as personal information when specifically combined with personal data. (Dkt. No. 253-7, ¶ 13.  As set forth below, Apple breached the Privacy Policy in its treatment of users' UDIDs[6].

**1.      Apple Collected UDIDs From Plaintiffs and Class Members for at Least 17 Different Systems But Its Chief Privacy Officer Does Not Know Why They Were Collected Or How They Were Treated**



1 ████████████████████ ████████████ ███████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ███████████████

6 **2.    Apple Knew Risks of Allowing Apps, Advertising Networks, and Analytics**
**Companies Free Access UDIDs**

7

8 During the Class Period, Apps had access to users' UDIDs through an API made available by

9 Apple. ██████████████████████ ████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████ Because Apple did not in practice apply its Privacy Policy to Apps using iOS to access

13 UDIDs, its Director of Global Privacy assumed no oversight role for that conduct. Kravitz Reply Decl.

14 Ex. 1 at 76:17-18. ████████████████████

15 ████████████████████████████████████████

16 ████████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ███████████████████

20 Since the Motion to Dismiss, Apple has repeated in every set of papers the refrain that

21 Plaintiffs do not have standing because they have not and cannot prove that UDIDs were accessed by

22 the Apps that they used. Apple took this position in the face of Plaintiffs' expert analysis, which

23 remained unscathed by Apple's critique. Apple even introduced a forensics specialist to say that

24 dynamic analysis cannot accurately reflect information captured. ████████████

25 ████████████████████████████████████████

26 ████████████████████████████ (Kravitz Reply Decl. Ex. 3, 193:6-

27 194:8.) ████████████████████████████████

28 ████████████████████████████████████████

████████████████████████████████████████

**B.** **Apple's Misrepresentations And Omissions Regarding App Privacy**

As set forth in Plaintiffs' motion papers, Apple engages in selective enforcement of its App review policies and that violates the Privacy Policy. Further the Privacy Policy omits to adequately inform users that Apple does not require all Apps to communicate a privacy policy to users. Apple's factual defense is two-fold; (i) A single sentence stating Plaintiffs cannot identify a single failure to enforce and (ii) a full page "infomercial" for Apple's App review process. Neither supports the basis for class certification.

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████

5 ██████████████████████████████████████

6   █████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████

10 ███████████████████████████████████████████████████████

11 ███████████████████████████████████████████████████████

12 ████████  ████████████████████████████████████████████

13 ████████████████████████████████████████████████████████

14 ██████████████████████████

   **C.    Apple's Misrepresentations Regarding Data Security**

15       Apple's Privacy Policy misrepresents "Apple online services such as the Apple Online Store

16 and iTunes Store use Secure Sockets Layer (SSL) encryption on all web pages where personal

17 information is collected." See *infra* Section IA; Kamber Decl. Ex. C-E (Dkt. Nos. 244-3, 244-4, &

18 244-5). The Privacy Policy omits that Apple fails to encrypt information that does not originate with

19 Apple or the consumer. Apple has thus misrepresented the security Apple accorded Plaintiffs' iDevice

20 data transmissions. Claims arising from that misrepresentation are appropriate for class certification.

21       First, Plaintiffs have provided evidence of the falsity of the representation on encryption by

22 demonstrating that one of the Plaintiffs experienced unencrypted data transmissions to the iTunes

23 server[7]. Plaintiffs' expert, Dr. Marziale, recorded Pandora's unencrypted transmission of Mr. Chiu's

24 UDID to itunes.apple.com under a detailed and transparent methodology.  Kravitz Decl. Ex. 3  ¶¶ 11–

25 ─────────────────────────────

26 [7] This finding is not a surprise since Apple often does not encrypt its data transmissions. *See* Kravitz
   Decl. Ex. 3 at Exs. 3 & 4, Rows 21, 36, 53-54, 60, 75 (transmissions to Apple's iTunes, location
27 tracking, and ad network servers) (Dkt. No. 245-3); Neuenschwander Decl. ¶ 32 (Dkt. No. 259)
   (admitting that Apple often does not encrypt data). Apple has the power to configure its servers to
28 force secured (encrypted) transmission from Apps by configuring the server to accept only HTTPS
   (SSL-encrypted) traffic, yet Apple fails to offer the data security and protection it promises.

15; 17–19 (Dkt. No. 245-3). Apple offers no basis whatsoever to question Dr. Marziale's credentials, methodology, or findings. Instead, its lawyers baldly state that his finding is without foundation or evidence. Def.'s Br. at 21 (Plaintiffs "have no evidence" of the transmission). Apple's feeble defense is that its own peculiarly narrow reading of the Privacy Policy must be right.  The only evidence Apple put in the record on the Privacy Policy's encryption provision was a single paragraph in the Horvath Declaration.   Yet, upon cross-examination, *Horvath conceded that Paragraph 14 of her sworn declaration was not true and needed to be corrected*. Kravitz Reply Decl. Ex. 1 at 101:21-102:4.

Second, Apple's reading of the Privacy Policy is patently unreasonable and further demonstrates the misrepresentations and omissions provided therein. Horvath testified that the only type of information required to be encrypted is information "Apple is transmitting to Apple servers." *Id.* at 133:11-15. However, this is contrary to any reasonable reading of the provision. Apple's Privacy Policy generally refers to "Apple online services" and, while Apple provides examples of services ("such as" its Online Store, iTunes Store), it does not exclude any online services at all. Further, the Privacy Policy uses passive voice in its encompassing reference to "all web pages where personal information is collected," without specifying *from where* Apple collects it, and without limiting SSL safeguards to data collection "via a user's direct interaction." *Compare* Kamber Decl. Ex. C-E (Dkt. Nos. 244-3, 244-4, & 244-5) *with* Def.'s Br. at 6 *and* Horvath Decl. ¶¶ 12–14 (Dkt. No. 258). The reality of Apple's position Apple will exercise appropriate precautions only when the user knows Apple is receiving her information,. But protections are even more needed when the user cannot witness the data transaction but the Privacy Policy leaves the consumer deceived and unprotected.

Plaintiffs seek injunctive relief for Apple to conform its data practices to its privacy policies by forcing the encryption of all personal information to or from Apple servers, including UDIDs or other unique identifiers. This is an ongoing harm that affects all members of the iDevice Class.

### D.      Apple's Misrepresentations Regarding Unauthorized Transmissions of Personal Information Resulting in Battery Drain and Costly Bandwidth Usage

The violations can be cured by injunctive relief requiring Apple to enforce its policies to prevent unauthorized transmissions from prematurely degrading the battery and wasting bandwidth, and requiring Apple to disclose this usage. Apple mischaracterizes the improper resource utilization allegations as a "new theory of liability – untethered to any alleged misrepresentations."  Def.'s Br. at 8:17-18.   First, the allegations are not new – they are specifically alleged in the First Amended

Consolidated complaint filed in November 2011. *See* Dkt. No. 25 ¶ 25 (Plaintiffs' "resources were measurable and of actual value, and included iDevice storage, battery life, and bandwidth . . . ."), as well as the operative complaint. Dkt. 104, *passim* (*e.g.*, ¶¶ 4, 17, 44(b), 58, 60, 61, 94-98, 159, 186). Further, the resource utilization issue is not a theory of liability, but a form of injury that Plaintiffs allege resulted from Apple's violations of representations in its Privacy Policy, Terms and Conditions, and SLAs, and is therefore a violation of the CLRA[8].

Apple also gets it wrong when it contends that Plaintiffs have no proof that they or anyone experienced resource depletion. Plaintiffs' expert, Dr. Egele, testifies to the battery drain and excessive use of bandwidth and storage for all users of the iDevices. Kravitz Decl. Ex. 7 (Egele Decl.) ¶¶ 7, 91-92, 98-101(Dkt. No. 245-7). In addition, Plaintiffs Dwyer and Capiro testified to resource utilization issues. Kamber Decl. Ex. R (I. Capiro Dep.) at 29:3-7, 42:23-43:2, 32:5-12 (Dkt. No. 244-18); *id.* Ex. P (I. Capiro Decl.) at ¶ 7 (Dkt. No. 244-16); Kravitz Decl. Ex. 1 (Dwyer Dep.) 73:6-8, 244:7-19 (Dkt. No. 245-1). Finally, Apple's contention that one of its documents on "an energy bug" was unrelated to the issues in this case, and that "traffic data" is not sent over cellular transmissions, does not establish that there were no battery usage problems or improper bandwidth utilization. Def.'s Br. 9:1-5.

**E.      Apple's Attempts To Defeat Certification of the Geolocation Subclass By Minimizing Its Breach as a "Harmless, Obscure, Bug" Defies Reality**

Apple does not oppose certification of a Geolocation Subclass because the problem did not happen. Rather, its opposition relies upon an attempt to minimize the breach of its representations as a "harmless, obscure, bug," and the contention that Plaintiffs cannot prove they were personally impacted. First, at the core of Apple's defense is its contention that Plaintiffs wrongfully claim that collection of location data by the iOS, while Location Services is off, even without transmission, is a violation of the SLA and Privacy Policy. Yet, on cross-examination, Apple's Director of Global Privacy ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Second, it is absurd to characterize as a "harmless obscure bug" a situation that was front-

---

[8] As set forth *infra* at Sec. V, Plaintiffs seek certification of a b(3) class for these resource usage violations on a liability only basis, as the liability is common to each class member. Kravitz Decl. Ex. 7 (Egele Decl.) at ¶¶ 89-105 (Dkt No, 245-7).

1  page news around the world, led to Congressional investigations, was subject to personal inquiry by

2  Steve Jobs (once it became public), and was likely exploited by the NSA to gain location information

3  of iPhone users.  *See* Kamber Reply Decl. Ex. A. ████████████████████████████

4  ████████████████████████████████████████████████████████████

5  ████████████████████████████

6      Third, Apple conveniently argues that Plaintiffs cannot prove they were personally impacted

7  by the bug, but any lack of evidence is a side-effect of the "bug" fix itself, which in fact ████████

8  ████████████████████████████████████████████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████

16      Finally, Apple has claimed to have fixed this issue in iOS version 4.3.3 (after the filing of the

17  prior Complaint) and later. However, it is not at all clear what is being done with putative class

18  members who have not updated to iOS 4.3.3 (and may not be able to). It appears such class members

19  are still at risk of harm. Plaintiffs seek a full disclosure of the operation of the issue and its risks to

20  any class member who still uses a pre-4.3.3 version of the iOS. Plaintiffs also seek an order requiring

21  Apple to purge any location data collected during this period, something that has not been done.

22  **V.    PLAINTIFFS' SATISFY ALL REQUIREMENTS OF BRINGING CLASS CLAIMS**

23      *First*, each aspect of the claims of the putative class may be proven by common evidence and

24  Apple's reliance on *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) is misplaced. *Dukes*

25  ───────────────

26  [9] When Apple fixed the issue in iOS 4.3.3, Apple had the update eliminate the database structure of the prior version and deleted all evidence along with it.

27  [10] The existence of a "bug" that affected an unknown, but substantial, number of Class Members is itself a common answer to the question, which Apple's fix *implicitly* acknowledges -- a universal "fix"

28  would not have been necessary, or probably even financially logical (as opposed to replacing a small number of phones), had there been only a handful of consumers affected.

dealt with claims of discrimination (which, in the absence of a uniformly applied policy, necessarily involve individual inquiries), not consumer protection claims arising from uniform misrepresentations and omissions. The overarching question here is whether all Class Members received the same misrepresentations and were subject to the same omissions. As is demonstrated above at IV. A - E, there is a common practice at the core of each of the five detailed breaches, in stark contrast to *Dukes*. *See, e.g., Tait v. BSH Home Appliances Corp.*, 2012 U.S. Dist. LEXIS 183649, at *14-16 (C.D. Cal. Dec. 20, 2012) ("To the extent that Defendant's frequent invocation of [*Dukes*] is intended to suggest that certification of *consumer* class actions has become more difficult, the Court rejects this argument.") (citation omitted); *see also Ries v. Arizona Beverages USA LLC*, No. 10-01139 RS, 2012 WL 5975247, at *14 (N.D. Cal. Nov. 27, 2012) ("[P]ost-*Dukes*, the underlying substantive law remains the same and district courts have continued to certify classes in cases alleging violation of the UCL, FAL, and CLRA for allegedly deceptive labeling.").

*Second*, in mischaracterizing Plaintiffs' UCL "unfairness" claims, Apple ignores that Plaintiffs' claims focus directly on Apple's misrepresentations and omissions concerning its safeguarding of its customers' privacy and the customers' ability to turn Location Services off. The individual analysis suggested by Apple is simply unnecessary. Plaintiffs' claims that Apple's misrepresentations are unfair in violation of the UCL can be resolved in one stroke. *First*, Apple's uniform misrepresentations do not raise individualized issues. *See Lozano v. AT&T Wireless Servs.*, 504 F.3d 718, 737 (9th Cir. 2007) (affirming decision to certify UCL claims because the "claim was based on uniform disclosures made by [defendant] to all its consumers . . . . [t]herefore, the individual circumstances regarding how these disclosures were read or received would not destroy predominance").

*Third*, Apple's false and misleading representations have no utility and are never a "fair" business practice. [11] *See Vasquez v. Super. Ct.*, 4 Cal.3d 800, 808 (1971) ("Protection of unwary consumers from being duped by unscrupulous sellers is an exigency of the utmost priority in contemporary society."). And while Plaintiffs have identified the harm caused by Apple's uniform misrepresentations to all class members, *supra* at IV. A-D, Apple has not named, and cannot name, a

---

[11] Apple suggests the "benefits [Plaintiffs] obtained from using Apps and Location Services outweigh any hypothetical concerns." Def.'s Br. at 22:8–9. This argument is a red herring. Apple represented that it would provide the benefit without the harm, but it failed to do so.

single benefit to consumers that justifies its uniform misrepresentations. Thus, the gravity of the harm Apple inflicted outweighs the utility of its conduct on a class-wide basis, and individualized assessment is not necessary.

*Fourth*, in response to Plaintiffs' CLRA claim, Apple incorrectly asserts, "Plaintiffs concede they have not been damaged, and it thus would be inappropriate to infer damages on behalf of the sweeping proposed class." Def.'s Br. at 24:3–4. But Plaintiffs make no such concessions. *See* Dkt. No. 266, pp. 14-18. Apple's remaining arguments are misplaced because they rely on its meritless reliance argument. Here, determination of whether Apple's uniform disclosures (which all class members were required to read and agree to) are likely to deceive will resolve an issue that is central to the validity of each of the claims in one stroke.  Thus, Plaintiffs have carried their burden of showing commonality. *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 589 (C.D. Cal. 2011); *Ries*, 2012 WL 5975247, at *13–14.

*Finally*, Apple's argument that "Plaintiffs do not share or even understand the privacy concerns animating this case" (Def.'s Br. at 18) is a gross misstatement of the record. There is no question that: (i) Plaintiffs and class members share the same interest in holding Apple liable for its deceptive and injurious conduct, and (ii) Plaintiffs consider the privacy and security of the personal information associated with their use of mobile devices in all facets of their daily lives to be substantially and significantly important to bring the instant lawsuit, sit for depositions, and respond to discovery. That Plaintiffs (or most any ordinary consumer) may be unable to articulate the highly technical, complex, and stealthy ways in which Apple has depleted their iDevice resources and failed to keep its uniform promises simply does not defeat typicality or adequacy. *See In re Napster, Inc. Copyright Litig.*, No. C MDL-00-1369 MHP, 2005 WL 1287611, at *6 (N.D. Cal. June 1, 2005).

Apple is simply wrong that Plaintiffs' claims are subject to "myriad unique defenses." Def.'s Br. at 24. "A unique defense will render the proposed class representative's claims atypical only if it is likely to be a 'major focus' of the litigation and not if it is insignificant or improbable." Newberg on Class Actions § 3:45 (5th ed.) (footnotes omitted). Here, the purported "unique defenses" cannot be a major focus of litigation because they are not true, are improbable, and are wholly manufactured by Apple.  Apple's argument that there are no damages flies in the face of this Court's prior Ruling.  Dkt No. 69 at 10 ("Plaintiffs have alleged actual injury, including: diminished and consumed iDevice resources, such as storage, battery life, and bandwidth (AC ¶¶ 3, 63b, 72d, 198); increased,

1    unexpected, and unreasonable risk to the security of sensitive personal information (AC ¶¶ 4, 18, 66-

2    67); and detrimental reliance on Apple's representations regarding the privacy protection afforded to

3    users of iDevice apps (AC ¶¶ 72c, 80-82)").  Nothing has shown falsity of those allegations, thus

4    standing of plaintiffs remains.  Apple has adduced no evidence to disturb those rulings, thus Plaintiffs'

5    standing remains.

## VI.    APPLE'S ATTACK ON THE FRCP 23(B)(3) BATTERY LIFE/BANDWIDTH CLASS CLAIMS MISAPREHENDS THE BASIS OF CERTIFICATION

7         Contrary to Apple's assertion, Plaintiffs have standing to bring the Battery Life/Bandwidth

8    Class claims.  See *infra* at IV. D. Since the only difference between the (b)(2) classes and the Battery

9    Life/Bandwidth Class is the determination of the appropriate remedy for Apple's misconduct, Plaintiffs

10   have necessarily satisfied the standing requirement of (b)(3) by having demonstrated the satisfaction of

11   the adequacy, manageability, and superiority requirements as well.

12        Apple further challenges certification of the Battery Life/Bandwidth Class on the basis of

13   predominance by misleadingly equating Plaintiffs' statements concerning the difficulty of assigning a

14   singular damage figure to compensate each (b)(3) class member to an admission that certification is

15   inappropriate.  Def.'s Br. at 28:9-21. Apple is again in error. The degradation of Plaintiffs' devices is

16   directly linked to Apple's misconduct and *liability* for its occurrence can be proven on a class-wide

17   basis. The fact that a *damage* figure may be determined individually for each class member does not

18   negate the fact that common questions predominate as detailed *supra* and does not preclude

19   certification here.  *Munoz v. PHH Corp*., 1:08-CV-0759-AWI-BAM, 2013 WL 2146925 (E.D. Cal.

20   May 15, 2013) ("individual class member damage calculations are permissible in a certified class

21   under Rule 23(b)(3)); *see also, In Re Whirlpool Corp. Front-Loading Washer Products Liability

22   Litigation,* 722 F.3d 838, 854 (6th Cir. 2013) ( ". . .[N]o matter how individualized the issue of

23   damages may be, these issues may be reserved for individual treatment with the question of liability

24   tried as a class action.") (internal quotations omitted). Indeed, permitting parties to reap the benefits

25   and efficiencies of class wide adjudication, while allowing for the unique compensation of individual

26   class members is one of the very purposes of a liability-only (b)(3) class.

## VII.   CONCLUSION

27        Plaintiffs have submitted evidence that supports Plaintiffs' claims that Apple has and will

28   continue, absent this Court's intervention, to violate the contractually-promised privacy rights of the

1   Plaintiffs, as well as continue to arbitrarily apply its own published privacy policies. Plaintiffs have

2   also satisfied each of the requirements of Rule 23 and therefore the defined Classes should be certified.

3                                   Respectfully submitted,

4   DATED: October 10, 2013                    KAMBERLAW, LLC

5                                   By:    _____s/Scott A. Kamber_____
                                           SCOTT A. KAMBER (pro hac vice)
6                                          DAVID A. STAMPLEY   (pro hac vice)
                                           skamber@kamberlaw.com
7                                          dstampley@kamberlaw.com
                                           KAMBERLAW, LLC
8                                          100 Wall Street, 23rd Floor
                                           New York, NY 10005
9                                          212.920.3072 Telephone
                                           212.202.6364 Facsimile
10
                                           DEBORAH KRAVITZ (SBN 275661)
11                                         dkravitz@kamberlaw.com
                                           KAMBERLAW, LLP
12                                         141 North St.
                                           Healdsburg, CA 95448
13                                         707.820.4247 Telephone
                                           212.202.6364 Facsimile
14
15                                         *Interim Class Counsel for Consolidated Plaintiffs*

16                                         WILLIAM M. AUDET
                                           JONAS P. MANN
17                                         waudet@audetlaw.com
                                           jmann@audetlaw.com
18                                         AUDET & PARTNERS, LLP
                                           221 Main Street, Suite 1460
19                                         San Francisco, CA 94105
                                           415.568.2555 Telephone
20                                         415.568.2556 Facsimile
21                                         *Liaison Counsel for Consolidated Plaintiffs*

22                                         ROBERT K. SHELQUIST
                                           KAREN H. RIEBEL
23                                         rshelquist@locklaw.com
                                           khriebel@locklaw.com
24                                         LOCKRIDGE GRINDAL NAUEN P.L.L.P.
                                           100 Washington Avenue S., Suite 2200
25                                         Minneapolis, MN 55401
                                           612.339.6900 Telephone
26                                         612.339.0981 Facsimile

27

28

LEIGH SMITH
JOSHUA E. KELLER
lsmith@milberg.com
jkeller@milberg.com
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
212.594.5300 Telephone
212.868.1229 Facsimile

JEREMY WILSON
jeremy@wtlfirm.com
WILSON TROSCLAIR & LOVINS
302 N. Market Street, Suite 501
Dallas, TX 75202
214.430.1930 Telephone
*Executive Committee for Consolidated Plaintiffs*

474721.1

18