# Exhibit 1

Highly Confidential, Attorneys' Eyes Only

Page 1

1                    UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                         SAN JOSE DIVISION

4

5

6    IN RE IPHONE APPLICATION          )

     LITIGATION                        )   No. 5:11-MD-02550-LHK

7    _____  )

8

9

        -- HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY --

10

11

12

                     DEPOSITION OF JANE HORVATH

13                      Palo Alto, California

                      Friday, October 4, 2013

14

15

16

17

18

19

20

21

22

23   Reported by:

24   LESLIE ROCKWOOD, RPR, CSR 3462

25   Job No. 66478

Highly Confidential, Attorneys' Eyes Only

1    Friday, October 4, 2013; Palo Alto, California

2                    10:02 A.M.

3                    --oOo--

4             JANE HORVATH, ESQ.,

5     called as a witness, having been duly sworn,

6     was examined and testified as follows:

7

8                  EXAMINATION

9   BY MR. KAMBER:

10      Q.  Good morning.  Can you tell me by whom you're

11  currently employed?

12      A.  Apple Inc.

13      Q.  And what is your position?

14      A.  I am the director of global privacy for Apple

15  in the legal department.

16      Q.  And when did you join Apple?

17      A.  In September of 2011.

18      Q.  And have you held the same position at Apple

19  since you joined in September of 2011?

20      A.  I have.

21      Q.  Have you given a deposition before?

22      A.  I have not.

23      Q.  And are you an attorney?

24      A.  Yes.

25      Q.  Prior to joining Apple in September 2011, what

Highly Confidential, Attorneys' Eyes Only

Page 36

1   Mac App Store.  So it's different.

2        Q.  Okay.

3            (Interruption in proceedings.)

4   BY MR. KAMBER:

5        Q.  You describe a mechanism by which customers

6   scroll through the terms.  Looking in paragraph 3

7   specifically, you say:  "By scrolling through the

8   agreement and clicking an on-screen button that is

9   prominently labeled 'agree.'"

10            Do you see that?

11        A.  Uh-huh.

12        Q.  And my question is:  Why do customers -- why

13  does Apple have customers scroll through the agreement

14  prior to clicking the on-screen button?

15        A.  To show that they have read the agreement.

16        Q.  And one cannot click the "agree" button until

17  it has been scrolled all the way through the document;

18  is that correct?

19        A.  I don't believe so.

20        Q.  So in your sentence that says "to create an

21  iTunes account a user must affirmatively agree to the

22  App Store terms and conditions" --

23        A.  Yes.

24        Q.  -- which includes the privacy" -- "Apple

25  privacy policy by scrolling through the agreement and

Highly Confidential, Attorneys' Eyes Only

Page 40

1    BY MR. KAMBER:

2         Q.   Referring to -- you referenced that you had

3    reviewed the class certification brief.

4         A.   Uh-huh.

5         Q.   In the class certification brief, it sets forth

6    two class definitions that have a start date and an end

7    date.

8         A.   Right.

9         Q.   Is it -- when you submitted this declaration --

10        A.   Uh-huh.

11        Q.   -- is it your -- was it intended that

12   paragraph 3 applies to all relevant time periods of the

13   class certification brief?

14        A.   Yes.

15        Q.   Do you know what percentage of iPhone users

16   have an iTunes account?

17        A.   I do not.

18        Q.   Do you have an understanding of a range in

19   which that is?

20        A.   I don't.

21        Q.   Directing your attention to paragraph 6.  It's

22   making reference to in July of 2010 --

23        A.   Uh-huh.

24        Q.   -- you joined Apple in September 2011.  How do

25   you have personal knowledge of the information set forth

Highly Confidential, Attorneys' Eyes Only

Page 46

1   asking about --

2           MR. KAMBER:  67,000 documents, not pages.

3           MR. JESSEN:  Right.  It's millions of pages.

4           I'll check.  I think that they've been -- I'll

5   check.

6           MR. KAMBER:  I'm just dotting my I's and

7   crossing my T's.

8           MR. JESSEN:  Of course.

9   BY MR. KAMBER:

10      Q.  You had attached as Exhibit A was, as you

11  stated, a true and correct copy of the current privacy

12  policy?

13      A.  Yes.

14      Q.  Are you familiar with how that has changed over

15  the course of the -- over the course of your time at

16  Apple?

17      A.  Yes.

18      Q.  What changes have there been?

19      A.  We added the cookies section, the link to the

20  statement about cookies to comply with the European

21  cookie -- it's known as the Cookie Directive.  And then

22  we recently changed the privacy policy to reflect our

23  education initiative.

24          We are selling iPads into K through 6 schools.

25  So we are now permitting through education and through

Highly Confidential, Attorneys' Eyes Only

1  schools under thirteens on the platform.  So up until --

2  prior to this, kids under 13 were not allowed to open an

3  account.

4      Q.  Are those all the changes?

5      A.  To my knowledge.

6      Q.  And when you're saying "my knowledge," you're

7  referring to your knowledge as director of global

8  privacy?

9      A.  Yes.

10     Q.  In paragraph 8 you state that the privacy

11  policy is covered solely Apple's internal collection and

12  use of data.  And you quote the first paragraph of the

13  privacy policy.

14         Now directing your attention to the first

15  paragraph of the privacy policy, which I would refer you

16  to -- it's the -- I think it's the first -- it's the

17  first -- oh, here it is.  I've got one that's got the

18  numbers correct.  It's page 9594151.

19         That paragraph was drafted prior to your

20  joining Apple?

21     A.  Yes.

22     Q.  Your description of the intent of that

23  paragraph is based upon your reviewing of that policy in

24  your professional capacity?

25     A.  Yes.

Highly Confidential, Attorneys' Eyes Only

Page 50

1  privacy is important to Apple so we've developed a

2  privacy policy that covers how we collect, use,

3  disclose, transfer and store your information.  Please

4  take a moment to familiarize yourself with our privacy

5  practices and let us know if you have any questions" on

6  its face.  I haven't changed that language so it's still

7  true.

8      Q.  In the paragraph you state that the privacy

9  policy has covered solely Apple's internal collection.

10     A.  Yes.

11     Q.  Is the entire basis of your opinion, as set

12 forth in paragraph 8, your reading of the plain language

13 of that paragraph?

14     A.  Yes, because on its face, it says it covers how

15 we collect, use, disclose, transfer and store your

16 information, and "we" is defined as Apple and Apple

17 affiliates.

18     Q.  So in your opinion to paragraph 8, aside from

19 your skills as a lawyer -- as a lawyer in reading the

20 English language, you're not relying upon any

21 information that you've gained in your position at

22 Apple?

23     A.  No, that's -- I rely on the plain language of

24 the statement and my skill as a privacy lawyer.

25     Q.  Where is "we" defined in the agreement?

Highly Confidential, Attorneys' Eyes Only

Page 51

1    A.  Apple.com is where this is hosted.

2    Q.  Uh-huh.

3    A.  And let me look at the privacy policy.

4        The first statement is:  "Your privacy is

5   important to Apple."  So then we "say so we've developed

6   a privacy policy."  It seems to me in the plain English

7   reading of that, that "we" is Apple.

8    Q.  I just want -- when you said it defined, I

9   wanted to make sure I wasn't missing a defined term.

10    A.  Okay.  It just, grammatically, if I'm reading

11   comprehension, I would say that "we" is Apple.

12    Q.  And you stated also, the "we" also includes the

13   affiliates, Apple affiliates?

14    A.  Yes, because it -- if you look down to the

15   paragraph 2 under "collection and use of personal

16   information," it says Apple and its affiliates.  And

17   affiliates would be our subs and affiliated companies in

18   our corporate structure.

19    Q.  Is "affiliates" defined anywhere in this

20   agreement?

21    A.  I believe that there was a hyperlink for

22   affiliates that it was defined, but I'm not sure.

23   There -- affiliates are what you would generally legally

24   determine to be an affiliate, which would be our subs

25   and our -- particularly our global companies.  We've

Highly Confidential, Attorneys' Eyes Only

Page 52

1  incorporated like Apple distribution international,

2  iTunes SARL.  Those are -- would be our affiliates.

3           MR. JESSEN:  We've been going, I think, over an

4  hour.  So --

5           MR. KAMBER:  The video hasn't had to be changed

6  yet.

7           THE WITNESS:  Could I just go to the restroom.

8           MR. JESSEN:  If now is a good time to take a

9  short break.

10          MR. KAMBER:  Give me 30 seconds.  We're just

11  about done, but I'd just like to just finish the

12  affiliates.

13  BY MR. KAMBER:

14      Q.  You mentioned the hyperlink -- the document

15  that was attached as Exhibit A --

16      A.  I'm not sure that there's a hyperlink or not.

17  I can't remember.  If there was, it may have been

18  Google's privacy policy.  I'm sorry.

19      Q.  But the privacy policy that is attached is --

20      A.  Is the privacy policy that's in effect right

21  now.

22      Q.  And that's -- okay.  So I just want to make

23  sure that you weren't changing anything from your

24  testimony.

25      A.  No.  No, I'm not.  I'm sorry.

Highly Confidential, Attorneys' Eyes Only

Page 56

1    Q.   With respect to the first sentence on paragraph

2    10, that Apple's privacy policy does not cover the data

3    practices of third parties, is there anything you rely

4    upon outside of the four corners of the privacy policy?

5    A.   No, there is actually a statement in the

6    privacy policy that says that.

7    Q.   What is a third party in the context of the

8    privacy policy?

9    A.   It's any entity other than Apple and Apple's

10   subs and affiliated companies.  And affiliated companies

11   would be defined in our SEC filing as an affiliated

12   company.

13   Q.   Now in the end of paragraph 10, it has the --

14   it has, hyphen, not Apple's.  And that's outside of the

15   quotes.

16        Do you see that?

17   A.   Uh-huh.

18   Q.   Is that -- I take it that it's outside of the

19   quotes that that is not included in the privacy policy

20   after that sentence --

21   A.   Correct.

22   Q.   -- that's quoted?

23   A.   It's inferred from by the statement in the

24   quotes.

25   Q.   Would the statement be clearer if it had -- if

Highly Confidential, Attorneys' Eyes Only

1      A.  They're an agreement between an Apple developer

2  and Apple.  They don't involve customers.  They're a

3  business agreement.

4      Q.  And you know that because you've been able --

5  you've reviewed those documents?

6      A.  I have.  I'm an Apple developer.

7      Q.  Okay.  Paragraph 12, does paragraph 12 state

8  your understanding of the stated provision in the

9  privacy policy?

10      A.  Yes.

11      Q.  Is it based upon anything else?

12      A.  The language on its face states that.

13      Q.  And paragraph 12 sets forth your understanding

14  of what the language on its face says?

15      A.  Yes.

16      Q.  Do you believe that that statement or that --

17  that that statement regarding personal information is

18  accurate?

19      A.  Yes.

20      Q.  Is it consistent with -- is it consistent with

21  the FTC's definition of personal information when the

22  FTC uses it?

23      A.  There is no legally defined mandated definition

24  by the FTC.  In some of its pieces it has said -- stated

25  that it believes that personal information should

Highly Confidential, Attorneys' Eyes Only

Page 61

1 include more.

2     Q. In your -- various, I think this is a -- in

3 2002, Microsoft entered into an agreement with the FTC,

4 a consent agreement regarding privacy issues. In your

5 capacity as a privacy professional, have you had an

6 opportunity to review that agreement?

7     A. I haven't read it in a very long time.

8     MR. KAMBER: Marking as Plaintiffs' Exhibit 78

9 for indication is a document headed "United States of

10 America Federal Trade Commission Agreement Containing

11 Consent Order," and I will point out this is a copy that

12 I have that is not signed.

13         (Exhibit 78, Agreement Containing Consent

14         Order, marked for identification.)

15     MR. KAMBER: My understanding based upon where

16 it was obtained is that it is accurate, but I don't want

17 to represent -- I'm not trying to represent on the

18 record or trying to trick the witness into saying that

19 it's a signed version of the document. It is not. It

20 is an unsigned version of the document.

21      And I do not have any understanding or belief

22 that it varies from that. I'm not representing -- but I

23 haven't seen the signed document.

24     MR. JESSEN: Just out of curiosity, is this a

25 document that plaintiffs have previously produced?

Highly Confidential, Attorneys' Eyes Only

Page 62

1          MR. KAMBER:  I would -- I will have to check on

2     that.

3          MR. JESSEN:  Okay.

4          MR. KAMBER:  It would surprise me because I

5     think it is a document that was obtained in the last few

6     days.

7     BY MR. KAMBER:

8          Q.  Directing -- I'm not asking -- there's very few

9     questions out of this so there's no reason to read the

10    eight-page document, but have you seen this document

11    before?

12         A.  Maybe.  Probably.

13         Q.  Okay.  Directing your attention to page 2 of

14    the document under "Definitions," under number one where

15    it says "personally identifiable information or personal

16    information shall mean"?

17         A.  Uh-huh.

18         Q.  Do you believe that that paragraph is

19    substantively different than Apple's definition?

20         A.  Yes.  But it's binding on Microsoft.  It has no

21    applicability to this case.

22         Q.  Does it have a -- does it inform -- is this --

23    does it reflect, given that it exists in an agreement

24    containing a consent order, does it reflect what the FTC

25    and Microsoft agreed that that meant at that point in

Highly Confidential, Attorneys' Eyes Only

Page 64

1        MR. JESSEN:  Can I just object?  Just for

2   clarity of the record, by paragraph 12 you're now going

3   back to your declaration?

4        MR. KAMBER:  I'm not.  Yes, good point.  Yes,

5   we are now done with Plaintiffs' Exhibit 78, and we are

6   back to the Horvath declaration, paragraph 12.

7        THE WITNESS:  Their own information in their

8   address book, yes, as it applies to if it were my

9   address book and I had my own data in the address book,

10  and yes, meaning Jane Horvath, my home address and

11  number.

12  BY MR. KAMBER:

13       Q.  But not other people's?  If you had other

14  people's information in your address book, that would

15  not be personal information?

16       A.  That's not your personal information; that's

17  other people's personal information.

18       Q.  Is a photograph personal information under

19  Apple's definition?

20       A.  If you are in the photo.

21       Q.  Is somebody's name personal information?

22       A.  Yes.

23       Q.  Now I see that name is one of the -- is one of

24  the fields that is identified in the definition.  It

25  includes one of the including but not -- you know,

Highly Confidential, Attorneys' Eyes Only

Page 76

1          MR. JESSEN:  Objection.  Lacks foundation --
2          THE WITNESS:  It's not my area of expertise.
3          MR. JESSEN:  -- ambiguous.
4   BY MR. KAMBER:
5      Q.  When you say, "This correctly describes Apple's
6   internal practices, which are to treat non-personal
7   information such as a UDID as personal information if it
8   is combined with other information," upon what do you
9   rely in making that statement?
10          MR. JESSEN:  Just objection to the extent you
11  misstated what was in the sentence.  I don't think you
12  did so purposefully, but you didn't read it exactly
13  right.
14  BY MR. KAMBER:
15     Q.  Look at the last sentence in paragraph 13?
16     A.  Yes.
17     Q.  Upon what information did you rely in making
18  that statement?
19     A.  It wouldn't be the collection; it would be our
20  internal use of that data.
21     Q.  But upon what did you rely -- upon what did
22  you --
23     A.  My own internal knowledge.
24     Q.  What Apple -- for what Apple databases is the
25  UDID used?

Highly Confidential, Attorneys' Eyes Only

1    opt-in consent basis.  And you can go into your device

2    and actually display what data is being sent to Apple,

3    and you can see the -- and associated with the Crash

4    Reporter key.

5            And we review those data collections very

6    strenuously.

7        Q.  Can any iPhone user upgrade to iOS 7

8    successfully?

9        A.  I believe there are certain older devices that

10   are not upgradeable.

11       Q.  Are there any issues with upgrading to iOS 7

12   based upon availability of space on the device or a

13   number of applications that have been installed or prior

14   application installations?

15       A.  I believe you have to have space on your device

16   to upgrade.

17       Q.  Now going back to your declaration.

18       A.  Uh-huh.

19       Q.  To paragraph 14.

20       A.  Oh, here it is.  Sorry.

21       Q.  Did you rely upon any information outside of

22   the four corners of the privacy policy or your own

23   professional knowledge in setting forth the statements

24   in paragraph 14?

25       A.  No, and I -- no.  And I wanted to clarify this

Highly Confidential, Attorneys' Eyes Only

1  statement.  In my -- in the drafting, it -- this

2  statement purely applies to Apple Online Services where

3  purchases are occurring and creating an account.  But

4  it's --

5      Q.  Did Apple draft its privacy policy?

6      A.  I don't have knowledge.  I don't know.

7      Q.  I mean, did Apple -- or I mean, was it

8  something that was -- that Apple drafted and put out

9  there as its privacy policy?

10     A.  Are you asking if an outside counsel drafted it

11 or whether Apple did?

12     Q.  No, no, no, whether Apple as an entity -- I

13 assume it's drafted by Apple, not by users.

14     A.  Oh, oh, you mean whether they put it out there

15 and let users comment on it?  I don't know what happened

16 when it was drafted.  I wasn't at Apple.

17     Q.  Okay.  No, it was actually just a question of

18 who was the author of the privacy -- who, as an entity,

19 what entity authored the privacy policy?

20     A.  I would say it was Apple Inc.

21         MR. KAMBER:  Given the time, I'm seeing what I

22 can skip through here.

23         MR. JESSEN:  Sure.

24 BY MR. KAMBER:

25     Q.  Paragraph -- paragraph 15, did you rely on

Highly Confidential, Attorneys' Eyes Only

1    A.   Yes.

2    Q.   Are you aware of whether -- of what it means to

3  turn location services off?

4    A.   Somewhat aware.

5    Q.   What do you understand location services off to

6  mean?

7    A.   If you turn location services off, I believe it

8  means that your location data will not be shared with --

9  either with -- it won't be -- it won't be collected.

10    Q.   By whom?

11    A.   By the operating system.

12    Q.   And does it have any -- and will it -- will any

13  information be shared with Apple if location services is

14  off?

15    A.   Not generally.

16    Q.   Okay.  Are you aware of any instances in which

17  the location services off did not behave in the way that

18  you described?

19    A.   It was before I was -- I vaguely recall

20  something --

21    MR. JESSEN:  Well, I just object to the extent

22  her knowledge is based upon privileged information.

23    THE WITNESS:  My knowledge is not -- yeah.

24  BY MR. KAMBER:

25    Q.   Okay.

Highly Confidential, Attorneys' Eyes Only

Page 133

1     Q.  So the paragraph in the privacy policy, the

2  section entitled "Protection of Personal Information,"

3  that your view of the second paragraph is that that only

4  applies to data transactions from a user to Apple on

5  those particular web pages?

6     A.  Where a user is using Apple Online Services --

7  and Apple Online Services would include iTunes Store,

8  Apple Online Store, that's where we would -- because

9  it's Apple transmitting to our servers.  It applies --

10  the privacy policy applies.

11     Q.  And in your view, that's the only type of

12  transaction that's required to be encrypted pursuant to

13  that paragraph?

14     A.  Yes, where Apple is transmitting to Apple

15  servers, yes.

16     MR. KAMBER:  Okay.  Then I will hand it over to

17  the next deposition.  We will end this on the caveats

18  that we both carved out, and I thank you very much for

19  your time.

20     THE WITNESS:  Thank you.  Have a safe trip

21  back.

22     MR. KAMBER:  And you can go and keep your

23  stomach from growling on your ride home now.

24     MR. JESSEN:  Thank you.

25     (Time noted:  2:02 p.m.)

# Additional Pages
# Submitted Under Seal