1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE IPHONE APPLICATION LITIGATION | ) Case No.: 11-MD-02250-LHK ) ) ORDER GRANTING DEFENDANT'S ) MOTION FOR SUMMARY JUDGMENT ) ) ) |

Plaintiffs, on behalf of themselves and a putative class, bring this action against Apple, Inc. ("Apple") for alleged violations of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*. Before the Court is Apple's Motion for Summary Judgment. ("Mot.") ECF No. 231. Plaintiffs oppose the Motion, ("Opp'n") ECF No. 266, and Apple replies, ("Reply") ECF No. 273. The Court held a hearing on the Motion on October 31, 2013. ECF No. 288; *see also* ("Oct. 31 Hr'g Tr.") ECF No. 291. Having considered the parties' submissions and oral arguments, the relevant law, and the record in this case, the Court GRANTS Apple's Motion for Summary Judgment.

## I.   BACKGROUND

### A.   Factual Background

#### 1.   The Parties

1    Plaintiffs filed their Third Amended Consolidated Complaint ("TAC") on behalf of four

2    named Plaintiffs who assert two separate types of claims and seek to represent two separate classes

3    of individuals. ECF No. 104.

4    Plaintiffs Anthony Chiu ("Chiu") and Cameron Dwyer ("Dwyer"), both California residents

5    assert "iDevice Claims." TAC ¶¶ 26-28.[1] Chiu first purchased an iPhone in 2008, and replaced it

6    with an iPhone 4 in or around June 2010. ("Kamber Decl.") ECF No. 267 at Ex. M ¶¶ 3-4. Dwyer

7    first began using an iPhone in or about August 2008, after receiving the phone from his father.

8    ("Kravitz Decl.") ECF No. 268 at Ex. 19 ¶ 3. Dwyer then purchased an iPhone between July and

9    December of 2010, which he replaced with an iPhone 3GS in or around November 2011. *Id.* ¶ 4.

10    Plaintiffs Isabella Capiro ("Isabella") and Alejandro Capiro ("Alejandro"), also California

11    residents, assert "Geolocation Claims." TAC ¶ 29. Alejandro purchased iPhone 4s for himself and

12    his daughter, Isabella, in late December 2010. Kamber Decl. Ex. P ¶¶ 3, 7.

13    Defendant Apple is a California corporation that manufactures iPhones and other devices.

14    TAC ¶¶ 31-32. Apple's iPhones generally consist of two components: the iPhone hardware and the

15    mobile operating system firmware ("iOS"). *Id.* ¶ 8. Apple's iOS software is analogous to

16    traditional computer-based operating systems such as Windows or Mountain Lion. ("Shoemaker

17    Decl.") ECF No. 236 ¶ 2. Apple frequently updates iOS, and users can install new versions of iOS

18    as they become available, without cost. *Id.* ¶ 3.

### 2.    iDevice Claims

20    Plaintiffs allege that Apple attracts consumers to purchase iPhones and other "iDevices,"

21    partly by offering thousands of purportedly "free" Apps in Apple's proprietary "App Store." TAC

22    ¶¶ 6, 12; *see also, e.g.*, Kamber Decl. Ex. M ¶ 6. Plaintiffs further allege that Apple regulates the

---

[1] In Plaintiffs' Motion for Class Certification and Opposition to Summary Judgment, Plaintiffs for the first time suggest that Isabella Capiro seeks to assert iDevice Claims as well as Geolocation Claims. *See* ECF No. 249 at 22-23; Opp'n at 12-13; *see also* Oct. 31 Hr'g Tr. at 3:23-5:6 (counsel for Plaintiffs conceding that Plaintiffs have not sought to amend TAC to add Isabella as an iDevice Plaintiff, but stating that she is "qualified" to assert both iDevice and Geolocation Claims). The TAC does not identify Isabella as an iDevice Plaintiff, and the Court therefore will not allow her to assert claims not pleaded in the TAC. Regardless, whether Isabella serves as an iDevice Plaintiff has no impact on the Court's conclusion that summary judgment in favor of Apple is warranted on all of Plaintiffs' claims.

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Apps that are available in the App Store. TAC ¶ 9. App developers can only create Apps using Apple-supplied software development kits ("SDKs"), and Apps can only be distributed in the App Store upon Apple's approval. *Id.* In addition, Apple controls what data Apps can and cannot transmit to third parties. *Id.* ¶ 14.

To users of the App Store, Apple represents in its Privacy Policy that it "takes precautions—including administrative, technical, and physical measures—to safeguard your personal information against loss, theft, and misuse, as well as against unauthorized access, disclosure, alteration, and destruction." Kamber Decl. Ex. A (June 2010 Privacy Policy). Apple's Privacy Policy further claims that users' privacy is a priority to Apple. *See id.* ("Your privacy is important to Apple. So we've developed a Privacy Policy that covers how we collect, use, disclose, transfer, and store your information.").

According to Plaintiffs, however, Apple allegedly "designed the iOS environment to easily transmit" Plaintiffs' "personal information" to third parties that collect and analyze such data without user consent or detection. Opp'n at 4; *see also* TAC ¶¶ 12-13, 81. Apple allegedly failed to adequately disclose to Plaintiffs that the "free" Apps collected Plaintiffs' information and sent it to third parties without user consent or detection. TAC ¶ 12.

Plaintiffs claim that they relied upon Apple's representations about privacy and data collection in purchasing their iPhones. *See, e.g.*, Kamber Decl. Ex. M ¶ 8 (Chiu Decl.) ("It was always my understanding that Apple would protect my personal and confidential information connected to my iPhone usage from disclosure to third parties. The protection that Apple was supposed to provide was important to me when I purchased the iPhone."). In light of Apple's statements about protecting users' privacy, Plaintiffs did not consent to the App developers transmitting Plaintiffs' information to third parties. *See, e.g.*, *id.* Plaintiffs assert that as a result of Apple's misrepresentations regarding its privacy and data collection practices, Plaintiffs both overpaid for their iPhones and suffered diminishment to their iPhones' battery, bandwidth, and storage "resources." *See* Opp'n at 14.

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

### 3.    Geolocation Claims

Plaintiffs further allege that for iPhone users "who ran iOS versions 4.1 and later from June 21, 2010, through April 27, 2011," Apple "collect[ed] and exchange[d] location information with Apple's servers" even when the "Location Services" setting on a user's iPhone was set to "off." Opp'n at 6. The "location information" exchanged with Apple's servers appears to have consisted of lists of wifi hotspots and cell towers located in the general vicinity of the iPhone. *See* ("Huang Decl.") ECF No. 235 ¶ 11.

Apple's iPhone Software License Agreements ("SLAs") state that consumers can prevent Apple from collecting location information "by going to the Location Services setting . . . [and] turning off the global Location Services setting." Kamber Decl. Ex. C (July 2010 SLA). Plaintiffs contend that Apple's representations regarding a user's ability to disable Location Services were false and misleading because Apple, prior to April 2011, continued to collect wifi hotspot and cell tower information from the iPhones, even after users, including Plaintiff Isabella Capiro, turned off the Location Services on their devices. *See* Opp'n at 6. Apple, for its part, attributes the iPhones' ability to continue to transmit wifi hotspot and cell tower data even when Location Services was turned off to a "software bug" that it resolved starting with iOS version 4.3.3. *See* Huang Decl. ¶¶ 11, 18.

Alejandro claims that he would have paid significantly less for the iPhones he purchased for himself and Isabella had he known that Apple continued to collect data about a user's locations even after the user turned the iPhone's Location Services off. Kamber Decl. Ex. P ¶ 6. Further, the Capiros contend that the exchange of location information with Apple's servers consumed their iPhones' resources. *See* Opp'n at 6, 14.[2]

---

[2] Plaintiffs' Opposition contains various other factual allegations, many of which do not appear in the TAC. For instance, the Opposition includes a discussion of "geotagging," a practice wherein Apple apparently collected wifi hotspot and cell tower information from iPhones even when Location Services was turned off for purposes of building an internal database of wifi hotspot and cell tower locations. *See* Opp'n at 5; Kamber Decl. Ex. S at 6-7 (describing the "geotagging" process). While allegations about geotagging appear nowhere in the TAC, Plaintiffs stated at the October 31 Hearing that they view geotagging allegations as a "rational expansion" of the TAC's Geolocation Claims. *See* Oct. 31 Hr'g Tr. at 6:11-7:23. Plaintiffs further represented at the October 31 Hearing that Isabella Capiro has standing to assert claims based on geotagging. *See id.* at 7:24-

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**B.    Procedural History**

This case is a consolidated multi-district litigation involving nineteen putative class action lawsuits. *See generally* ("Consolidated Compl."), *Lalo v. Apple, Inc.*, Case No. 10-CV-5878, ECF No. 71. The first two of these consolidated actions were filed on December 23, 2010. *See Lalo v. Apple, Inc.*, Case No. 10-CV-5878; *Freeman v. Apple, Inc.*, Case No. 10-CV-5881. Other, substantially similar actions followed, both in this District and throughout the country. On August 25, 2011, the Judicial Panel on Multidistrict Litigation ("MDL") issued a Transfer Order, centralizing these nineteen actions in the Northern District of California before the undersigned judge. *See* Case No. 11-MD-2250, ECF No. 1.

The Consolidated Complaint was filed on April 21, 2011. Case No. 10-CV-5878, ECF No. 71. On September 20, 2011, the Court granted Apple's motion to dismiss on the basis that Plaintiffs failed to establish Article III Standing. *See* ("Sept. 20 Order"), Case No. 11-MD-2250, ECF No. 8.[3] Plaintiffs were given leave to amend the complaint. *Id.* at 21.

On November 22, 2011, Plaintiffs' filed the First Amended Consolidated Class Action Complaint ("Amended Consolidated Compl."). ECF No. 25. The Court granted in part and denied in part Apple's motion to dismiss the Amended Consolidated Complaint on June 12, 2012. ("June

---

8:2. The record demonstrates, however, that the "geotagging" process ran only on iOS versions prior to iOS 4.1, and that Isabella never had an iPhone that ran a version of iOS prior to version 4.2.1. *See* Kamber Decl. Ex. S at 4; ("Buckley Decl.") ECF No. 234 ¶¶ 23-25. Because Isabella's iPhone never ran a version of iOS capable of "geotagging," no Plaintiff has standing to assert claims based on this practice. Accordingly, the Court will not consider Plaintiffs' geotagging allegations further. Moreover, the Court notes that because Plaintiffs have failed to identify any specific alleged misrepresentations regarding geotagging on which Plaintiffs relied, consideration of Plaintiffs' geotagging allegations would not impact the Court's standing analysis in any event.

Plaintiffs' Opposition also contains numerous references to something called "iAd," which is apparently an internal Apple advertising network. *See* Opp'n at 10-11; Kamber Decl. Ex. K at 9 (explaining iAd). Allegations related to iAd do not appear in the TAC, but Plaintiffs stated at the October 31 Hearing that they view iAd allegations as related to their iDevice Claims and that the iAd allegations arise from the same alleged misrepresentations as the iDevice Claims. *See* Oct. 31 Hr'g Tr. at 27:19-29:23. Because Plaintiffs do not seek to state a separate claim based on iAd and because the iAd allegations relate to the same alleged Apple misrepresentations as Plaintiffs' other iDevice Claims, the Court will not separately discuss iAd further.

[3] Unless otherwise noted, all further citations to ECF are from Case No. 11-MD-2250.

5

12 Order") ECF No. 69. Only the claims against Apple for violations of the UCL and CLRA survived the motion to dismiss. *Id.*

Plaintiffs then filed the Second Amended Consolidated Class Action Complaint on July 3, 2012. ECF No. 74. Apple filed a partial motion to dismiss certain named plaintiffs from the case. ECF No. 76. In response, Plaintiffs filed the TAC, which replaced the named plaintiffs to which Apple objected in its partial motion to dismiss. ECF No. 104. Apple then withdrew its partial motion to dismiss. ECF No. 107. The TAC, the operative complaint, was filed on October 4, 2012. ECF No. 104.

Apple filed its first Motion for Summary Judgment on December 14, 2012. ECF No. 120. Plaintiffs filed their first Motion for Class Certification on December 17, 2012. ECF No. 127. Following a hearing on these Motions held on February 28, 2013, however, the Court became concerned that Apple had relied on documents in its Motion for Summary Judgment that Apple had not produced to Plaintiffs in discovery. ("Mar. 7 Order") ECF No. 209 at 1. Upon further investigation, it became clear that Apple's document production was, in fact, far from complete and not in compliance with Magistrate Judge Grewal's November 21, 2012 discovery order as of the end of February 2013. *Id.* at 2-4. In light of Apple's incomplete production, the Court denied Apple's first Motion for Summary Judgment and ordered Plaintiffs' to withdraw their first Motion for Class Certification pending Apple's completion of its document production. *Id.* at 4-5.

Following the March 7 Order, the parties entered into a Stipulation governing the remaining discovery in the case. ECF Nos. 221, 222. With this Court's permission, *see* ECF No. 226 at 1, Apple filed a renewed Motion for Summary Judgment on May 17, 2013, ECF No. 231. Plaintiffs filed their Opposition on September 26, 2013, ECF No. 266,[4] and Apple filed its Reply on October

---

[4] Plaintiffs' Opposition contains within it a Motion to Strike the Opinions of Apple's Expert Jeffrey Bolas Pursuant to Federal Rule of Evidence 702. *See* Opp'n at 2-4. Bolas's opinions all concern whether data stored on Plaintiffs' iPhones provides support for Plaintiffs' claims that their personal information was collected by Apps or that Plaintiffs' iPhones transmitted wifi hotspot and cell tower data to Apple's servers when Location Services was turned off. ("Bolas Decl.") ECF No. 233 ¶ 5. For the reasons discussed below, *see infra* Part III, the Court does not reach the issue of whether Plaintiffs have raised a genuine issue of material fact concerning whether such data was collected from their iPhones. Accordingly, the Court DENIES Plaintiffs' Motion to Strike Bolas's Opinions as moot.

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

10, 2013, ECF No. 273. Plaintiffs filed a renewed Motion for Class Certification on August 20, 2013. ("Class Cert. Mot.") ECF No. 249. Apple filed its Opposition to Plaintiffs' Motion for Class Certification on September 19, 2013, ("Class Cert. Opp'n") ECF No. 254, and Plaintiffs filed their Reply in Support of Class Certification on October 11, 2013, ("Class Cert. Reply") ECF No. 277. Following the filing of Plaintiffs' Class Certification Reply, Apple filed an Objection to New Evidence purportedly contained in the Class Certification Reply. ECF No. 281. Plaintiffs responded with a Motion for Leave to File a Motion to Strike Apple's Objection. ECF No. 282.

## II.   LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. *See id.* at 322-23. If the nonmoving party fails to make this showing, "the moving party is entitled to judgment as a matter of law." *Id.* at 323 (internal quotation marks omitted).

At the summary judgment stage, the Court must view the evidence in the light most favorable to the nonmoving party and "all reasonable inferences that may be drawn from the facts placed before the court must be drawn" in favor of the opposing party. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1065 (9th Cir. 2003) (internal quotation marks omitted). If evidence produced by the moving party conflicts with evidence produced by the nonmoving party, a court must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir.1999). However, "[b]ald assertions that genuine

7

United States District Court
For the Northern District of California

issues of material fact exist are insufficient." *See Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007); *see also Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1159 (C.D. Cal. 2013) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Further, a motion for summary judgment may not be defeated by evidence that is "merely colorable" or "not significantly probative." *Anderson*, 477 U.S. at 249-50; *see also Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1183 (9th Cir. 2005) (same). If the nonmoving party fails to produce evidence sufficient to create a genuine dispute of material fact, the moving party is entitled to summary judgment. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103 (9th Cir. 2000).

## III.    DISCUSSION

Apple moves for summary judgment on the grounds that: (1) Plaintiffs lack Article III standing; (2) Plaintiffs lack standing under the UCL and the CLRA; and (3) Plaintiffs have failed to create a genuine issue of material fact concerning the substantive elements of Plaintiffs' UCL and CLRA claims. For the reasons discussed below, the Court concludes that Plaintiffs have failed to create a genuine issue of material fact concerning their standing under Article III or the CLRA and UCL to bring their claims and therefore that Apple is entitled to summary judgment in its favor. Because this conclusion disposes of the case, the Court will not address the substantive elements of Plaintiffs' claims.

### A.    Standing

#### 1.    Legal Standards

##### a.    Article III Standing

To have Article III standing, a plaintiff must plead and prove that he or she has suffered sufficient injury to satisfy the "case or controversy" requirement of Article III of the United States Constitution. *See Clapper v. Amnesty Int'l*, --- U.S. ---, 133 S. Ct. 1138, 1146 (2013) ("One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'" (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997))). Therefore, for Article III standing, a plaintiff must establish: (1) injury-in-fact that is concrete and particularized, as well as actual or imminent; (2) that this injury is fairly traceable to the challenged action of the defendant;

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

and (3) that this injury is redressable by a favorable ruling from the court. *Monsanto Co. v. Geertson Seed Farms*, --- U.S. ---, 130 S. Ct. 2743, 2752 (2010); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Since the elements of Article III standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* This means that at summary judgment, a plaintiff may no longer rely on "mere allegations," but rather must set forth "specific facts" supporting standing. *Id.* (internal quotation marks omitted); *see also Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (same); *Baghdasarian v. Amzaon.com, Inc.*, No. 05-8060, 2009 WL 4823368, at *4 (C.D. Cal. Dec. 9, 2009) (allegations of standing found sufficient at the class certification stage do not definitively establish standing for purposes of summary judgment), *aff'd*, 458 F. App'x 622 (9th Cir. 2011).

### b.    Statutory Standing Under the CLRA and UCL

The CLRA and UCL also require Plaintiffs to demonstrate standing. To have standing under the CLRA, a plaintiff must allege that she relied on the defendant's alleged misrepresentations and that she suffered economic injury as a result. *See, e.g.*, *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010) (plaintiff must have "relied on a[] representation by" defendant in order to have standing to bring CLRA claim based on a misrepresentation); *Aron v. U-Haul Co.*, 143 Cal. App. 4th 796, 802 (2006) ("To have standing to assert a claim under the CLRA, a plaintiff must have suffer[ed] any damage *as a result of* the . . . practice declared to be unlawful." (alterations in original) (internal quotation marks omitted)).

Likewise, to establish standing under the UCL, a plaintiff must demonstrate that she "suffered injury in fact and [] lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. Interpreting this statutory language—which California voters added to the UCL in 2004 through the passage of Proposition 64, *see In re Tobacco II Cases*, 46 Cal. 4th 298, 314 (2009)—California courts have held that when the "unfair competition" underlying a

**United States District Court**
For the Northern District of California

9

plaintiff's UCL claim consists of a defendant's misrepresentation, a plaintiff must have actually relied on the misrepresentation, and suffered economic injury as a result of that reliance, in order to have standing to sue. While the California Supreme Court first announced this actual reliance requirement in relation to claims brought under the UCL's fraud prong, *see id.* at 326 ("[W]e conclude that [Section 17204, as amended by Proposition 64] imposes an actual reliance requirement on plaintiffs prosecuting a private enforcement action under the UCL's fraud prong."), California courts have subsequently extended the actual reliance requirement to claims brought under the UCL's unlawful prong to the extent "the predicate unlawful conduct is based on misrepresentations." *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1355 (2010); *accord Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011). Moreover, in *Kwikset*, the California Supreme Court indicated that the actual reliance requirement applies *whenever* a UCL action is predicated on misrepresentations. 51 Cal. 4th at 326 & n.9 ("The theory of the case is that [defendant] engaged in misrepresentations and deceived consumers. Thus, our remarks in *In re Tobacco II Cases . . .* concerning the cause requirement in deception cases, are apposite." (citation omitted)). Thus, the Court concludes that the actual reliance requirement also applies to claims under the UCL's unfair prong to the extent such claims are based on a defendant's misrepresentations. *See In re Actimmune Mktg. Litig.*, No. 08-2376, 2010 WL 3463491, at *8 (N.D. Cal. Sept. 1, 2010) (holding "that a plaintiff must plead 'actual reliance,' even if their [*sic*] claim arises under the unlawful or unfair prongs, so long as the pleadings assert a cause of action grounded in misrepresentation or deception."), *aff'd*, 464 F. App'x 651 (9th Cir. 2011); *see also Kane v. Chobani, Inc.*, No. 12-2425, 2013 WL 5289253, at *6 (N.D. Cal. Sept. 19, 2013) (same).

Here, the gravamen of Plaintiffs' claims under the UCL's unlawful, unfair, and fraud prongs is that Apple misrepresented its data collection and privacy practices, thereby luring Plaintiffs into spending more money for their iPhones than they would have had they known the true nature of the data being collected by Apple and the third party apps. *See, e.g.*, Opp'n at 6 (Apple "violated the iDevice SLAs' express provision that a user can turn [L]ocation [S]ervices 'off' completely and for all purposes" since the iPhones continued to send certain data to Apple's servers even when the Location Services feature was turned off); *id.* at 7 ("Apple's omissions and

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

misrepresentations create the false impression that much of the information it gathers from users' iDevices is not 'personal' information."). Accordingly, to demonstrate standing under the UCL, Plaintiffs must set forth specific facts showing that they actually relied on Apple's misrepresentations and suffered economic injury as a result of that reliance.

A showing of actual reliance under the UCL requires a plaintiff to establish that "the defendant's misrepresentation or nondisclosure was an immediate cause of the plaintiff's injury-producing conduct." *Tobacco II*, 46 Cal. 4th at 326 (internal quotation marks omitted). "A plaintiff may establish that the defendant's misrepresentation is an immediate cause of the plaintiff's conduct by showing that in its absence the plaintiff in all reasonable probability would not have engaged in the injury-producing conduct." *Id.* (internal quotation marks omitted). While a plaintiff need not demonstrate that the defendant's misrepresentations were "the sole or even the predominant or decisive factor influencing his conduct," the misrepresentations must have "played a substantial part" in the plaintiff's decisionmaking. *Id.* Further, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* at 327.

### 2. Analysis

#### a. Injury

As explained above, to establish standing under either Article III or the CLRA and UCL, Plaintiffs must demonstrate that they have suffered a concrete injury in fact. Furthermore, to have standing under the CLRA and UCL, this injury must be economic in nature. Here, Plaintiffs identify two forms of economic harm. First, Plaintiffs claim that they overpaid for their iPhones. Opp'n at 14. Second, Plaintiffs claim that the unauthorized transmission of data from their iPhones taxed the phones' resources by draining the battery and using up storage space and bandwidth. *Id.*[5]

---

[5] Plaintiffs additionally claim injury based on the fact that "Plaintiffs' personal information was transmitted to third parties and location data was transmitted to Apple when Location Services was off." Opp'n at 14. Plaintiffs do not, however, explain how the mere transmission of data caused them concrete harm. This Court has already rejected Plaintiffs' theory of injury based on the "collection of personal information itself," ECF No. 69 at 9; *see also* ECF No. 8 at 7 (dismissing Consolidated Complaint for failure to allege concrete injury stemming from the collection of personal information); the Court declines to revisit this issue here.

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1    Apple contends that Plaintiffs have failed to raise a genuine issue of material fact as to

2  whether they suffered either of the aforementioned forms of injury. In particular, Apple argues that

3  Plaintiffs have conceded that they did not suffer *any* harm as a result of Apple's alleged

4  misconduct. Mot. at 7. The Court is not convinced. Although Plaintiffs' depositions contain

5  potentially damaging testimony in which Plaintiffs struggle to identify what harm they suffered,

6  other portions of these same depositions support Plaintiffs' claims of harm. *Compare* ("Beringer

7  Decl.") ECF No. 232 at Ex. A at 147:16-24 (Chiu Dep.) ("[Q:] Sitting here today, can you identify

8  any harm that you personally experienced due to the alleged collection of information and

9  transmission of information from your phone? . . . [A:] I don't know specifically. [Q:] Is the

10  answer no you cannot identify any harm, sitting here today? [A:] Correct."), *and id.* Ex. D at

11  243:12-16 (Dwyer Dep.) ("[Q:] But can you actually point to harm that you did experience that's

12  not hypothetical as a result of [apps disclosing personal information]? . . . [A:] Personally, I cannot,

13  no."), *and id.* Ex. C at 131:23-132:4 (Alejandro Dep.) ("[Q:] And am I correct that you aren't

14  aware of any harm that you experienced due to the collection of any information by these apps on

15  your device? . . . [A:] It's the same answer. I don't know."), *and id.* Ex. B at 101:9-14 (Isabella

16  Dep.) ("[Q:] Can you identify any harm that you personally have experienced due to anything

17  having to do with Location Services? . . . [A:] No."), *with* Kravitz Decl. Ex. 21 at 244:7-19 (Dwyer

18  Dep.) (Dwyer ran out of storage space on his iPhones), *and* Kamber Decl. Ex. N at 30:20-31:2

19  (Alejandro Dep.) ("My factual belief would have to be based on the premise that it is true that

20  when you turn off that feature during whatever time period that was, that if the iPhone was not—

21  was actually doing that, it was still transmitting information, then the iPhone was not doing what it

22  was intended to do, and from my perspective I overpaid for that phone because it's not functioning

23  as it was designed to."), *and id.* Ex. O at 29:3-17 (Isabella Dep.) (Isabella's iPhone batteries

24  drained rapidly). While the apparent conflicts in Plaintiffs' deposition testimony may weaken the

25  credibility of the evidence supporting Plaintiffs' claims of injury, the fact remains that there is

26  evidence in the record supporting each side's position on injury. *See Leslie*, 198 F.3d at 1158; *see*

27  *also S. Cal. Painters & Allied Trade Dist. Council No. 36 v. Best Interiors, Inc.*, 359 F.3d 1127,

28  1134 (9th Cir. 2004). The Court finds that this conflicting evidence is sufficient to create a genuine

**United States District Court**
For the Northern District of California

1    issue of material fact regarding whether Plaintiffs have suffered injury in fact. Summary judgment

2    is not warranted on this ground.

3                          **b.    Causation/Actual Reliance**

4            Adequately establishing injury in fact, however, is only part of the battle. To demonstrate

5    standing, Plaintiffs must also show that this injury is causally linked to Apple's misrepresentations

6    regarding data collection and privacy. *See, e.g.*, *Geertson Seed Farms*, 130 S. Ct. at 2752 (a

7    plaintiff's injury must be "fairly traceable to the challenged action of the defendant" for purposes

8    of Article III standing); *Tobacco II*, 46 Cal. 4th at 324-26 (UCL requirement that a plaintiff suffer

9    injury "as a result of" defendant's conduct requires a causal link between defendant's conduct and

10   plaintiff's harm). As discussed above, for purposes of standing under the CLRA and UCL, a

11   showing of causation requires a showing that Plaintiffs actually relied on Apple's alleged

12   misrepresentations regarding data collection and privacy to their detriment. *See supra* Part

13   III.A.1.b. In addition, the Court finds, in the context of this case, that Plaintiffs must establish

14   actual reliance on Apple's alleged misrepresentations to demonstrate causation for purposes of

15   Article III standing. Plaintiffs' theory of this case is that they suffered harm, in the form of

16   overpayment and reduced battery life, bandwidth, and storage, as a result of Apple's

17   misrepresentations concerning its data collection and privacy policies. For the Plaintiffs' harm to

18   be "fairly traceable" to Apple's misrepresentations, Plaintiffs must have seen the

19   misrepresentations and taken some action based on what they saw—that is, Plaintiffs must have

20   actually relied on the misrepresentations to have been harmed by them. *See Actimmune Mktg.*,

21   2010 WL 3463491, at *10 (no Article III standing where plaintiffs failed to adequately plead actual

22   reliance); *In re HP Inkjet Printer Litig.*, No. 05-3580, 2008 WL 2949265, at *2 (N.D. Cal. July 25,

23   2008) (actual reliance on alleged misrepresentation required for Article III standing). Accordingly,

24   the Court concludes that actual reliance is an essential element of standing in this case under

25   Article III, as well as the CLRA and UCL.

26           Unfortunately for Plaintiffs, the Court also concludes that Plaintiffs have failed to establish

27   a genuine issue of material fact concerning actual reliance. The reasons for this conclusion are set

28   forth below.

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

### i.    Apple's Alleged Misrepresentations

Plaintiffs identify a number of alleged Apple misrepresentations regarding data collection and privacy, nearly all of which appear in either Apple's Privacy Policy, the iPhone SLA, or the App Store/iTunes Terms and Conditions.[6] For instance, Plaintiffs identify the following alleged misrepresentations in Apple's Privacy Policy:

- "Your privacy is important to Apple. So we've developed a Privacy Policy that covers how we collect, use, disclose, transfer, and store your information." Kamber Decl. Ex. A (June 2010 Privacy Policy).

- "To make sure your personal information is secure, we communicate our privacy and security guidelines to Apple employees and strictly enforce privacy safeguards within the company." *Id.* Ex. B (Current Privacy Policy).

- "Apple takes precautions—including administrative, technical, and physical measures—to safeguard your personal information against loss, theft, and misuse as well as against unauthorized access, disclosure, alteration, and destruction." *Id.* Ex. A.

- "Personal information is data that can be used to uniquely identify or contact a single person. . . . We also collect non-personal information—data in a form that does not permit direct association with any specific individual. . . . The following are some examples of non-personal information that we collect[:] . . . occupation, language, zip code, area code, unique device identifier, location, and the time zone where an Apple product is used . . . ." *Id.*; *see also* Oct. 31 Hr'g Tr. at 33:17-34:22.

Plaintiffs identify the following additional misrepresentations in the SLA:

- "You agree that Apple and its subsidiaries and agents may collect, maintain and process and use . . . information, including but not limited to information about your iPhone . . . . as long as it is collected anonymously in a form that does not personally identify you, to improve our products or to provide services or technologies to you." Kamber Decl. Ex. C

---

[6] While different versions of these Apple documents were in effect throughout the class period, the parties generally agree that the alleged misrepresentations contained in the documents were materially identical across different versions. *See* Buckley Decl. ¶¶ 2-22; Class Cert. Reply at 3. At the October 31 Hearing, a disagreement arose as to whether the Apple Privacy Policy in effect in March 2008 contained any reference to a "unique device identifier" ("UDID") or was linked to the App Store Terms and Conditions. *Compare* Oct. 31 Hr'g Tr. at 33:9-14, 34:10-22 (counsel for Plaintiffs stating that Privacy Policy in effect in March 2008 mentioned UDID), *with id.* at 34:23-35:1 (counsel for Apple stating that Privacy Policy in effect in March 2008 did not reference UDID and that App Store did not exist in March 2008). The Court concludes that this dispute concerning the terms of the Privacy Policy in effect in March 2008 has no bearing on the Court's standing analysis. As discussed below, *see infra* Part III.A.2.b.ii-iii, Plaintiffs lack standing because they fail to raise a genuine issue of material fact as to whether any Plaintiff read and relied on any version of Apple's Privacy Policy, or any other Apple document containing an alleged misrepresentation. Because no Plaintiff has offered any evidence that he or she saw the Privacy Policy in effect in March 2008 in the first place, the precise contents of the Privacy Policy in effect at that time are immaterial.

14

(July 2010 SLA).

- "You may withdraw [consent to have location data collected] at any time by going to the Location Services setting on your iPhone and either turning off the global Location Services setting or turning off the individual location settings of each location-aware application on your iPhone." *Id.*

- "The location data and queries collected by Apple are collected in a form that does not personally identify you and may be used by Apple and its partners and licensees to provide location-based products and services." *Id.* Ex. E (Dec. 2011 SLA).[7]

Plaintiffs' Opposition also implies that the App Store/iTunes Terms and Conditions contain Apple misrepresentations. *See* Opp'n at 5 (citing paragraphs of the Buckley Declaration that identify various versions of the App Store or iTunes Terms and Conditions in support of Plaintiffs' Geolocation Claims). At the October 31 Hearing, however, Plaintiffs clarified that their iDevice Claims are based solely on alleged misrepresentations contained in either Apple's SLAs or Privacy Policies, while Plaintiffs' Geolocation Claims are based exclusively on alleged misrepresentations contained in Apple's SLAs. *See* Oct. 31 Hr'g Tr. at 14:11-20 ("And just so we're clear, your Honor, the Privacy Policy itself is not the representation. It is not the representations in the Privacy Policy that are the basis for the [Geolocation] claim. The basis for the [Geolocation] claim is the software agreement that was given to Ms. Capiro at the time of the purchase of the iPhone. There are two different elements throughout—for the iDevice—for the iDevice case, it is the Privacy Policy in addition to the SLA for the Geolocation representation.").[8]

In addition to alleged misrepresentations appearing in Apple's Privacy Policies and SLAs, Plaintiffs identify two misrepresentations that relate specifically to Plaintiffs' Geolocation Claims.

---

[7] Many of these alleged misrepresentations are identified only in Plaintiffs' Motion for Class Certification. *See* Class Cert. Mot. at 3-4; Class Cert. Reply at 2-3. Nevertheless, given the overlap between the issues in the pending motions for summary judgment and class certification, the Court will consider arguments appearing in the parties' class certification briefs in ruling on the Motion for Summary Judgment. The Court has also considered the additional documents cited for the first time in Plaintiffs' Reply in Support of Class Certification in ruling on the Motion for Summary Judgment, *see* Oct. 31 Hr'g Tr. at 59:16-61:8 (counsel for Plaintiffs requesting that the Court consider documents and arguments filed in connection with Motion for Class Certification in deciding Motion for Summary Judgment), but finds that these documents do not affect the Court's conclusion that Plaintiffs lack standing.

[8] Though Plaintiffs do not base their claims on any specific misrepresentations contained in the iTunes/App Store Terms and Conditions, Plaintiffs appear to argue that the Terms and Conditions are nevertheless relevant because certain versions of the Terms and Conditions incorporate the Privacy Policies. *See* Oct. 31 Hr'g Tr. at 25:10-13.

15

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

First, Isabella Capiro states that in mid-March 2011, an Apple store employee told her that she "could improve battery life by turning off Apps, by turning off the Internet, and by turning off Location Services." Kamber Decl. Ex. Q ¶ 7. Plaintiffs claim that this statement was false or misleading because, at the time Isabella spoke with the Apple store employee, she was running a version of iOS that would, under certain circumstances, continue to drain the iPhone's battery by transmitting wifi hotspot and cell tower data to Apple's servers even when Location Services was off. *See* Opp'n at 6; Huang Decl. ¶¶ 11-12. Second, Plaintiffs claim that the very existence of an "off" button in the Apple settings that purported to allow a user to disable Location Services constitutes a misrepresentation that Location Services could be turned off when, in fact, the iPhone continued to transmit wifi hotspot and cell tower data to Apple's servers even when Location Services was ostensibly disabled. *See* Opp'n at 18.[9]

    ii.    **Absence of Evidence that Plaintiffs Relied on Any Alleged Misrepresentation**

        (a)    **iDevice Claims**

While the iDevice Plaintiffs identify numerous purported misrepresentations and argue that they relied on them in purchasing their iPhones, *see* Opp'n at 11-13, the evidentiary record is devoid of "specific facts" to support Plaintiffs' assertions. Critically, *none* of the Plaintiffs presents evidence that he or she even saw, let alone read and relied upon, the alleged misrepresentations contained in the Apple Privacy Policies, SLAs, or App Store Terms and Conditions, either prior to purchasing his or her iPhone, or at any time thereafter.[10]

In their depositions, Plaintiffs either could not recall having read any of these policies (or

---

[9] Plaintiffs also identify statements Apple made to the U.S. Copyright Office as an alleged Apple misrepresentation. *See* Opp'n at 4 n.8. Plaintiffs fail to explain whether or how Plaintiffs state a claim based on this misrepresentation. Because Plaintiffs have not explained how they could state a claim based on an alleged misrepresentation made to the Copyright Office, of which no Plaintiff claims to have been aware, the Court will not consider this alleged misrepresentation further. The Court notes, however, that its reasoning for why Plaintiffs lack standing to pursue their claims applies equally to this alleged misrepresentation. *See infra* Part III.A.2.b.ii.

[10] As noted earlier, *see supra* note 1, there is some uncertainty concerning whether Isabella Capiro now seeks to bring iDevice Claims in addition to Geolocation claims. Regardless of whether Isabella may now assert iDevice Claims that she did not allege in the TAC, the Court concludes that Isabella, and, for that matter, Alejandro, lack standing to bring iDevice Claims for the same reasons that Chiu and Dwyer lack standing to assert these claims.

16

any other Apple representation) in connection with obtaining their iPhones, or expressly disavowed having read any Apple policy, or anything else about the iPhone, prior to purchasing one. Dwyer stated he did not read anything other than online reviews in connection with his purchase of the iPhone. *See* Beringer Decl. Ex. D at 18:9-19:9 ("[Q:] Aside from—from reading reviews, do you recall any other information that you relied on in making the decision to purchase the iPhone back in 2008? [A:] No. I certainly didn't take advice from my friends or anything, if that's what you mean. . . . [Q:] My question was broader: Was there anything else that you—that you relied on in making the decision to purchase an iPhone in 2008? [A:] Nothing else besides the online reviews.").

Chiu stated that he recalled having read some Apple agreement in connection with setting up his iTunes account—which, according to Apple's records, happened in 2005, *see* Class Cert. Reply at 3—but he did not recall either the nature of the document or the content of what he read. *See* Kravitz Decl. Ex. 20 at 45:16-24 ("[Q:] Do you recall whether you read any terms or agreements as part of signing up for an iTunes account? [A:] Yes. [Q:] And what do you recall reading? . . . [A:] In terms of recall[ing] what I've read, no, I don't recall what I've read."); *id.* at 48:18-49:2 ("[Q:] You don't recall specifically what you've read? [A:] Right. [Q:] You just know that generally you have read things— [A:] Correct. [Q:] —from time to time? Can you recall anything about what you've read? [A:] No, no.").[11] Chiu did not recall reading anything in connection with purchasing his iPhone or with using the App store. *See* Beringer Decl. Ex. A at 24:1-6 ("[Q:] Okay. Did you read any other agreements in the course of [purchasing the iPhone 4]? [A:] For the AT&T site or— [Q:] In the course of purchasing an iPhone 4 on the AT&T site. [A:] No, that was it."); Kravitz Decl. Ex. 20 at 47:20-24 ("[Q:] And do you recall going through any separate process to set up the Apple ID for making app-related downloads separate and apart from the iTunes account you set up to download music? [A:] I don't recall that.").

---

[11] At the October 31 Hearing, counsel for Plaintiffs stated that Chiu specifically testified, on page 45 of his deposition, "that he read, that he remembers reading the Privacy Policy." Oct. 31 Hr'g Tr. at 53:4-6. Chiu did not so testify. Rather, Chiu testified that he recalled reading some "general information" in some "terms or agreements" when signing up for his iTunes account; Chiu did not identify the Privacy Policy, nor could he recall anything about what he read. *See* Kravitz Decl. Ex. 20 at 45:16-24.

17

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

United States District Court
For the Northern District of California

1    Alejandro Capiro stated that he did not read anything related to the iPhone prior to

2    purchasing iPhones for himself and his children, either in deciding to buy the iPhones, *see* Beringer

3    Decl. Ex. C at 16:12-17 ("[Q:] Did you conduct any research before purchasing the iPhones? [A:]

4    No. [Q:] Did you review any written materials about the iPhone before purchasing those phones?

5    [A:] No."), or at the Apple store when he went to purchase the iPhones, *see id.* at 16:24-17:2 ("[Q:]

6    And did you review any materials about the iPhone during the course of being at the AT&T store

7    before you purchased the phones? [A:] No.").

8    Finally, Isabella Capiro did not purchase her phone, but she testified that she did not read

9    anything about the iPhone in connection with deciding to ask for one from her father. *See id.* Ex. B

10    at 11:6-12 ("[Q:] Okay. Did you—other than playing with your friends' phones, did you do any

11    research about the iPhone before you got your first iPhone? [A:] Not really. [Q:] Did you read

12    anything about the iPhone as part of making the decision to get an iPhone? [A:] No.").

13    In declarations filed after Plaintiffs' depositions, and after this Court expressed concern

14    about Plaintiffs' ability to demonstrate actual reliance at the February 28 Hearing, *see, e.g.*, Feb. 28

15    Hr'g at 9:4-12; 16:14-17:8; 22:1-5; 22:21-23:5; 37:7-13, Plaintiffs attempt to retreat from their

16    deposition testimony concerning reliance. *See* Kravitz Decl. Ex. 19 ¶ 7 (Dwyer Decl.) ("It has been

17    my understanding . . . prior to my iPhone purchases in 2010 and 2011, that Apple would protect the

18    privacy and security of my personal information connected to my iPhone use."); Kamber Decl. Ex.

19    M ¶ 8 (Chiu Decl.) ("It was always my understanding that Apple would protect my personal and

20    confidential information connected to my iPhone usage from disclosure to third parties. The

21    protection that Apple was supposed to provide was important to me when I purchased the

22    iPhone."); *id.* Ex. P ¶ 9 (Alejandro Decl.) ("It was always my understanding that Apple would

23    protect my personal and confidential information connected to my iPhone usage from disclosure to

24    third parties."); *id.* Ex. Q ¶ 10 (Isabella Decl.) (same).

25    These declarations are flawed in multiple respects. To begin with, to the extent the

26    declarations endeavor to contradict prior deposition testimony in which Plaintiffs acknowledged

27    that they had not read Apple's alleged misrepresentations regarding privacy prior to purchasing

28    their iPhones, the Court notes that attempting to create a genuine issue of material fact by

18

submitting an affidavit contradicting one's own prior deposition testimony is generally disfavored. *See, e.g.*, *Nelson v. City of Davis*, 571 F.3d 924, 927-28 (9th Cir. 2009). More importantly, however, none of these declarations actually states that Plaintiffs read or relied on any particular Apple misrepresentation regarding privacy. Plaintiffs each allude to a vague "understanding" regarding Apple's privacy policies without providing any evidence whatsoever concerning the basis for this understanding. But a vague "understanding" about Apple's privacy policies is not enough. To survive summary judgment, Plaintiffs are required to set forth "specific facts" in support of standing. *See Lujan*, 504 U.S. at 561. In this context, this means that Plaintiffs must point to specific facts indicating that Plaintiffs actually saw the misrepresentations about which they complain, and that those misrepresentations were "substantial factor[s]" in Plaintiffs' decisions to purchase their iPhones. *See Tobacco II*, 46 Cal. 4th at 326; *see also Durell*, 183 Cal. App. 4th at 1362-63; *Pfizer Inc. v. Superior Court*, 182 Cal. App. 4th 622, 632-33 (2010). The declarations, with their unsupported references to an amorphous "understanding" about privacy, do not satisfy Plaintiffs' burden to show standing at summary judgment. Accordingly, even setting aside any other problems with these declarations, the Court finds that the declarations fail to raise a genuine issue of material fact concerning whether Plaintiffs read or relied on the alleged misrepresentations Plaintiffs identify in Apple's Privacy Policies, SLAs, and App Store Terms and Conditions.

On a motion for summary judgment, Apple, as the moving party bears the initial "burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). Because Plaintiffs bear the ultimate burden of proof on the issue of standing, Apple's burden was satisfied once it pointed out that there was an absence of evidence to support Plaintiffs' standing to pursue their claims. *See Celotex*, 477 U.S. at 325. Once Apple met its initial burden by showing that Plaintiffs had failed to produce evidence showing that Plaintiffs saw or relied on any alleged Apple misrepresentation regarding data collection or privacy, the burden shifted to Plaintiffs "to designate *specific facts* demonstrating the existence of genuine issues for trial" concerning whether they had, in fact, seen and relied on Apple's misrepresentations. *Oracle*, 627 F.3d at 387; *see also* ("This burden is not a light one. The non-

19

1    moving party must show more than the mere existence of a scintilla of evidence. . . . [and] must do

2    more than show there is some 'metaphysical doubt' as to the material facts at issue." (citing

3    *Anderson*, 477 U.S. at 252; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

4    (1986))). Plaintiffs have not satisfied this burden, either through their declarations or otherwise,

5    and summary judgment on the iDevice claims is therefore appropriate.

6                                    **(b)      Geolocation Claims**

7            As with the iDevice Plaintiffs, the Court finds that the Geolocation Plaintiffs (Alejandro

8    and Isabella Capiro) fail to set forth specific facts supporting their standing to pursue their claims.

9    Initially, as noted above, neither Capiro presents any evidence that he or she read or relied upon

10   any alleged misrepresentations related to Location Services contained in Apple's Privacy Policies,

11   SLAs, or App Store Terms and Conditions, either prior to obtaining an iPhone or at any point

12   thereafter. *See supra* Part III.A.2.b.ii(a). This alone defeats Alejandro's standing to pursue

13   Geolocation claims. In addition, Alejandro conceded in his deposition testimony that he did not

14   even realize that Location Services existed at the time he purchased his iPhone. *See* Beringer Decl.

15   Ex. C at 19:22-25 ("[Q:] Did you have any understanding of what would happen if you turned

16   Location Services off on your iPhone in December of 2010? [A:] I didn't know it existed."); *id.* at

17   20:11 ("I didn't know the location feature existed.").

18           Isabella, however, identifies an additional Apple misrepresentation. Specifically, Isabella

19   stated that in mid-March 2011—at a time when her iPhone was running a version of iOS

20   containing the "bug" that allowed an iPhone to query wifi hotspot and cell tower information even

21   when Location Services was turned off, Huang Decl. ¶ 11—she visited an Apple store to address

22   problems she was having with her iPhone's battery, which was draining rapidly. *See* Kamber Decl.

23   Ex. Q ¶¶ 6-7. Isabella further testified that an Apple store employee told her that she could preserve

24   her iPhone's battery life by, among other things, turning Location Services off. *See id.* Ex. O at

25   32:5-12. Isabella stated that, in response to this advice, she turned Location Services off several

26   times in an effort to save battery power. *See id.* at 32:9-12. This testimony identifies a specific

27   Apple representation—one which Plaintiffs allege was false and misleading in light of the "bug"

28   contained in Isabella's iPhone's iOS at the time, Huang Decl. ¶ 11—and is therefore sufficient to

**United States District Court**
For the Northern District of California

20

1    create a genuine issue of material fact concerning whether Isabella heard an Apple

2    misrepresentation.

3            The problem with using this statement from the Apple store employee as a basis for

4    establishing standing, however, is that Isabella cannot demonstrate that this statement was causally

5    linked to any of the harms she claims to have suffered. Because Isabella had this conversation

6    concerning battery life months after receiving her initial iPhone from her father, she cannot claim

7    that Apple's representation regarding the ability to save battery power by turning Location Services

8    off had any impact on her decision to obtain an iPhone. Indeed, Isabella admitted that she did not

9    even know how to turn Location Services off prior to her conversation with the Apple store

10   employee in mid-March 2011. *See* Beringer Reply Decl. Ex. C at 40:16-18 ("[Q:] So prior to

11   February 27th, 2011, you did not know how to turn Location Services off; correct? [A:] Yes.").[12]

12   Because there is no evidence that Isabella based her decision to obtain an iPhone, in whole or in

13   part, on the ability to save battery power by turning Location Services off, she cannot claim to have

14   relied on this alleged misrepresentation in obtaining her iPhone and thus cannot claim to have

15   "overpaid"[13] for her iPhone as a result of this representation.[14]

16           Furthermore, while the Court acknowledges that the reduced battery capacity of Isabella's

17   iPhone is a cognizable harm that Isabella suffered, there is no evidence that the Apple store

18   employee's representation to Isabella that she could save battery power on her iPhone by turning

19   Location Services off *caused* this harm. Plaintiffs have never alleged, and the record does not

_____

[12] This admission also prevents Isabella from claiming to have relied on any alleged
misrepresentation stemming from the fact that the button in the iPhone settings used to switch
Location Services off stated that the feature was "off," even though, for certain versions of iOS, the
iPhone was still sending wifi hotspot and cell tower data to Apple's servers. *See* Opp'n at 18
(suggesting that the "off" switch was itself a misrepresentation). Since Isabella did not know how
to use this button until months after obtaining her iPhone, she cannot claim to have relied on its
availability in deciding to obtain the phone.

[13] Isabella did not pay for her iPhone, which raises doubts as to whether she could establish
standing based on an "overpayment" theory of standing in the first place. The parties have not
focused on this issue, however, and because the Court finds that Isabella fails to establish standing
for other reasons, it need not address whether Isabella could have overpaid for a phone she did not
purchase.

[14] Nor has Isabella ever asserted that she would have sought to return her iPhone, or to obtain a
different phone, after mid-March 2011, had she known that turning Location Services off would
not have any effect on preserving battery life.

21

1   support, a theory that the iPhone's battery drained faster when Location Services was turned off

2   (but the phone was still sending wifi hotspot and cell tower data to Apple's servers) than when

3   Location Services was turned on. Thus, even in the best case scenario for Plaintiffs, the battery

4   capacity of Isabella's iPhone was the same whether or not Location Services was turned off. But if

5   turning Location Services off had no effect on the rate of battery drainage, then there is no way that

6   the Apple store employee's advice to Isabella to turn Location Services off could have caused

7   Isabella's iPhone's battery to drain at a faster-than-average rate.

8       Accordingly, the Court finds that while Isabella identifies a specific Apple

9   misrepresentation, Isabella cannot establish that she suffered any injury as a result of this

10   misrepresentation. Because a causal link between a defendant's misrepresentation and a plaintiff's

11   injury is required to establish standing under Article III, the CLRA, and the UCL, the Court finds

12   that Isabella Capiro does not have standing, either constitutional or statutory, to pursue her

13   Geolocation claims.

### iii.   Plaintiffs' Arguments in Support of Standing Are Not Persuasive

15       Plaintiffs' briefs filed in connection with both the instant Motion for Summary Judgment

16   and the pending Motion for Class Certification assert various arguments in support of standing.

17   Plaintiffs asserted additional arguments in support of standing at the October 31 Hearing. None of

18   these arguments is persuasive.

19       First, Plaintiffs suggest that standing is established as long as a plaintiff "receives" a

20   misrepresentation. *See* Opp'n at 16. The implication of this argument seems to be that a plaintiff

21   can show standing as long as the defendant has disseminated the alleged misrepresentation to her in

22   some fashion, regardless of whether the plaintiff ever actually sees, reads, or hears the defendant's

23   statement. The Court questions how one can act in reliance on a statement one does not see, read,

24   or hear. Moreover, this argument is foreclosed by case law interpreting the actual reliance

25   requirements in the UCL and CLRA. In *Durell*, for instance, the plaintiff brought UCL and CLRA

26   claims based on a misrepresentation contained in the defendant hospital's "Agreement for

27   Services," which the plaintiff signed when receiving treatment at the defendant's emergency room.

28   183 Cal. App. 4th at 1356. The California Court of Appeal found that plaintiff lacked standing to

22

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    sue over this misrepresentation, when the plaintiff did "not allege [plaintiff] relied on either

2    [defendant's] Web site representations or on the language in the Agreement for Services in going

3    to [defendant's] Hospital or in seeking or accepting services once he was transported there. Indeed,

4    the [complaint did] not allege [plaintiff] ever visited [defendant's] Web site *or even that he ever

5    read the Agreement for Services*." *Id.* at 1363 (emphasis added). Similarly, in *Kwikset*, the

6    California Supreme Court found that plaintiffs adequately alleged standing when the complaint

7    stated that "(1) [defendant] labeled certain locksets with 'Made in U.S.A.' or a similar designation,

8    (2) these representations were false, (3) plaintiffs *saw and relied on* the labels for their truth in

9    purchasing [defendant's] locksets, and (4) plaintiffs would not have bought the locksets otherwise."

10   51 Cal. 4th at 327-28 (emphasis added). *See also In re LinkedIn User Privacy Litig.*, 932 F. Supp.

11   2d 1089, 1093 (N.D. Cal. 2013) (allegations of having read a misrepresentation necessary to have

12   standing to bring claim based on that misrepresentation); *Actimmune Mktg. Litig.*, 2010 WL

13   3463491 at, *10 (vague, generalized allegations that doctors were "exposed" to alleged

14   misrepresentations insufficient to plead actual reliance, even under the generous pleading standard

15   of Federal Rule of Civil Procedure 8(a)); *Herrington v. Johnson & Johnson Consumer Cos.*, 2010

16   WL 3448531, at *7-8 (N.D. Cal. Sept. 1, 2010) (no standing under the CLRA and UCL where

17   plaintiffs failed to allege that they saw any particular alleged misrepresentation).

18        The sole support Plaintiffs identify for the proposition that one need only "receive" a

19   misrepresentation in order to have standing to sue over its contents is *In re HP Inkjet Printer

20   Litigation*. 2008 WL 2949265, at *2-3. In *HP Inkjet*, the plaintiffs claimed that HP's "smart chip"

21   technology was designed to tell consumers that their printers were low on ink and required new ink

22   cartridges, even though many pages worth of ink remained in the cartridges. *Id.* at *1. The alleged

23   misrepresentation at issue in *HP Inkjet* was therefore a warning that would appear on HP's printers

24   stating that the printer was "low on ink." *Id.* at *2-3. HP moved for summary judgment on standing

25   grounds, claiming that there was no evidence in the record that plaintiffs had ever seen the low on

26   ink warnings on their printers. *Id.* at *2. The court rejected HP's standing challenge, concluding

27   that, because each plaintiff testified in his deposition that he had seen the low on ink warning and

28   could recall the warning's general contents, "[a] reasonable jury could find that [plaintiffs] in fact

23

United States District Court
For the Northern District of California

1  received a[] [low on ink] message notwithstanding [plaintiffs'] failure to recall the warning

2  verbatim." *Id.* at *3.

3      Plaintiffs seize on the *HP Inkjet* court's use of the word "received" in the above quote, but

4  read in context, the court's statement does not support the proposition that one can actually rely on

5  a statement one never sees (or reads or hears). Crucially, the plaintiffs in *HP Inkjet* testified that

6  they had seen the low on ink warnings, and that testimony was supported by the plaintiffs'

7  recollections of the general terms of the warnings. *Id.* at *2-3. Accordingly, there was evidence in

8  the record to support plaintiffs' claims of actual reliance in *HP Inkjet*, and there is no indication

9  that the court would have found a triable issue of fact on actual reliance in the absence of this

10  evidence. *HP Inkjet* therefore does not establish that a plaintiff may survive summary judgment

11  without evidence to show that she actually saw, read, or heard the defendant's alleged

12  misrepresentation, and the Court rejects Plaintiffs' argument that one need not see, read, or hear a

13  misrepresentation in order to rely on it.

14      Second, Plaintiffs argue that the Court should infer reliance from the fact that Plaintiffs had

15  iTunes accounts[15] and therefore had to, at some point, agree to Apple's Terms and Conditions and

16  Privacy Policy. *See* Oct. 31 Hr'g Tr. at 22:10-20. Plaintiffs have not articulated this theory in the

17  clearest of terms, but it appears to proceed as follows. First, three of the four Plaintiffs (Chiu,

18  Dwyer, and Isabella) set up iTunes accounts at some point before obtaining their iPhones.[16] *See*

19  Class Cert. Reply at 3 (citing Apple documents showing that Chiu opened an iTunes account in

20  July 2005, Dwyer opened an iTunes account in March 2008, and Isabella opened an iTunes

21  account in July 2007); Kamber Decl. Ex. M ¶ 3 (Chiu bought his first iPhone in August 2008);

22

23  ─────────────
    [15] Plaintiffs sometimes refer to the iTunes account as an "App Store account," but evidence in the
24  record indicates, and Plaintiffs do not appear to contest, that there is no separate App Store account
    and that individuals instead access the App Store through their iTunes accounts. *See* Oct. 31 Hr'g
25  Tr. at 24:10-12; *see also* ("Horvath Decl.") ECF No. 253-7 ¶ 3 ("Before a user can download any
    free or paid app from the App Store, he or she must first register and create an iTunes account.").
26  [16] While Plaintiffs assert in their summary judgment papers that "all Plaintiffs" had iTunes
    accounts," Opp'n at 16, Plaintiffs have not identified when, if ever, Alejandro set up an iTunes
27  account. *See* Class Cert. Reply at 3 (identifying iTunes accounts for Chiu, Dwyer, and Isabella, but
    not Alejandro). At the October 31 Hearing, Plaintiffs stated that Alejandro's iTunes account is not
28  relevant to Plaintiffs' actual reliance claims. *See* Oct. 31 Hr'g Tr. at 10:20-23.

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   Kravitz Decl. Ex. 19 ¶¶ 3-4 (Dwyer first received an iPhone from his father in August 2008 and

2   purchased his first iPhone between July and December 2010); Kamber Decl. Ex. Q ¶ 4 (Isabella

3   received her first iPhone from her father in December 2010).[17] Second, by virtue of having active

4   iTunes accounts, Plaintiffs would have been asked to agree to Apple's updated Privacy Policy at

5   some point during the class period. *See* Oct. 31 Hr'g Tr. at 22:10-15.[18] From these two facts,

6   Plaintiffs ask the Court to infer that Plaintiffs must have read and relied on misrepresentations

7   contained in Apple's Privacy Policy at some point during the class period.[19]

8         There are two problems with this theory. Most critically, it has no evidentiary support. No

---

[17] In their briefs, Plaintiffs appeared to claim that they saw alleged Apple misrepresentations at the time they set up their iTunes accounts, and that they relied on these representations when obtaining their iPhones, even though Plaintiffs set up their iTunes accounts months or years before first obtaining their iPhones. *See* Opp'n at 16; Class Cert. Reply at 3. At the October 31 Hearing, however, Plaintiffs clarified that they do not claim to have relied on any alleged misrepresentations contained in the Apple Terms and Conditions in effect when Plaintiffs first opened their iTunes accounts. *See* Oct. 31 Hr'g Tr. at 21:10-14 ("[The Court:] So you are not relying on any misrepresentations by Apple when Mr. Chiu first opened his iTunes account in July of 2005; correct? [Plaintiffs' Counsel:] Correct, not that version of the agreement, that's correct."); *id.* at 21:24-22:6 ("[Plaintiffs' Counsel:] [Chiu] was provided the Privacy Policy when he first logged on to iTunes, when he first created an iTunes account. [The Court:] In July of 2005— [Plaintiffs' Counsel:] In July 2005— [The Court:] —That contained no misrepresentations? [Plaintiffs' Counsel:] Correct. That's not part of our case. That's prior.").

[18] At the October 31 Hearing, the parties disagreed as to when iTunes account holders were first asked to agree to an updated Privacy Policy. Counsel for Plaintiffs represented that this first occurred in 2008, *see* Oct. 31 Hr'g Tr. at 22:17-20, while counsel for Apple represented that this first occurred in July 2010, *see id.* at 22:21-23:2. Upon reviewing the parties' citations to the record, the Court concludes that there is no evidence in the record to support Plaintiffs' claim that Apple required iTunes account holders to agree to an updated Apple Privacy Policy at any point prior to July 2010. At the October 31 Hearing, Plaintiffs cited the Horvath Declaration in support of their claim that Apple required users to agree to an updated Privacy Policy in 2008, *see id.* at 23:3-11, but the Horvath Declaration clearly states that iTunes account holders were first asked to agree to an updated Privacy Policy in July 2010. Horvath Decl. ¶ 6; *see* Buckley Decl. ¶ 15 (same).

[19] Plaintiffs similarly claim that they "must" have read alleged misrepresentations contained in Apple's SLAs, because all iPhones come in a box that contains a copy of the SLA. *See* Oct. 31 Hr'g Tr. at 15:9-24. However, no Plaintiff states anywhere in the record that he or she saw or read any agreement that came with his or her iPhone. Moreover, Plaintiffs acknowledge that they would not have had an opportunity to review this paper copy of the SLA until *after* Plaintiffs had purchased their iPhones. *See id.* at 15:16-19. The Court therefore fails to see how Plaintiffs could have relied on alleged misrepresentations in the paper copy of the SLA when deciding to obtain an iPhone in the first place. While Plaintiffs' counsel suggested at the October 31 Hearing that Plaintiffs could have returned their iPhones after reading the SLAs, *see id.* at 15:16, no Plaintiff has ever testified that he or she would have sought to return her iPhone because of the alleged misrepresentations contained in the SLA, which, again, no Plaintiff claims to have seen or read.

25

Plaintiff, in either a deposition or declaration, identified an Apple Privacy Policy as the source of his or her "understanding" regarding Apple's policies concerning privacy and data collection. Indeed, no Plaintiff states anywhere in the record that he or she ever saw or read or even heard of any version of Apple's Privacy Policy, either before or after July 2010.

What is more, the mere fact that Plaintiffs had to scroll through a screen and click on a box stating that they agreed with the Apple Privacy Policy in July 2010 does not establish, standing alone, that Plaintiffs actually read the alleged misrepresentations contained in that Privacy Policy, let alone that these misrepresentations subsequently formed the basis for Plaintiffs' "understanding" regarding Apple's privacy practices. *See* Horvath Decl. ¶ 6 (stating that the July 2010 updated Privacy Policy required Plaintiffs to scroll through the agreement and click "Agree"). Accordingly, the existence of Plaintiffs' iTunes accounts does not, *by itself*, demonstrate that Plaintiffs actually read and relied on any misrepresentations contained in the updated Privacy Policy from July 2010. *Accord Durell*, 183 Cal. App. 4th at 1356, 1362-63 (no standing when plaintiff failed to allege that he read the alleged misrepresentation, even though plaintiff had signed the agreement containing the alleged misrepresentation).

Plaintiffs have been on notice from very early in this lawsuit that they would need to substantiate their standing allegations. *See* ECF No. 8 at 5-9 (First Order dismissing case for lack of standing). Indeed, a major part of the February 28 Hearing on the parties' first Motions for Summary Judgment and Class Certification was devoted to standing. *See, e.g.*, Feb. 28 Hr'g at 9:4-12; 16:14-17:8; 22:1-5; 22:21-23:5; 37:7-13. At the February 28 Hearing, the Court repeatedly expressed its skepticism regarding the sufficiency of Plaintiffs' standing allegations, as well as the viability of Plaintiffs' theory that they must have standing because they must have agreed to Apple's Privacy Policy at some point, even if no Plaintiff could remember having done so. *See, e.g., id.* at 16:16-17 ("[The Court:] From the deposition testimony, I'm not persuaded that [Chiu and Dwyer] ever saw any of these terms and conditions."); *id.* at 19:7-8 ("[The Court:] But can you point to any deposition testimony where [Chiu and Dwyer] said that they [saw the Terms and Conditions, Privacy Policies, or SLAs]?"); *id.* at 23:3-5 ("[The Court:] I don't see anywhere in this Declaration, either for Mr. Chiu or Mr. Dwyer, where they say 'I relied on this specific

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

misrepresentation.'"); *id.* at 37:7-10 ("[The Court:] Okay. Give me any evidence that anyone [looked at the Terms and Conditions Policy] before they bought the phone, that class members would have looked at an iTunes Terms and Conditions Privacy Policy before they bought the iDevice."). Following the February 28 Hearing, Plaintiffs were granted, due to Apple's failure to comply with its discovery obligations, an additional *seven months* in which Plaintiffs could have bolstered their standing allegations before being called upon to respond to Apple's standing challenge a second time. Plaintiffs failed to do so. Plaintiffs' repeated failure to provide any evidence to support the theory that they must have read or seen the alleged misrepresentations in Apple's Privacy Policy strengthens the Court's conclusion that Plaintiffs have not met their burden to demonstrate standing.

The Court acknowledges that, on a motion for summary judgment, the Court is required to draw "all justifiable inferences" in favor of the nonmoving party. *Anderson*, 477 U.S. at 255. The key modifier here, however, is "justifiable." *See, e.g.*, *Aleman v. City of Bakersfield*, No. 11-2006, 2013 WL 3936740, at *3 (E.D. Cal. July 30, 2013) ("While a 'justifiable inference' need not be the most likely or the most persuasive inference, a 'justifiable inference' must be rational or reasonable." (quoting *Narayan v. EGL, Inc.*, 616 F.3d 895, 899 (9th Cir. 2010)). Were Plaintiffs' "iTunes account/Privacy Policy" theory of actual reliance supported by *something* more than Plaintiffs' counsel's mere say so, the Court might conclude that it could justifiably infer that Plaintiffs relied on misrepresentations contained in the July 2010 updated Privacy Policy, even if no Plaintiff explicitly identified this Privacy Policy as the source of the alleged misrepresentations on which he or she actually relied. But here there is nothing more. Plaintiffs all but concede in their depositions that they did not rely on any alleged Apple misrepresentation regarding privacy in obtaining their iPhones, *see supra* Part III.A.2.b.ii(a); Plaintiffs' declarations fail to offer any evidence regarding the misrepresentations on which Plaintiffs relied in formulating their "understanding" of Apple's privacy policy, *see supra* Part III.A.2.b.ii(a); and the record is simply devoid of any other evidence indicating actual reliance. In the absence of any evidence, as opposed to mere argument, to support Plaintiffs' "iTunes account/Privacy Policy" theory of actual reliance, the Court cannot justifiably infer standing on this basis. *Accord Aleman*, 2013 WL 3936740, at *3

27

1    ("Inferences are not drawn out of the air, and it is the opposing party's obligation to produce a

2    factual predicate from which the inference may be drawn.").

3         Third, Plaintiffs invoke *Tobacco II*'s statement that "a presumption, or at least an inference,

4    of reliance arises wherever there is a showing that a misrepresentation was material," 46 Cal. 4th at

5    327, to argue that Plaintiffs have created a genuine issue of fact concerning actual reliance under

6    the CLRA and UCL. *See* Opp'n at 19. This statement from *Tobacco II* does not, however, stand for

7    the proposition that Plaintiffs can claim to have relied on misrepresentations they never saw. *See*

8    *Durell*, 183 Cal. App. 4th at 1362-63; *Pfizer*, 182 Cal. App. 4th at 632-33. This statement from

9    *Tobacco II* would be of some use to Plaintiffs if the fundamental standing issue in this case was

10   whether Apple's alleged misrepresentations regarding privacy were a "substantial factor" in

11   Plaintiffs' decisions to obtain iPhones. *See Tobacco II*, 46 Cal. 4th at 326. Plaintiffs' difficulty in

12   establishing actual reliance is more fundamental than this, however, because Plaintiffs have failed

13   to create a genuine issue of material fact concerning whether any Plaintiff saw, read, or heard

14   Apple's alleged misrepresentations about privacy in the first place.[20] Because an inference of

15   reliance cannot arise for misrepresentations Plaintiffs did not see, this statement from *Tobacco II*

16   does not help Plaintiffs in establishing standing.[21]

17   _____

18   [20] *Ries v. AriZona Beverages USA LLC*, 287 F.R.D. 523 (N.D. Cal. 2012), the sole case Plaintiffs
     cite in support of their argument that the Court should infer reliance based on materiality, actually
19   highlights the need for a UCL or CLRA plaintiff to show that she actually saw the alleged
     misrepresentation in order to establish standing for purposes of summary judgment. In *Ries*, the
20   Court noted that actual reliance was satisfied for purposes of summary judgment because
     "*critically . . . plaintiffs specifically recall defendants' representations of AriZona beverages as
21   'natural,'* and indicate that statement was material to their purchase." *Id.* at 530 (emphasis added).
     Here, by contrast, no plaintiff specifically recalls any Apple misrepresentation regarding privacy.
22   [21] While Plaintiffs have not raised the point, the Court notes that Plaintiffs also cannot rely on
     *Tobacco II*'s statement that a plaintiff "is not required to necessarily plead and prove individualized
23   reliance on specific misrepresentations or false statements where . . . those misrepresentations and
     false statements were part of an extensive and long-term advertising campaign," 46 Cal. 4th at 328,
24   to argue that Plaintiffs need not have relied on specific Apple representations in obtaining their
     iPhones. For one thing, Plaintiffs have never alleged that Apple's misrepresentations were "part of
25   an extensive and long-term advertising campaign," and subsequent California cases have clarified
     that, absent allegations of an extensive and long-term advertising campaign on par with that at
26   issue in *Tobacco II*, a plaintiff must generally identify the specific misrepresentations on which she
     claims to have relied. *See, e.g.*, *Pfizer*, 182 Cal. App. 4th at 632; *Herrington*, 2010 WL 3448531, at
27   *8. Moreover, even if a plaintiff successfully demonstrates that a defendant's alleged
     misrepresentations were part of an extensive and long-term advertising campaign, the plaintiff still
28

Case No.: 11-MD-02250-LHK
ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

To be clear, the Court is not suggesting that a plaintiff's burden to show standing at the summary judgment stage when bringing a CLRA or UCL claim based on a defendant's alleged misrepresentation is unusually onerous, nor is it departing from the numerous cases that find a genuine issue of material fact as to actual reliance when a plaintiff manages to put some manner of evidence in the record to indicate that she both saw the alleged misrepresentation and relied on it to her detriment. *See, e.g.*, *Ries*, 287 F.R.D. at 530 (standing requirement met at summary judgment when "critically . . . plaintiffs specifically recall defendants' representations of AriZona beverages as 'natural,' and indicate that statement was material to their purchase"); *O'Shea v. Epson Am., Inc.*, 2011 WL 3299936, at *10 (C.D. Cal. July 29, 2011) (triable issue of fact sufficient to survive summary judgment present when plaintiff "expressly testified that she 'made [her] decision [to purchase the Epson NX200 series printer] based on what information was provided on the [printer] boxes' in the store . . . and that she would not have purchased the printer but for Epson's misleading representation and failure to disclose how the printer actually functioned" (alterations in original) (citation omitted)); *HP Inkjet*, 2008 WL 2949265, at *2-3 (triable issue on actual reliance where plaintiffs testified that they saw alleged misrepresentation and could recall general contents of the misrepresentation). To survive a standing challenge at summary judgment, Plaintiffs must be able to provide *some* evidence that they saw one or more of Apple's alleged misrepresentations, that they actually relied on those misrepresentations, and that they were harmed thereby. In a case founded on the premise that Apple's misrepresentations caused Plaintiffs substantial harm, this evidentiary burden is far from unreasonable, yet Plaintiffs have failed to meet it.

As Plaintiffs have failed to show that there is a genuine issue of material fact concerning whether any Plaintiff actually relied on any of Apple's alleged misrepresentations, the Court concludes that no Plaintiff has standing to pursue either the iDevice or Geolocation claims. The

---

must show that she saw at least *some* portions of that campaign. *See Pfizer*, 182 Cal. App. 4th at 632-33 ("*Tobacco II* does not stand for the proposition that a consumer who was never exposed to an alleged false or misleading advertising or promotional campaign is entitled to restitution."); *Cohen v. DIRECTV, Inc.*, 178 Cal. App. 4th 966, 980 (2009) ("[W]e do not understand the UCL to authorize an award for injunctive relief and/or restitution on behalf of a consumer who was never exposed in any way to an allegedly wrongful business practice.").

29

1    Court therefore GRANTS Apple's Motion for Summary Judgment in full.[22]

2    **IV.    CONCLUSION**

3          For the foregoing reasons, the Court GRANTS Apple's Motion for Summary Judgment on

4    the ground that Plaintiffs lack standing under Article III and the CLRA and UCL to pursue their

5    claims. Because the Court's Order does not reach any issue as to which Bolas's opinions are

6    relevant, Plaintiffs' Motion to Strike Bolas's Opinions Pursuant to Federal Rule of Evidence 702,

7    *see* Opp'n at 2-4, is DENIED as moot. Plaintiffs' pending Motion for Class Certification, ECF No.

8    249, is similarly DENIED as moot. Finally, Plaintiffs' Motion for Leave to File a Motion to Strike

9    Apple's Objection to New Evidence in Plaintiffs' Reply Memorandum in Support of Class

10   Certification, ECF No. 282, is DENIED as moot.

11   **IT IS SO ORDERED.**

12

13   Dated: November 25, 2013                     _Lucy H. Koh_

14                                                LUCY H. KOH
                                                  United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26   _____
     [22] Because the Court finds that Plaintiffs have failed to set forth "specific facts" to support the
27   Article III requirement that their injuries be "fairly traceable" to Apple's alleged misconduct or to
     support the CLRA and UCL requirements of actual reliance, the Court need not address the third
28   prong of Article III standing, namely, whether Plaintiffs' alleged harms are redressable by a ruling
     from this Court. *See Geertson Seed Farms*, 130 S. Ct. at 2752.

     30

     Case No.: 11-MD-02250-LHK
     ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**United States District Court**
For the Northern District of California